IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARK LEVY, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 06-517 (GMS) |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT J. THERRIEN  and BROOKS | ) | |
| AUTOMATION, INC., | ) | |
| | ) | |
| Defendants. | ) | |

OPENING BRIEF IN SUPPORT OF
<u>DEFENDANT ROBERT J. THERRIEN'S MOTION TO DISMISS</u>

POTTER ANDERSON & CORROON LLP
Arthur L. Dent (#2491)
Brian C. Ralston (#3770)
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, Delaware 19801
(302) 984-6000
Email:  adent@potteranderson.com
<u>bralston@potteranderson.com</u>

*Attorneys for Robert J. Therrien*

OF COUNSEL:

MINTZ LEVIN COHN FERRIS GLOVSKY
 & POPEO, P.C.
R. Robert Popeo
John F. Sylvia
Joseph P. Messina
One Financial Center
Boston, Massachusetts 02111
(617) 542-6000

Dated:  October 12, 2006

755505

TABLE OF CONTENTS

PAGE No.

INTRODUCTION ................................................................................................ 1

STATEMENT OF RELEVANT FACTS ........................................................... 1

ARGUMENT ....................................................................................................... 3

I.    PLAINTIFF HAS FAILED TO PLEAD AN ACTIONABLE
      SECTION 16(B) CLAIM ........................................................................... 3

      A.    Plaintiff Cannot Prove That Therrien Profited From Any
            Short-Swing Transaction Under Section 16(b) Because,
            As Alleged, Therrien's 1999 Acquisition of BAI Stock
            Was An Option Exercise Exempt From Section 16(b) --
            Not A Purchase of Stock .............................................................. 5

II.   IN ANY EVENT, PLAINTIFF'S CLAIM IS TIME-BARRED ................. 8

CONCLUSION ................................................................................................. 10

TABLE OF AUTHORITIES

PAGE NO.

CASES

*Carr-Consolidated Biscuit v. Moore*,
  125 F.Supp. 423 (M.D. Pa. 1954) .......................................................................... 8

*Conley v. Gibson*,
  355 U.S. 41 (1957) .............................................................................................. 5

*Donoghue v. American Skiing Co.*,
  155 F.Supp. 2d 70 (S.D.N.Y. 2001) .................................................................. 8, 9

*Litzler v. CC Investments, LDC*,
  362 F.3d 203 (2d Cir. 2004) ............................................................................. 4, 9

*Manhattan Telecommunications Corp., Inc. v. DialAmerica Marketing Inc.*,
  156 F.Supp.2d 376 (S.D.N.Y. 2001) ................................................................. 6

*Tristar Corp. v. Freitas*,
  84 F.3d 550 (2d Cir. 1996), *cert. denied*, 521 U.S. 1118 (1997) .......................... 4

*In re U.S.E.C. Sec. Lit.*,
  190 F.Supp.2d 808 (D.Md. 2002) ................................................................. 3, 6, 7


MISCELLANEOUS

15 U.S.C. § 78p(b) ........................................................................................ 3, 4, 8

17 C.F.R. 240.16b-6 .......................................................................................... 4, 5, 6

17 C.F.R. 240.16b-3 ............................................................................................. 4

Ownership Reports & Trading By Officers, Directors & Principal Sec.
  Holders, Release No. 25254, 28869, 35-25254, 34-28869, IC-17991,
  48 SEC Dkt 216 at p. 12, 1991 WL 292000 (Feb. 21, 1991) ............................. 5, 6

Peter J. Romeo and Alan L. Dye, "Section 16 Insider Reporting and
  Short-Swing Liability Treatise and Reporting Guide" (Michael Gettelman
  ed., E.P. Executive Press, Inc. 1994) ................................................................. 4

5A Charles A. Wright and Arthur R. Miller, FEDERAL PRACTICE AND
  PROCEDURE § 1357 (2d ed. 1990) .................................................................. 1

INTRODUCTION

The instant action concerns Plaintiff's attempt to recover for Defendant Brooks
Automation, Inc. ("BAI"), proceeds received by Robert J. Therrien ("Therrien") from the
sale of BAI stock in 2000. Plaintiff seeks recovery under Section 16(b) of the Securities
Exchange Act of 1934 (the "34 Act") on the theory that Therrien "purchased" BAI shares
in 1999 and then sold BAI stock within six months of that "purchase." Plaintiff's claim
fails as a matter of law because there is no dispute that the 1999 "purchase" at issue
resulted from the exercise of an option granted to Therrien in 1994. As such, the
"purchase" is exempt from the recapture provision of Section 16(b). Accordingly,
Plaintiff's Complaint must be dismissed. In addition, Plaintiff's Complaint also must be
dismissed because the action is barred by the two-year statute of limitations provision
contained in Section 16(b).

STATEMENT OF RELEVANT FACTS[1]

Robert J. Therrien is the former President, CEO and Chairman of BAI.
Complaint at ¶ 4. In January 2000, in a Proxy Statement filed with the SEC, BAI
reported that it had loaned Therrien $546,750, to fund Therrien's exercise of an option for
225,000 shares of BAI Common Stock. *Id.* at ¶ 8. After exercising this option, Therrien
repaid the loan on November 19, 1999. *Id.*

Nearly seven years later, on July 31, 2006, BAI filed an amended Form 10-K (for
the year ending September 30, 2005). *Id.* at ¶ 9. Plaintiff contends that BAI's amended

---

[1] For purposes of this motion, only the well pleaded allegations of fact in the Complaint are taken as true.
The Court need not, however, "accept conclusory allegations concerning the legal effect of the events
plaintiff has set out if these allegations do not reasonably follow from his description of what happened, or
if these allegations are contradicted by the description itself." 5A Charles Alan Wright and Arthur R.
Miller, FEDERAL PRACTICE AND PROCEDURE § 1357, at 319-320 (1990). Furthermore, where documents
incorporated in the complaint by reference contradict the plaintiff's allegations, a court will not accept
those allegations as true. *Id.*, at § 1363, 464-465.

Form 10-K disclosed that Therrien's 1999 stock transaction "*did not take place pursuant to any option previously granted to [Therrien] by the Company.*" *Id* (emphasis added).

To support this contention plaintiff quotes *selectively* to BAI's10-K/A:

> [i]n November 1999, three directors of the Company (including Mr. Therrien) signed a ratification document pursuant to which Mr. Therrien was deemed to have been granted a loan as of August 1999. According to the document, in June 1999 our directors (Messrs. Khoury, Emerick and Therrien) discussed extending a loan to Mr. Therrien for the purpose of permitting him to exercise an option to purchase 225,000 shares of the Company's stock prior to its expiration in August 1999. Based on the document, the Company in November 1999 deemed Mr. Therrien to have timely exercised the options, and accounted for the exercise without recognizing compensation expense. As a result of facts obtained by the Special Committee, we determined that Mr. Therrien misrepresented the facts of the loan and the ratification document described above was false as there were no discussions concerning a loan in June 1999. As a result, we have determined that the option expired in August 1999 and that compensation expense should have been recorded in connection with Mr. Therrien's purchase of stock in November 1999. At that time, Mr. Therrien paid approximately $560,000 (the exercise price of $2.43 per share, plus interest deemed due on the loan) for 225,000 shares then worth approximately $6,314,000 (or $28.06 per share). In the restatement, we have recognized compensation expense in November 1999 equal to the difference between the price paid by Mr. Therrien and the market value of the stock on the date of sale. The three directors including Mr. Therrien are no longer affiliated with the Company.

Complaint at ¶ 9.

Tellingly, plaintiff excluded the following sentence, which preceded the section quoted above (and attached hereto as Exhibit A):

> we [BAI] have concluded he [Therrien] **was permitted to exercise [the option] in November 1999** *despite its expiration in August of 1999.* This transaction was previously accounted for and disclosed as a loan by the Company to Mr. Therrien for the purpose of permitting him to exercise the option.

BAI July 31, 2006 Form 10-K/A (attached as Exhibit A) at 23   (bold and emphasis added).[2]

Plaintiff also alleges that Therrien sold 225,000 shares of BAI common stock on March 23, 2000 (Complaint at ¶ 11), and that Therrien "failed to properly disclose the true date and circumstances surrounding his purchase of the 225,000 shares from Brooks on correct Form 4's." *Id.* at 13.

## ARGUMENT

I.    PLAINTIFF HAS FAILED TO PLEAD AN ACTIONABLE SECTION 16(B) CLAIM

By its terms, Section 16(b) of the '34 Act establishes the right of a corporation to recover short-swing profits from an officer, director, or principal stockholder.  *See*, 15 U.S.C. §78p(b).[3]

---

[2]  In considering motions [to dismiss], the Court should consider the facts stated in the complaint, as well as the documents referred to in the complaint and relied upon by plaintiff in bringing the action.  *In re U.S.E.C. Sec. Lit.*, 190 F.Supp.2d 808 (D.Md. 2002) (citing *Recupito v. Prudential Sec., Inc.*, 112 F.Supp.2d 449, 453 (D.Md. 2000)).  It is therefore appropriate for this Court to consider the contents of BAI's SEC filings, including the Form 10-K/A which the parties rely upon and the authenticity of which is not challenged.  *Id.* (citing *In re MicroStrategy, Inc. Sec. Litig.*, 115 F.Supp.2d 620, 623 n. 4 (E.D.Va 2000)).

[3]  § 78p Directors, officers, and principal stockholders

(b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months  Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.

3

Aimed at curbing "the misuse of confidential information by corporate insiders," Section 16(b)'s "preamble confirms that the provision was enacted '[f]or the purpose of preventing the unfair use of information which may have been obtained by a [statutory insider] by reason of his relationship to the issuer.'" *See*, Peter J. Romeo and Alan L. Dye, "Section 16 Insider Reporting and Short-Swing Liability Treatise and Reporting Guide" at 8-4 (Michael Gettelman ed., E.P. Executive Press, Inc. 1994) (citing S.Rep No. 1455, 73d Cong. 2d Sess. 55, 68 (1934)). Section 16(b) was not designed to create liability for exempt transactions where the Section 16(b) *beneficiary* elects, *post hoc*, to reclassify its accounting treatment of the transaction in question. Yet, this is exactly how the Plaintiff seeks to apply Section 16(b) in this case. The statutory cast net is not so elastic.

To the contrary, to succeed on a claim under Section 16(b), a plaintiff must show that a director, officer or beneficial owner of more than 10% of any class of outstanding shares of an issuer ("a statutory insider") profited from short-swing transactions in that issuer's securities. *See Tristar Corp. v. Freitas*, 84 F.3d 550, 552-53 (2d Cir. 1996), *cert. denied*, 521 U.S. 1118 (1997) (citing 15 U.S.C. §78p(b)). A short-swing transaction is "any *purchase and sale* or any *sale and purchase*, of any equity security of such issuer ... within any period less than six months." *Id.* (emphasis added). Where, as here, the "purchase" results from the exercise of an option, Section 16(b) does not apply. *See* C.F.R. 240.16b-6, 17 C.F.R. 240.16b-3.

Consequently, the plaintiff at bar can prove no set of facts in support of his claim which would entitle him to relief, and dismissal is proper. *See Litzler v. CC Investments,*

---

15 U.S.C. § 78p(b).

4

*LDC*, 362 F.3d 203 (2d Cir. 2004) (quoting *Tribune Co. v. Abiola*, 66 F.3d 12, 13 (2d.

Cir. 1995); *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

> A.   Plaintiff Cannot Prove That Therrien Profited From Any Short-
>       Swing Transaction Under Section 16(b) Because, As Alleged,
>       Therrien's 1999 Acquisition of BAI Stock Was An Option
>       <u>Exercise Exempt From Section 16(b) -- Not A Purchase of Stock.</u>

In adopting amendments to the rules exempting certain transactions from the

short-swing recovery provisions of Section 16, the SEC concluded that the exercise of a

derivative security (*e.g.*, an option to purchase stock) should "not be an event that is

matched against another transaction in the equity securities for purposes of short-swing

profit recovery." Ownership Reports & Trading By Officers, Directors & Principal Sec.

Holders, Release No. 25254, 28869, 35-25254, 34-28869, IC-17991, 48 SEC Dkt 216 at

p. 12, 1991 WL 292000 (Feb. 21, 1991). To the contrary, for Section 16(b) purposes, "a

purchase takes place at the time of the *grant* of employee options," because "the short-

swing profit opportunity is set at the time of the grant" rather than at the time of exercise.

*Id.* at 15. As the SEC has noted, this approach makes abundant sense:

> The rules correspondingly recognize that, for purposes of the abuse
> addressed by Section 16, the exercise of a derivative security, much like
> the conversion of a convertible security, essentially changes the form of
> beneficial ownership from indirect to direct . . . [and thus] the exercise
> represents neither the acquisition nor the disposition of a right affording
> the opportunity to profit.

*Id.* at 12. The SEC codified this exemption in Rule 16b-6. *See*, 17 C.F.R. 240.16b-6.[4]

---

[4] § 240.16b-6 Derivative securities.

(a) The establishment of or increase in a call equivalent position or liquidation of or decrease in a
put equivalent position shall be deemed a purchase of the underlying security for purposes of
section 16(b) of the Act, and the establishment of or increase in a put equivalent position or
liquidation of or decrease in a call equivalent position shall be deemed a sale of the underlying
securities for purposes of section 16(b) of the Act: Provided, however, That if the increase or
decrease occurs as a result of the fixing of the exercise price of a right initially issued without a
fixed price, where the date the price is fixed is not known in advance and is outside the control of

In the present case, the key document relied on by Plaintiff to support its claim,
the Amended Form 10-K, conclusively demonstrates that Therrien's 1999 transaction
was an exempt *exercise*. Consequently, the Complaint must be dismissed.

Although a Court ordinarily must accept the truth of the allegations contained in
the Complaint when considering a Motion to Dismiss, where, as here, a document cited
in the Complaint is essential to a plaintiff's claim, the document is, by necessity,
incorporated in the Complaint and properly can be considered by this Court as part of the
pleadings. *See Manhattan Telecommunications Corp., Inc. v. DialAmerica Marketing
Inc.*, 156 F.Supp.2d 376 (S.D.N.Y. 2001) (citing *Cortec Indus. Inc. v. Sum Holding L.P.*,
949 F.2d 42, 48 (2d Cir.1991)) (finding that documents referred to or incorporated in the
complaint may properly be considered by the district court, even if those documents are
not attached as exhibits)). Moreover, where the incorporated document demonstrates that
a plaintiff's claim or claims, as alleged, fails to pass muster, a Court may consider them
in ruling on a motion to dismiss. *See In re U.S.E.C. Sec. Lit.*, 190 F.Supp.2d 808 (D.Md.
2002) (citing *Recupito v. Prudential Sec., Inc.*, 112 F.Supp.2d 449, 453 (D.Md. 2000)
(language in certain SEC filings cited in Complaint precluded several of plaintiff's
claims). It is therefore appropriate for this Court to consider the contents of BAI's SEC

---

the recipient, the increase or decrease shall be exempt from section 16(b) of the Act with respect to
any offsetting transaction within the six months prior to the date the price is fixed.

(b) The closing of a derivative security position as a result of its exercise or conversion shall be
exempt from the operation of section 16(b) of the Act, and the acquisition of underlying securities
at a fixed exercise price due to the exercise or conversion of a call equivalent position or the
disposition of underlying securities at a fixed exercise price due to the exercise of a put equivalent
position shall be exempt from the operation of section 16(b) of the Act: Provided, however, That
the acquisition of underlying securities from the exercise of an out-of-the-money option, warrant,
or right shall not be exempt unless the exercise is necessary to comport with the sequential
exercise provisions of the Internal Revenue Code (26 U.S.C. 422A).

17 C.F.R. 240.16b-6

filings, including the Form 10-K/A which the parties rely upon and the authenticity of which is not challenged. *Id.* (citing *In re MicroStrategy, Inc. Sec. Litig.*, 115 F.Supp.2d 620, 623 n. 4 (E.D.Va. 2000)).

In this case, Plaintiff alleges that BAI's disclosure in the Company's amended 10-K "*means*" that "Therrien's purchase of stock in November 1999 was *not* made pursuant to an option previously granted to him by the Company." The document plaintiff relies upon to support this allegation, however, belies such a contention. Indeed, contrary to Plaintiff's unfounded allegation, BAI *actually* disclosed that a restatement was required because BAI had "permitted [Therrien] to *exercise* [his option] in November 1999, despite its [prior] expiration." (Exhibit A at 23).

Needless to say, Therrien disagrees with BAI's findings. For Section 16(b) purposes, however, the issue is of no moment. Plaintiff does not dispute that BAI granted a valid option to Therrien. Likewise, given BAI's disclosure, there also can be no dispute that Therrien exercised that option in 1999. The only questions BAI addressed were whether Therrien should have been permitted to exercise that option, and if not, what would the accounting consequences be for BAI.

Plaintiff's case requires accepting the fiction that Therrien *never* exercised an option in 1999. Because the sole beneficiary under Section 16(b) is BAI, however, Plaintiff cannot ignore BAI's statements in his attempt to transfer that fiction into reality.

Because there is (and can be) no dispute that Therrien's 1999 transaction was an exempt option exercise, and not a "purchase of stock" pursuant to which Section 16(b) liability may attach, the Complaint fails to allege a valid claim for recoupment of short-swing profits, and accordingly must be dismissed.

7

II.    IN ANY EVENT, PLAINTIFF'S CLAIM IS TIME-BARRED

Section 16(b) expressly provides that claims must be brought within two years of

the transaction that gives rise to the short-swing profits:

> Suit to recover such profit may be instituted at law or in equity in any
> court of competent jurisdiction by the issuer, or by the owner of any
> security of the issuer in the name and in behalf of the issuer if the issuer
> shall fail or refuse to bring such suit within sixty days after request or shall
> fail diligently to prosecute the same thereafter; but no such suit shall be
> brought more than two years after the date such profit was realized.

15 U.S.C. Sec. 78p(b).

In this case, Plaintiff concedes that the purported "short-swing" transaction at

issue occurred in March of 2000. *See*, Complaint at ¶¶ 11-12. Accordingly, this action is

time barred.

Recognizing this problem, Plaintiff asserts that the statute of limitations "has been

tolled" because "Therrien has to date failed to properly disclose the true date and

circumstances surrounding his purchase . . . on correct Form 4s." *Id.* at ¶ 13. Plaintiff's

contention cannot withstand scrutiny.

Equitable tolling, for Section 16(b) purposes, requires fraudulent concealment.[5]

*See Donoghue v. American Skiing Co.*, 155 F.Supp.2d 70 (S.D.N.Y. 2001). Indeed, in

*Litzler v. CC Investments, LDC*, Judge Jacobs acknowledged that to permit equitable

tolling in cases absent allegations of "fraud or concealment," would have the effect of

---

[5] At least one court has questioned whether the doctrine of equitable tolling even applies to Section 16(b) cases. *See Carr-Consolidated Biscuit v. Moore*, 125 F.Supp. 423 (M.D.Pa. 1954). The *Carr-Consolidated* Court stated that because Section 16(b) contains within itself a statute of limitations, such a limitation "becomes an integral part of the right of action created by the statute and limits it that an aggrieved person cannot maintain his suit after the time fixed by the statute has expired." *Id.* at 429-430 (citing *Pennsylvania Company for Ins. v. Deckert*, 123 F.2d 979, 985 (3d Cir. 1941)). The Court added that "such statutes cannot be tolled, after the manner of an ordinary statute of limitation, even for fraud or concealment by the defendant which prevent the plaintiff from bringing the action within time." *Id.* at 430.

allowing claims affecting long-settled transactions "to hang forever over honest persons."
*Litzler*, 362 F.3d at 208, at 208.

Moreover, to invoke the equitable tolling doctrine, plaintiff must plead (with
particularity) (1) wrongful "concealment by defendants, (2) which prevented plaintiff's
discovery of the claim, and (3) due diligence by plaintiff in pursuing discovery of the
claim." *Donoghue v. American Skiing Co.*, 155 F.Supp. 2d 70 (S.D.N.Y. 2001). Plaintiff
has not done so in this case, and cannot do so.

Notably, Plaintiff does not allege in the Complaint that Therrien endeavored to
fraudulently conceal his 1999 transaction. *See Donoghue*, 155 F.Supp2d 70, 76 (holding
that to invoke equitable tolling doctrine plaintiff must plead such wrongful concealment).
This is hardly surprising insofar as the transactions in question were disclosed.
Specifically, Therrien disclosed the fact that he exercised an option in 1999 to acquire
225,000 shares. Moreover, as Plaintiff concedes, Therrien disclosed the sale of stock in
2000. *See* "Annual Statement of Changes in Beneficial Ownership" to the SEC, filed
November 15, 1999 (attached Exhibit B).

Accordingly, because Plaintiff has not alleged (and cannot allege) that Therrien
concealed the exercise of his option or the subsequent sale, Plaintiffs' claim is barred by
the statute of limitations under Section 16(b).

<u>CONCLUSION</u>

For the foregoing reasons, Therrien submits that the Complaint should be dismissed for failure to state a claim upon which relief may be granted. Insofar as the factual record precludes the ability to cure the Complaint's deficiencies by repleading, Therrien submits that the dismissal should be with prejudice and without leave to replead.

POTTER ANDERSON & CORROON LLP

By:_____

Arthur L. Dent (#2491)
Brian C. Ralston (#3770)
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, Delaware 19899
(302) 984-6000
Email: adent@potteranderson.com
        bralston@potteranderson.com

*Attorneys for Defendant Robert J. Therrien*

OF COUNSEL:

MINTZ LEVIN COHN FERRIS GLOVSKY
    & POPEO, P.C.
R. Robert Popeo
John F. Sylvia
Joseph P. Messina
One Financial Center
Boston, Massachusetts 02111
(617) 542-6000

Dated: October 12, 2006

755505

10

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

## CERTIFICATE OF SERVICE

I, Brian C. Ralston, hereby certify that on October 12, 2006, the within

document was filed with the Clerk of the Court using CM/ECF which will send

notification of such filing(s) to the following; that the document was served on the

following counsel as indicated; and that the document is available for viewing and

downloading from CM/ECF.

> Jeffrey S. Goddess, Esquire
> Rosenthal Monhait Gross & Goddess, P.A.
> 919 Market Street, Suite 1401
> P.O. Box 1070
> Wilmington, DE 19899
> jgoddess@rmgglaw.com

> Brian C. Ralston (I.D. No. 3770)
> Potter Anderson & Corroon LLP
> Hercules Plaza, 6th Floor
> 1313 N. Market Street
> P. O. Box 951
> Wilmington, DE 19899
> (302) 984-6000
> bralston@potteranderson.com

# EXHIBIT A
# PART 1 OF 4



# FORM 10−K/A

## BROOKS AUTOMATION INC − BRKS

**Filed: July 31, 2006 (period: September 30, 2005)**

Amendment to a previously filed 10−K

# Table of Contents

## Part II

Item 6 Selected Financial Data;

## PART I

| | |
|---|---|
| Item 1. | Business |
| Item 2. | Properties |
| Item 3. | Legal Proceedings |
| Item 4. | Submission of Matters to a Vote of Security Holders |

## PART II

| | |
|---|---|
| Item 5. | Market for Registrant s Common Equity, Related Stockholder Matters and Issuer Purchases of E |
| Item 6. | Selected Financial Data |
| Item 7. | Management s Discussion and Analysis of Financial Condition and Results of Operations |
| Item 7A. | Quantitative and Qualitative Disclosure About Market Risk |
| Item 8. | Financial Statements and Supplementary Data |
| Item 9. | Changes In and Disagreements With Accountants on Financial Accounting and Financial Disclosu |
| Item 9A. | Controls and Procedures |
| Item 9B. | Other Information |

## PART III

| | |
|---|---|
| Item 10. | Directors and Executive Officers of the Registrant |
| Item 11. | Executive Compensation |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matt |
| Item 13. | Certain Relationships and Related Transactions |
| Item 14. | Principal Accountant Fees and Services |

## PART IV

| | |
|---|---|
| Item 15. | Exhibits and Financial Statement Schedules |
| SIGNATURES | |
| EX-31.01 | |
| EX-31.02 | |
| EX-32 (Certifications required under Section 906 of the Sarbanes-Oxley Act of 2002) | |

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# Form 10−K/A

### Amendment No. 1

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For fiscal year ended September 30, 2005

Or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from        to        .

Commission File Number: 0−25434

# Brooks Automation, Inc.

*(Exact name of Registrant as Specified in Its Charter)*

| | |
|---|---|
| **Delaware** | **04−3040660** |
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |
| **15 Elizabeth Drive** | **01824** |
| **Chelmsford, Massachusetts** | *(Zip Code)* |
| *(Address of Principal Executive Offices)* | |

**978−262−2400**

*(Registrant's Telephone Number, Including Area Code)*

Securities registered pursuant to Section 12(b) of the Act:

**None**

Securities registered pursuant to Section 12(g) of the Act:

**Common Stock, $0.01 par value**
**Rights to Purchase Common Stock**

Indicate by check mark if the registrant is a well−known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes    ☐ No   ☑

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. Yes   ☐ No    ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes   ☐ No    ☑

Indicate by check mark if disclosure of delinquent filers pursuant to Rule 405 of Regulation S−K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10−K/A or any amendment to the Form 10−K/A.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non−accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b−2 of the Exchange Act. (Check one):
Large accelerated filer   ☑ Accelerated filer ☐ Non−accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b−2). Yes   ☐ No    ☑

The aggregate market value of the registrant's Common Stock, $0.01 par value, held by nonaffiliates of the registrant as of March 31, 2005, was $673,316,217 based on the closing price per share of $15.18 on that date on the Nasdaq Stock Market. As of March 31, 2005, 45,261,240 shares of the registrant's Common Stock, $0.01 par value, were outstanding. As of November 29, 2005,

74,537,762 shares of the registrant's Common Stock, $0.01, par value, were outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's Proxy Statement involving the election of directors, which is expected to be filed within 120 days after the end of the registrant's fiscal year, are incorporated by reference in Part III of this Report.

Table of Contents

**Explanatory Note**
**Restatement of Consolidated Financial Statements**

We are amending our Annual Report on Form 10−K (the "Original Filing") for the year ended September 30, 2005 to restate our consolidated financial statements for the years ended September 30, 2005, 2004 and 2003 and the related disclosures. This Form 10−K/A also includes the restatement of selected financial data as of and for the years ended September 30, 2005, 2004, 2003, 2002 and 2001, which is included in Item 6.

On May 10, 2006, our Board of Directors concluded that our consolidated financial statements for the years ended September 30, 2005, 2004 and 2003 as well as the selected financial data for the years ended September 30, 2002 and 2001 should be restated to record additional non−cash stock−based compensation expense resulting from stock options granted during fiscal years 1996 to 2005 that were incorrectly accounted for under generally accepted accounting principles ("GAAP"). The Company's decision to restate its financial statements was based on the facts obtained by management and an independent investigation into our stock option accounting that was conducted under the direction of a special committee ("Special Committee") of the Board of Directors. The Board created the Special Committee, which was composed solely of independent directors, to conduct a review of matters related to past stock option grants (including the timing of such grants and associated documentation) after receiving inquiries regarding the timing of certain stock option grants. Separately, the Company's management also reviewed stock option grants from 1995 through the second quarter of fiscal 2006 to determine whether any material accounting errors had occurred with respect to stock option grants.

We have not amended and we do not intend to amend any of our other previously filed annual reports on Form 10−K for the periods affected by the restatements or adjustments. As we have previously announced, the consolidated financial statements and related financial information contained in such previously filed reports should no longer be relied upon. All the information in this Form 10−K/A is as of September 30, 2005 and does not reflect any subsequent information or events other than the restatement and related matters discussed in footnote 22 to the consolidated financial statements appearing in this Form 10−K/A. For the convenience of the reader, this Form 10−K/A sets forth the Original 10−K in its entirety. However, the following items have been amended solely as a result of, and to reflect, the restatement, and no other information in the Original Filing is amended hereby as a result of the restatement:

Part II − Item 6 − Selected Financial Data;

Part II − Item 7 − Management's Discussion and Analysis of Financial Condition and Results of Operations;

Part II − Item 8 − Financial Statements and Supplementary Data;

Part II − Item 9A − Controls and Procedures;

Part IV − Item 15 − Exhibits and Financial Statement Schedules

Other than discussed above, this Form 10−K/A does not reflect events occurring after the filing of the Original Filing or modify or update disclosures (including, except as otherwise provided herein, the exhibits to the Original Filing), affected by subsequent events. Accordingly, this Form 10−K/A should be read in conjunction with our periodic filings made with the Securities and Exchange Commission ("SEC") subsequent to the date of the Original Filing, including any amendments to those filings. In addition, in accordance with applicable SEC rules, this Form 10−K/A includes updated certifications from our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") as Exhibits 31.01, 31.02, and 32.

**TABLE OF CONTENTS**

PART I

| Item 1. | Business | 1 |
|---|---|---|
| Item 2. | Properties | 15 |
| Item 3. | Legal Proceedings | 16 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 17 |

PART II

| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 18 |
|---|---|---|
| Item 6. | Selected Financial Data | 18 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 21 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 48 |
| Item 8. | Financial Statements and Supplementary Data | 49 |
| Item 9. | Changes In and Disagreements With Accountants on Financial Accounting and Financial Disclosure | 87 |
| Item 9A. | Controls and Procedures | 87 |
| Item 9B. | Other Information | 89 |

PART III

| Item 10. | Directors and Executive Officers of the Registrant | 89 |
|---|---|---|
| Item 11. | Executive Compensation | 90 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 90 |
| Item 13. | Certain Relationships and Related Transactions | 90 |
| Item 14. | Principal Accountant Fees and Services | 90 |

PART IV

| Item 15. | Exhibits and Financial Schedules | 91 |
|---|---|---|
| SIGNATURES | | 100 |
| EX-31.01 Section 302 Certification of C.E.O. | | |
| EX-31.02 Section 302 Certification of C.F.O. | | |
| EX-32 Section 906 Certification of C.E.O &C.F.O. | | |

Table of Contents

PART I

### Item 1. *Business*

Brooks Automation, Inc. ("Brooks", "we", "us" or "our") is a leading supplier of automation products and solutions primarily serving the worldwide semiconductor market. We supply hardware, software and services to both chip manufacturers and original equipment manufacturers, or OEMs, who make semiconductor device manufacturing equipment. We are a technology and market leader with offerings ranging from individual hardware and software modules to fully integrated systems as well as services to install and support our products world–wide. Although our core business addresses the increasingly complex automation and integrated subsystems requirements of the global semiconductor industry, we are also focused on providing automation solutions for a number of related industries, including the flat panel display manufacturing, data storage and certain other industries which have complex manufacturing environments.

We were founded in 1978 to develop and market automated substrate handling equipment for semiconductor manufacturing and became a publicly traded company in February 1995. We have grown significantly from being a niche supplier of wafer–handling robot modules for vacuum–based processes, to become the largest merchant supplier of hardware and software automation products for the semiconductor industry in consecutive calendar years from 2001 through 2004, and the world's twelfth largest semiconductor front–end capital equipment company in 2004, according to the independent market research firm Gartner Dataquest.

Our business is significantly dependent on capital expenditures by semiconductor manufacturers, which in turn are dependent on the current and anticipated market demand for integrated circuit ("IC") chips and electronics equipment. To maintain manufacturing leadership and growth in the semiconductor industry, companies make significant capital expenditures in manufacturing equipment and investments in research and development. For example, investments in the production of chips that use advanced 130–nanometer ("nm") and 90nm process technology are the enablers (increased chip performance, decreased power consumption and reduced cost) for a broad range of new products that are expected to help drive growth in the chip industry. Further advances in IC designs utilizing 65nm and smaller sizes continue to enable innovation and are driving the need for new manufacturing facilities and new generation processing equipment. Demand for semiconductors is cyclical and has historically experienced periodic expansions and downturns. The semiconductor industry experienced a prolonged downturn from fiscal 2001 to the end of fiscal 2003. As the industry economics improved significantly at the start of our fiscal 2004, we were able to benefit from some of the cost reduction initiatives implemented during the downturn, resulting in our return to profitability in fiscal 2004. The industry conditions weakened again in our fiscal 2005 leading to a decline in revenues and profitability for Brooks during 2005.

On July 11, 2005, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with Helix Technology Corporation ("Helix"), a Delaware corporation and Mt. Hood Corporation ("Mt. Hood"), a newly–formed Delaware corporation and a direct wholly–owned subsidiary of the Company. This acquisition closed on October 26, 2005. Under the terms of the Merger Agreement, Mt. Hood merged (the "Merger") with and into Helix, with Helix continuing as the surviving corporation. Each share of Helix common stock, par value $1.00 per share, other than shares held by Helix as treasury stock and shares held by the Company or Mt. Hood, was cancelled and extinguished and automatically converted into 1.11 ("Exchange Ratio") shares of the Company's common stock. In addition, the Company assumed all options then outstanding under Helix's existing equity incentive plans, each of which is now exercisable into a number of shares of the Company's common stock (and at an exercise price) adjusted to reflect the Exchange Ratio. The Helix acquisition is preliminarily valued at approximately $459 million, consisting of 28.8 million shares of common stock valued at $444.4 million, the fair value of assumed Helix options of $6.0 million and cash of $8.4 million. This transaction qualifies as a tax–free reorganization under Section 368(a) of the Internal Revenue Code of 1986, as amended, and the Company is in the process of evaluating the impact that the Merger may have on the Company's net operating loss carryforwards and other tax attributes. Helix is a leader in the development, manufacture, and application of innovative vacuum technology solutions for the semiconductor, data storage, and flat panel display markets. The acquisition of Helix enables us to better serve our current market, increase our addressable market, reduce the volatility that both business have historically faced and position us to enhance our financial performance.

1

Table of Contents

## Industry Background

Automation plays a critical role in the manufacturing of semiconductors. The majority of modern semiconductor fabrication facilities, or fabs, manufacture IC chips on circular silicon wafers with diameters of 150mm, or 6 inches, and 200mm, or 8 inches. More recently the industry has begun to adopt wafers with diameter sizes of 300mm, or 12 inches. A production manufacturing batch or lot for 150mm and 200mm wafer sizes consists of 25 wafers, contained in either an open cassette or a fully enclosed pod called SMIF, or standard mechanical interface. Production lots for 300mm manufacturing typically consist of 25 wafers contained in a FOUP, or front−opening unified pod. Both SMIF and FOUP technologies isolate the wafers from their surroundings by creating an ultra−clean "mini−environment" within the pod. One wafer may yield hundreds of chips, and each chip may contain tens or hundreds of millions of microscopic transistors in leading devices. Chips are used in a wide variety of applications, ranging from complex logic and memory chips used in a broad range of computers to application−specific integrated circuits, or ASICs, used in automobiles and consumer products, to Digital Signal Processing (DSP) and analog semiconductors used in the mobile Internet market such as for color−screen multimedia cell phones.

In order to create the millions of microscopic transistors and connect them together horizontally and in vertical layers into a functioning IC chip, the silicon wafers must go through hundreds of process steps that require complex processing equipment, or tools, to create the integrated circuits. A large production fab may have more than 70 different types of process and metrology tools, totaling as many as 500 tools or more. Up to 40 percent of these tools perform processes in a vacuum, such as removing, depositing or measuring material on wafer surfaces. Wafers can go through as many as 400 different process steps before completion. As the complexity of semiconductors continues to increase, the number of process steps also increases, resulting in a greater need for automation due to more handling and tracking requirements, and higher number of tools. In addition, with the transition to 300mm wafers, the size, expense and weight of a FOUP of wafers increase significantly, making manual handling of wafers difficult and risky.

During processing, the wafers need to be physically transported between different process tools, repeatedly identified, tracked, loaded into the equipment and processed, unloaded, verified and inspected, and dispatched to the next process step or storage area. All these actions can be automated. Automation enables the right material to be delivered at the right time to the right equipment with the right process recipe. Similarly, non−production wafers and durable goods, such as wafer carriers and photolithography masks or reticles used in production, must also be handled, tracked and managed. Consequently, the automation systems physically touch and handle nearly every wafer in the fab, while the software systems manage the tracking and recording of data for virtually every manufacturing lot, piece of equipment and resource in the fab.

The capital expenditure by a semiconductor company to create a modern 200mm fab can be as much as $2 billion while the cost for a 300mm fab can exceed $3 billion. While most 200mm fabs were only partially automated, virtually all 300mm production fabs are fully automated due to the heavier weight and value of a production lot. The investment in automation hardware, software and services has grown from approximately $50 million in a 200mm fab to $180 million in a 300mm fab. Typically 75 to 80 percent of the capital investment for a fab is for manufacturing equipment, while the remainder is dedicated to the land, the physical building, the clean room production floor and automation, network and facilities infrastructure. The served available market for semiconductor automation approximates $1.9 billion in 2004, according to Dataquest. We believe we are the only company with a portfolio of hardware and software products and system integration services that can address the majority of the automation needs for semiconductor manufacturing.

Today, almost every aspect of processing includes automation, from material handling, tracking work−in−process, process control and scheduling. Factory and equipment automation directly impact factory performance. Factory performance, in turn, drives semiconductor manufacturers' ability to:

- reduce manufacturing costs;

- reduce cycle time, making the throughput more predictable;

- deliver products to market first when product profitability is greatest; and

- reduce defects and improve yield.

2

Table of Contents

We operate in two segments: hardware and software.

The hardware segment provides wafer handling products and components for use within semiconductor process equipment. These systems automate the movement of wafers into and out of semiconductor manufacturing process chambers and provide an integration point between factory automation systems and process tools. The products offered by Brooks include vacuum and atmospheric systems and robots and related components. We also offer the assembly and manufacturing of customer designed automation systems, or contract automation systems. The primary customers for these solutions are manufacturers of process tool equipment. Additionally, we provide hardware directly to fabs including automated material handling systems, or AMHS, that use overhead monorail systems and overhead hoist vehicles to store, transport and manage the movement of material throughout the fab. Other hardware products include equipment for lithography automation that manage the storage, inspection and transport of photomasks, or reticles. Further, on October 26, 2005, Brooks completed the acquisition of Helix Technology Corporation ("Helix"), a world leader in the development, manufacture and application of innovative vacuum technology solutions for the semiconductor, data storage and flat panel display markets. Semiconductor manufacturers use Helix products to create and maintain a vacuum environment in their manufacturing process equipment.

The software segment addresses the need for production management systems driven by the extensive tracking and tracing requirements of the semiconductor industry. At the core of these production systems is the manufacturing execution system ("MES") that is primarily responsible for tracking the movement of production wafers in a fab, and managing the data and actions for every wafer, equipment, operator and other resources in the fab. These mission−critical systems provide real time information primarily to production operators, supervisors and fab managers. We provide other important software applications to meet the critical requirements of the fab, such as real time dispatching and scheduling, equipment communications, advanced process control, material control using the AMHS, activity execution and control, automated maintenance management of equipment, and other applications. Customers often purchase more than one of these software products from Brooks for a single fab, often driving the need for consulting and integration services. Our software products enable semiconductor manufacturers to increase their return on investment by maximizing production efficiency, and may be sold as part of an integrated solution or on a stand−alone basis. These software products and services are also used in many similar manufacturing industries as semiconductor, including flat panel display, data storage, and electronic assembly.

*Hardware*

Modern semiconductor process tools demand fast, error−free handling of the silicon wafers on which the integrated circuits are produced. In the late 1980's and early 1990's, many processes done in vacuum, such as chemical vapor deposition (CVD), physical vapor deposition (PVD), dry etching and other processes, changed from batch processing to single wafer processing, driving the need for equipment that could process individual wafers simultaneously in multiple chambers. The single wafer tool configuration is often referred to as a cluster tool because of the typically radial layout, or cluster, of process chambers surrounding one or more central wafer handling robot. The transition to cluster tools greatly increased the demands on the automation system, forcing it to become as much as four to eight times more reliable than previous generations. The result was a market need for highly reliable and fast vacuum robots, as well as vacuum cluster tool platforms, both of which were the genesis of our business model.

Vacuum cluster tools consist of three primary sections: the equipment front−end module or EFEM, the cluster tool platform and the process modules or chambers that are attached to the tool platform. An intermediate chamber, called a load−lock, separates the vacuum environment used in processing from the EFEM, which operates at standard atmosphere. A vacuum robot performs the task of transferring wafers from the load−lock to the process chambers that are mounted on the cluster tool platform. Wafers are placed in the load−lock by atmospheric robots that are housed in the EFEM. Vacuum tool automation includes load−locks, robots and other modules as well as the cluster tool platform. Brooks vacuum systems, acquired in the Helix transaction, provide enabling technology for several key steps within the semiconductor manufacturing process, including ion implant, and PVD metrology.

The introduction and adoption of new materials and technology in semiconductor processing drove the emergence of important non−vacuum processes such as chemical mechanical planarization, or CMP, and electro−chemical deposition,

3

Table of Contents

or ECD, as well as increased dependence on other atmospheric processes such as metrology, all requiring automation. The growth in atmospheric tool automation has been further driven by the transition to 300mm technology and smaller feature sizes on ICs.

Atmospheric tools consist of an EFEM and a processing portion, but do not require the cluster tool platform. EFEMs have modules called loadports on which wafer carriers are placed. Loadports have mechanisms that open the carriers so that the atmospheric robots can gain access to the wafers in the carriers. The individual atmospheric modules can be sold separately or as an integrated atmospheric system or EFEM which includes the loadports, the atmospheric robots, and other necessary modules such as aligners, fan filter units and control software.

The evolution of the wafer carrier technology enabled semiconductor manufacturers to reduce both fab construction costs and production defects. Historically, wafer processing has been performed in clean rooms in order to reduce or eliminate particulates in the atmosphere that could create defects on wafers during processing. As the feature sizes on an integrated circuit became exponentially smaller, the need for cleaner air became more critical, and more expensive. In the late 1990's the semiconductor industry adopted SMIF technology to protect and isolate wafers from the environment. The air in a SMIF pod is 1,000 times cleaner than a typical surgical operating room; it essentially has its own ultra–pure mini–environment. The SMIF technology gained acceptance in many modern 200mm fabs, although open cassettes are still used widely. In the transition to 300mm wafer sizes, the industry adopted the FOUP technology as its new standard. While SMIF was essentially an after–market modification to 200mm equipment, since the time of their original design virtually all 300mm tools have integrated the FOUP technology. Automation enabled the transition from open cassette carriers to mini–environment pods by providing the loadport modules and robotics to transfer the wafers into and out of process tools as well as the means to track and identify the wafers. As a result, the need for automation has increased for both 300mm and 200mm SMIF fabs.

Our hardware offerings also include high–precision airflow and pressure controls for key semiconductor manufacturing applications such as the wafer track used to coat light–sensitive photoresist onto wafers in the photolithography process, as well as high temperature furnaces and stations used for liquid chemical processes, called wet stations or wet benches.

Many modern fabs are laid out in a series of processing rooms or bays that contain similar equipment. Process engineers recognized early in the history of semiconductor manufacturing that human handling of wafer carriers or wafers was a significant source of defects and errors. Automating the transport and handling of wafers to reduce or eliminate human handling created a market for factory automation. For 200mm fabs, AMHS was widely adopted for inter–bay transport only. AMHS consists of rails that are attached to the ceilings in the main aisles between bays on which cars transport the wafer carriers to a stocker at the head of a bay. These stockers automated the storage and retrieval of the carriers. Virtually all the movement of materials within a bay, or intra–bay transport, is done manually in 200mm fabs — operators carry the cassette or SMIF pod from the stocker to a process tool. As wafer sizes have become larger, carriers have become heavier and the value per wafer has increased significantly, resulting in the need for intra–bay automation systems for transporting wafers directly to and from a tool or stocker. These fully automated systems have become the standard method of transport for 300mm manufacturing. Having the capability of tool–to–tool or tool–to–stocker delivery versus the stocker–to–stocker approach used in 200mm manufacturing eliminates the manual handling of carriers by operators.

Identification of carriers such as SMIF pods and FOUPs has become critical with increased automation. Currently two main technologies are in use, infrared, or IR, and radio frequency, or RF, to identify and track the carriers. IR is used widely in 200mm SMIF fabs, while RF has emerged as the identification technology of choice for 300mm.

Wafer sorters and inspection systems are other technologies which minimize human interaction with product wafers. It is a common requirement in a fab to frequently identify each wafer in a batch, transfer wafers between cassettes or FOUPS, or change a wafer's slot position within cassettes. Sorters are used to perform these tasks in order to reduce or eliminate human handling of wafers.

The semiconductor process requiring the largest capital investment is photolithography, or lithography, and the related photomask, also called a reticle. A process tool called a lithography stepper exposes ultraviolet light through the photomask to print a circuit pattern on a wafer that has been coated with light–sensitive photoresist. This

Table of Contents

lithography process is repeated numerous times over the course of the semiconductor manufacturing process. Each lithography step requires a unique reticle. The capital expenditure for a set of reticles to manufacture one type of IC in a fab can exceed $1 million. In order to protect its investment in reticles, fabs are turning more towards automating the storage, inspection and handling of reticles, representing a growing opportunity in the area of lithography automation.

### Software

We are a leading provider of software for:

- manufacturing execution systems, or MES, used within one factory or to manage multiple sites, for manufacturers of discrete products;

- factory logistics applications such as simulation, scheduling and dispatching;

- connecting and integrating equipment with factory management systems;

- advanced process control; and

- data analysis and management for factory and enterprise performance monitoring.

In addition, we provide the necessary training, consulting and other services required by customers to successfully implement and use our software.

The production of semiconductors is arguably one of the most complex manufacturing environments in the world. Factory automation software has played an important role in semiconductor manufacturing since the 1970's. Computer integrated manufacturing was conceived to control the work flow of a process, gather data and track product in a fab, and to measure and analyze fab performance in order to assist in production and business decisions.

Similar to the MES applications, other software packages were developed by various companies to meet fab requirements, ranging from communicating with and controlling process equipment to factory modeling, scheduling, automated dispatching, planning and data analysis. Industry standards that established protocols for equipment to communicate with a host computer system, and other protocols, paved the way for equipment to be connected online to fab management systems such as the MES, enabling full automation when further integrated with the material handling systems, automated dispatching applications and other software. We entered the factory automation software market through an acquisition strategy aimed at consolidating a number of applications into an integrated software suite.

As semiconductor manufacturing moves towards full automation, factory automation software takes on even more importance. The MES software is required to model and store in its database nearly every resource in the fab — production lots, wafers, non−production wafers, equipment, recipes, process plans, operators, engineers, durable goods such as carriers, reticles, and so forth. The MES contains the real−time status of every item so that, as an example, fab managers can track the location of virtually any production lot or the state of virtually any process tool such as running, idle, down, etc. More importantly, this information is available to other software applications so that dispatching decisions, reports, alarms, data analysis and machine commands can be executed automatically.

We believe it is critical that the major software applications are integrated together to provide an overall solution that meets the increasingly complex demands of automation. These solutions help increase throughput, improve utilization of resources and factory performance, and reduce in−process inventory. Although many of the software applications already have the ability to integrate to other applications or systems, the implementation of individual pieces require services and consulting expertise from the software providers. Services can range from training and best practices consulting to full integration services that essentially deliver a turnkey solution to the customer.

The functionality of semiconductor MES software allowed it to be applied to other complex industries that require tracking and control of work−in−process, such as in the manufacture of liquid crystal displays or LCD, storage devices such as magnetic thin film heads, medical devices, and telecommunications fiber optics. New

Table of Contents

markets are being opened for Brooks outside of the semiconductor industry as track and trace capabilities become more in demand in various industries, driven in part by new government regulations like the Tread Act. Likewise, simulation and modeling software can be used in a number of different industries where logistics and planning are important, ranging from airport traffic control to theme park scheduling. Finally, many engineering data analysis and statistical process control products are being used in complex manufacturing environments in addition to the semiconductor industry, such as LCD, precision electronics, automotive, aerospace, and life sciences industries.

Software presents us with potential for growth outside of the semiconductor industry as we leverage our offerings in the semiconductor industry to other industries where we believe the growing demand for real time applications at both the manufacturing and enterprise levels creates new markets for our software. We already have real time enterprise applications that address enterprise strategies and trends such as lean manufacturing, enterprise performance management, supply chain execution, and closed loop automation.

We recognize the importance of providing best–in–class software as well as integrated systems in order to become a leading automation supplier to the semiconductor and other industries. According to Gartner Dataquest, in 2003 we were the largest software product supplier in fab automation and the second largest supplier in software and services in fab automation.

## Products

### Hardware Products

Our hardware for process and metrology equipment are offered as either modules or systems. Modules are discrete components such as robots and aligners, cryogenic pumps, chillers and vacuum gauges, while systems are pre–integrated assemblies such as the cluster tool platform that may consist of a number of modules provided by us or other suppliers. We provide automation modules and systems for vacuum and atmospheric equipment as well as tool control software, mini–environment products, calibration and alignment products, and high–precision airflow controls primarily for the semiconductor industry. Other industries that we serve in this segment of the market include LCD and data storage. We use a common architecture in the design and production of systems and modules. Shared technologies and common software controls enable us to respond to changing industry demands, such as processing larger 300mm semiconductor wafers. Our Original Equipment Manufacturer ("OEM") customers have the option of either buying individual modules from us and assembling their own systems in–house, or buying the entire automation system from us, pre–assembled, tested and certified from our factory. Also included in this segment is the assembly and manufacturing of customer designed automation systems, known as contract automation systems.

The major modules we offer for equipment are vacuum robotics, atmospheric robotics, wet robotics and loadport modules.

Vacuum modules include:

* MagnaTran 7, a family of robots used in vacuum processes such as CVD, PVD and etch;

* VacuTran, the legacy vacuum robot product line; and

* MagnaTran 8, a new family of robots that addresses the needs of specific customers.

Vacuum pumping components and systems include:

* CTI–Cryogenics cryopumps and systems;

* On–Board monitoring and control systems; and

* Turbo Plus® waterpumps and Turbopumps

6

Table of Contents

Vacuum measurement components and systems include:

- STABL−ION®, CONVECTRON® and MICRO−ION components and systems; and
- Vacuum gauging products that are integrated into analytical instruments such as mass spectrometers

Our atmospheric robot modules include:

- Reliance, a family of 3−, 4−, and 5−axis robots; and
- 407, a legacy atmospheric robot with a large installed base of customers.

Over the next year, we are planning on releasing a new generation of atmospheric automation products internally called the Series 9 family, the culmination of an aggressive R&D program the past 2 years. These new products were developed using a rigorous product life cycle management process designed to meet goals for performance, manufacturability, cost, reliability and support.

We also offer modules for wet processing, i.e., processes that utilize liquid chemicals such as acid baths for removing material from wafer surfaces, developers for photoresist and cleaning stations. The products we offer include:

- AquaTran 7 wet robot;
- Reliance 8, a new family of wet robots for CMP; and
- WetBot, a legacy wet robot.

Modules for LCD process tools include:

- MagnaTran 70 series vacuum robots for Gen3, Gen4 and Gen5 glass technologies; and
- DLX and SLX vacuum robots for Gen6 and Gen7 technologies.

Also within the category of modules sold to OEMs are 300mm FOUP loadports. Our loadport modules include:

- FixLoad 6M, a new 300mm loadport;
- FixLoad 5, a legacy 300mm loadport; and
- SMIFLoad, a 200mm SMIF loadport.

Vacuum systems for semiconductor manufacturing that we offer include:

- Gemini Express, a platform for vacuum cluster tools;
- InLine Express, a platform for linear, or in−line, tool configurations;
- Marathon Express, our legacy cluster tool platform; and
- Custom systems, typically a customer−designed system with our modules.

Atmospheric systems we offers include:

- Fab Express, an EFEM for 300mm and 200mm wafer sizes;
- Atmospheric Express, a controlled environment atmospheric cluster tool for 200mm and smaller wafers; and
- Custom systems, typically a customer−designed system with our modules.

7

Table of Contents

For the LCD market, our systems offerings include:

- Hercules Express, a cluster tool platform; and

- Bali 400, an EFEM for LCD process tools.

We provide the AMHS to transport and store both wafers and reticles for 200mm and 300mm fabs. The first generation 300mm AMHS offerings generally had segregated inter−bay, intra−bay and stocker modules, managed by the material control software. We introduced a new generation product in July, 2003, the OneFab AMHS, which provides a unified system using a common layout for both inter−bay and intra−bay, and includes the following:

- AeroLoader IV vehicles with bi−directional capability for transporting FOUPs throughout the fab and directly loading and unloading process tools;

- Tracks, straight and curved overhead monorail tracks on which the vehicles travel;

- Turntables, rotating mechanisms that join multiple tracks;

- UTS, or under−track storage;

- UTS Carousel stockers for automated storage and retrieval;

- OLUS, or Operator Load−Unload Station; and

- AMHSworks software for material control.

Our AMHS offerings for 200mm include:

- AeroTrak vehicles for inter−bay transport;

- Tracks, straight and curved overhead monorail tracks on which the vehicles travel;

- Turntables, rotating mechanisms that join multiple tracks;

- TurboStockers for automated storage and retrieval;

- TurboStocker XT for inter−floor transport and storage; and

- TransNet software for material control.

Lithography automation solutions for reticle inspection, storage and management include:

- Guardian Bare Reticle Stocker for storing reticles; and

- Zaris, our reticle sorting, cleaning and macro−inspection tool.

In addition, our AMHS systems are capable of transporting reticles between stockers and lithography tools.

We provide 200mm SMIF products directly to factory customers, including:

- ErgoSpeed II loadport for 200mm SMIF that complements a number of other SMIF products that we provides to our customers;

- Hermos RF readers for RFID applications;

- IRIDnet, a tracking system utilizing infra−red technology; and

- Custom mini−environments and tool enclosures.

Automated ID and tracking of carriers in a 300mm fab is provided by our RFID readers.

Table of Contents

*Software Products*

We offer a range of products, from MES that manage the operations of an entire fab, to logistics software for scheduling and coordinating work flow, to individual software packages designed to meet specific requirements such as preventive maintenance systems for equipment. We also offer integrated systems that incorporate our software on an open architecture to deliver factory automation solutions tailored specifically for customers within the context of their industry.

Our software also provides the capabilities to tie fab software systems into the enterprise and supply chain with planning and logistics software applications. We provide business system integration modules to provide integration between our manufacturing applications and business systems from SAP, Oracle, Peoplesoft (JD Edwards) and others. Real–time dispatching and factory scheduling applications can be used to drive manufacturing according to a customer's best practices. Automation and job management functions help to control manufacturing workflow and automate decision–making across multiple computer integrated manufacturing systems. Simulation software allows manufacturers to model and analyze the use and performance of their tools, systems and overall manufacturing environment.

Our MES products span a wide spectrum of factory requirements. Our offerings include:

- FACTORYworks, a high–end MES that is flexible and highly configurable and can be tailored to meet the advanced requirements of complex operations such as 300mm manufacturing; and

- Promis Systems, with its mature off–the–shelf functionality and large installed base, more suitable for customers who do not require extensive customization of functionality.

We have built our software suite of applications by acquiring and developing products that complement our MES offerings. Products for equipment integration utilizing the SECS protocol include:

- CELLworks–Grapheq, a UNIX–based cell controller;

- WinSECS, a Windows–based equipment integration package;

- STATIONworks, a Windows–based station control system; and

- FAbuilder, a Windows–based cell controller.

Real–time execution systems and logistics software include:

- RTD, real–time dispatcher;

- APF Reporter for factory performance reporting and analysis;

- Activity Manager, an adaptive workflow manager that integrates workflow between multiple plant and enterprise applications workflow between the transport system and MES;

- AutoSched for simulation and planning of workflow; and

- CLASS–MCS for transport control that provides an equipment–neutral software system to manage and control material handling equipment including AMHS systems, conveyors, wafer and reticle stockers, and inter–floor lift devices in clean room environments.

Composite applications designed to simplify and lower the cost of integration between enterprise and plant floor systems and aid demand–driven manufacturing include:

- RealView Manufacturing Intelligence, an enterprise manufacturing application to enhance overall plant performance;

- Demand Execution, integrating Brooks' Real–Time dispatcher with SAPs APO product;

9

Table of Contents

- Enterprise Quality Management, a framework for quality management that captures and analyzes data from multiple sources;

- Asset Management, providing detailed production planning capabilities; and

- Enterprise Integration Hub, which is designed to connect and integrate the capabilities of the four products listed immediately above and is certified for us with the products of SAP, AG, with whom Brooks software is collaborating on joint development activities.

We have recognized the growing need for process optimization and advanced process control, APC, in modern fabs. Our offerings for these requirements include:

- Patterns for fault detection and classification;

- BAP for advance process control and run–to–run control applications; and

- iProcess for factory–wide process and tool health monitoring.

Engineering data analysis is another important requirement for managing a fab. We offer products that provide extensive data analysis and statistical process control, or SPC, including:

- SPACE, a module for real–time SPC; and

- RS Series and Cornerstone for design of experiments and statistical analysis.

We offer unique industry–specific systems that address the comprehensive needs of the customers who prefer a total solutions approach from one supplier, including:

- 300works for 300mm manufacturers; and

- LCDworks for LCD manufacturers.

These offerings provide applications built around our products.

Our software supports a wide range of manufacturing environments, from manual and semi–automated to fully automated operations. In deploying our solutions, manufacturers worldwide have seen improvements in their cycle times, yields, work–in–process levels, customer responsiveness and fulfillment, plant utilization, and their return–on–manufacturing–assets.

In addition to software packages, we offer comprehensive solutions delivery, training, consulting and post–implementation services designed to empower our customers to realize the capabilities of our products and solutions.

## Customers

We sell our products and services to nearly every major semiconductor chip manufacturer and OEM in the world, including all of the top ten chip companies and nine of the top ten equipment companies. Our customers also include companies who are in the LCD, data storage and other similar industries. As a result of the Helix acquisition, certain products are sold to non–semiconductor customers in imaging and coating and analytic instruments. We have major customers in the United States, Europe and Asia. We expect international revenues to continue to represent a significant percentage of total revenues. Our industry is seeing an increasing business shift to Asia. See Note 17, "Segment and Geographic Information" of Notes to the Consolidated Financial Statements for further discussion of our sales by geographic region and revenue, income and assets by financial reporting segment.

10

Table of Contents

Relatively few customers account for a substantial portion of our revenues, with the top twenty customers accounting for slightly more than fifty percent of our business in fiscal 2005. We do not have any single customer who makes up more than ten percent of our overall revenue.

## Sales, Marketing and Customer Support

We market and sell our equipment and factory automation hardware and software in the United States, Asia and Europe through our direct sales organization. The sales process for our products is often multilevel, involving a team comprised of individuals from sales, marketing, engineering, operations and senior management. In many cases a customer is assigned a team that engages the customer at different levels of its organization to facilitate planning, provide product customization where required, and to assure open communication and support.

Our marketing activities include participation in trade shows, delivery of seminars, participation in industry forums, distribution of sales literature, and publication of press releases and articles in business and industry publications. To enhance communication and support, particularly with our international customers, we maintain sales and service centers in the United States, China, Japan, South Korea, Taiwan, Singapore, Malaysia, the United Kingdom and Germany. These facilities, together with our headquarters, maintain local support capability and demonstration equipment for customers to evaluate. Customers are encouraged to discuss the features and applications of our demonstration equipment with our engineers located at these facilities.

We also provide services to assist customers, including the installation of hardware products, software implementation, product training, consulting and on-site support. We strive to provide world-class support to our customers to help make them successful users of our products through:

- Telephone technical support;

- Direct training programs;

- User symposia and seminars; and

- Operating manuals and other technical support information for our products.

We maintain spare parts inventories in regional hubs to enable our personnel to serve our customers and to service our products more efficiently.

For the area of vacuum systems, utilizing the service capabilities previously offered by Helix, we provide an extensive range of global support and vacuum system monitoring services that lower vacuum systems end-users' total costs of ownership. We increase our customers' system uptime through rapid response to potential operating problems. We also develop and deliver enhancements to our customers' installed base of production tools. Our service offerings in the vacuum systems segment include TrueBlue Service Agreements, GUTS® (Guaranteed Up Time Support) customer response system and GOLDLink® (Global On-Line Diagnostics) support system, which provides a remote e-diagnostics solution that allows us to monitor, in real time, the vacuum system performance of our customers' production tools. The GOLDLink capability has made us a leading total solution provider in the emerging market for Internet-based, proactive e-diagnostics for the semiconductor and semiconductor capital equipment industries.

## Competition

### Hardware

The semiconductor fabs and process equipment manufacturing industries are highly competitive and characterized by continual changes and improvements in technology. The majority of equipment automation is still done in-house by OEMs. As a result, we believe that our primary opportunity in this area is from the larger semiconductor OEMs that currently satisfy their substrate handling needs in-house rather than by purchasing them from an external supplier such as us. For example, Applied Materials, the leading process equipment OEM, develops and manufactures a majority of

11

Table of Contents

its own central vacuum wafer handling systems and vacuum modules. Our competitors among external vacuum automation suppliers are primarily Japanese companies such as Daihen, Daikin and Yaskawa.

Atmospheric tool automation is more outsourced with a number of competitors due to the low barriers to entry. We compete directly with other equipment automation suppliers of atmospheric modules and systems such as Asyst, Hirata, Kawasaki, Rorze, TDK and Yaskawa.

We believe our customers will purchase our equipment automation products as long as we continue to provide the necessary throughput, reliability, contamination control and accuracy for their advanced processing tools at an acceptable price point. We believe that we have very competitive offerings with respect to all of these factors; however, we cannot guarantee that we will be successful in selling our products to OEMs who currently satisfy their automation needs in-house or from other independent suppliers, regardless of the performance or the price of our products.

In addressing the Asian markets, we may be at a competitive disadvantage to local suppliers.

We believe that the competitive factors when selling hardware directly to fabs are technical capabilities, reliability, price/performance, ease of integration and global sales and support resources. We believe that our solutions compete favorably with respect to all these factors.

In the AMHS market, we encounter direct competition primarily from Asyst-Shinko, Daifuku and Murata. These competitors have a particularly strong presence in Japan, which places us at a disadvantage in the Japanese market and other Asian markets. All three competitors have viable and similar offerings for 300mm, which in turn places pressure on pricing and potentially reduces profitability. We have a differentiated product, the OneFab AMHS, which is designed to put a premium on the software utilized to meet system requirements while simplifying and reducing the hardware.

Asyst, RECIF and Rorze are our chief competitors in the wafer sorter market. We no longer are actively pursuing new customers in this market. We are currently supporting our installed base for our sorter products.

Competition in the lithography automation market is still emerging, while our chief competitor in SMIF opportunities is Asyst.

*Software*

We believe that the primary competitive factors in the end-user market for factory automation software are product functionality, degree of integration with other applications, compatibility of hardware and software architecture, price/performance, ease of implementation, cost of ownership, vendor reputation and financial stability. We believe our products compete favorably with other systems with regards to the factors listed above due to the unique nature of the software segment. We also believe that the relative importance of these competitive factors may change over time.

We experience direct competition in the factory automation software market from various companies, including Applied Materials, Camstar, IBM and numerous small independent software companies. In some cases, we are able to sell our software products to our direct competitors. For example, Daifuku uses our software to control the operations of their AMHS hardware.

Many customers purchase software products from more than one supplier. Even in cases where a competitor is selected over us for a particular application, we may still gain substantial business with that customer since our product offerings cover a wide range of requirements and are considered best-in-class for many applications.

In advanced fabs, a greater burden is placed on software and implementation of increasingly complex automation applications, resulting in a critical need for integration of many different software and hardware components. We cooperate with large organizations such as IBM, SAP and Hewlett Packard to deliver complete solutions for customers. Sometimes when we subcontract our products and services to another company, our ability to win business is highly dependent on the success of the prime contractor with whom we have partnered.

12

Table of Contents

### Research and Development

Our research and development efforts are focused on developing new products and services as well as further enhancing the functionality, degree of integration, reliability and performance of our existing products. Our engineering, marketing, operations and management personnel have developed close collaborative relationships with many of their counterparts in customer organizations and have used these relationships to identify market demands and focus our research and development investment to meet those demands. With the rapid pace of change that characterizes semiconductor technology it is essential for us to provide high–performance and reliable products in order for us to maintain our leadership position. Software in particular represents a business that relies heavily on research and development resources to develop, enhance and support our products.

### Manufacturing

Manufacturing is one of our core competencies. Our manufacturing operations are used for product assembly, integration and testing. We have adopted quality assurance procedures that include standard design practices, component selection procedures, vendor control procedures and comprehensive reliability testing and analysis to assure the performance of our products. Our two major manufacturing facilities in Chelmsford, Massachusetts and Kiheung, Korea are ISO 9001 certified. Additionally we have a facility in Jena, Germany whose purpose is to perform integration and final testing of our products for the European market. We acquired additional manufacturing facilities in Mansfield, Massachusetts and Longmont, Colorado in connection with the acquisition of Helix.

We utilize a just–in–time manufacturing strategy, based on the concepts of demand flow technology, for a large portion of our manufacturing process. We believe that this strategy coupled with the outsourcing of non–critical components such as machined parts, wire harnesses, PC boards, etc. reduces fixed operating costs, improves working capital efficiency, reduces manufacturing cycle times and improves flexibility to rapidly adjust our production capacities. While we often use single source suppliers for certain key components and common assemblies to achieve quality control and the benefits of economies of scale, we believe that these parts and materials are readily available from other supply sources.

We have established a subsidiary in India to provide low cost off–shore engineering resources primarily for sustaining mature software products. As a result, our core staff of software engineers should be better enabled to focus on research and development of new technology and enriching the functions of currently active products.

### Joint Venture with ULVAC

Since the Helix merger in October 2005, we participate in a joint venture, ULVAC Cryogenics, Inc., or UCI, with ULVAC Corporation of Chigasaki, Japan. Formed in 1981 by Helix and ULVAC Corporation. UCI manufactures and sells cryogenic vacuum pumps, principally to ULVAC Corporation, one of the largest semiconductor and flat panel OEMs in Japan. Each company owns 50% of UCI. Helix made an initial cash investment of approximately $100,000, with no subsequent cash investments. The joint venture arrangement includes a license and technology agreement exclusively involving technology previously owned by Helix.

### Patents and Proprietary Rights

We rely upon patents, trade secret laws, confidentiality procedures, copyrights, trademarks and licensing agreements to protect our technology. Due to the rapid technological change that characterizes the semiconductor and flat panel display process equipment industries, we believe that the improvement of existing technology, reliance upon trade secrets and unpatented proprietary know–how and the development of new products may be as important as patent protection in establishing and maintaining competitive advantage. To protect trade secrets and know–how, it is our policy to require all technical and management personnel to enter into nondisclosure agreements. We cannot guarantee that these efforts will meaningfully protect our trade secrets.

We have obtained patents and will continue to make efforts to obtain patents, when available, in connection with our product development program. We cannot guarantee that any patent obtained will provide protection or be of commercial benefit to us. Despite these efforts, others may independently develop substantially equivalent proprietary information and techniques. As of September 30, 2005, we have obtained 205 United States patents and

13

Table of Contents

had 117 United States patent applications pending on our behalf. In addition, we have obtained 270 foreign patents and had 259 foreign patent applications pending on our behalf. Our United States patents expire at various times through April 2022. We cannot guarantee that our pending patent applications or any future applications will be approved, or that any patents will not be challenged by third parties. Others may have filed and in the future may file patent applications that are similar or identical to ours. These patent applications may have priority over patent applications filed by us.

We have successfully licensed our FOUP load port technology to several companies and continue to pursue the licensing of this technology to more companies that we believe are utilizing our intellectual property.

There has been substantial litigation regarding patent and other intellectual property rights in the semiconductor and related industries. We have in the past been, and may in the future be, notified that we may be infringing intellectual property rights possessed by other third parties. We cannot guarantee that infringement claims by third parties or other claims for indemnification by customers or end users of our products resulting from infringement claims will not be asserted in the future or that such assertions, if proven to be true, will not materially and adversely affect our business, financial condition and results of operations. If any such claims are asserted against our intellectual property rights, we may seek to enter into a royalty or licensing arrangement. We cannot guarantee, however, that a license will be available on reasonable terms or at all. We could decide in the alternative to resort to litigation to challenge such claims or to attempt to design around the patented technology. Litigation or an attempted design around could be costly and would divert our management's attention and resources. In addition, if we do not prevail in such litigation or succeed in an attempted design around, we could be forced to pay significant damages or amounts in settlement. Even if a design around is effective, the functional value of the product in question could be greatly diminished.

We acquired certain assets, including a transport system known as IridNet, from the Infab division of Jenoptik AG on September 30, 1999. Asyst Technologies, Inc. had previously filed suit against Jenoptik AG and other defendants, or collectively, the defendants, in the Northern District of California charging that products of the defendants, including IridNet, infringe Asyst's U.S. Patent Nos. 4,974,166, or the '166 patent, and 5,097,421, or the '421 patent. Asyst later withdrew its claims related to the '166 patent from the case. Summary judgment of noninfringement was recently granted in that case by the District Court and judgment was issued in favor of Jenoptik on the ground that the product at issue did not infringe the asserted claims of the '421 patent. Asyst has appealed the adverse judgment and the case is being heard at the Federal Circuit Court.

We had received notice that Asyst might amend its complaint in this Jenoptik litigation to name us as an additional defendant, but no such action was ever taken. Based on our investigation of Asyst's allegations, we do not believe we are infringing any claims of Asyst's patents. We intend to continue to support Jenoptik to argue vigorously, among other things, the position that the IridNet system does not infringe the Asyst patent. If Asyst prevails in its appeal and ultimately in its case against Jenoptik, Asyst may seek to prohibit us from developing, marketing and using the IridNet product without a license. We cannot guarantee that a license would be available to us on reasonable terms, if at all. If a license from Asyst were not available, we could be forced to incur substantial costs to reengineer the IridNet product, which could diminish its value. In any case, we could face litigation with Asyst. Jenoptik has agreed to indemnify us for any loss we may incur in this action.

In addition, Asyst made assertions in approximately 1995 that certain technology employed in products manufactured and sold by Hermos Informatik GmbH infringed one or more of Asyst's patents. We acquired Hermos in July 2002. To date Asyst has taken no steps to assert or enforce any such rights against us, and to our knowledge, Asyst never commenced enforcement proceedings against Hermos prior to its acquisition by us. Should Asyst seek to pursue any such claims against Hermos or us, we would be subject to all of the business and litigation risks identified in the preceding paragraph.

### Backlog

Backlog for our products as of September 30, 2005, totaled $87.2 million as compared to $156.7 million at September 30, 2004. Backlog consists of purchase orders for which a customer has scheduled delivery within the next 12 months. Backlog for our hardware segment and software segment was $66.7 million and $20.5 million, respectively, at September 30, 2005. Orders included in the backlog may be cancelled or rescheduled by customers

14

Table of Contents

without significant penalty. Backlog as of any particular date should not be relied upon as indicative of our revenues for any future period. A substantial percentage of current business generates no backlog because we deliver our products and services in the same period in which the order is received.

## Employees

At September 30, 2005, we had approximately 1,800 employees as compared to 1,900 employees at September 30, 2004. The net reduction is reflective of the Company's workforce reduction program based on estimates of near term future revenues and operating costs. An additional 80 employees were notified and will be reduced from the workforce over the first half of fiscal year 2006. We believe our future success will depend in large part on our ability to attract and retain highly skilled employees. Approximately 120 employees in our Jena, Germany facility are covered by a collective bargaining agreement. We consider our relationships with our employees to be good.

## Available Information

Our Internet website address is http://www.brooks.com. Through our website, we make available, free of charge, our annual report on Form 10–K, quarterly reports on Form 10–Q, current reports on Form 8–K and any amendments to those reports, as soon as reasonable practicable after we electronically file such material with, or furnish it to, the SEC. These SEC reports can be accessed through the investor relations section of our website. The information found on our website is not part of this or any other report we file with or furnish to the SEC.

## Gartner Information

Information contained in this annual report on Form 10–K/A attributable to Gartner, Gartner Dataquest or Dataquest as reflected in their 2004 Semiconductor Manufacturing Equipment Market Share Analysis published in April 2005 represents Gartner's estimates and we make no representation that this information represents facts.

## Item 2. *Properties*

Our corporate headquarters and primary manufacturing/research and development facilities are currently located in three buildings in Chelmsford, Massachusetts, which we purchased in January 2001. We have a lease on a fourth building in Chelmsford adjacent to the three that we own. In summary, we maintain the following active facilities:

| Location | Functions | Square Footage (approx.) | Ownership Status/Lease Expiration |
|---|---|---|---|
| Chelmsford, Massachusetts | Corporate headquarters, training, manufacturing, hardware and software R&D | 295,000 | Owned |
| Chelmsford, Massachusetts | Manufacturing, training, warehouse | 93,000 | October 2014 |
| Jena, Germany | Manufacturing, R&D hardware, sales, support, training (4 buildings) | 66,000 | Several Leases with terms that end through July 2006 |
| Salt Lake City, Utah | R&D software, training | 46,900 | September 2006 |
| San Jose, California | Sales and support, R&D hardware and software | 55,600 | January 2010 |
| Kiheung, South Korea | Manufacturing, R&D hardware, sales and support | 63,000 | November 2015 |
| Phoenix, Arizona | R&D hardware and software | 19,500 | Owned |
| Mansfield, Massachusetts | Helix corporate headquarters, manufacturing, R&D | 160,000 | December 2006 |
| Longmont, Colorado | Engineering, manufacturing, R&D | 60,000 | February 2015 |

15

Table of Contents

Our hardware segment utilizes the facilities in Massachusetts, California, South Korea, and Germany. Our software segment utilizes facilities in Massachusetts, Utah and Arizona.

We maintain additional sales, support, service, and training offices in the United States (New York, North Carolina, Pennsylvania, Texas), in Toronto, Canada and overseas in Europe (France, Germany, UK), as well as in Asia (Japan, China, Malaysia, Singapore, South Korea, India and Taiwan) and the Middle East (Israel).

As a result of our restructuring activities, there are a number of properties that are owned or leased by us that we do not use or occupy at this time. These vacant properties include a total of approximately 138,300 square feet of a mix of office space and manufacturing/research and development space located principally in Massachusetts. We actively explore options to market these surplus properties for sublease or sale or to negotiate early termination agreements for the leases in question. In addition to the property above, we classify an additional 207,100 square feet of space as sub-leased office and flexible use space.

## Item 3. *Legal Proceedings*

There has been substantial litigation regarding patent and other intellectual property rights in the semiconductor and related industries. Brooks has in the past been, and may in the future be, notified that it may be infringing intellectual property rights possessed by other third parties. Brooks cannot guarantee that infringement claims by third parties or other claims for indemnification by customers or end users of its products resulting from infringement claims will not be asserted in the future or that such assertions, if proven to be true, will not materially and adversely affect Brooks' business, financial condition and results of operations. If any such claims are asserted against Brooks' intellectual property rights, we may seek to enter into a royalty or licensing arrangement. Brooks cannot guarantee, however, that a license will be available on reasonable terms or at all. Brooks could decide in the alternative to resort to litigation to challenge such claims or to attempt to design around the patented technology. Litigation or an attempted design around could be costly and would divert our management's attention and resources. In addition, if Brooks does not prevail in such litigation or succeed in an attempted design around, Brooks could be forced to pay significant damages or amounts in settlement. Even if a design around is effective, the functional value of the product in question could be greatly diminished.

In addition to the material set forth below, please see "Patents and Proprietary Rights" in Part 1, Item 1, "Business" for a description of certain potential patent disputes.

On or about April 21, 2005, Brooks was served with a third-party complaint seeking to join Brooks as a party to a patent lawsuit brought by an entity named Information Technology Innovation, LLC based in Northbrook, Illinois ("ITI") against Motorola, Inc. ("Motorola") and Freescale Semiconductor, Inc. ("Freescale"). The lawsuit (the "ITI Lawsuit") also involves two individuals: Robert W. Atherton ("Atherton"), the named inventor on the patent, and Willis E. Higgins ("Higgins"), an attorney who worked with Atherton to obtain the patent. ITI began the ITI Lawsuit against Motorola in the United States District Court for the Northern District of Illinois (Eastern Division) in November 2004, and ITI added Freescale to the ITI Lawsuit in March 2005. ITI claims that Motorola and Freescale have infringed a U.S. patent that ITI asserts covers processes used to model a semiconductor manufacturing plant. ITI asserts that Brooks has induced and contributed to the infringement of the patent.

Freescale alleges that Brooks has a duty to indemnify Freescale and Motorola from any infringement claims asserted against them based on their use of Brooks' AutoSched software program by paying all costs and expenses and all or part of any damages that either of them might incur as a result of the ITI Lawsuit brought by ITI. AutoSched is a software program sold by Brooks and by one or more companies that formerly owned the AutoSched product prior to the acquisition of AutoSched by Brooks in 1999 from Daifuku U.S.A, Inc.

On July 7, 2005, Intel Corporation ("Intel") filed a lawsuit against ITI seeking a declaratory judgment that Intel has not infringed and is not infringing the patent (the "Intel Lawsuit"). In letters dated May 26, 2005 and September 23, 2005, Intel notified Brooks that Intel believes that Brooks has an indemnification obligation to Intel, but that, at present, Intel is not seeking to have those obligations determined and enforced in the Intel Lawsuit. Thus, Brooks has not been made a party to the Intel Lawsuit. The Intel Lawsuit is pending before the same judge as the ITI Lawsuit, but has a separate schedule.

Brooks believes that ITI is not a company that is engaged in the business of manufacturing hardware or software products. It is a limited liability company that apparently acquired an exclusive license to the patent at issue in the

16

Table of Contents

litigation and is now in the business of seeking to license the patent to others. Brooks also believes that in or after December 2004, ITI's parent, Global Patent Holdings,LLC, was acquired by Acacia Research Corporation. Brooks believes that Acacia Research Corporation is a publicly–traded company that is in the business of acquiring patents and then seeking to license the patents to others.

On September 7, 2005, the parties presented arguments to the court in the ITI Lawsuit about how the claims of the patent should be construed or interpreted. On October 4, 2005, the court issued its claim construction ruling. The fact discovery period in the ITI Lawsuit ends on November 30, 2005, and expert discovery is scheduled to end on February 3, 2006. No trial date has been set for the ITI Lawsuit.

Brooks believes that it has meritorious defenses to any claim that Brooks' AutoSched product infringes the patent identified in the ITI Lawsuit against Motorola and Freescale, as well as the Intel Lawsuit. Brooks plans to contest any such patent infringement claims in those lawsuits. Brooks also believes that meritorious defenses exist to the claims asserted by ITI against Motorola and Freescale, in the ITI Lawsuit and to the counterclaims asserted by ITI against Intel in the Intel Lawsuit. Brooks intends to cooperate fully with Motorola, and Freescale, and Intel in the defense of those claims. In any such matter there can be no assurance as to the outcome, and for the reasons described in the first paragraph of this "Legal Proceedings" section, the ITI litigations could have a material adverse effect on Brooks.

In any patent litigation matter there can be no assurances as to the final outcome and this litigation could have a material adverse effect on us. If a judgment of infringement were obtained against us, we could be required to pay substantial damages and a court could issue an order preventing us from continuing to sell our AutoSched product. We cannot predict the extent to which we might be required to seek licenses or alter our products as a result of the ITI litigation so that they no longer infringe upon the rights of others. We also cannot guarantee that the terms of any licenses we may be required to seek will be reasonable. Similarly, changing our products or processes to avoid infringing the rights of others may be costly or impractical and could detract from the value of our products. Further, the cost of defending this litigation and the diversion of management attention brought about by such litigation could be substantial, even if we ultimately prevail.

In September 2005, the Company filed suit against BlueShift Technologies, Inc. ("Blue Shift") and Peter van der Meulen, a former employee of the Company, alleging that BlueShift and Mr. van der Meulen had misappropriated certain business and technical information owned by the Company and used such information to advance the business of BlueShift in competition with the Company. In November 2005 a jury in the Suffolk Superior Court Business Section in Boston, Massachusetts returned a verdict in favor of BlueShift and Mr. van der Meulen, finding that Mr. van der Meulen had not competed improperly with the Company and that neither he nor BlueShift had misappropriated the Company's proprietary information. The jury also found that the Company's filing of the suit against BlueShift was without merit and that the Company had improperly interfered with BlueShift's business such that BlueShift lost a $209,000 purchase order from a customer, and the jury awarded that amount to BlueShift as damages. A further hearing will be scheduled by the court to determine whether the case had merit and whether BlueShift is entitled to any further damages. It has been the Company's view since the time of the filing of the suit that the suit had merit and was well founded. While the Company is evaluating its options going forward, it does not anticipate further damages being awarded on this matter.

### Item 4. *Submission of Matters to a Vote of Security Holders*

During the quarter ended September 30, 2005, no matters were submitted to a vote of security holders through the solicitation of proxies or otherwise.

Table of Contents

## PART II

**Item 5.** *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*

Our common stock is traded on the Nasdaq National Market under the symbol "BRKS". The following table sets forth, for the periods indicated, the high and low close prices per share of our common stock, as reported by the Nasdaq National Market:

|  | High | Low |
|---|---|---|
| Fiscal year ended September 30, 2005 | | |
| First quarter | $18.26 | $13.48 |
| Second quarter | $18.73 | $14.38 |
| Third quarter | $16.21 | $12.86 |
| Fourth quarter | $16.60 | $13.00 |
| Fiscal year ended September 30, 2004 | | |
| First quarter | $27.22 | $19.56 |
| Second quarter | $27.30 | $17.80 |
| Third quarter | $23.01 | $16.50 |
| Fourth quarter | $18.72 | $11.62 |

### Number of Holders

As of November 29, 2005, there were 1,197 holders on record of our common stock.

### Dividend Policy

We have never declared or paid any cash dividends on our capital stock and do not plan to pay any cash dividends in the foreseeable future. Our current policy is to retain all of our earnings to finance future growth. In addition, we have never declared or issued any stock dividends on our capital stock and do not plan to issue any stock dividends in the foreseeable future.

### Issuance of Unregistered Common Stock

On February 15, 2005, we issued the remaining 34,433 shares of our common stock reserved for issuance under the acquisition agreement of Intelligent Automation Systems, Inc. and IAS Products, Inc. The common stock issued and reserved for issuance in this transaction was sold in reliance upon the exemptions from registration set forth in Section 4(2) of the Securities Act of 1933 to sales by an issuer not involving any public offering. The shares in this transaction have been registered for resale pursuant to an effective registration statement on Form S−3.

### Issuer's Purchases of Equity Securities

We did not repurchase any of our equity securities during the fourth quarter of fiscal 2005.

**Item 6.** *Selected Financial Data*

The statement of operations data included in the selected consolidated financial data set forth below for the years ended September 30, 2005, 2004 and 2003 and the balance sheet data set forth below at September 30, 2005 and 2004 are derived from, and should be read in conjunction with, our audited consolidated financial statements and notes thereto and "Management's Discussion and Analysis of Financial Condition and Results of Operations," included in this Annual Report on Form 10−K/A. The statement of operations data set forth below for the years ended September 30, 2002 and 2001 and the balance sheet data set forth below at September 30, 2003, 2002 and 2001 has been restated to conform to the financial statements included in this Form 10−K/A and is presented herein on an unaudited basis.

Refer to the "Restatement of Previously Issued Financial Statements" explanatory note presented in this Annual Report on Form 10−K/A and Note 3 to our consolidated financial statements for more detailed information regarding

Table of Contents

the restatement of our consolidated financial statements for the years ended September 30, 2005, 2004 and 2003 and at September 30, 2005 and 2004.

| | Year Ended September 30, | | |
|---|---|---|---|
| | 2005(5) (as restated) | 2004(5) (as restated) | 2003(1)(2)(5)(6) (as restated) |
| | (In thousands, except per share data) | | |
| Revenues | $463,746 | $535,053 | $ 340,092 |
| Gross profit | $162,431 | $202,276 | $ 98,516 |
| Income (loss) from continuing operations before income taxes and minority interests | $ (2,751) | $ 32,398 | $(194,806) |
| Income (loss) from continuing operations | $ (8,096) | $ 24,134 | $(199,926) |
| Net income (loss) | $ (11,612) | $ 14,659 | $(203,024) |
| Basic earnings (loss) from continuing operations per share | $ (0.18) | $ 0.56 | $ (5.44) |
| Diluted earnings (loss) from continuing operations per share | $ (0.18) | $ 0.55 | $ (5.44) |
| Shares used in computing basic earnings (loss) per share | 44,919 | 43,006 | 36,774 |
| Shares used in computing diluted earnings (loss) per share | 44,919 | 43,573 | 36,774 |

| | Year Ended September 30, | | | | | |
|---|---|---|---|---|---|---|
| | 2002(3)(5)(7) (as reported) | 2002(3)(5)(7) (restatement) | 2002(3)(5)(7) (as restated) | 2001(4) (as reported) | 2001(4) (restatement) | 2001(4) (as restated) |
| | (In thousands, except per share data) | | | | | |
| Revenues | $ 300,538 | $ — | $ 300,538 | $381,716 | $ — | $381,716 |
| Gross profit | $ 82,478 | $ (3,722) | $ 78,756 | $152,384 | $ (2,456) | $149,928 |
| Loss from continuing operations before income taxes and minority interests | $(620,997) | $(16,494) | $(637,491) | $(36,523) | $(11,477) | $ (48,000) |
| Loss from continuing operations | $(713,539) | $(18,683) | $(732,222) | $(29,660) | $ (7,516) | $ (37,176) |
| Net loss | $(719,954) | $(18,683) | $(738,637) | $(29,660) | $ (7,516) | $ (37,176) |
| Accretion and dividends on preferred stock | $ — | $ — | $ — | $ 90 | $ — | $ 90 |
| Net loss attributable to common stockholders | $(719,954) | $(18,683) | $(738,637) | $(29,750) | $ (7,516) | $ (37,266) |
| Basic loss from continuing operations per share | $ (27.65) | $ (0.72) | $ (28.37) | $ (1.65) | $ (0.42) | $ (2.07) |
| Diluted loss from continuing operations per share | $ (27.65) | $ (0.72) | $ (28.37) | $ (1.65) | $ (0.42) | $ (2.07) |
| Shares used in computing basic loss per share | 25,807 | — | 25,807 | 18,015 | — | 18,015 |
| Shares used in computing diluted loss per share | 25,807 | — | 25,807 | 18,015 | — | 18,015 |

Table of Contents

| | 2005 (as restated) | 2004 | As of September 30. 2003 | 2002 | 2001 (as restated) |
|---|---|---|---|---|---|
| | | | (In thousands) | | |
| Total assets | $624,080 | $671,039 | $493,245 | $657,497 | $711,893 |
| Working capital(1) | $168,231 | $294,137 | $135,156 | $176,338 | $282,163 |
| Notes payable and revolving credit facilities | $ — | $ — | $ — | $ — | $ 17,122 |
| Current portion of long–term debt and other obligations | $ 12 | $ 11 | $ 98 | $ 8 | $ 392 |
| Subordinated notes due 2008(1) | $175,000 | $175,000 | $175,000 | $175,000 | $175,000 |
| Other long–term debt (less current portion) | $ 2 | $ 14 | $ 25 | $ 177 | $ 31 |
| Stockholders' equity | $309,835 | $312,895 | $162,830 | $308,235 | $426,358 |

(1)  As a result of the restatement, the Company has reclassified $175 million of debt principal and associated deferred financing costs of $2.2 million from long–term to short–term at September 30, 2005.

   The following tables present selected unaudited consolidated quarterly financial information as restated for all quarters in fiscal years 2005 and 2004 from previously reported information filed on Form 10–Q and Form 10–K as a result of the restatement of our financial results discussed in this Form 10–K/A.

**As reported**

| | Year Ended September 30, 2005 | | | |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| | (In thousands, except per share data) | | | |
| Revenues | $117,233 | $129,454 | $113,760 | $103,299 |
| Gross profit | $ 42,066 | $ 43,860 | $ 40,085 | $ 36,791 |
| Income (loss) from continuing operations | $ 81 | $ (251) | $ 1,283 | $ (7,654) |
| Basic earnings (loss) from continuing operations per share | $ 0.00 | $ (0.01) | $ 0.03 | $ (0.17) |
| Diluted earnings (loss) from continuing operations per share | $ 0.00 | $ (0.01) | $ 0.03 | $ (0.17) |

**Restatement**

| | Year Ended September 30, 2005 | | | |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| | (In thousands, except per share data) | | | |
| Revenues | $ — | $ — | $ — | $ — |
| Gross profit | $ (333) | $ (14) | $ (12) | $ (12) |
| Loss from continuing operations | $(1,485) | $ (23) | $ (23) | $ (24) |
| Basic loss from continuing operations per share | $ (0.03) | $(0.00) | $(0.00) | $(0.00) |
| Diluted loss from continuing operations per share | $ (0.03) | $(0.00) | $(0.00) | $(0.00) |

**As restated**

| | Year Ended September 30, 2005 | | | |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| | (In thousands, except per share data) | | | |
| Revenues | $117,233 | $129,454 | $113,760 | $103,299 |
| Gross profit | $ 41,733 | $ 43,846 | $ 40,073 | $ 36,779 |
| Income (loss) from continuing operations | $ (1,404) | $ (274) | $ 1,260 | $ (7,678) |
| Basic earnings (loss) from continuing operations per share | $ (0.03) | $ (0.01) | $ 0.03 | $ (0.17) |
| Diluted earnings (loss) from continuing operations per share | $ (0.03) | $ (0.01) | $ 0.03 | $ (0.17) |

20

**As reported**

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| | (In thousands, except per share data) | | | |
| Revenues | $81,545 | $137,377 | $153,787 | $162,344 |
| Gross profit | $29,932 | $ 50,927 | $ 57,275 | $ 64,659 |
| Income (loss) from continuing operations | $(8,365) | $ 7,612 | $ 12,451 | $ 15,498 |
| Basic earnings (loss) from continuing operations per share | $ (0.22) | $ 0.17 | $ 0.28 | $ 0.35 |
| Diluted earnings (loss) from continuing operations per share | $ (0.22) | $ 0.17 | $ 0.28 | $ 0.35 |

**Restatement**

Year Ended September 30, 2004

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| | (In thousands, except per share data) | | | |
| Revenues | $ — | $ — | $ — | $ — |
| Gross profit | $ (236) | $ (93) | $ (101) | $ (87) |
| Loss from continuing operations | $ (979) | $(665) | $(1,003) | $ (415) |
| Basic loss from continuing operations per share | $(0.02) | $(0.01) | $ (0.02) | $(0.01) |
| Diluted loss from continuing operations per share | $(0.02) | $(0.02) | $ (0.03) | $(0.01) |

**As restated**

Year Ended September 30, 2004

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| | (In thousands, except per share data) | | | |
| Revenues | $81,545 | $137,377 | $153,787 | $162,344 |
| Gross profit | $29,696 | $ 50,834 | $ 57,174 | $ 64,572 |
| Income (loss) from continuing operations | $(9,344) | $ 6,947 | $ 11,448 | $ 15,083 |
| Basic earnings (loss) from continuing operations per share | $ (0.24) | $ 0.16 | $ 0.26 | $ 0.34 |
| Diluted earnings (loss) from continuing operations per share | $ (0.24) | $ 0.15 | $ 0.25 | $ 0.34 |

(1) Amounts include results of operations of Microtool, Inc. (acquired October 9, 2002) for the periods subsequent to its acquisition.

(2) Amounts include our share of the results of operations of Brooks Switzerland in accordance with the equity method of accounting.

(3) Amounts include results of operations of Hermos Informatik GmbH (acquired July 3, 2002); PRI Automation, Inc. (acquired May 14, 2002); Intelligent Automation Systems, Inc. and IAS Products, Inc. (acquired February 15, 2002) (see Note 5); Fab Air Control (acquired December 15, 2001); the Automation Systems Group of Zygo Corporation (acquired December 13, 2001); Tec–Sem A.G. (acquired October 9, 2001) and General Precision, Inc. (acquired October 5, 2001) for the periods subsequent to their respective acquisitions.

(4) Amounts include results of operations of SEMY Engineering, Inc. (acquired February 16, 2001), the KLA e–Diagnostics product business (acquired June 26, 2001), CCS Technology, Inc. (acquired June 25, 2001) and SimCon N.V. (acquired May 15, 2001) for the periods subsequent to their respective acquisitions.

(5) Amounts from continuing operations exclude results of operations of the Specialty Equipment and Life Sciences division, previously reported as the Company's "Other" reportable segment, which was reclassified as a discontinued operation in June 2005.

(6) Amounts include $40.0 million for asset impairments.

(7) Amounts include $474.4 million for asset impairments and $106.7 million for deferred tax write–offs.

**Item 7.** *Management's Discussion and Analysis of Financial Condition and Results of Operations*

Certain statements in this Form 10–K/A constitute "forward-looking statements" which involve known risks, uncertainties and other factors which may cause the actual results, our performance or achievements to be materially

21

Table of Contents

different from any future results, performance or achievements expressed or implied by such forward-looking statements such as estimates of future revenue, gross margin, and expense levels as well as the performance of the semiconductor industry as a whole. Such factors include the "Factors That May Affect Future Results" set forth in Management's Discussion and Analysis of Financial Condition and Results of Operations below. Precautionary statements made herein should be read as being applicable to all related forward-looking statements whenever they appear in this report.

## Restatement of Consolidated Financial Statements

On May 10, 2006, our Board of Directors concluded that our consolidated financial statements for the years ended September 30, 2005, 2004 and 2003 as well as the selected financial data for the years ended September 30, 2002 and 2001 should be restated to record additional non-cash stock-based compensation expense resulting from stock options granted during fiscal years 1996 to 2005 that were incorrectly accounted for under generally accepted accounting principles ("GAAP"). Our decision to restate our financial statements was based on the facts obtained by management and an independent investigation into our stock option accounting that was conducted under the direction of a special committee ("Special Committee") of the Board of Directors. The Board created the Special Committee, which was composed solely of independent directors, to conduct a review of matters related to past stock option grants (including the timing of such grants and associated documentation) after receiving inquiries regarding the timing of certain stock option grants. Separately, the Company's management also reviewed stock option grants from 1995 through the second quarter of fiscal 2006 to determine whether any material accounting errors had occurred with respect to stock option grants.

We have concluded that there were material accounting errors with respect to a number of stock option grants. In general, these stock options were granted with an exercise price equal to the Nasdaq closing market price for our common stock on the date set forth on written consents signed by one or more directors. We used the stated date of these consents as the "measurement date" for the purpose of accounting for them under GAAP, and as a result recorded no compensation expense in connection with the grants.

We have concluded that a number of written consents were not fully executed or effective on the date set forth on the consents and thus that using the stated date as the measurement date was incorrect. We have determined a revised measurement date for each stock option grant based on the information now available to us. Generally, the changes in measurement dates are due to two kinds of errors: (1) we treated unanimous written consents of directors approving stock option grants as effective on the date stated on the consent, instead of the date upon which we received the consent form containing the last signature required for unanimity; and (2) we treated option grants to multiple employees as effective prior to the date upon which we had determined the exact number of options that would be granted to each individual employee. In cases where the closing market price on the revised measurement date exceeded the Nasdaq closing market price on the original measurement date, we have recognized compensation expense equal to this excess over the vesting term of each option.

We have determined that the cumulative, pre-tax, non-cash, stock-based compensation expense resulting from revised measurement dates was approximately $58.7 million during the period from our initial public offering in 1996 through September 30, 2005. The corrections made in the restatement relate to options covering approximately 6.0 million shares. In the restatement, we recorded stock-based compensation expense of $1.6 million, $3.1 million and $17.3 million for the years ended September 30, 2005, 2004 and 2003, respectively, and $36.7 million prior to fiscal 2003. In addition, we recorded an income tax benefit of $1.8 million prior to fiscal 2003. The cumulative effect of the restatement adjustments on our consolidated balance sheet at September 30, 2005 was an increase in additional paid-in capital offset by a corresponding increase in the accumulated deficit and deferred compensation which results in no net effect on stockholders' equity. The adjustments increased previously reported diluted loss from continuing operations per common share by $0.03 and $0.47 for the years ended September 30, 2005 and 2003, respectively, and decreased diluted earnings from continuing operations per common share by $0.07 for the year ended September 30, 2004. Approximately 99% of the charges relating to revised measurement dates arose from incorrect measurement dates for stock options granted during fiscal years 1996 through 2002. Subsequent to fiscal 2002 and prior to the inception of the investigation, we had revised our stock option and restricted stock grant practices. Neither the Company nor the Special Committee concluded that anyone now affiliated with the Company was complicit in any intentional wrongdoing. The Company and the Special Committee were unable to conclude that the accounting errors relating to revised measurement dates for

22

Table of Contents

stock option grants were the result of intentional misconduct of any company personnel. There was no impact on revenue or net cash provided by operating activities as a result of this compensation expense.

In addition to the compensation expenses described above, we also recorded approximately $5.8 million of non−cash, stock−based compensation expense in connection with a stock option held by former CEO Robert J. Therrien that we have concluded he was permitted to exercise in November 1999 despite its expiration in August of 1999. This transaction was previously accounted for and disclosed as a loan by the Company to Mr. Therrien for the purpose of permitting him to exercise the option. Specifically, in November 1999, three directors of the Company (including Mr. Therrien) signed a ratification document pursuant to which Mr. Therrien was deemed to have been granted a loan as of August 1999. According to the document, in June 1999 our directors (Messrs. Khoury, Emerick and Therrien) discussed extending a loan to Mr. Therrien for the purpose of permitting him to exercise an option to purchase 225,000 shares of the Company's stock prior to its expiration in August 1999. Based on the document, the Company in November 1999 deemed Mr. Therrien to have timely exercised the options, and accounted for the exercise without recognizing compensation expense. As a result of facts obtained by the Special Committee, we determined that Mr. Therrien misrepresented the facts of the loan and that the ratification document described above was false as there were no discussions concerning a loan in June 1999. As a result, we have determined that the option expired in August 1999 and that compensation expense should have been recorded in connection with Mr. Therrien's purchase of stock in November 1999. At that time, Mr. Therrien paid approximately $560,000 (the exercise price of $2.43 per share, plus interest deemed due on the loan) for 225,000 shares then worth approximately $6,314,000 (or $28.06 per share). In the restatement, we have recognized compensation expense in November 1999 equal to the difference between the price paid by Mr. Therrien and the market value of the stock on the date of sale. The three directors including Mr. Therrien are no longer affiliated with the Company.

As part of our review, we assessed generally whether there were other matters which should have been corrected in our previously issued financial statements. Apart from the errors underlying the restatement described above, no other matters have come to our attention that should be adjusted in our previously issued financial statements.

As a result, we recorded in the restatement cumulative, non−cash pre−tax stock−based compensation expense of approximately $64.5 million and a tax benefit of $1.8 million. Principally as a result of losses incurred, we recorded a full valuation allowance against all deferred tax assets beginning in 2002 and consequently, there is no tax effect of the additional stock−based compensation expense recorded in the years ended September 30, 2005, 2004 and 2003.

### Related Proceedings

On May 12, 2006, we announced that we had received notice that the Boston Office of the United States Securities and Exchange Commission (the "SEC") was conducting an informal inquiry concerning stock option grant practices to determine whether violations of the securities laws had occurred. On June 2, 2006, the SEC issued a voluntary request for information to us in connection with an informal inquiry by that office regarding a loan we previously reported had been made to Mr. Therrien in connection with his exercise of stock options in 1999. On June 23, 2006, we were informed that the SEC had opened a formal investigation into this matter and on the general topic of the timing of stock option grants. On June 28, 2006, the SEC issued a subpoena to us seeking documents related to our stock option grant practices and a purported loan to Robert Therrien in August 1999 in connection with his exercise of a stock option.

On May 19, 2006, we received a grand jury subpoena from the United States Attorney (the "DOJ") for the Eastern District of New York requesting documents relating to stock option grants. Responsibility for the DOJ's investigation was subsequently assumed by the United States Attorney for the District of Massachusetts. On June 22, 2006, the United States Attorney's Office for the District of Massachusetts issued a grand jury subpoena to us in connection with an investigation by that office into the timing of stock option grants by us and the loan to Mr. Therrien mentioned above.

We are cooperating fully with the investigations being conducted by the SEC and the DOJ.

Table of Contents

On May 22, 2006, a derivative action was filed nominally on our behalf in the Superior Court for Middlesex County, Massachusetts, captioned as Mollie Gedell, Derivatively on Behalf of Nominal Defendant Brooks Automation, Inc. v. A. Clinton Allen, *et al*. The Defendants in the case are: A. Clinton Allen, Director of the Company; Roger D. Emerick, former Director of the Company; Edward C. Grady, Director, President and CEO of the Company; Amin J. Khoury, former Director of the Company; Joseph R. Martin, Director of the Company; John K. McGillicuddy, Director of the Company; and Robert J. Therrien, former Director, President and CEO of the Company. The complaint alleges defendants breached their fiduciary duties by backdating stock option grants; violating Generally Accepted Accounting Principles; causing us to issue false and misleading financial statements; and causing us to file false proxy statements and Form 4's. The complaint further alleges that Messrs. Therrien, Grady, Emerick and Khoury were unjustly enriched as a result of their receipt and retention of backdated stock option grants. The Complaint seeks, on our behalf, *inter alia*, damages against the individual defendants for breaches of fiduciary duties; disgorgement of any backdated stock options or the proceeds of any related exercised stock options; other equitable relief to remedy breached fiduciary duties; and plaintiff's costs.

On May 26, 2006, a derivative action was filed in the Superior Court for Middlesex County, Massachusetts nominally on our behalf, captioned as Ralph Gorgone, Derivatively on Behalf of Nominal Defendant Brooks Automation, Inc. v. Edward C. Grady, *et al*. The Defendants in the action are: Mr. Grady; Mr. Allen; Mr. Emerick; Mr. Khoury; Robert J. Lepofsky, Director of the Company; Mr. Martin; Mr. McGillicuddy; Krishna G. Palepu, Director of the Company; Alfred Woollacott, III, Director of the Company; Mark S. Wrighton, Director of the Company; and Marvin Schorr, Director of the Company. The complaint alleges defendants breached fiduciary duties owed us by causing or allowing the backdating of stock option grants; the issuance of inaccurate financial results; abuse of control; gross mismanagement; waste of corporate assets; and unjust enrichment. The complaint seeks, on our behalf, *inter alia*, damages against the director defendants for breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; the Court to direct us to take actions to improve corporate governance and internal procedures; extraordinary equitable and/or injunctive relief; restitution and disgorgement of profits; and plaintiff's costs.

The parties have filed a motion to consolidate the two state derivative actions in Massachusetts Superior Court. If the motion is granted, a consolidated complaint is required to be filed within 30 days of the consolidation order.

On May 30, 2006, a derivative action was filed in the United States District Court for the District of Massachusetts, captioned as Mark Collins, Derivatively on Behalf of Nominal Defendant Brooks Automation, Inc. v. Robert J. Therrien, *et al*. The defendants in the action are: Mr. Therrien; Mr. Allen; Mr. Emerick; Mr. Grady; Mr. Khoury; Mr. Martin; and Mr. McGillicuddy. The complaint alleges breach of fiduciary duties in connection with the management of the Company; disseminating false information to the market; failing to design and implement adequate internal controls; and as against Messrs. Therrien, Grady, Emerick and Khoury, unjust enrichment. The complaint seeks, on our behalf, *inter alia*, damages against the individual defendants for breaches of fiduciary duties; disgorgement of backdated stock options or proceeds from exercised stock options; other equitable relief to remedy the breaches of fiduciary duties; and plaintiff's costs.

On June 7, 2006, a derivative action was filed in the United States District Court for the District of Massachusetts, captioned as City of Pontiac General Employees' Retirement System, Derivatively on Behalf of Brooks Automation, Inc. v. Robert J. Therrien, *et al*. The Defendants in this action are: Mr. Therrien; Mr. Emerick; Mr. Khoury; Mr. Allen; Mr. Grady; Mr. Lepofsky; Mr. Martin; Mr. McGillicuddy; Mr. Palepu; Mr. Woollacott, III; Mr. Wrighton; and Mr. Schorr. The complaint alleges violations of Section 10(b) and Rule 10b−5 of the Exchange act; Section 14(a) of the Exchange Act; Section 20(a) of the Exchange Act; breach of fiduciary duty; breach of fiduciary duty and/or aiding and abetting; abuse of control; gross mismanagement; constructive fraud; corporate waste; unjust enrichment; rescission against Messrs. Therrien, Emerick and Khoury; and breach of contract against Mr. Therrien. The complaint seeks, on our behalf, *inter alia*, damages against the individual defendants for breaches of fiduciary duties; extraordinary equitable and/or injunctive relief; and plaintiff's costs.

The parties have filed a motion to consolidate the two federal derivative actions in the United States District Court for the District of Massachusetts. If the order is granted, the plaintiffs will have 45 days to file a consolidated complaint, or to designate one of the existing complaints as the operative complaint.

24

# EXHIBIT A
# PART 2 OF 4

Table of Contents

On June 19, 2006, a putative class action was filed in the United States District Court, District of Massachusetts, captioned as Charles E. G. Leech Sr. v. Brooks Automation, Inc., *et al.* The defendants in this action are: the Company; Mr. Therrien; Ellen Richstone, the Company's former Chief Financial Officer; Mr. Emerick; Mr. Khoury; Robert W. Woodbury, Jr., the Company's Chief Financial Officer; and Mr. Grady. The complaint alleges violations of Section 10(b) of the Exchange Act and Rule 10b−5 against us and the individual defendants; Section 20(a) of the Exchange Act against the individual defendants; Section 11 of the Securities Act against us and Messrs. Grady, Woodbury, Emerick, Khoury and Therrien; Section 12 of the Securities Act against us and Messrs. Grady, Woodbury, Emerick, Khoury and Therrien; and Section 15 of the Securities Act against Messrs. Grady, Woodbury, Emerick, Khoury and Therrien. The complaint seeks, *inter alia*, damages, including interest, and plaintiff's costs.

On July 19, 2006, a putative class action was filed in the United States District Court for the District of Massachusetts, captioned as James R. Shaw v. Brooks Automation, Inc., *et al.* The Defendants in the case are: the Company; Mr. Therrien; Ms. Richstone; Mr. Emerick; Mr. Khoury; Mr. Woodbury; and Mr. Grady. As of this date, we have not been served with the complaint. The complaint alleges violations of Section 10(b) of the Exchange Act and Rule 10b−5 against all defendants and violations of Section 20(a) of the Exchange Act against all individual defendants. The complaint seeks, *inter alia*, damages, including interest, and plaintiff's costs.

We are aware of additional proposed class actions, posted on the websites of the Brower Piven, the Charles H. Johnson and Associates, and the Federwood & Sherwood law firms. We are not yet aware of the filing of such actions, and Brooks has not been served with a complaint or any other process in any of these matters.

## Overview

We are a leading supplier of automation products and solutions primarily serving the worldwide semiconductor market. We supply hardware, software and services to both chip manufacturers and original equipment manufacturers, or OEMs, who make semiconductor device manufacturing equipment. We are a technology and market leader with offerings ranging from individual hardware and software modules to fully integrated systems as well as services to install and support our products world−wide. Although our core business addresses the increasingly complex automation requirements of the global semiconductor industry, we are also focused on providing automation solutions for a number of related industries, including flat panel display manufacturing, data storage and other complex manufacturing.

We operate in two segments: hardware and software. In the fourth quarter of fiscal year 2005, the Company's equipment automation and factory automation segments were combined into the hardware segment, which reflects how management now evaluates its business. Prior year amounts have been reclassified to conform to the current year presentation.

The hardware segment provides wafer handling products and components for use within semiconductor process equipment. These systems automate the movement of wafers into and out of semiconductor manufacturing process chambers and provide an integration point between factory automation systems and process tools. The products offered by Brooks include vacuum and atmospheric systems and robots and related components. We also offer the assembly and manufacturing of customer designed automation systems, or contract automation systems. The primary customers for these solutions are manufacturers of process tool equipment. Additionally, we provide hardware directly to fabs including automated material handling systems, or AMHS, that use overhead monorail systems and overhead hoist vehicles to store, transport and manage the movement of material throughout the fab. Other hardware products include equipment for lithography automation that manage the storage, inspection and transport of photomasks, or reticles.

The software segment addresses the need for production management systems driven by the extensive tracking and tracing requirements of the semiconductor industry. Our software products enable semiconductor manufacturers to increase their return on investment by maximizing production efficiency, and may be sold as part of an integrated solution or on a stand−alone basis. These software products and services are also used in many similar manufacturing industries as semiconductor, including flat panel display, data storage, and electronic assembly.

In June 2005, the Company signed definitive purchase and sale agreements to sell substantially all the assets of the Company's Specialty Equipment and Life Sciences division ("SELS"), formerly known as IAS, which provided

Table of Contents

standard and custom automation technology and products for the semiconductor, photonics, life sciences and certain other industries. This sale was completed and all activities of SELS have ceased during the fourth quarter of fiscal 2005. Effective June 2005, the Company's consolidated financial statements and notes have been reclassified to reflect this business as a discontinued operation in accordance with Financial Accounting Standards Board Statement No. 144, "Accounting for the Impairment or Disposal of Long–Lived Assets."

The semiconductor industry is cyclical in nature, and we are in a period where the market conditions indicate relatively flat to declining demand in fiscal year 2005 as compared to fiscal year 2004. We are focusing our major efforts in the following areas:

- Sustaining our ability to meet our customers' requirements on a timely basis;

- Continuing to invest in other industries such as flat panel display manufacturing for our equipment automation products;

- Expanding our sales of equipment automation products to process tool manufacturers that currently produce automation equipment internally;

- Continuing to develop our customer designed automation ("CDA") business with process tool manufacturers;

- Greater expansion of software development capabilities in countries outside of the United States, specifically India and Korea;

- Greater expansion of our hardware and software products into the China market;

- Implementing new sales and service strategies to improve customer support and satisfaction;

- Implementing a final integration and test strategy to provide manufacturing capabilities for customer specific end of line configuration of our products;

- Evaluating our strategic direction and value of non–core products;

- Improving the efficiency of our internal information and business systems, which could result in the upgrade or replacement of certain applications; and

- Continuing to evaluate on an opportunistic basis whether new acquisitions of or alliances with other companies would be beneficial to our business and shareholders.

In fiscal 2005, our total revenues decreased 13.3% to $463.7 million from the prior year compared to 57.3% growth in fiscal 2004. This decrease is consistent with, and reflective of, lower industry demand for semiconductor capital equipment in fiscal 2005. Our revenue by segment for fiscal 2005 and 2004 is as follows (in thousands):

|  | For the Year Ended September 30, | | | |
|  | 2005 | | 2004 | |
| Hardware | $369,778 | 79.7% | $415,474 | 77.7% |
| Software | 93,968 | 20.3% | 119,579 | 22.3% |
|  | $463,746 | 100.0% | $535,053 | 100.0% |

Our hardware segment revenues decreased 11.0% from the prior year to $369.8 million. This decrease reflects the lower demand for semiconductor capital equipment during fiscal year 2005. We expect fiscal 2006 revenues for our hardware segment to remain relatively flat compared to present levels in the absence of any industry trend toward higher demand. Our software segment revenues decreased 21.4% from the prior year to $94.0 million. The decrease is primarily attributable to lower market demand for our software products, and by the absence of the significant European software project for approximately $17.3 million which was recognized upon completion in the second quarter of fiscal 2004. We expect fiscal 2006 revenues for our software segment to remain relatively flat as compared to present levels as decreasing forecasted demand from semiconductor customers is offset by increased demand for our software products from other industries.

26

Table of Contents

Gross margins decreased 2.8 percentage points to 35.0% for fiscal 2005 from the prior year in comparison to an 8.8 percentage point increase in fiscal 2004. The decrease is primarily attributable to reduced overhead absorption due to reduced sales volumes. We expect our gross margins to increase slightly in the near term as a result of various cost reduction measures.

We recorded a loss from continuing operations of $8.1 million or $0.18 per diluted share in fiscal 2005 compared to income from continuing operations of $24.1 million or $0.55 per diluted share in fiscal 2004. This loss is the result of declining revenues and gross margins and includes a restructuring charge of $16.5 million related to workforce reductions and excess facilities charges. We were able, however, to generate $31.1 million of cash from operations in fiscal year 2005 as a result of diligent working capital management, compared to a positive cash flow from operations of $8.9 million in fiscal 2004. At September 30, 2005, we had cash, cash equivalents and marketable securities aggregating $357.0 million.

## Recent Developments

On July 11, 2005, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with Helix Technology Corporation ("Helix"), a Delaware corporation and Mt. Hood Corporation ("Mt. Hood"), a newly-formed Delaware corporation and a direct wholly-owned subsidiary of the Company. This acquisition closed on October 26, 2005. Under the terms of the Merger Agreement, Mt. Hood merged (the "Merger") with and into Helix, with Helix continuing as the surviving corporation. Each share of Helix common stock, par value $1.00 per share, other than shares held by Helix as treasury stock and shares held by the Company or Mt. Hood, was cancelled and extinguished and automatically converted into 1.11 ("Exchange Ratio") shares of the Company's common stock. In addition, the Company assumed all options then outstanding under Helix's existing equity incentive plans, each of which is now exercisable into a number of shares of the Company's common stock (and at an exercise price) adjusted to reflect the Exchange Ratio. The Helix acquisition is preliminarily valued at approximately $459 million, consisting of 28.8 million shares of common stock valued at $444.4 million, the fair value of assumed Helix options of $6.0 million, and cash of $8.4 million. This transaction qualifies as a tax-free reorganization under Section 368(a) of the Internal Revenue Code of 1986, as amended, and the Company is in the process of evaluating the impact that the Merger may have on the Company's net operating loss carryforwards and other tax attributes. Helix is a leader in the development, manufacture, and application of innovative vacuum technology solutions for the semiconductor, data storage, and flat panel display markets. The acquisition of Helix enables us to better serve our current market, increase our addressable market, reduce the volatility that both businesses have historically faced and position us to enhance our financial performance.

## Related Parties

On June 11, 2001, we appointed Joseph R. Martin to our Board of Directors. Mr. Martin is a director of Fairchild Semiconductor International, Inc. ("Fairchild"), one of our customers. Accordingly, Fairchild is considered a related party for the period subsequent to June 11, 2001. Revenues from Fairchild for the years ended September 30, 2005, 2004 and 2003 were approximately $319,000, $409,000, and $250,000 respectively. The amounts due from Fairchild included in accounts receivable at September 30, 2005 and 2004 were $33,000 and $13,000, respectively.

Related party transactions and amounts included in accounts receivable and revenue are on standard pricing and contractual terms and manner of settlement for products and services of similar types and at comparable volumes.

## Critical Accounting Policies and Estimates

The preparation of the Consolidated Financial Statements requires us to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent assets and liabilities. On an ongoing basis, we evaluate our estimates, including those related to bad debts, inventories, intangible assets, goodwill, income taxes, warranty obligations, the adequacy of restructuring reserves and contingencies. We base our estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, including current and anticipated worldwide economic conditions both in general and specifically in relation to the semiconductor industry, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. As

27

Table of Contents

discussed in the year over year comparisons below, actual results may differ from these estimates under different assumptions or conditions.

We believe the following critical accounting policies affect our more significant judgments and estimates used in the preparation of our Consolidated Financial Statements.

*Revenues*

Product revenues are associated with the sale of hardware systems and components as well as software licenses. Service revenues are associated with hardware−related field service, training, software maintenance and software−related consulting and integration services.

Revenue from product sales that do not include significant customization is recorded upon delivery and transfer of risk of loss to the customer provided there is evidence of an arrangement, fees are fixed or determinable, collection of the related receivable is reasonably assured and, if applicable, customer acceptance criteria have been successfully demonstrated. Customer acceptance provisions include final testing and acceptance carried out prior to shipment. These pre−shipment testing and acceptance procedures ensure that the product meets the published specification requirements before the product is shipped. In the limited situations where the arrangement contains extended payment terms, revenue is recognized as the payments become due. Shipping terms are customarily FOB shipping point. Amounts charged to customers for costs incurred for shipping and handling and reimbursable expenses are included in revenues with the corresponding cost recorded in cost of revenues. When significant on site customer acceptance provisions are present in the arrangement, revenue is recognized upon completion of customer acceptance testing.

Revenue from the sale of off−the−shelf software licenses is recognized upon delivery to the customer provided there is evidence of an arrangement, fees are fixed or determinable, collection of the related receivable is probable, and there are no unusual acceptance criteria or extended payment terms. If the arrangement contains acceptance criteria or testing, then revenue is recognized upon acceptance or the successful completion of the testing. If the arrangement contains extended payment terms, revenue is recognized as the payments become due. Revenue related to post−contract support is deferred and recognized ratably over the contract period.

For tailored software contracts, we provide significant consulting services to tailor the software to the customer's environment. If we are able to reasonably estimate the level of effort and related costs to complete the contract, we recognize revenue using the percentage−of−completion method, which compares costs incurred to total estimated project cost. Revisions in revenue and cost estimates are recorded in the period in which the facts that require such revisions become known. If our ability to complete the tailored software is uncertain or if we cannot reasonably estimate the level of effort and related costs, completed contract accounting is applied. Losses, if any, are provided for in the period in which such losses are first identified by management. Generally, the terms of long−term contracts provide for progress billing based on completion of certain phases of work. For maintenance contracts, service revenue is deferred based on vendor specific objective evidence of its fair value and is recognized ratably over the term of the maintenance contract. Deferred revenue primarily relates to services and maintenance agreements and billings in excess of revenue recognized on long term contracts accounted for using the percentage−of−completion method and contracts awaiting final customer acceptance.

In transactions that include multiple products and/or services, such as tailored software arrangements, described above, or software sales with post−contract support, we allocate the sales value among each of the elements based on their relative fair values and recognize such revenue when each element is delivered. If these relative fair values are not known, the Company uses the residual method to recognize revenue from arrangements with one or more elements to be delivered at a future date, when evidence of the fair value of all undelivered elements exists. Under the residual method, the fair value of any the undelivered elements at the date of delivery, such as post−contract support, are deferred and the remaining portion of the total arrangement fee is recognized as revenue. The Company determines fair value of undelivered services based on the prices that are charged when the same element is sold separately to customers.

28

Table of Contents

*Intangible Assets and Goodwill*

We have made a number of acquisitions in previous years, and as a result, identified significant intangible assets and generated significant goodwill. Intangible assets are valued based on estimates of future cash flows and amortized over their estimated useful life. Goodwill is subject to annual impairment testing as well as testing upon the occurrence of any event that indicates a potential impairment. Intangible assets and other long–lived assets are subject to an impairment test if there is an indicator of impairment. The carrying value and ultimate realization of these assets is dependent upon estimates of future earnings and benefits that we expect to generate from their use. If our expectations of future results and cash flows are significantly diminished, intangible assets and goodwill may be impaired and the resulting charge to operations may be material. When we determine that the carrying value of intangibles or other long–lived assets may not be recoverable based upon the existence of one or more indicators of impairment, we use the projected undiscounted cash flow method to determine whether an impairment exists, and then measure the impairment using discounted cash flows. For goodwill, we compare the fair value of our reporting units by measuring discounted cash flows to the book value of the reporting units and measure impairment, if any, as the difference between the resulting implied fair value of goodwill and the recorded book value of the goodwill.

The estimation of useful lives and expected cash flows require us to make significant judgments regarding future periods that are subject to some factors outside of our control. Changes in these estimates can result in significant revisions to the carrying value of these assets and may result in material charges to the results of operations.

We have elected to perform our annual goodwill impairment testing as required under FAS 142 on September 30 of each fiscal year. In fiscal 2003, we performed our annual goodwill impairment test under FAS 142 in the fourth quarter. During this process estimates of revenue and expense were developed for each of our segments and as a whole based on internal as well as external market forecasts. Based on this analysis, we determined that the implied fair value of the our former factory automation hardware reporting unit's goodwill was less than its book value and therefore recorded a charge of $40.0 million to operations to write–down the value of this goodwill.

In connection with a third party letter of intent dated October 18, 2004 to purchase the assets of our former SELS division, we assessed the potential impairment of goodwill in the segment. We considered the offer in the letter of intent as an indication of the fair value of the segment. Based on our analysis, we determined that the implied fair value of the goodwill associated with the SELS division was $7.4 million less than its book value and recorded a charge to write–down the value of this goodwill in the fourth quarter. This charge has been recorded as a component of the loss from discontinued operations of $9.5 million for fiscal year 2004.

We performed our annual impairment test under FAS 142 in the fourth quarter of fiscal 2004 on all other segments and fiscal 2005 for all segments using a discounted cash flow analyses of expectations of future earnings. During this process detailed estimates of revenue and expense were developed for the reporting units based on internal as well as external market forecasts. Our analyses indicated no impairment of the goodwill in fiscal 2004 or fiscal 2005.

*Accounts Receivable*

We record trade accounts receivable at the invoiced amount. Trade accounts receivables do not bear interest. The allowance for doubtful accounts is the Company's best estimate of the amount of probable credit losses in its existing accounts receivable. The Company determines the allowance based on historical write–off experience by industry. The Company reviews its allowance for doubtful accounts monthly. Past due balances over 120 days and over a specified amount are reviewed individually for collectibility. All other balances are reviewed on a pooled basis by type of receivable. Account balances are charged off against the allowance when the Company feels it is probable the receivable will not be recovered. The Company does not have any off–balance–sheet credit exposure related to its customers.

*Warranty*

We provide for the estimated cost of product warranties at the time revenue is recognized. While we engage in extensive product quality programs and processes, including actively monitoring and evaluating the quality of our component suppliers, our warranty obligation is estimated by assessing product failure rates and material usage and service delivery costs incurred in correcting a product failure. Should actual product failure rates, material usage or

29

Table of Contents

service delivery costs differ from our estimates, revisions to the estimated warranty liability would be required and may result in additional benefits or charges to operations.

*Inventory*

We provide reserves for estimated obsolescence or unmarketable inventory equal to the difference between the cost of inventory and the estimated market value based upon assumptions about future demand and market conditions. We fully reserve for inventories and noncancelable purchase orders for inventory deemed obsolete. We perform periodic reviews of all inventory items to identify excess inventories on hand by comparing on−hand balances to anticipated usage using recent historical activity as well as anticipated or forecasted demand, based upon sales and marketing inputs through our planning systems. If estimates of demand diminish further or actual market conditions are less favorable than those projected by management, additional inventory write−downs may be required.

*Deferred Taxes*

We record a valuation allowance to reduce our deferred tax assets to the amount that is more likely than not to be realized. We have considered future taxable income and ongoing prudent and feasible tax planning strategies in assessing the need for the valuation allowance. In the event we determine that we would be able to realize our deferred tax assets in excess of their net recorded amount, an adjustment to the deferred tax asset would increase income in the period such determination was made. Likewise, should we subsequently determine that we would not be able to realize all or part of our net deferred tax assets in the future, an adjustment to the deferred tax assets would be charged to income in the period such determination was made.

*Stock−Based Compensation*

Our employee stock compensation plans are accounted for in accordance with Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25") and related interpretations. Under this method, no compensation expense is recognized as long as the exercise price equals or exceeds the market price of the underlying stock on the date of the grant. We elected the disclosure−only alternative permitted under Statement of Financial Accounting Standards No. 123, "Accounting for Stock−Based Compensation" ("FAS 123"), as amended by FAS 148, for fixed stock−based awards to employees. All non−employee stock−based awards are accounted for at fair value and recorded as compensation expense over the period of service in accordance with FAS 123 and related interpretations.

Under APB No. 25, compensation expense is measured as of the date the quantity of shares to an individual who is entitled to receive them and exercise price becomes fixed. Generally, this occurs on the grant date, in which case the stock option is accounted for as a fixed award as of the date of grant. The grant date cannot precede the date on which the grant is approved through either the execution of written consents (i.e. unanimously by the Compensation Committee or, for certain awards, individually by the Chief Executive Officer in his delegated capacity as Sole Member of a Special Committee of the Board of Directors) or through a valid meeting of the Compensation Committee. Compensation expense associated with fixed awards is measured as the difference between the fair market value of our stock on the date of grant and the grant recipient's exercise price, which is the intrinsic value of the award on that date. Stock compensation expense is recognized over the vesting period using the ratable method, whereby an equal amount of expense is recognized for each year of vesting.

We account for modifications to stock options under FIN No. 44. Modifications include, but are not limited to acceleration of vesting and continued vesting while not providing substantive services. Compensation expense is recorded in the period of modification for the intrinsic value of the vested portion of the award, including vesting that occurs while not providing substantive services, on the date of modification. The intrinsic value of the award is the difference between the fair market value of our common stock on the date of modification and the optionee's exercise price.

We value stock options assumed in conjunction with business combinations accounted for using the purchase method at fair value on the date of acquisition using the Black−Scholes option−pricing model, in accordance with FIN No. 44. The fair value of assumed options is included as a component of the purchase price. The intrinsic value

30

Table of Contents

of unvested stock options is recorded as unearned stock-based compensation and amortized to expense over the remaining vesting period of the stock options using the straight-line method.

## Year Ended September 30, 2005, Compared to Year Ended September 30, 2004

### Revenues

We reported revenues of $463.7 million for the year ended September 30, 2005, compared to $535.1 million in the previous year, a 13.3% decrease. The decrease is consistent with and reflective of the lower demand for semiconductor capital equipment experienced in fiscal 2005.

Our hardware segment reported revenues of $369.8 million in the year ended September 30, 2005, a decrease of 11.0% from the prior year. This decrease reflects the lower demand for semiconductor capital equipment during fiscal year 2005. We expect fiscal 2006 revenues for our hardware segment to remain relatively flat compared to present levels in the absence of any industry trend for higher demand.

Our software segment reported revenues of $94.0 million, a 21.4% decrease from $119.6 million in the prior year. The decrease is primarily attributable to lower software license sales driven by reduced market demand. Included in the March 31, 2004 quarter we recognized $17.3 million of revenue on a European software services project which had been accounted for on the completed contract basis. Excluding the impact of this contract for fiscal year 2004, software revenues decreased by $8.3 million or 8.1%. We expect fiscal 2006 revenues for our software segment to remain relatively flat as compared to present levels as decreasing forecasted demand from semiconductor customers is offset by increased demand for our software products from other industries. A significant portion of revenue for the software segment relates to maintenance contracts. Maintenance revenues are only slightly affected by an economic downturn, as customers typically continue to use previously purchased software products and renew related maintenance arrangements.

Product revenues decreased $64.2 million, or 16.0%, to $338.1 million, in the year ended September 30, 2005, from $402.3 million in the previous year. This decrease is attributable to reduced demand for our hardware products and software license revenues reflective of industry trends of decreased demand for semiconductor capital equipment in fiscal 2005. Product revenues associated with our hardware segment decreased by 13.2% from fiscal 2004 levels, while product revenues from our software segment decreased by 37.6%. Service revenues decreased $7.1 million, or 5.4%, to $125.7 million. This decrease is primarily attributable to the completion and acceptance by the customer of a major European software project for approximately $17.3 million in the second quarter of fiscal 2004.

Revenues outside the United States were $223.1 million, or 48.1% of total revenues, and $262.4 million, or 49.0% of total revenues, in the years ended September 30, 2005 and 2004, respectively. We expect that foreign revenues will continue to account for a significant portion of total revenues. The current international component of revenues is not indicative of the future international component of revenues.

Deferred revenue of $22.1 million at September 30, 2005 consisted of $11.9 million related to deferred maintenance contracts and $10.2 million related to revenues deferred for percentage-of-completion method arrangements and contracts awaiting final customer acceptance.

### Gross Margin

Gross margin decreased to $162.4 million or 35.0% for the year ended September 30, 2005, compared to $202.3 million or 37.8% for the previous year. Our hardware segment gross margin decreased to $99.8 million or 27.0% in the year ended September 30, 2005, from $130.1 million or 31.3% in the prior year. The decrease is primarily attributable to reduced overhead absorption due to reduced sales volumes. Our software segment's gross margin for the year ended September 30, 2005, decreased to $62.6 million or 66.7%, compared to $72.2 million or 60.3% in the prior year. The decrease in gross margin is primarily attributable to lower software license sales. The increase in the gross margin as a percentage of revenue primarily reflects the impact of lower gross margins realized on the $17.3 million of software project revenue recognized upon completion and acceptance by the customer in the second quarter of fiscal 2004.

Table of Contents

Gross margin on product revenues was $101.3 million or 30.0% for the year ended September 30, 2005, compared to $160.0 million or 39.8% for the prior year. The decrease in product margins is primarily attributable to reduced overhead absorption due to reduced sales volumes.

Gross margin on service revenues was $61.1 million or 48.6% for the year ended September 30, 2005, compared to $42.3 million or 31.9% in the previous year. The increase is primarily the result of the higher margins on hardware segment services coupled with the impact of lower gross margins realized on the $17.3 million software project revenue discussed above.

### Research and Development

Research and development expenses for the year ended September 30, 2005, were $62.7 million, a decrease of $2.9 million, compared to $65.6 million in the previous year. Research and development expenses increased as a percentage of revenues, to 13.5%, from 12.3% in the prior year. The decrease in absolute spending is primarily the result of our cost reduction actions, while the increase as a percentage of revenue reflects the lower revenue levels against which these costs were measured. Our plan in hardware is to continue to invest in research and development to enhance existing products and develop new products for the semiconductor industry. Our plan in software is to continue to invest in research and development to enhance existing factory automation products and develop new products for the semiconductor market, as well as invest in the development of manufacturing software for other industries, principally medical instrumentation.

### Selling, General and Administrative

Selling, general and administrative expenses were $81.7 million for the year ended September 30, 2005, a decrease of $4.9 million, compared to $86.6 million in the prior year. Selling, general and administrative expenses increased as a percentage of revenues, to 17.6% in the year ended September 30, 2005, from 16.2% in the previous year. The decrease in absolute spending is primarily due to lower expenses for incentive compensation plans of approximately $5.2 million, offset by costs for Sarbanes–Oxley 404 compliance and the reversal of excess bad debt reserves of $2.1 million recorded in fiscal 2004, while the increase as a percentage of revenue reflects the lower revenue levels against which these costs were measured.

### Stock–Based Compensation Expense

Stock–based compensation expense resulted from the granting of stock options with exercise prices below fair market value and the vesting of restricted stock awards. Total stock–based compensation expense decreased slightly in fiscal 2005 compared to fiscal 2004. In fiscal 2006, we expect that the stock–based compensation cost will have a material effect on our net income as a result of the adoption of Statement 123R.

### Amortization of Acquired Intangible Assets

Amortization expense for acquired intangible assets totaled $3.1 million for the year ended September 30, 2005, compared to $3.7 million for the prior year. The reduction in amortization of acquired intangible assets is primarily attributable to certain assets reaching the end of their useful lives in fiscal 2005.

### Restructuring and Acquisition–related Charges

We recorded a charge to continuing operations of $16.5 million in the year ended September 30, 2005, of which $13.3 million related to workforce reductions of approximately 270 employees worldwide and $3.2 million to excess facilities charges. Workforce reduction charges included $4.3 million for headcount reductions of approximately 100 employees associated with our software segment, $3.6 million for reductions of approximately 65 employees in our Jena, Germany facility and $5.4 million related to various other actions undertaken in fiscal 2005. Excess facilities charges of $3.2 million consisted of excess facilities identified in fiscal 2005 that were recorded to recognize the expected amount of the remaining lease obligations. These costs have been estimated from the time when the space is vacant, and there are no plans to utilize the facility. Costs incurred prior to vacating the facilities were charged to operations. Of the $3.2 million of facilities charges, $1.5 million represents an additional accrual on a previous

32

Table of Contents

vacated facility due to a longer period than initially estimated to sub−lease the facility. This revision, including lower estimates of expected sub−rental income over the remainder of the lease terms, are based on management's evaluation of the rental space available. The balance of these excess facilities charges primarily relates to excess and abandoned facilities in Toronto Canada, Jena Germany, Austin Texas, and Livingston Scotland. We believe that the cost reduction programs implemented will align costs with revenues at present levels. In the event we are unable to achieve this alignment, additional cost cutting programs may be required in the future. The accruals for workforce reductions are expected to be paid over the fiscal year 2006. The facilities charges are expected to be paid over the remaining lease periods extending to 2011. These charges helped better align our cost structure. We estimate that salary and benefit savings as a result of these actions will be approximately $23.0 million annually. The impact of these cost reductions on our liquidity is not significant, as these actions yield equivalent actual cash savings within twelve months.

We also recorded a charge of $1.0 million in fiscal year 2005 for workforce reductions of approximately 25 employees related to our discontinued SELS division, which is included in the loss from discontinued operations.

We recorded a charge to continuing operations of $5.4 million in the year ended September 30, 2004, of which $0.1 million related to acquisitions and $5.3 million to restructuring costs. The $0.1 million related to acquisitions is comprised of $0.1 million of legal and consulting costs to integrate and consolidate acquired entities into our existing entities. The $5.3 million of restructuring costs consisted of $3.9 million related to workforce reductions of approximately 60 employees world wide, across all functions of the business and $1.4 million related to excess facilities. Excess facilities charges of $1.4 million consisted of $0.2 million for excess facilities identified in fiscal 2004 that we recorded to recognize the amount of remaining lease obligations. These costs have been estimated from the time when the space is vacant, and there are no plans to utilize the facility. Costs incurred prior to vacating the facilities were charged to operations. Final exit costs for facilities abandoned in previous restructurings amounted to $0.7 million. The remaining $0.5 million represents a reevaluation of the assumptions used in determining the fair value of certain lease obligations related to facilities abandoned in a previous restructuring.

### Interest Income and Expense

Interest income increased by $4.3 million, to $9.3 million, in the year ended September 30, 2005, from $5.0 million the previous year. This increase is due primarily to higher cash balances available for investment. Interest expense of $9.5 million in each of the years ended September 30, 2005 and 2004, respectively, relates primarily to the 4.75% Convertible Subordinated Notes.

### Other (Income) Expense

Other income, net of $1.8 million for the year ended September 30, 2005 consisted of the receipt of principal repayments on a note that had been previously written off, foreign exchange gains, and gains on the sales of other assets. Other expense, net of $0.9 million for the year ended September 30, 2004 consisted primarily of the settlement of an arbitration proceeding in Israel of $0.7 million and realized losses on foreign currency transactions during the year.

### Income Tax Provision

We recorded an income tax provision of $5.2 million in the year ended September 30, 2005 and an income tax provision of $8.1 million in the year ended September 30, 2004. The tax provision recorded in fiscal 2005 and 2004 is attributable to foreign income and withholding taxes. We continued to provide a full valuation allowance for our net deferred tax assets at September 30, 2005 and 2004, as we believe it is more likely than not that the future tax benefits from accumulated net operating losses and deferred taxes will not be realized. If we generate future taxable income against which these tax attributes may be applied, some portion or all of the valuation allowance would be reversed and a corresponding increase in net income would be reported in future periods.

### Discontinued Operations

We recorded a loss from operations for our discontinued SELS business of $3.5 million for the year ended September 30, 2005, compared to a loss of $9.5 million in the previous year. The reduced loss reflects the winding

Table of Contents

down of this business in fiscal year 2005, and the $7.4 million goodwill impairment charge recorded in fiscal year 2004 as previously discussed in "Intangible Assets and Goodwill."

**Year Ended September 30, 2004, Compared to Year Ended September 30, 2003**

*Revenues*

We reported revenues of $535.1 million for the year ended September 30, 2004, compared to $340.1 million in the previous year, a 57.3% increase. The increase is consistent with and reflective of a large increase in demand for semiconductor capital equipment experienced in fiscal 2004.

Our hardware segment reported revenues of $415.5 million in the year ended September 30, 2004, an increase of 62.7% from the $255.4 million in the prior year. This increase is primarily attributable to an increase in order volume and market demand, reflective of current industry trends of increased demand for semiconductor capital equipment.

Our software segment reported revenues of $119.6 million, a 41.2% increase from $84.7 million in the prior year. The increase is primarily attributable to strong software license sales driven by increased market demand coupled with the completion and acceptance by the customer of a major European software project for approximately $17.3 million in the second quarter of fiscal 2004.

Product revenues increased $176.8 million, or 78.4%, to $402.3 million, in the year ended September 30, 2004, from $225.4 million in the previous fiscal year. Product revenues for our hardware and software segments grew by 78.0%, and 81.9%, respectively, from fiscal 2003 levels. Service revenues increased $18.2 million, or 15.8%, to $132.8 million. This increase is primarily attributable to the completion and acceptance by the customer of a major European software project for approximately $17.3 million in the second quarter of fiscal 2004. We were unable to make a reasonable and dependable estimate of the costs to fulfill this contract due to the complexity of the arrangement. As a result, we concluded that the completed contract method of accounting was required for this contract.

Revenues outside the United States were $262.4 million, or 49.0% of total revenues, and $171.1 million, or 50.3% of total revenues, in the years ended September 30, 2004 and 2003, respectively. We expect that foreign revenues will continue to account for a significant portion of total revenues. The current international component of revenues is not indicative of the future international component of revenues.

Deferred revenues of $34.5 million at September 30, 2004 consisted of $9.4 million related to deferred maintenance contracts and $25.1 million related to revenues deferred for completed contract method arrangements and contracts awaiting final customer acceptance.

*Gross Margin*

Gross margin increased to $202.3 million or 37.8% for the year ended September 30, 2004, compared to $98.5 million or 29.0% for the previous year. Our hardware segment gross margin increased to $130.1 million or 31.3% in the year ended September 30, 2004, from $52.7 million or 20.6% in the prior year. The increase is primarily attributable to our plant consolidation and other cost reduction measures along with increased volumes resulting in more favorable absorption of fixed costs, along with the completion of several low margin projects which contributed to lower margins in fiscal 2003. Our software segment's gross margin for the year ended September 30, 2004, increased to $72.2 million or 60.3%, compared to $45.8 million or 54.1% in the prior year. The increase is primarily the result of higher license revenue, which yield higher gross margins in the current year period and the favorable impact of our cost reduction measures, offset by the impact of lower gross margins realized on the $17.3 million of software project revenue recognized upon completion and acceptance by the customer in the second quarter of fiscal 2004.

Gross margin on product revenues was $160.0 million or 39.8% for the year ended September 30, 2004, compared to $56.4 million or 25.0% for the prior year. The increase in product margins is primarily attributable to

34

Table of Contents

the impact of our cost reduction measures along with a more favorable hardware product mix and software license revenues which have higher gross margins.

Gross margin on service revenues was $42.3 million or 31.9% for the year ended September 30, 2004, compared to $42.1 million or 36.7% in the previous year. The decrease is primarily the result of the services revenue mix partially offset by the positive impact of our cost reduction initiatives. Service revenues margins were impacted by lower gross margins realized on the $17.3 million of software project revenue recognized upon completion and acceptance by the customer in the second quarter of fiscal 2004.

### Research and Development

Research and development expenses for the year ended September 30, 2004 were $65.6 million, a decrease of $3.6 million, compared to $69.2 million in the previous year. Research and development expenses also decreased as a percentage of revenues to 12.3%, from 20.4% in the prior year. The decrease in absolute spending and as a percentage of revenues is primarily the result of our cost reduction actions coupled with higher revenue levels against which these costs were measured.

### Selling, General and Administrative

Selling, general and administrative expenses were $86.6 million for the year ended September 30, 2004, a decrease of $4.7 million, compared to $91.3 million in the prior year. Selling, general and administrative expenses decreased as a percentage of revenues, to 16.2% in the year ended September 30, 2004, from 26.9% in the previous year. Apart from the higher revenue levels against which these costs were measured, the decrease in absolute spending and as a percentage of revenues is primarily the result of our cost containment and reduction initiatives as well as the reversal of excess bad debt reserves of $2.1 million in fiscal 2004 as collections of overdue receivables improved. This decrease is offset by higher expenses for incentive compensation plans that we have established in fiscal 2005.

### Stock—Based Compensation Expense

Stock—based compensation expense resulted from the granting of stock options with exercise prices below fair market value and the vesting of restricted stock awards. Total stock—based compensation expense decreased in fiscal 2004 compared to fiscal 2003. The decrease was primarily due to stock—based compensation expense for stock options which were fully amortized in fiscal 2003.

### Amortization of Acquired Intangible Assets

Amortization expense for acquired intangible assets totaled $3.7 million for the year ended September 30, 2004, compared to $4.7 million for the prior year. The reduction in amortization of acquired intangible assets is attributable to certain assets reaching the end of their useful lives.

### Goodwill Impairment Charges

Goodwill impairment charges totaled $40.0 million for the year ended September 30, 2003 and consisted of the impairment of our goodwill related to our former factory automation hardware segment, as described previously in "Intangible Assets and Goodwill."

### Restructuring and Acquisition—related Charges

We recorded a charge to operations of $5.4 million in the year ended September 30, 2004, of which $0.1 million related to acquisitions and $5.3 million to restructuring costs. The $0.1 million related to acquisitions is legal and consulting costs to integrate and consolidate acquired entities into our existing entities. The $5.3 million of restructuring costs consisted of $3.9 million related to workforce reductions of approximately 60 employees world wide, across all functions of the business and $1.4 million related to excess facilities. Excess facilities charges of $1.4 million consisted of $0.2 million for excess facilities identified in fiscal 2004 that were recorded to recognize the expected amount of the remaining lease obligations. These costs have been estimated from the time when the

Table of Contents

space is vacant, and there are no plans to utilize the facility. Costs incurred prior to vacating the facilities were charged to operations. Final exit costs for facilities abandoned in previous restructurings amounted to $0.7 million. The remaining $0.5 million represents a reevaluation of the assumptions used in determining the fair value of certain lease obligations related to facilities abandoned in a previous restructuring. The revised assumptions, including lower estimates of expected sub–rental income over the remainder of the lease terms, are based on management's evaluation of the rental space available. These charges helped better align our cost structure. We estimate that salary and benefit savings in principally the selling, general and administrative functions as a result of these actions were approximately $5.6 million annually.

We recorded a charge to operations of $46.3 million in the year ended September 30, 2003, of which $6.2 million related to acquisitions, $6.1 million related to the write–off of capitalized costs associated with cancelled internal systems applications and infrastructure programs, and $34.0 million to restructuring costs. Of this amount, $27.0 million related to workforce reductions of approximately 1,000 employees and $12.8 million related to excess facilities. Excess facilities charges of $12.8 million consisted of $2.7 million for excess facilities identified in fiscal 2003 that were recorded to recognize the remaining lease obligations, net of any sublease rentals. These costs have been estimated from the time when the space is vacant and there are no plans to utilize the facilities. Costs incurred prior to vacating the facilities were charged to operations. The remaining $10.1 million represents a reevaluation of assumptions used in determining the fair value of certain lease obligations related to facilities abandoned in a previous restructuring. The revised assumptions, including lower estimates of expected sub–rental income over the remainder of the lease terms are based on management's evaluation of the rental space available. Periodically, the accruals related to restructuring charges are reviewed and compared to their respective cash requirements. As a result of those reviews, the accruals are adjusted for changes in cost and timing assumptions of previously accrued and recorded initiatives. During fiscal 2003, we identified $4.7 million of excess accruals associated with headcount reduction plans previously announced and implemented and $1.2 million of excess accruals for other restructuring costs. The final costs associated with these actions were lower than originally anticipated and accrued. As a result, the excess accruals for these actions were reversed, with a corresponding reduction to restructuring expense. The $6.2 million related to acquisitions is comprised of the $3.2 million loss on the disposition of our Swiss subsidiary, associated legal costs of $0.5 million and $2.5 million of legal, relocation and consulting costs to integrate and consolidate acquired entities into our existing entities. These charges helped better align our cost structure. We estimate that salary and benefit savings across all expense categories as a result of these actions were approximately $42.0 million annually. The impact of these cost reductions on our liquidity is not significant, as these cost savings yield actual cash savings within twelve months. We estimate annual facilities savings were approximately $3.0 million principally within our cost of sales as a result of these actions.

### Interest Income and Expense

Interest income increased by $0.9 million, to $5.0 million, in the year ended September 30, 2004, from $4.1 million the previous year. This increase is due primarily to higher cash balances that were available for investment offset by lower interest rates that were realized on our investment balances. Interest expense of $9.5 million and $10.0 million for the years ended September 30, 2004 and 2003, respectively, relates primarily to the 4.75% Convertible Subordinated Notes.

### Other (Income) Expense

Other expense decreased by $15.4 million, to $0.9 million, in the year ended September 30, 2004, from $16.3 million the previous year. Other expense for the year ended September 30, 2004 consisted primarily of the settlement of an arbitration proceeding in Israel of $0.7 million and realized losses on foreign currency transactions during the year. Other expense in the year ended September 30, 2003 consisted primarily of losses we incurred as a result of the disposal of the Shinsung warrants and shares in the amount of $11.6 million and $3.0 million, respectively, and realized losses on foreign currency transactions.

### Income Tax Provision

We recorded an income tax provision of $8.1 million in the year ended September 30, 2004 and an income tax provision of $4.9 million in the year ended September 30, 2003. The tax provision recorded in fiscal 2004 and 2003 is attributable to foreign income and withholding taxes. We continued to provide a full valuation allowance for our

Table of Contents

net deferred tax assets at September 30, 2004 and 2003, as we believe it is more likely than not that the future tax benefits from accumulated net operating losses and deferred taxes will not be realized. If we generate future taxable income against which these tax attributes may be applied, some portion or all of the valuation allowance would be reversed and a corresponding increase in net income would be reported in future periods.

### Discontinued Operations

We recorded a loss from operations for our discontinued SELS business of $9.5 million for the year ended September 30, 2004, compared to a loss of $3.1 million in the previous year. The increased loss was due to the $7.4 million goodwill impairment charge recorded in fiscal year 2004 as previously discussed in "Intangible Assets and Goodwill."

### Liquidity and Capital Resources

Our business is significantly dependent on capital expenditures by semiconductor manufacturers and OEM's that are, in turn, dependent on the current and anticipated market demand for semiconductors. Demand for semiconductors is cyclical and has historically experienced periodic downturns. The semiconductor industry experienced such a downturn that extended from 2001 well into 2003. The downturn affected revenues, gross margins and operating results. In response to this downturn, we have implemented cost reduction programs aimed at aligning our ongoing operating costs with our currently expected revenues over the near term. These cost management initiatives have included consolidating facilities, reductions to headcount, salary and wage reductions and reduced spending. We believe the semiconductor industry has again softened after a modest upturn in 2004. Our revenues in fiscal year 2005 declined from the prior fiscal year. We believe that the cost reduction programs implemented have aligned costs with revenues. In the event we are unable to sustain this alignment, additional cost cutting programs may be required in the future. The cyclical nature of the industry make estimates of future revenues, results of operations and net cash flows inherently uncertain.

At September 30, 2005, we had cash, cash equivalents and marketable securities aggregating $357.0 million. This amount was comprised of $202.5 million of cash and cash equivalents, $121.6 million of investments in short−term marketable securities and $32.9 million of investments in long−term marketable securities.

At September 30, 2004, we had cash, cash equivalents and marketable securities aggregating $329.1 million. This amount was comprised of $193.3 million of cash and cash equivalents, $62.1 million of investments in short−term marketable securities and $73.7 million of investments in long−term marketable securities.

Cash and cash equivalents were $202.5 million at September 30, 2005, an increase of $9.2 million from September 30, 2004. This increase in cash and cash equivalents was primarily due to cash provided by operations of $31.1 million and $5.3 million of net proceeds from the issuance of common stock offset by net purchases of marketable securities of $17.2 million and $11.7 million used for capital additions.

Cash provided by operations was $31.1 million for the year ended September 30, 2005, and was primarily attributable to changes in our net working capital of $23.5 million offset by our net loss of $11.6 million and adjusted for non−cash depreciation and amortization of $16.4 million and compensation expense related to common stock and options of $3.6 million. This change in working capital was primarily the result of decreased accounts receivable balances of $47.9 million and a decreased inventory balance of $23.9 million. The decrease in accounts receivable is a result of our strong collection efforts through fiscal year 2005, and a reduced level of business. The decrease in inventory is a result of our continued focus of inventory management and is also reflective of decreased balances of deferred inventory located at customer sites waiting for acceptance. Other changes in working capital included decreased accounts payable levels of $14.2 million primarily as a result of lower inventory purchases, decreased deferred revenue of $12.7 million due principally to the reduced level of business, decreased accrued compensation and benefits of $9.8 million resulting from payments for variable compensation plans, and decreased accrued expenses and other liabilities of $9.7 million primarily due to the $10.1 million retirement benefit paid to our former Chief Executive Officer in January 2005 under the terms of his employment agreement.

Table of Contents

Cash used by investing activities was $27.6 million for the year ended September 30, 2005, and is principally comprised of net purchases of marketable securities of $17.2 million and $11.7 million used for capital additions, offset by proceeds from the sale of long–lived assets of $1.3 million.

Cash provided by financing activities was $5.3 million for the year ended September 30, 2005 from the issuance of stock under our employee stock purchase plan and the exercise of options to purchase our common stock.

On May 23, 2001, we completed the private placement of $175.0 million aggregate principal amount of 4.75% Convertible Subordinated Notes due in 2008. Interest on the notes is paid on June 1 and December 1 of each year. The notes mature on June 1, 2008. We may redeem the notes at stated premiums. Holders may require us to repurchase the notes upon a change in control of us in certain circumstances. The notes are convertible at any time prior to maturity, at the option of the holders, into shares of our common stock, at a conversion price of $70.23 per share, subject to certain adjustments. The notes are subordinated to our senior indebtedness and structurally subordinated to all indebtedness and other liabilities of our subsidiaries.

We did not file our quarterly report on Form 10–Q for the period ended March 31, 2006 by the prescribed due date. As a result of this delay, we were not in compliance with our obligation under Section 6.2 of the indenture with respect to our 4.75% Convertible Subordinated Notes due 2008 to file with the SEC all reports and other information and documents which we are required to file with the SEC pursuant to Sections 13 or 15(d) of the Securities Exchange Act of 1934.

Under the indenture, an event of default occurs if we fail to cure the default within 60 days after written notice of the default to the Company and the trustee by holders of at least 25% in aggregate principal amount of notes outstanding. On May 15, 2006, we received a notice from holders of more than 25% in aggregate principal amount of notes outstanding that we are in default of Section 6.2 of the indenture based on our failure to file our Form 10–Q. On Friday July 14, 2006, we received a further notice from holders of more than 25% of the aggregate outstanding principal amount of our notes accelerating our obligation to repay the unpaid principal on the notes because our Report on Form 10–Q for the quarter ended March 31, 2006 had not yet been filed. On Monday, July 17, 2006, we paid the outstanding $175 million principal balance to the trustee. Under the terms of the indenture, holders of a majority in aggregate principal amount of the outstanding notes may elect to rescind an acceleration and its consequences. To date the Company has received no notice of any such election being made. If such an election were made, the funds paid to the trustee would be returned to the Company and the obligations set forth pursuant to the notes and the indenture would be restored.

On May 12, 2006, we received a staff determination letter from the Nasdaq Stock Market stating that our failure to timely file our quarterly report on Form 10–Q for the fiscal quarter ended March 31, 2006 was a violation of Nasdaq rules and that our securities would be delisted unless we requested a hearing. We requested a hearing, and this request stayed the delisting pending the outcome of the hearing. A hearing has been held at which we requested additional time to complete any necessary filings prior the delisting of our securities. On July 25, 2006, we received notice from the Nasdaq Stock Market that our common stock will not be delisted provided that we file our quarterly report on Form 10–Q for our fiscal quarter ended March 31, 2006 and all required restatements on or prior to August 15, 2006. If we are unable to file these reports on or before August 15, 2006, our common stock may be delisted. The delisting of our common stock would likely make the market for trading of our common stock less liquid. In addition, it would be more difficult for us to raise capital through an issuance of equity or convertible debt securities, which could have a material adverse effect on our ability to raise needed financing.

While we have no significant capital commitments, as we expand our product offerings, we anticipate that we will continue to make capital expenditures to support our business and improve our computer systems infrastructure. We may also use our resources to acquire companies, technologies or products that complement our business.

At September 30, 2005, we had approximately $0.7 million of letters of credit outstanding

Our contractual obligations consist of the following (in thousands):

38

Table of Contents

| | Total | Less than One Year | One to Three Years | Four to Five Years | Thereafter |
|---|---|---|---|---|---|
| Contractual obligations (as restated) | | | | | |
| Operating leases — continuing | $ 20,865 | $ 4,471 | $ 7,065 | $ 3,296 | $ 6,033 |
| Operating leases — exited facilities | 32,000 | 5,646 | 16,015 | 10,339 | — |
| Purchase commitments | 32,340 | 32,340 | — | — | — |
| Debt(1) | 175,014 | 175,012 | 2 | — | — |
| Interest on convertible subordinated notes | 24,938 | 8,313 | 16,625 | — | — |
| Total contractual obligations | $285,157 | $225,782 | $ 39,707 | $ 13,635 | $ 6,033 |

(1)   As a result of the restatement, the Company has reclassified $175 million of debt principal and associated deferred financing costs of $2.2 million from long−term to short−term at September 30, 2005.

We believe that our existing resources will be adequate to fund our currently planned working capital and capital expenditure requirements for both the short and long−term. However, the cyclical nature of the semiconductor industry makes it difficult for us to predict future liquidity requirements with certainty. We may be unable to obtain any required additional financing on terms favorable to us, if at all. If adequate funds are not available on acceptable terms, we may be unable to fund our expansion, successfully develop or enhance products, respond to competitive pressure or take advantage of acquisition opportunities, any of which could have a material adverse effect on our business. In addition, we are subject to litigation related to our stock−based compensation restatement which could have an adverse affect on our existing resources.

## Recently Enacted Accounting Pronouncements

In November 2004, the FASB issued FASB Statement No. 151, "Inventory Costs — an Amendment of ARB No. 43, Chapter 4" ("FAS 151"). FAS 151 amends ARB 43, Chapter 4, to clarify that abnormal amounts of idle facility expense, freight, handling costs, and wasted materials (spoilage) should be recognized as current−period charges. In addition, this Statement requires that allocation of fixed production overheads to the costs of conversion be based on the normal capacity of the production facilities. The provisions of this Statement are effective for inventory costs incurred during fiscal years beginning after June 15, 2005. The adoption of the provisions of FAS 151 is not expected to have a material impact on the Company's financial position or results of operations.

In December 2004, the FASB issued Statement of Financial Accounting Standards No. 123R, "Share−Based Payment" ("SFAS 123R"). SFAS 123R replaces SFAS 123 and supersedes APB 25. SFAS 123R focuses primarily on the accounting for transactions in which an entity obtains employee services in share−based payment transactions. SFAS 123R requires companies to recognize in the statement of operations the cost of employee services received in exchange for awards of equity instruments based on the grant−date fair value of those awards (with limited exceptions). SFAS 123R was originally expected to be effective for the Company beginning in its third quarter of fiscal year 2005. In April 2005, the effective date was amended by the Securities and Exchange Commission. As a result, SFAS 123R is now effective for the Company as of October 1, 2005. Accordingly, the Company will adopt SFAS 123R in its first quarter of fiscal year 2006. The Company expects to use the modified−prospective transition method and will not restate prior periods for the adoption of SFAS 123R. Although the Company is currently evaluating the provisions of SFAS 123R and its implications on its employee benefit plans, the Company believes that the adoption of this standard, based on the terms of the options outstanding at September 30, 2005, will have a material effect on its net income in fiscal year 2006. The Company is also evaluating the form of any stock based incentive compensation it may offer in the future.

In December 2004, the FASB issued FASB Statement No. 153, "Exchanges of Nonmonetary Assets, an amendment of APB Opinion No. 29, Accounting for Nonmonetary Transactions" ("FAS 153"). FAS 153 requires that exchanges of nonmonetary assets be measured based on the fair value of the assets exchanged. Further, it expands the exception for nonmonetary exchanges of similar productive assets to nonmonetary assets that do not have commercial substance. The provisions of this Statement are effective for nonmonetary asset exchanges occurring in fiscal periods beginning after June 15, 2005. The adoption of the provisions of FAS 153 is not expected to have a material impact on the Company's financial position or results of operations.

In May 2005, the FASB issued FASB Statement No. 154, "Accounting Changes and Error Corrections, a replacement of APB Opinion No. 20, Accounting Changes and FASB Statement No. 3, Reporting Accounting Changes in Interim Financial Statements" ("FAS 154"). FAS 154 provides guidance on the accounting for and reporting of accounting changes and error corrections. It establishes, unless impracticable, retrospective application as the required method for reporting a change in accounting principle in the absence of explicit transition requirements specific to the newly adopted accounting principle. FAS 154 also provides guidance for determining

39

Table of Contents

whether retrospective application of a change in accounting principle is impracticable and for reporting a change when retrospective application is impracticable. The provisions of this Statement are effective for accounting changes and corrections of errors made in fiscal periods beginning after December 15, 2005. The adoption of the provisions of FAS 154 is not expected to have a material impact on the Company's financial position or results of operations.

## Factors That May Affect Future Results

You should carefully consider the risks described below and the other information in this report before deciding to invest in shares of our common stock. These are the risks and uncertainties we believe are most important for you to consider. Additional risks and uncertainties not presently known to us, which we currently deem immaterial or which are similar to those faced by other companies in our industry or business in general, may also impair our business operations. If any of the following risks or uncertainties actually occurs, our business, financial condition and operating results would likely suffer. In that event, the market price of our common stock could decline and you could lose all or part of your investment.

## Risks Relating to Our Industry

**Due in part to the cyclical nature of the semiconductor manufacturing industry and related industries, we have recently incurred substantial operating losses and may have future losses.**

Our business is largely dependent on capital expenditures in the semiconductor manufacturing industry and other businesses employing similar manufacturing technology. The semiconductor manufacturing industry in turn depends on current and anticipated demand for integrated circuits and the products that use them. In recent years, these businesses have experienced unpredictable and volatile business cycles due in large part to rapid changes in demand and manufacturing capacity for semiconductors. The semiconductor industry experienced a prolonged downturn, which negatively impacted us from the third quarter of fiscal 2001 until well into 2003. As a result of that downturn, our OEM and end-user customers significantly reduced the rate at which they purchased our products and services. That reduced demand adversely affected our sales volume and gross margins and resulted in substantial operating losses during fiscal 2001, 2002 and 2003. These losses were due to, among other things, writedowns for obsolete inventory and expenses related to investments in research and development and global service and support necessary to maintain our competitive position. Although our business became profitable during 2004, a downward trend again developed during fiscal 2005 in the semiconductor industry, and our revenues in the fiscal year just ended declined from the prior year. We could continue to experience future operating losses during an industry downturn and any period of uncertain demand. If an industry downturn continues for an extended period of time, our business could be materially harmed. Conversely, if demand improves rapidly, we could have insufficient inventory and manufacturing capacity to meet our customer needs on a timely basis, which could result in the loss of customers and various other expenses that could reduce gross margins and profitability. We cannot assure you as to whether we will be able to attain the profitability we have recently achieved.

## Risks Relating to Brooks

**Our operating results could fluctuate significantly, which could negatively impact our business.**

Our revenues, operating margins and other operating results could fluctuate significantly from quarter to quarter depending upon a variety of factors, including:

- demand for our products as a result of the cyclical nature of the semiconductor manufacturing industry and the markets upon which it depends or otherwise;

- changes in the timing and terms of product orders by our customers as a result of our customer concentration or otherwise;

- changes in the mix of products and services that we offer;

- timing and market acceptance of our new product introductions;

40

Table of Contents

- delays or problems in the planned introduction of new products, or in the performance of any such products following delivery to customers;

- our competitors' announcements of new products, services or technological innovations, which can, among other things, render our products less competitive due to the rapid technological change in our industry;

- the timing and related costs of any acquisitions, divestitures or other strategic transactions;

- our ability to reduce our costs due to decreased demand for our products and services;

- disruptions in our manufacturing process or in the supply of components to us;

- write-offs for excess or obsolete inventory; and

- competitive pricing pressures.

As a result of these risks, we believe that quarter to quarter comparisons of our revenue and operating results may not be meaningful, and that these comparisons may not be an accurate indicator of our future performance. If our quarterly results fluctuate significantly, our business could be harmed.

**Our restructuring activities and cost reduction measures may be insufficient to offset reduced demand for our products and may have materially harmed our business.**

Primarily in response to reduced demand for our products, during recent downturns in the semiconductor industry, we implemented cost reductions and other restructuring activities throughout our organization. These cost saving measures included several reductions in workforce, salary and wage reductions, reduced inventory levels, consolidation of our manufacturing facilities to our Chelmsford, Massachusetts facilities and the discontinuation of certain product lines and information technology projects. Although we had net income in fiscal 2004 when the semiconductor industry rebounded, we experienced a net loss in fiscal 2005 when our sales levels begin to decline. Our failure to adequately manage our costs, in response to reduced demand for our products and services, could materially harm our business and prospects and our ability to maintain our competitive position. Our restructuring activities could harm us because they may result in reduced productivity by our employees and increased difficulty in retaining and hiring a sufficient number of qualified employees familiar with our products and processes and the locales in which we operate.

**Delays and technical difficulties in our products and operations may result in lost revenue, lost profit, delayed or limited market acceptance or product liability claims.**

As the technology in our systems and manufacturing operations has become more complex and customized, it has become increasingly difficult to design and integrate these technologies into our newly-introduced systems, procure adequate supplies of specialized components, train technical and manufacturing personnel and make timely transitions to volume manufacturing. Due to the complexity of our manufacturing processes, we have on occasion failed to meet our customers' delivery or performance criteria, and as a result we have deferred revenue recognition, incurred late delivery penalties and had higher warranty and service costs. We cannot guarantee that we will not experience these problems in the future. We may be unable to recover expenses we incur due to changes or cancellations of customized orders. There are also substantial unanticipated costs associated with ensuring that new products function properly and reliably in the early stages of their life cycle. These costs have been and could in the future be greater than expected as a result of these complexities. Our failure to control these costs could materially harm our business and profitability.

Because many of our customers use our products for business-critical applications, any errors, defects or other performance or technical problems could result in financial or other damage to our customers and could significantly impair their operations. Our customers could seek to recover damages from us for losses related to any of these issues. A product liability claim brought against us, even if not successful, would likely be time- consuming and costly to defend and could adversely affect our marketing efforts.

41

Table of Contents

**If we do not continue to introduce new products and services that reflect advances in technology in a timely and effective manner, our products and services will become obsolete and our operating results will suffer.**

Our success is dependent on our ability to respond to the rapid rate of technological change present in the semiconductor manufacturing industry. During fiscal 2005 we introduced new products in several market segments. The success of our product development and introduction depends on our ability to:

- accurately identify and define new market opportunities and products;

- obtain market acceptance of our products;

- timely innovate, develop and commercialize new technologies and applications;

- adjust to changing market conditions;

- differentiate our offerings from our competitors' offerings;

- ability to obtain intellectual property rights;

- continue to develop a comprehensive, integrated product and service strategy;

- properly price our products and services; and

- design our products to high standards of manufacturability such that they meet customer requirements

If we cannot succeed in responding in a timely manner to technological and/or market changes or if the new products that we introduce do not achieve market acceptance, we could lose our competitive position which could materially harm our business and our prospects.

**The global nature of our business exposes us to multiple risks.**

For the twelve months ended September 30, 2005, approximately 48% of our revenues were derived from sales outside North America. We expect that international sales, including increased sales in Asia, will continue to account for a significant portion of our revenues. As a result of our international operations, we are exposed to many risks and uncertainties, including:

- difficulties in staffing, managing and supporting operations in multiple countries;

- longer sales-cycles and time to collection;

- tariff and international trade barriers;

- fewer legal protections for intellectual property and contract rights abroad;

- different and changing legal and regulatory requirements in the jurisdictions in which we operate;

- government currency control and restrictions on repatriation of earnings;

- fluctuations in foreign currency exchange and interest rates; and

- political and economic changes, hostilities and other disruptions in regions where we operate.

Negative developments in any of these areas in one or more countries could result in a reduction in demand for our products, the cancellation or delay of orders already placed, threats to our intellectual property, difficulty in

42

Table of Contents

collecting receivables, and a higher cost of doing business, any of which could materially harm our business and profitability.

**Our business could be materially harmed if we fail to adequately integrate the operations of the businesses that we have acquired or may acquire.**

We acquired Helix effective October 26, 2005. In addition we have made in the past, and may make in the future, acquisitions or significant investments in businesses with complementary products, services and/or technologies. Our acquisitions present numerous risks, including:

- difficulties in integrating the operations, technologies, products and personnel of the acquired companies and realizing the anticipated synergies of the combined businesses;

- defining and executing a comprehensive product strategy;

- managing the risks of entering markets or types of businesses in which we have limited or no direct experience;

- the potential loss of key employees, customers and strategic partners of acquired companies;

- unanticipated problems or latent liabilities, such as problems with the quality of the installed base of the target company's products;

- problems associated with compliance with the target company's existing contracts;

- difficulties in managing geographically dispersed operations; and

- the diversion of management's attention from normal daily operations of the business.

If we acquire a new business, we may be required to expend significant funds, incur additional debt or issue additional securities, which may negatively affect our operations and be dilutive to our stockholders. In periods following an acquisition, we will be required to evaluate goodwill and acquisition–related intangible assets for impairment. When such assets are found to be impaired, they will be written down to estimated fair value, with a charge against earnings. For example, we were required to record impairment charges on acquired intangible assets and goodwill aggregating $474.4 million in fiscal 2002. The failure to adequately address these risks could materially harm our business and financial results.

**Failure to retain key personnel could impair our ability to execute our business strategy.**

The continuing service of our executive officers and essential engineering, technical and management personnel, together with our ability to attract and retain such personnel, is an important factor in our continuing ability to execute our strategy. There is substantial competition to attract such employees and the loss of any such key employees could have a material adverse effect on our business and operating results. The same could be true if we were to experience a high turnover rate among engineering and technical personnel and we were unable to replace them.

**Risks Relating to Our Customers**

**We face substantial competition which may lead to price pressure and otherwise adversely affect our sales.**

We face substantial competition throughout the world in each of our product areas. Our primary competitors are Asyst/Shinko, Daifuku, Camstar, Datasweep, Intercim, IBM, Murata, Rorze, TDK and Yaskawa and other smaller, regional companies. We also endeavor to sell products to OEM manufacturers, such as Applied Materials, Novellus, KLA–Tencor and TEL, that satisfy their semiconductor and flat panel display handling needs internally rather than by purchasing systems or modules from a supplier like us. Some of our competitors have substantially greater financial resources and more extensive engineering, manufacturing, marketing and customer support capabilities

43

Table of Contents

than we do. We expect our competitors to continue to improve the performance of their current products and to introduce new products and technologies that could adversely affect sales of our current and future products and services. New products and technologies developed by our competitors or more efficient production of their products could require us to make significant price reductions to avoid losing orders. If we fail to respond adequately to pricing pressures or fail to develop products with improved performance or developments with respect to the other factors on which we compete, we could lose customers or orders. If we are unable to compete effectively, our business and prospects could be materially harmed.

**Because we rely on a limited number of customers for a large portion of our revenues, the loss of one or more of these customers could materially harm our business.**

We receive a significant portion of our revenues in each fiscal period from a relatively limited number of customers, and that trend is likely to continue. Sales to our ten largest customers accounted for approximately 44% of our total revenues in the fiscal year ended September 30, 2005, 39% of our total revenues in fiscal 2004, and 37% in fiscal 2003. As the semiconductor manufacturing industry continues to consolidate and further shifts to foundries which manufacture semiconductors designed by others, the number of our potential customers could decrease, which would increase our dependence on our limited number of customers. The loss of one or more of these major customers or a decrease in orders from one of these customers could materially affect our revenue, business and reputation.

**Because of the lengthy sales cycles of many of our products, we may incur significant expenses before we generate any revenues related to those products.**

Our customers may need several months to test and evaluate our products. This increases the possibility that a customer may decide to cancel or change plans, which could reduce or eliminate our sales to that customer. The impact of this risk can be magnified during the periods in which we introduce a number of new products, as has been the case during fiscal 2005. As a result of this lengthy sales cycle, we may incur significant research and development expenses, and selling, general and administrative expenses before we generate the related revenues for these products, and we may never generate the anticipated revenues if our customer cancels or changes its plans.

In addition, many of our products will not be sold directly to the end-user but will be components of other products. As a result, we rely on OEMs of our products to select our products from among alternative offerings to be incorporated into their equipment at the design stage; so-called design-ins. The OEM's decisions often precede the generation of volume sales, if any, by a year or more. Moreover, if we are unable to achieve these design ins from OEMs, we would have difficulty selling our products to that OEM because changing suppliers involves significant cost, time, effort and risk on the part of that OEM.

**Customers generally do not make long term commitments to purchase our products and our customers may cease purchasing our products at any time.**

Sales of our products are often made pursuant to individual purchase orders and not under long-term commitments and contracts. Our customers frequently do not provide any assurance of minimum or future sales and are not prohibited from purchasing products from our competitors at any time. Accordingly, we are exposed to competitive pricing pressures on each order. Our customers also engage in the practice of purchasing products from more than one manufacturer to avoid dependence on sole-source suppliers for certain of their needs. The existence of these practices makes it more difficult for us to gain new customers and to win repeat business from existing customers.

### Other Risks

**Claims of infringement involving one or more of our products in a case pending in a U.S. Federal court could result in significant expense.**

On or about April 21, 2005, Brooks was served with a third-party complaint seeking to join Brooks as a party to a patent lawsuit brought by an entity named Information Technology Innovation, LLC based in Northbrook, Illinois ("ITI") against Motorola, Inc. ("Motorola") and Freescale Semiconductor, Inc. ("Freescale"). ITI began the lawsuit

44

Table of Contents

against Motorola in the United States District Court for the Northern District of Illinois (Eastern Division) in November 2004, and ITI added Freescale to the lawsuit in March 2005. ITI claims that Motorola and Freescale have infringed a U.S. patent that ITI asserts covers processes used to model a semiconductor manufacturing plant.

Freescale alleges that Brooks has a duty to indemnify Freescale and Motorola from any infringement claims asserted against them based on their use of Brooks' AutoSched software program by paying all costs and expenses and all or part of any damages that either of them might incur as a result of the suit brought by ITI. AutoSched is a software program sold by Brooks and by one or more companies that formerly owned the AutoSched product prior to the acquisition of AutoSched by Brooks in 1999 from Daifuku U.S.A, Inc.

Brooks believes that ITI is not a company that is engaged in the business of manufacturing hardware or software products. It is a limited liability company that apparently acquired an exclusive license to the patent at issue in the litigation and is now in the business of seeking to license the patent to others.

Brooks believes that it has meritorious defenses to any claim that Brooks' AutoSched product infringes the patent identified by ITI in its suit against Motorola and Freescale, and Brooks will contest any such claim. Brooks also believes that meritorious defenses exist to the claims asserted by ITI against Motorola and Freescale, and Brooks intends to cooperate fully with Motorola and Freescale in the defense of those claims. In any such matter there can be no assurance as to the outcome, and for the reasons described in the "Contingency" section of Note 19, the ITI litigation could have a material adverse effect on Brooks.

**We may be subject to claims of infringement of third–party intellectual property rights, or demands that we license third–party technology, which could result in significant expense and prevent us from using our technology.**

We rely upon patents, trade secret laws, confidentiality procedures, copyrights, trademarks and licensing agreements to protect our technology. Due to the rapid technological change that characterizes the semiconductor and flat panel display process equipment industries, we believe that the improvement of existing technology, reliance upon trade secrets and unpatented proprietary know–how and the development of new products may be as important as patent protection in establishing and maintaining competitive advantage. To protect trade secrets and know–how, it is our policy to require all technical and management personnel to enter into nondisclosure agreements. We cannot guarantee that these efforts will meaningfully protect our trade secrets.

There has been substantial litigation regarding patent and other intellectual property rights in the semiconductor related industries. We have in the past been, and may in the future, notified that we may be infringing intellectual property rights possessed by other third parties. We cannot guarantee that infringement claims by third parties or other claims for indemnification by customers or end users of our products resulting from infringement claims will not be asserted in the future or that such assertions, if proven to be true, will not materially and adversely affect our business, financial condition and results of operations.

Particular elements of our technology could be found to infringe on the intellectual property rights or patents of others. Other companies may hold or obtain patents on inventions or otherwise claim proprietary rights to technology necessary to our business. For example, twice in 1992 and once in 1994 we received notice from General Signal Corporation that it believed that certain of our tool automation products infringed General Signal's patent rights. We believe the matters identified in the notice from General Signal were also the subject of a dispute between General Signal and Applied Materials, Inc., which was settled in November 1997. There are also claims that have been made by Asyst Technologies Inc. that certain products we acquired through acquisition embody intellectual property owned by Asyst. To date no action has been instituted against us directly by General Signal, Applied Materials or Asyst.

We cannot predict the extent to which we might be required to seek licenses or alter our products so that they no longer infringe the rights of others. We also cannot guarantee that the terms of any licenses we may be required to seek will be reasonable. Similarly, changing our products or processes to avoid infringing the rights of others may be costly or impractical and could detract from the value of our products. If a judgment of infringement were obtained against us, we could be required to pay substantial damages and a court could issue an order preventing us from selling one or more of our products. Further the cost and diversion of management attention brought about by

45

Table of Contents

such litigation could be substantial, even if we were to prevail. Any of these events could result in significant expense to us and may materially harm our business and our prospects.

**Our failure to protect our intellectual property could adversely affect our future operations.**

Our ability to compete is significantly affected by our ability to protect our intellectual property. Existing trade secret, trademark and copyright laws offer only limited protection, and certain of our patents could be invalidated or circumvented. In addition, the laws of some countries in which our products are or may be developed, manufactured or sold may not fully protect our products. We cannot guarantee that the steps we have taken to protect our intellectual property will be adequate to prevent the misappropriation of our technology. Other companies could independently develop similar or superior technology without violating our intellectual property rights. In the future, it may be necessary to engage in litigation or like activities to enforce our intellectual property rights, to protect our trade secrets or to determine the validity and scope of proprietary rights of others, including our customers. This could require us to incur significant expenses and to divert the efforts and attention of our management and technical personnel from our business operations.

**If the site of the majority of our manufacturing operations were to experience a significant disruption in operations, our business could be materially harmed.**

Most of our manufacturing facilities are concentrated in one location. If the operations of these facilities were disrupted as a result of a natural disaster, fire, power or other utility outage, work stoppage or other similar event, our business could be seriously harmed because we may be unable to manufacture and ship products and parts to our customers in a timely fashion.

**Our business could be materially harmed if one or more key suppliers fail to deliver key components.**

We currently obtain many of our key components on an as−needed, purchase order basis from numerous suppliers. We do not generally have long−term supply contracts with these suppliers, and many of them have undertaken cost−containment measures in light of the recent downturn in the semiconductor industry. In the event of an industry upturn these suppliers could face significant challenges in delivering components on a timely basis. Our inability to obtain components in required quantities or of acceptable quality could result in delays or reductions in product shipments to our customers. In addition, if a supplier or sub−supplier alters their manufacturing processes suffers a production stoppage for any reason or modifies or discontinues their products, this could result in a delay or reduction in product shipments to our customers. Any of the contingencies could cause us to lose customers, result in delayed or lost revenue and otherwise materially harm our business.

**We are exposed to potential risks and we will continue to incur increased costs as a result of the internal control testing and evaluation process mandated by Section 404 of the Sarbanes−Oxley Act of 2002.**

We assessed the effectiveness of our internal control over financial reporting as of September 30, 2005 and assessed all deficiencies on both an individual basis and in combination to determine if, when aggregated, they constitute more than a significant deficiency. As a result of this evaluation, no material weaknesses were identified. Although we have completed the documentation and testing of the effectiveness of our internal control over financial reporting for fiscal 2005, as required by Section 404 of the Sarbanes−Oxley Act of 2002, we expect to continue to incur costs, including increased accounting fees and increased staffing levels, in order to maintain compliance with that section of the Sarbanes−Oxley Act. We continue to monitor controls on an ongoing basis in fiscal 2006 for any deficiencies. No evaluation can provide complete assurance that our internal controls will detect or uncover all failures of persons within our company to disclose material information otherwise required to be reported. The effectiveness of our controls and procedures could also be limited by simple errors or faulty judgments. In addition, if we continue to expand globally, the challenges involved in implementing appropriate internal controls will increase and will require that we continue to improve our internal controls.

In the future, if we fail to complete the Sarbanes−Oxley 404 evaluation in a timely manner, we could be subject to regulatory scrutiny and a loss of public confidence in our internal controls. In addition, any failure to implement

46

Table of Contents

required new or improved controls, or difficulties encountered in their implementation, could harm our operating results or cause us to fail to meet our reporting obligations.

Recently completed and future acquisitions of companies, some of which may have operations outside the United States, may provide us with challenges in implementing the required processes, procedures and controls in our acquired operations. Acquired companies may not have disclosure controls and procedures or internal control over financial reporting that are as thorough or effective as those required by securities laws in the United States. Although we intend to devote substantial time and incur substantial costs, as necessary, to ensure ongoing compliance, we cannot be certain that we will be successful in complying with Section 404.

**Our stock price is volatile.**

The market price of our common stock has fluctuated widely. Since the beginning of fiscal year 2004 through the end of fiscal year 2005, our stock price fluctuated between a high of $27.30 per share and a low of $11.62 per share. The market price of our common stock reached a low of approximately $7.59 on April 11, 2003. Consequently, the current market price of our common stock may not be indicative of future market prices, and we may be unable to sustain or increase the value of an investment in our common stock. Factors affecting our stock price may include:

- variations in operating results from quarter to quarter;

- changes in earnings estimates by analysts or our failure to meet analysts' expectations;

- changes in the market price per share of our public company customers;

- market conditions in the semiconductor industry or the industries upon which it depends;

- general economic conditions;

- political changes, hostilities or natural disasters such as hurricanes and floods;

- low trading volume of our common stock; and

- the number of firms making a market in our common stock.

In addition, the stock market has recently experienced significant price and volume fluctuations. These fluctuations have particularly affected the market prices of the securities of high technology companies like ours. These market fluctuations could adversely affect the market price of our common stock.

**Provisions in our organizational documents, contracts and Convertible Subordinated Notes may make it difficult for someone to acquire control of us.**

Our certificate of incorporation, bylaws, contracts and 4.75% Convertible Subordinated Notes Due 2008 contain provisions that would make more difficult an acquisition of control of us and could limit the price that investors might be willing to pay for our securities, including:

- the ability of our board of directors to issue shares of preferred stock in one or more series without further authorization of stockholders;

- a prohibition on stockholder action by written consent;

- the elimination of the right of stockholders to call a special meeting of stockholders;

- a requirement that stockholders provide advance notice of any stockholder nominations of directors to be considered at any meeting of stockholders;

- a requirement that the affirmative vote of at least 80 percent of our shares be obtained for certain actions requiring the vote of our stockholders;

47

Table of Contents

- a requirement under our shareholder rights plan that, in many potential takeover situations, rights issued under the plan become exercisable to purchase our common stock at a price substantially discounted from the then applicable market price of our common stock; and

- a requirement upon specified types of change of control that we repurchase the 4.75% Convertible Subordinated Notes at a price equal to 100% of the principal outstanding amount thereof, plus accrued and unpaid interest, if any.

**We will incur significant stock—based compensation charges related to certain stock options and restricted stock in future periods.**

The Financial Accounting Standards Board (FASB) issued in December 2004 Statement of Financial Accounting Standards (SFAS) No. 123R, *Share—Based Payment*, an amendment of FASB Statements Nos. 123 and 95, that addresses the accounting treatment for employee stock options and other share—based payment transactions. The statement eliminates the ability to account for share—based compensation transactions using Accounting Principles Board (APB) Opinion No. 25, "*Accounting for Stock Issued to Employees*," and requires that such transactions be accounted for using a fair—value—based method and recognized as expenses. The statement and the change in accounting treatment will result in our reporting increased operating expenses beginning for our next fiscal quarter ending December 31, 2005, which would decrease any reported net income or increase any reported net loss, and could adversely affect the market price of our common stock. In fiscal 2006, we expect that the stock—based compensation cost will have a material effect on our net income as a result of the adoption of Statement 123R.

**Item 7A.** *Quantitative and Qualitative Disclosure About Market Risk*

**Concentration of Credit Risk**

Financial instruments that potentially subject us to concentration of credit risk consist primarily of trade receivables and temporary and long—term cash investments in treasury bills, certificates of deposit and commercial paper. We restrict our investments to repurchase agreements with major banks, U.S. government and corporate securities, and mutual funds that invest in U.S. government securities, which are subject to minimal credit and market risk. Our customers are concentrated in the semiconductor industry, and relatively few customers account for a significant portion of our revenues. Our top ten largest customers accounted for 44% of revenues for the fiscal year ended September 30, 2005. Our top twenty largest customers account for 56% of revenues for the fiscal year ended September 30, 2005. We regularly monitor the creditworthiness of our customers and believe that we have adequately provided for exposure to potential credit losses.

**Interest Rate Exposure**

At September 30, 2005, we had no variable interest rate debt; accordingly, a 10% change in the effective interest rate percentage would impact interest income although it would not materially affect the consolidated results of operations or financial position.

**Currency Rate Exposure**

Our foreign revenues are generally denominated in United States dollars. Accordingly, foreign currency fluctuations have not had a significant impact on the comparison of the results of operations for the periods presented. The costs and expenses of our international subsidiaries are generally denominated in currencies other than the United States dollar. However, since the functional currency of our international subsidiaries is the local currency, foreign currency translation adjustments do not impact operating results, but instead is reflected as a component of stockholders' equity under the caption "Accumulated other comprehensive income (loss)". To the extent that we expand our international operations or change our pricing practices to denominate prices in foreign currencies, we will be exposed to increased risk of currency fluctuation. Assets and liabilities of our international subsidiaries are translated at period end exchange rates. As such, foreign currency fluctuation results in increases and decreases in translated foreign currency assets and liabilities with the resulting offset being reflected in "Accumulated other comprehensive income (loss)."

48

Table of Contents

**Item 8.** *Financial Statements and Supplementary Data*

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | 50 |
| Consolidated Balance Sheets as of September 30, 2005 and 2004, as restated | 52 |
| Consolidated Statements of Operations for the three years ended September 30, 2005, 2004 and 2003, as restated | 53 |
| Consolidated Statements of Changes in Stockholders' Equity for the three years ended September 30, 2005, 2004 and 2003, as restated | 54 |
| Consolidated Statements of Cash Flows for the three years ended September 30, 2005, 2004 and 2003, as restated | 55 |
| Notes to Consolidated Financial Statements, as restated | 56 |

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders
of Brooks Automation, Inc.:

We have completed an integrated audit of Brooks Automation, Inc.'s 2005 consolidated financial statements and of its internal control over financial reporting as of September 30, 2005 and audits of its 2004 and 2003 consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our opinions, based on our audits, are presented below.

### Consolidated financial statements

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Brooks Automation, Inc. and its subsidiaries at September 30, 2005 and 2004, and the results of their operations and their cash flows for each of the three years in the period ended September 30, 2005 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As described in Note 3 to the consolidated financial statements, the Company has restated its 2005, 2004 and 2003 consolidated financial statements.

### Internal control over financial reporting

Also, in our opinion, management's assessment, included in Management's Report on Internal Control Over Financial Reporting appearing under Item 9A, that the Company maintained effective internal control over financial reporting as of September 30, 2005 based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria. Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of September 30, 2005, based on criteria established in *Internal Control — Integrated Framework* issued by the COSO. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable

50

Table of Contents

assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/S/ PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP

Boston, Massachusetts
December 12, 2005, except with respect to our opinion on the consolidated financial statements insofar as it relates to Note 3, as to which the date is July 31, 2006

51

Table of Contents

BROOKS AUTOMATION, INC.

CONSOLIDATED BALANCE SHEETS

| | September 30, 2005 | September 30, 2004 |
|---|---|---|
| | (as restated) | (as restated) |
| | (In thousands, except share and per share data) | |
| **ASSETS** | | |
| Current assets | | |
| Cash and cash equivalents | $ 202,462 | $ 193,281 |
| Marketable securities | 121,561 | 62,086 |
| Accounts receivable, net | 77,555 | 122,889 |
| Inventories | 48,434 | 71,614 |
| Current assets from discontinued operations | 55 | 1,403 |
| Prepaid expenses and other current assets | 18,259 | 9,862 |
| Total current assets | 468,326 | 461,135 |
| Property, plant and equipment, net | 54,165 | 58,507 |
| Long-term marketable securities | 32,935 | 73,743 |
| Goodwill | 62,094 | 62,034 |
| Intangible assets, net | 3,828 | 6,929 |
| Non-current assets from discontinued operations | — | 303 |
| Other assets | 2,732 | 8,388 |
| Total assets | $ 624,080 | $ 671,039 |
| **LIABILITIES, MINORITY INTERESTS AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities | | |
| Current portion of long-term debt | $ 12 | $ 11 |
| Short-term debt | 175,000 | — |
| Accounts payable | 30,820 | 44,771 |
| Deferred revenue | 22,143 | 34,476 |
| Accrued warranty and retrofit costs | 9,782 | 11,946 |
| Accrued compensation and benefits | 15,886 | 25,523 |
| Accrued retirement benefit | — | 9,899 |
| Accrued restructuring costs | 12,171 | 6,654 |
| Accrued income taxes payable | 17,331 | 16,015 |
| Current liabilities from discontinued operations | 399 | 674 |
| Accrued expenses and other current liabilities | 16,551 | 17,029 |
| Total current liabilities | 300,095 | 166,998 |
| Long-term debt | 2 | 175,014 |
| Accrued long-term restructuring | 10,959 | 13,536 |
| Other long-term liabilities | 2,129 | 1,678 |
| Total liabilities | 313,185 | 357,226 |
| Commitments and contingencies (Note 20) | | |
| Minority interests | 1,060 | 918 |
| Stockholders' equity | | |
| Preferred stock, $0.01 par value, 1,000,000 shares authorized, 0 and one share issued and outstanding at September 30, 2005 and 2004, respectively | — | — |
| Common stock, $0.01 par value, 125,000,000 shares authorized, 45,434,709 and 44,691,844 shares issued and outstanding at September 30, 2005 and 2004, respectively | 454 | 447 |
| Additional paid-in capital | 1,307,145 | 1,296,550 |
| Deferred compensation | (3,493) | (1,844) |
| Accumulated other comprehensive income | 11,958 | 12,359 |
| Accumulated deficit | (1,006,229) | (994,617) |
| Total stockholders' equity | 309,835 | 312,895 |
| Total liabilities, minority interests and stockholders' equity | $ 624,080 | $ 671,039 |

The accompanying notes are an integral part of these consolidated financial statements.

## BROOKS AUTOMATION, INC.

### CONSOLIDATED STATEMENTS OF OPERATIONS

|  | Year Ended September 30, | | |
|---|---|---|---|
|  | 2005 (as restated) | 2004 (as restated) | 2003 (as restated) |
|  | (In thousands, except per share data) | | |
| Revenues |  |  |  |
| Product | $338,072 | $ 402,252 | $ 225,442 |
| Services | 125,674 | 132,801 | 114,650 |
| Total revenues | 463,746 | 535,053 | 340,092 |
| Cost of revenues |  |  |  |
| Product | 236,534 | 241,790 | 165,932 |
| Services | 64,410 | 90,233 | 69,541 |
| Stock–based compensation |  |  |  |
| Product | 195 | 494 | 3,121 |
| Services | 176 | 260 | 2,982 |
| Total cost of revenues | 301,315 | 332,777 | 241,576 |
| Gross profit | 162,431 | 202,276 | 98,516 |
| Operating expenses |  |  |  |
| Research and development | 62,748 | 65,613 | 69,224 |
| Selling, general and administrative | 81,718 | 86,572 | 91,322 |
| Stock–based compensation |  |  |  |
| Research and development | 367 | 653 | 6,540 |
| Selling, general and administrative | 2,274 | 2,602 | 13,132 |
| Amortization of acquired intangible assets | 3,100 | 3,663 | 4,654 |
| Goodwill impairment charge | — | — | 39,951 |
| Restructuring charges | 16,542 | 5,356 | 46,257 |
| Total operating expenses | 166,749 | 164,459 | 271,080 |
| Income (loss) from continuing operations | (4,318) | 37,817 | (172,564) |
| Interest income | 9,284 | 4,984 | 4,067 |
| Interest expense | 9,469 | 9,492 | 10,042 |
| Other (income) expense, net | (1,752) | 911 | 16,267 |
| Income (loss) from continuing operations before income taxes and minority interests | (2,751) | 32,398 | (194,806) |
| Income tax provision | 5,204 | 8,053 | 4,906 |
| Income (loss) from continuing operations before minority interests | (7,955) | 24,345 | (199,712) |
| Minority interests in income of consolidated subsidiary | 141 | 211 | 214 |
| Income (loss) from continuing operations | (8,096) | 24,134 | (199,926) |
| Discontinued operations: |  |  |  |
| Loss from operations | (3,492) | (9,475) | (3,098) |
| Loss on disposal | (24) | — | — |
| Loss from discontinued operations, net of income taxes | (3,516) | (9,475) | (3,098) |
| Net income (loss) | $(11,612) | $ 14,659 | $ (203,024) |
| Basic income (loss) per share from continuing operations | $ (0.18) | $ 0.56 | $ (5.44) |
| Basic income (loss) per share from discontinued operations | (0.08) | (0.22) | (0.08) |
| Basic net income (loss) per share | $ (0.26) | $ 0.34 | $ (5.52) |
| Diluted income (loss) per share from continuing operations | $ (0.18) | $ 0.55 | $ (5.44) |
| Diluted income (loss) per share from discontinued operations | (0.08) | (0.22) | (0.08) |
| Diluted net income (loss) per share | $ (0.26) | $ 0.34 | $ (5.52) |
| Shares used in computing earnings (loss) per share |  |  |  |
| Basic | 44,919 | 43,006 | 36,774 |
| Diluted | 44,919 | 43,573 | 36,774 |

The accompanying notes are an integral part of these consolidated financial statements.

# EXHIBIT A
# PART 3 OF 4

Table of Contents

# BROOKS AUTOMATION, INC.

## CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY

| | Common Stock Shares | Common Stock at Par Value | Additional Paid-In Capital (as restated) | Deferred Compensation (as restated) | Comprehensive Income (Loss) (as restated) | Accumulated Other Comprehensive Income (Loss) | Accumulated Deficit (as restated) | Total Stockholders' Equity (as restated) |
|---|---|---|---|---|---|---|---|---|
| | | | (In thousands, except share data) | | | | | |
| Balance September 30, 2002 | 36,199,333 | $ 362 | $ 1,164,751 | $ (42,568) | | $ (8,058) | $ (806,252) | $ 308,235 |
| Shares issued under stock option and purchase plans | 545,172 | 6 | 6,128 | | | | | 6,134 |
| Common stock issued in acquisitions | 521,676 | 5 | 5,257 | | | | | 5,262 |
| Deferred compensation, net of forfeitures | | | (10,709) | 10,709 | | | | — |
| Amortization of deferred compensation | | | | 25,775 | | | | 25,775 |
| Comprehensive income (loss): | | | | | | | | |
| Net loss | | | | | $ (203,024) | | (203,024) | (203,024) |
| Currency translation adjustments | | | | | 10,625 | 10,625 | | 10,625 |
| Unrealized gain on marketable securities | | | | | 544 | 544 | | 544 |
| Unrealized gain on investment in Shinsung | | | | | 9,279 | 9,279 | | 9,279 |
| Comprehensive loss | | | | | $ (182,576) | | | |
| Balance September 30, 2003 | 37,266,181 | 373 | 1,165,427 | (6,084) | | 12,390 | (1,009,276) | 162,830 |
| Shares issued under stock option and purchase plans | 487,161 | 5 | 5,917 | | | | | 5,922 |
| Common stock offering | 6,900,000 | 69 | 124,213 | | | | | 124,282 |
| Common stock issued in acquisitions | 38,502 | — | 1,181 | | | | | 1,181 |
| Deferred compensation, net of forfeitures | | | (188) | 188 | | | | — |
| Amortization of deferred compensation | | | | 4,052 | | | | 4,052 |
| Comprehensive income (loss): | | | | | | | | |
| Net income | | | | | $ 14,659 | | 14,659 | 14,659 |
| Currency translation adjustments | | | | | 928 | 928 | | 928 |
| Unrealized loss on marketable securities | | | | | (959) | (959) | | (959) |
| Comprehensive income | | | | | $ 14,628 | | | |
| Balance September 30, 2004 | 44,691,844 | 447 | 1,296,550 | (1,844) | | 12,359 | (994,617) | 312,895 |
| Shares issued under stock option and purchase plans | 708,432 | 7 | 5,306 | | | | | 5,313 |
| Common stock issued in acquisitions | 34,433 | — | 628 | | | | | 628 |
| Deferred compensation, net of forfeitures | | | 4,661 | (4,661) | | | | — |
| Amortization of deferred compensation | | | | 3,012 | | | | 3,012 |
| Comprehensive income (loss): | | | | | | | | |
| Net loss | | | | | $ (11,612) | | (11,612) | (11,612) |
| Currency translation adjustments | | | | | 353 | 353 | | 353 |
| Unrealized loss on marketable securities | | | | | (754) | (754) | | (754) |
| Comprehensive loss | | | | | $ (12,013) | | | |
| Balance September 30, 2005 | 45,434,709 | $ 454 | $ 1,307,145 | $ (3,493) | | $ 11,958 | $ (1,006,229) | $ 309,835 |

The accompanying notes are an integral part of these consolidated financial statements.

54

Table of Contents

**BROOKS AUTOMATION, INC.**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Year ended September 30, | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| | (as restated) | (as restated) (In thousands) | (as restated) |
| Cash flows from operating activities | | | |
| Net income (loss) | $ (11,612) | $ 14,659 | $ (203,024) |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | | |
| Depreciation and amortization | 16,351 | 17,541 | 30,972 |
| Impairment of assets | — | 7,421 | 46,012 |
| Stock−based compensation | 3,640 | 4,824 | 26,629 |
| Premium (discount) on marketable securities | (1,936) | — | — |
| Impairment/loss on disposal of Shinsung | — | — | 14,568 |
| Amortization of debt issuance costs | 839 | 839 | 839 |
| Minority interests | 141 | 211 | 214 |
| Loss on disposal of long−lived assets | 178 | 505 | 4,870 |
| Changes in operating assets and liabilities, net of acquired assets and liabilities: | | | |
| Accounts receivable | 47,922 | (53,960) | 20,191 |
| Inventories | 23,933 | (17,744) | 25,468 |
| Prepaid expenses and other assets | (3,048) | 8,376 | (2,035) |
| Accounts payable | (14,202) | 17,967 | (3,960) |
| Deferred revenue | (12,718) | (91) | 7,383 |
| Accrued warranty and retrofit costs | (2,104) | 231 | (6,813) |
| Accrued compensation and benefits | (9,847) | 10,621 | (3,961) |
| Accrued restructuring costs | 3,300 | (9,123) | (4,454) |
| Accrued expenses and other liabilities | (9,723) | 6,578 | (1,229) |
| Net cash provided by (used in) operating activities | 31,114 | 8,855 | (48,330) |
| Cash flows from investing activities | | | |
| Purchases of property, plant and equipment | (11,704) | (8,203) | (13,810) |
| Acquisition of businesses, net of cash acquired | — | — | 400 |
| Proceeds from sale of business line | — | — | 550 |
| Purchases of marketable securities | (635,683) | (231,687) | (74,878) |
| Sale/maturity of marketable securities | 618,453 | 169,141 | 121,729 |
| Proceeds from sale of long−lived assets | 1,294 | — | 8,420 |
| Decrease in other assets | — | — | 1,182 |
| Net cash provided by (used in) investing activities | (27,640) | (70,749) | 43,593 |
| Cash flows from financing activities | | | |
| Proceeds from issuance of long−term debt | — | — | 153 |
| Payments of short− and long−term debt | (11) | (98) | (119) |
| Proceeds from issuance of common stock, net of issuance costs | 5,313 | 130,203 | 6,134 |
| Net cash provided by financing activities | 5,302 | 130,105 | 6,168 |
| Effects of exchange rate changes on cash and cash equivalents | 405 | 71 | (1,729) |
| Net increase (decrease) in cash and cash equivalents | 9,181 | 68,282 | (298) |
| Cash and cash equivalents, beginning of year | 193,281 | 124,999 | 125,297 |
| Cash and cash equivalents, end of year | $ 202,462 | $ 193,281 | $ 124,999 |
| **Supplemental disclosure of cash flow information** | | | |
| Cash paid during the year for interest | $ 8,603 | $ 8,653 | $ 9,200 |
| Cash paid during the year for income taxes, net of refunds | $ 3,696 | $ 2,237 | $ 6,100 |

The accompanying notes are an integral part of these consolidated financial statements.

55

Table of Contents

BROOKS AUTOMATION, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### 1. Nature of the Business

Brooks Automation, Inc. ("Brooks" or the "Company") is a leading supplier of automation products and solutions primarily serving the worldwide semiconductor market. Brooks supplies hardware, software and services to both chip manufacturers and original equipment manufacturers, or OEMs, who make manufacturing equipment for making semiconductor devices. Brooks has offerings ranging from hardware and software modules to fully integrated systems and system integration services to deploy its products on a world–wide basis. Although Brooks' core business addresses the increasingly complex automation requirements of the global semiconductor industry, Brooks is also focused on providing automation solutions for a number of related industries, including flat panel display manufacturing, data storage and other complex manufacturing.

### 2. Summary of Significant Accounting Policies

#### Principles of Consolidation and Basis of Presentation

The consolidated financial statements include the accounts of the Company and all majority–owned subsidiaries. All intercompany accounts and transactions are eliminated.

In June 2005, the Company signed definitive purchase and sale agreements to sell substantially all the assets of the Company's Specialty Equipment and Life Sciences division ("SELS"), formerly known as IAS, which provided standard and custom automation technology and products for the semiconductor, photonics, life sciences and certain other industries. This sale was completed and all activities of SELS have ceased during the fourth quarter of fiscal 2005. Effective June 2005, the Company's consolidated financial statements and notes have been reclassified to reflect this business as a discontinued operation in accordance with Financial Accounting Standards Board Statement No. 144, "Accounting for the Impairment or Disposal of Long–Lived Assets," (see Note 21).

#### Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates include bad debts, inventories, intangible assets, goodwill, deferred income taxes and warranty obligations. Although the Company regularly assesses these estimates, actual results could differ from those estimates. Changes in estimates are recorded in the period in which they become known.

#### Foreign Currency Translation

Some transactions of the Company and its subsidiaries are made in currencies different from their functional currency. Foreign currency gains (losses) on these transactions or balances are recorded in "Other (income) expense, net" when incurred. Net foreign currency transaction gains (losses) included in income (loss) before income taxes and minority interest totaled $0.4 million, $(0.4) million and $(1.6) million for the years ended September 30, 2005, 2004 and 2003, respectively. For non–U.S. subsidiaries, assets and liabilities are translated at period–end exchange rates, and income statement items are translated at the average exchange rates for the period. The local currency for all foreign subsidiaries is considered to be the functional currency and, accordingly, translation adjustments are reported in "Accumulated other comprehensive income (loss)". Foreign currency translation adjustments are one of the components added to the Company's net income (loss) in the calculation of comprehensive net income (loss).

#### Cash and Cash Equivalents

Cash and cash equivalents include cash and highly liquid investments with original maturities of three months or less. At September 30, 2005 and 2004, cash equivalents were $111.3 million and $88.8 million, respectively. Cash equivalents are held at fair value.

56

Table of Contents

**BROOKS AUTOMATION, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Concentration of Credit Risk*

Financial instruments that potentially subject the Company to concentration of credit risk consist primarily of trade receivables and temporary and long−term cash investments in treasury bills, certificates of deposit and commercial paper. The Company restricts its investments to repurchase agreements with major banks, U.S. government and corporate securities, and mutual funds that invest in U.S. government securities, which are subject to minimal credit and market risk. The Company's customers are concentrated in the semiconductor industry, and relatively few customers account for a significant portion of the Company's revenues. The Company's top twenty largest customers account for slightly more than 50% of revenues. The Company regularly monitors the creditworthiness of its customers and believes that it has adequately provided for exposure to potential credit losses.

*Accounts Receivable and Allowance for Doubtful Accounts*

Trade accounts receivable are recorded at the invoiced amount and do not bear interest. The allowance for doubtful accounts is the Company's best estimate of the amount of probable credit losses in its existing accounts receivable. The Company determines the allowance based on historical write−off experience by industry. The Company reviews its allowance for doubtful accounts monthly. Past due balances over 120 days and over a specified amount are reviewed individually for collectibility. All other balances are reviewed on a pooled basis by type of receivable. Account balances are charged off against the allowance when the Company feels it is probable the receivable will not be recovered. The Company does not have any off−balance−sheet credit exposure related to its customers.

*Inventories*

Inventories are stated at the lower of cost or market, cost being determined using the first−in, first−out method. The Company provides inventory reserves for excess, obsolete or damaged inventory based on changes in customer demand, technology and other economic factors.

*Fixed Assets and Impairment of Long−lived Assets*

Property, plant and equipment are stated at cost less accumulated depreciation. Depreciation is computed using the straight−line method. Depreciable lives are summarized below:

| | |
|---|---|
| Buildings | 20 − 40 years |
| Computer equipment and software | 2 − 6 years |
| Machinery and equipment | 2 − 10 years |
| Furniture and fixtures | 3 − 10 years |

Leasehold improvements and equipment held under capital leases are amortized over the shorter of their estimated useful lives or the term of the respective leases. Equipment used for demonstrations to customers is included in machinery and equipment and is depreciated over its estimated useful life. Repair and maintenance costs are expensed as incurred.

The Company periodically evaluates the recoverability of long−lived assets, including its intangible assets, whenever events and changes in circumstances indicate that the carrying amount of an asset may not be fully recoverable. This periodic review may result in an adjustment of estimated depreciable lives or an asset impairment. When indicators of impairment are present, the carrying values of the asset are evaluated in relation to their operating performance and future undiscounted cash flows of the underlying business. If the future undiscounted cash flows are less than their book value, an impairment exists. The impairment is measured as the difference between the book value and the fair value of the underlying asset. Fair values are based on estimates of market prices and assumptions concerning the amount and timing of estimated future cash flows and assumed discount rates, reflecting varying degrees of perceived risk.

When an asset is retired, the cost of the asset disposed of, and the related accumulated depreciation, are removed from the accounts, and any resulting gain or loss is included in the determination of operating profit (loss).

57

Table of Contents

BROOKS AUTOMATION, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*Intangible Assets and Goodwill*

Patents include capitalized direct costs associated with obtaining patents as well as assets that were acquired as a part of purchase business combinations. Capitalized patent costs are amortized using the straight–line method over the estimated economic life of the patents. As of September 30, 2005 and 2004, the net book value of the Company's patents was $0.2 million and $0.3 million, respectively.

Goodwill represents the excess of purchase price over the fair value of net tangible and identifiable intangible assets of the businesses the Company acquired. The Company performs an annual impairment test of its goodwill as required under the provisions of FAS 142 on September 30 of each fiscal year unless interim indicators of impairment exist (see Note 6).

The amortizable lives of intangible assets, including those identified as a result of purchase accounting, are summarized as follows:

| | |
|---|---|
| Patents | 3 – 5 years |
| Completed technology | 2 – 10 years |
| License agreements | 5 years |
| Trademarks and trade names | 3 – 5 years |
| Non–competition agreements | 3 – 5 years |
| Customer relationships | 4 – 7 years |

*Revenue Recognition*

Product revenues are associated with the sale of hardware systems and components as well as software licenses. Service revenues are associated with hardware–related field service, training, software maintenance and software–related consulting and integration services.

Revenue from product sales that do not include significant customization is recorded upon delivery and transfer of risk of loss to the customer provided there is evidence of an arrangement, fees are fixed or determinable, collection of the related receivable is reasonably assured and, if applicable, customer acceptance criteria have been successfully demonstrated. Customer acceptance provisions include final testing and acceptance carried out prior to shipment. These pre–shipment testing and acceptance procedures ensure that the product meets the published specification requirements before the product is shipped. In the limited situations where the arrangement contains extended payment terms, revenue is recognized as the payments become due. Shipping terms are customarily FOB shipping point. Amounts charged to customers for costs incurred for shipping and handling and reimbursable expenses are included in revenues with the corresponding cost recorded in cost of revenues. When significant on site customer acceptance provisions are present in the arrangement, revenue is recognized upon completion of customer acceptance testing.

Revenue from the sale of off–the–shelf software licenses is recognized upon delivery to the customer provided there is evidence of an arrangement, fees are fixed or determinable, collection of the related receivable is probable, and there are no unusual acceptance criteria or extended payment terms. If the arrangement contains acceptance criteria or testing, then revenue is recognized upon acceptance or the successful completion of the testing. If the arrangement contains extended payment terms, revenue is recognized as the payments become due. Revenue related to post–contract support is deferred and recognized ratably over the contract period.

For tailored software contracts, we provide significant consulting services to tailor the software to the customer's environment. If we are able to reasonably estimate the level of effort and related costs to complete the contract, we recognize revenue using the percentage–of–completion method, which compares costs incurred to total estimated project costs. Revisions in revenue and cost estimates are recorded in the period in which the facts that require such revisions become known. If our ability to complete the tailored software is uncertain or if we cannot reasonably estimate the level of effort and related costs, completed contract accounting is applied. Losses, if any, are provided for in the period in which such losses are first identified by management. Generally, the terms of long–term contracts provide for progress billing based on completion of certain phases of work. For maintenance contracts, service revenue is deferred based on vendor specific objective evidence of its fair value and is recognized ratably over the term of the maintenance contract. Deferred revenue primarily relates to services and maintenance agreements and billings in excess of revenue recognized on long term contracts accounted for using the percentage–of–completion method and contracts awaiting final customer acceptance.

58

BROOKS AUTOMATION, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

In transactions that include multiple products and/or services, such as tailored software arrangements, described above, or software sales with post–contract support, we allocate the sales value among each of the elements based on their relative fair values and recognize such revenue when each element is delivered. If these relative fair values are not known, the Company uses the residual method to recognize revenue from arrangements with one or more elements to be delivered at a future date, when evidence of the fair value of all undelivered elements exist. Under the residual method, the fair value of any the undelivered elements at the date of delivery, such as post–contract support, are deferred and the remaining portion of the total arrangement fee is recognized as revenue. The Company determines fair value of undelivered services based on the prices that are charged when the same element is sold separately to customers.

*Warranty*

The Company offers warranties on the sales of certain of its products and records an accrual for estimated future claims. Such accruals are based upon historical experience and management's estimate of the level of future claims.

*Research and Development Expenses*

Research and development costs are charged to expense when incurred, except for certain software development costs. Software development costs are expensed prior to establishing technological feasibility and capitalized thereafter until the product is available for general release to customers. Capitalized software development costs are amortized to cost of sales on a product–by–product basis over the estimated lives of the related products, typically three years. The Company did not capitalize any such costs during fiscal 2005, 2004 or 2003.

*Stock–Based Compensation*

The Company's employee stock compensation plans are accounted for in accordance with Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25") and related interpretations. Under this method, no compensation expense is recognized as long as the exercise price equals or exceeds the market price of the underlying stock on the date of the grant. The Company elected the disclosure–only alternative permitted under Statement of Financial Accounting Standards No. 123, "Accounting for Stock–Based Compensation" ("FAS 123"), as amended by FAS 148, for fixed stock–based awards to employees. All non–employee stock–based awards are accounted for at fair value and recorded as compensation expense over the period of service in accordance with FAS 123 and related interpretations.

Under APB No. 25, compensation expense is measured as of the date the number of shares and exercise price become fixed. Generally, this occurs on the grant date, in which case the stock option is accounted for as a fixed award as of the date of grant. The grant date cannot precede the date on which the grant is approved through either the execution of written consents (i.e. unanimously by the Compensation Committee or, for certain awards, individually by the Chief Executive Officer in his delegated capacity as Sole Member of a Special Committee of the Board of Directors) or through a valid meeting of the Compensation Committee. Compensation expense associated with fixed awards is measured as the difference between the fair market value of our stock on the date of grant and the grant recipient's exercise price, which is the intrinsic value of the award on that date. Stock compensation expense is recognized over the vesting period using the ratable method, whereby an equal amount of expense is recognized for each year of vesting.

The Company accounts for modifications to stock options under FIN No. 44. Modifications include, but are not limited to acceleration of vesting and continued vesting while not providing substantive services. Compensation expense is recorded in the period of modification for the intrinsic of the vested portion of the award, including vesting that occurs while not providing substantive services, on the date of modification. The intrinsic value of the award is the difference between the fair market value of our common stock on the date of modification and the optionee's exercise price.

The Company values stock options assumed in conjunction with business combinations accounted for using the purchase method at fair value on the date of acquisition using the Black–Scholes option–pricing model, in accordance with FIN No. 44. The fair value of assumed options is included as a component of the purchase price. The intrinsic value of unvested stock options is recorded as unearned stock–based compensation and amortized to expense over the remaining vesting period of the stock options using the straight–line method. On December 23, 2004, the Company accelerated the vesting of certain unvested stock options awarded to employees, officers and other eligible participants under the Company's various stock option plans, other than its 1993 Non–Employee Director Stock Option Plan. As such, the Company fully vested options to purchase

Table of Contents

### BROOKS AUTOMATION, INC.

#### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

1,229,239 shares of the Company's common stock with exercise prices greater than or equal to $24.00 per share. The acceleration of the vesting of these options resulted in a charge based on generally accepted accounting principles of approximately $1.0 million. For pro forma disclosure requirements under FAS 123, the Company recognized approximately $25.0 million of stock–based compensation for all options whose vesting was accelerated. The Company took this action because it may produce a more favorable impact on the Company's results from operations in light of the effective date of FAS 123(R), which will take place in the Company's first fiscal quarter of 2006.

As discussed in Note 3, the restated pro forma footnote shows a decrease in the FAS 123 compensation expense of approximately $8.3 million and $8.3 million for the years ended September 30, 2005 and 2004, respectively, and an increase in the FAS 123 compensation expense of approximately $42.9 million for the year ended September 30, 2003 as a result of the restatement in connection with measurement dates of certain identified stock option grants. This error related to this pro forma information does not have any impact on the Company's consolidated statements of operations, consolidated balance sheets or consolidated statements of cash flows for any period.

The following pro forma information regarding net income (loss) has been calculated as if the Company had accounted for its employee stock options and stock purchase plan under the fair value method under FAS 123.

BROOKS AUTOMATION, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The fair value of each option grant was estimated on the date of grant using the Black–Scholes option–pricing model with the following assumptions:

| | Year Ended September 30, | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| Risk–free interest rate | 3.3% – 4.0% | 2.6% – 3.3% | 2.2% – 2.7% |
| Volatility | 65% | 60% | 82% |
| Expected life (years) | 4.0 | 4.0 | 4.0 |
| Dividend yield | 0% | 0% | 0% |

The fair value of each employee stock purchase right was estimated on the commencement date of each offering period using the Black–Scholes option–pricing model with the following assumptions:

| | Year Ended September 30, | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| Risk–free interest rate | 3.2% | 1.6% | 1.3% |
| Volatility | 39% | 55% | 75% |
| Expected life | 6 months | 6 months | 6 months |
| Dividend yield | 0% | 0% | 0% |

For purposes of pro forma disclosures, the estimated fair value of the options is amortized to expense over the options' vesting period. The Company's pro forma information follows (in thousands, except per share information):

| | Year Ended September 30, | | |
|---|---|---|---|
| | 2005 (as restated) | 2004 (as restated) | 2003 (as restated) |
| Net income (loss), as reported | $(11,612) | $ 14,659 | $ (203,024) |
| Add stock–based employee compensation expense included in reported net income (loss) | 3,012 | 4,052 | 25,775 |
| Deduct pro forma stock–based compensation expense | 24,319 | 21,889 | 66,339 |
| Pro forma net loss | $(32,919) | $ (3,178) | $ (243,588) |
| Earnings (loss) per share | | | |
| Basic earnings (loss) per share, as reported | $ (0.26) | $ 0.34 | $ (5.52) |
| Diluted earnings (loss) per share, as reported | $ (0.26) | $ 0.34 | $ (5.52) |
| Basic loss per share, pro forma | $ (0.73) | $ (0.07) | $ (6.62) |
| Diluted loss per share, pro forma | $ (0.73) | $ (0.07) | $ (6.62) |

*Income Taxes*

The Company records income taxes using the asset and liability method. Deferred income tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective income tax bases, and operating loss and tax credit carryforwards. The Company's consolidated financial statements contain certain deferred tax assets which have arisen primarily as a result of operating losses, as well as other temporary differences between financial and tax accounting. Statement of Financial Accounting Standards No. 109 "Accounting for Income Taxes," requires the Company to establish a valuation allowance if the likelihood of realization of the deferred tax assets is reduced based on an evaluation of objective verifiable evidence. Significant management judgment is required in determining the Company's provision for income taxes, the Company's deferred tax assets and liabilities and any valuation allowance recorded against those net deferred tax assets. The Company evaluates the weight of all available evidence to determine whether it is more likely than not that some portion or all of the net deferred income tax assets will not be realized.

*Earnings (Loss) Per Share*

Basic earnings (loss) per share is calculated based on the weighted average number of common shares outstanding during the period. Diluted earnings (loss) per share is calculated based on the weighted average number of common shares and dilutive common equivalent shares assumed outstanding during the period. Shares used to compute diluted earnings (loss) per share exclude common share equivalents if their inclusion would have an anti–dilutive effect.

61

Table of Contents

BROOKS AUTOMATION, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*Fair Value of Financial Instruments*

The Company's financial instruments consist of cash and cash equivalents, investments in long− and short−term debt securities, accounts receivable, accounts payable and accrued expenses. The carrying amounts reported in the balance sheets approximate their fair value at September 30, 2005 and 2004. The Company's financial instruments also include its convertible notes. At September 30, 2005, the estimated fair value of the Company's convertible notes was approximately $169.3 million compared to the carrying value of $175.0 million. The estimated fair value of the convertible notes is based on the quoted market price of the convertible notes on September 30, 2005.

*Reclassifications*

Certain reclassifications have been made in the 2004 and 2003 Consolidated Financial Statements to conform to the 2005 presentation.

*Recent Accounting Pronouncements*

In November 2004, the FASB issued FASB Statement No. 151, "Inventory Costs — an Amendment of ARB No. 43, Chapter 4" ("FAS 151"). FAS 151 amends ARB 43, Chapter 4, to clarify that abnormal amounts of idle facility expense, freight, handling costs, and wasted materials (spoilage) should be recognized as current−period charges. In addition, this Statement requires that allocation of fixed production overheads to the costs of conversion be based on the normal capacity of the production facilities. The provisions of this Statement are effective for inventory costs incurred during fiscal years beginning after June 15, 2005. The adoption of the provisions of FAS 151 is not expected to have a material impact on the Company's financial position or results of operations.

In December 2004, the FASB issued Statement of Financial Accounting Standards No. 123R, "Share−Based Payment" ("SFAS 123R"). SFAS 123R replaces SFAS 123 and supersedes APB 25. SFAS 123R focuses primarily on the accounting for transactions in which an entity obtains employee services in share−based payment transactions. SFAS 123R requires companies to recognize in the statement of operations the cost of employee services received in exchange for awards of equity instruments based on the grant−date fair value of those awards (with limited exceptions). SFAS 123R was originally expected to be effective for the Company beginning in its third quarter of fiscal year 2005. In April 2005, the effective date was amended by the Securities and Exchange Commission. As a result, SFAS 123R is now effective for the Company as of October 1, 2005. Accordingly, the Company will adopt SFAS 123R in its first quarter of fiscal year 2006. The Company expects to use the modified−prospective transition method and will not restate prior periods for the adoption of SFAS 123R. Although the Company is currently evaluating the provisions of SFAS 123R and its implications on its employee benefit plans, the Company believes that the adoption of this standard, based on the terms of the options outstanding at September 30, 2005, will have a material effect on its net income in fiscal year 2006. The Company is also evaluating the form of any stock based incentive compensation it may offer in the future.

In December 2004, the FASB issued FASB Statement No. 153, "Exchanges of Nonmonetary Assets, an amendment of APB Opinion No. 29, Accounting for Nonmonetary Transactions" ("FAS 153"). FAS 153 requires that exchanges of nonmonetary assets be measured based on the fair value of the assets exchanged. Further, it expands the exception for nonmonetary exchanges of similar productive assets to nonmonetary assets that do not have commercial substance. The provisions of this Statement are effective for nonmonetary asset exchanges occurring in fiscal periods beginning after June 15, 2005. The adoption of the provisions of FAS 153 is not expected to have a material impact on the Company's financial position or results of operations.

In May 2005, the FASB issued FASB Statement No. 154, "Accounting Changes and Error Corrections, a replacement of APB Opinion No. 20, Accounting Changes and FASB Statement No. 3, Reporting Accounting Changes in Interim Financial Statements" ("FAS 154"). FAS 154 provides guidance on the accounting for and reporting of accounting changes and error corrections. It establishes, unless impracticable, retrospective application as the required method for reporting a change in accounting principle in the absence of explicit transition requirements specific to the newly adopted accounting principle. FAS 154 also provides guidance for determining whether retrospective application of a change in accounting principle is impracticable and for reporting a change when retrospective application is impracticable. The provisions of this Statement are effective for accounting changes and corrections of errors made in fiscal periods beginning after December 15, 2005. The adoption of the provisions of FAS 154 is not expected to have a material impact on the Company's financial position or results of operations.

62

BROOKS AUTOMATION, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**3. Restatement of Previously Issued Financial Statements**

On May 10, 2006, the Company's Board of Directors concluded that the Company's consolidated financial statements for the years ended September 30, 2005, 2004 and 2003 as well as the selected financial data for the years ended September 30, 2002 and 2001 should be restated to record additional non−cash stock−based compensation expense resulting from stock options granted during fiscal years 1996 to 2005 that were incorrectly accounted for under generally accepted accounting principles ("GAAP"). The Company's decision to restate its financial statements was based on the facts obtained by management and an independent investigation into our stock option accounting that was conducted under the direction of a special committee ("Special Committee") of the Board of Directors. The Board created the Special Committee, which was composed solely of independent directors, to conduct a review of matters related to past stock option grants (including the timing of such grants and associated documentation) after receiving inquiries regarding the timing of certain stock option grants. Separately, the Company's management also reviewed stock option grants from 1995 through the second quarter of fiscal 2006 to determine whether any material accounting errors had occurred with respect to stock option grants.

The Company has concluded that there were material accounting errors with respect to a number of stock option grants. In general, these stock options were granted with an exercise price equal to the Nasdaq closing market price for the Company's common stock on the date set forth on written consents signed by one or more directors. The Company used the stated date of these consents as the "measurement date" for the purpose of accounting for them under GAAP, and as a result recorded no compensation expense in connection with the grants.

The Company has concluded that a number of written consents were not fully executed or effective on the date set forth on the consents and thus that using the stated date as the measurement date was incorrect. The Company has determined a revised measurement date for each stock option grant based on the information now available to the Company. Generally, the changes in measurement dates are due to two kinds of errors: (1) the Company treated unanimous written consents of directors approving stock option grants as effective on the date stated on the consent, instead of the date upon which the Company received the consent form containing the last signature required for unanimity; and (2) the Company treated option grants to multiple employees as effective prior to the date upon which the Company had determined the exact number of options that would be granted to each individual employee. In cases where the closing market price on the revised measurement date exceeded the Nasdaq closing market price on the original measurement date, the Company has recognized compensation expense equal to this excess over the vesting term of each option.

The Company has determined that the cumulative, pre−tax, non−cash, stock−based compensation expense resulting from revised measurement dates was approximately $58.7 million during the period from the Company's initial public offering in 1996 through September 30, 2005. The corrections made in the restatement relate to options covering approximately 6.0 million shares. In the restatement, the Company recorded stock−based compensation expense of $1.6 million, $3.1 million and $17.3 million for the years ended September 30, 2005, 2004 and 2003, respectively, and $36.7 million prior to fiscal 2003. In addition, the Company recorded an income tax benefit of $1.8 million prior to fiscal 2003. The cumulative effect of the restatement adjustments on the Company's consolidated balance sheet at September 30, 2005 was an increase in additional paid−in capital offset by a corresponding increase in the accumulated deficit and deferred compensation which results in no net effect on stockholders' equity. The adjustments increased previously reported diluted loss from continuing operations per common share by $0.03 and $0.47 for the years ended September 30, 2005 and 2003, respectively, and decreased diluted earnings from continuing operations per common share by $0.07 for the year ended September 30, 2004. Approximately 99% of the charges relating to revised measurement dates arose from incorrect measurement dates for stock options granted during fiscal years 1996 through 2002. Subsequent to fiscal 2002 and prior to the inception of the investigation, the Company had revised its stock option and restricted stock grant practices. Neither the Company nor the Special Committee concluded that anyone now affiliated with the Company was complicit in any intentional wrongdoing. The Company and the Special Committee were unable to conclude that the accounting errors relating to revised measurement dates for stock option grants were the result of intentional misconduct of any company personnel. There was no impact on revenue or net cash provided by operating activities as a result of this compensation expense.

In addition to the compensation expenses described above, the Company also recorded approximately $5.8 million of non−cash, stock−based compensation expense in connection with a stock option held by former CEO Robert J. Therrien that the Company has concluded he was permitted to exercise in November 1999 despite its expiration in August of 1999. This

63

Table of Contents

**BROOKS AUTOMATION, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

transaction was previously accounted for and disclosed as a loan by the Company to Mr. Therrien for the purpose of permitting him to exercise the option. Specifically, in November 1999, three directors of the Company (including Mr. Therrien) signed a ratification document pursuant to which Mr. Therrien was deemed to have been granted a loan as of August 1999. According to the document, in June 1999 the Company's directors (Messrs. Khoury, Emerick and Therrien) discussed extending a loan to Mr. Therrien for the purpose of permitting him to exercise an option to purchase 225,000 shares of the Company's stock prior to its expiration in August 1999. Based on the document, the Company in November 1999 deemed Mr. Therrien to have timely exercised the options, and accounted for the exercise without recognizing compensation expense. As a result of facts obtained by the Special Committee, the Company determined that Mr. Therrien misrepresented the facts of the loan and the ratification document described above was false as there were no discussions concerning a loan in June 1999. As a result, the Company has determined that the option expired in August 1999 and that compensation expense should have been recorded in connection with Mr. Therrien's purchase of stock in November 1999. At that time, Mr. Therrien paid approximately $560,000 (the exercise price of $2.43 per share, plus interest deemed due on the loan) for 225,000 shares then worth approximately $6,314,000 (or $28.06 per share). In the restatement, the Company has recognized compensation expense in November 1999 equal to the difference between the price paid by Mr. Therrien and the market value of the stock on the date of sale. The three directors including Mr. Therrien are no longer affiliated with the Company.

As a result, the Company recorded in the restatement cumulative, non–cash pre–tax stock–based compensation expense of approximately $64.5 million and a tax benefit of $1.8 million. Principally as a result of losses incurred, the Company recorded a full valuation allowance against all deferred tax assets beginning in 2002 and consequently, there is no tax effect of the additional stock–based compensation expense recorded in the years ended September 30, 2005, 2004 and 2003.

The following tables set forth the effects of the restatement on certain line items within the Company's consolidated statements of operations for the years ended September 30, 2005, 2004 and 2003 and consolidated balance sheets as of September 30, 2005 and 2004:

| | Year ended September 30, | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| | | In thousands | |
| Cost of revenues stock–based compensation expense product | | | |
| As previously reported | $ — | $ 237 | $ 1,821 |
| As restated | $ 195 | $ 494 | $ 3,121 |
| | | | |
| Cost of revenues stock–based compensation expense services | | | |
| As previously reported | $ — | $ — | $ — |
| As restated | $ 176 | $ 260 | $ 2,982 |
| | | | |
| Gross profit | | | |
| As previously reported | $162,802 | $202,793 | $ 102,798 |
| As restated | $162,431 | $202,276 | $ 98,516 |
| | | | |
| Stock–based compensation expense research and development | | | |
| As previously reported | $ 23 | $ 208 | $ 2,414 |
| As restated | $ 367 | $ 653 | $ 6,540 |
| | | | |
| Stock–based compensation expense selling, general and administrative | | | |
| As previously reported | $ 1,434 | $ 502 | $ 4,276 |
| As restated | $ 2,274 | $ 2,602 | $ 13,132 |
| | | | |
| Income (loss) from continuing operations | | | |
| As previously reported | $ (6,541) | $ 27,196 | $(182,662) |
| As restated | $ (8,096) | $ 24,134 | $(199,926) |

64

Table of Contents

**BROOKS AUTOMATION, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

|  | Year ended September 30, | | |
|---|---|---|---|
|  | 2005 | 2004 | 2003 |
|  | | In thousands | |
| Net income (loss) | | | |
| As previously reported | $(10,057) | $17,721 | $(185,760) |
| As restated | $(11,612) | $14,659 | $(203,024) |
| | | | |
| Basic net income (loss) per share | | | |
| As previously reported | $ (0.22) | $ 0.41 | $ (5.05) |
| As restated | $ (0.26) | $ 0.34 | $ (5.52) |
| | | | |
| Diluted net income (loss) per share | | | |
| As previously reported | $ (0.22) | $ 0.41 | $ (5.05) |
| As restated | $ (0.26) | $ 0.34 | $ (5.52) |

|  | As of September 30, | |
|---|---|---|
|  | 2005 | 2004 |
|  | In thousands | |
| Additional paid-in capital | | |
| As previously reported | $ 1,244,184 | $1,233,526 |
| As restated | $ 1,307,145 | $1,296,550 |
| | | |
| Accumulated deficit | | |
| As previously reported | $ (943,470) | $ (933,413) |
| As restated | $(1,006,229) | $ (994,617) |
| | | |
| Deferred compensation | | |
| As previously reported | $ (3,291) | $ (24) |
| As restated | $ (3,493) | $ (1,844) |

|  | As of September 30, 2005 |
|---|---|
|  | In thousands |
| Short-term debt | |
| As previously reported | $ — |
| As restated | $175,000 |
| Long-term debt | |
| As previously reported | $175,002 |
| As restated | $ 2 |

As a result of the restatement, the Company, as discussed in footnote 22, has reclassified $175 million of debt principal and $2.2 million of associated deferred financing costs from long-term to short-term at September 30, 2005.

The following is a summary of the effect of these corrections on the Company's pro forma calculation of its net income (loss) per share for the years ended September 30, 2005, 2004 and 2003:

|  | 2005 (as previously reported) | 2005 (as restated) |
|---|---|---|
| Net loss: | | |
| As reported | $ (10,057) | $ (11,612) |
| Add stock-based employee compensation expense included in reported net loss | 1,457 | 3,012 |
| Deduct pro forma stock-based compensation expense | 32,636 | 24,319 |
| Pro forma net loss | $ (41,236) | $ (32,919) |

65

BROOKS AUTOMATION, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

| | 2005 (as previously reported) | 2005 (as restated) |
|---|---|---|
| Basic and diluted net loss per share: | | |
| As reported | $ (0.22) | $ (0.26) |
| Pro forma | $ (0.92) | $ (0.73) |

| | 2004 (as previously reported) | 2004 (as restated) |
|---|---|---|
| Net income: | | |
| As reported | $ 17,721 | $ (14,659) |
| Add stock−based employee compensation expense included in reported net income | 990 | 4,052 |
| Deduct pro forma stock−based compensation expense | 30,148 | 21,889 |
| Pro forma net loss | $ (11,437) | $ (3,178) |
| Basic net income (loss) per share: | | |
| As reported | $ 0.41 | $ 0.34 |
| Pro forma | $ (0.27) | $ (0.07) |
| Diluted net income (loss) per share: | | |
| As reported | $ 0.41 | $ 0.34 |
| Pro forma | $ (0.27) | $ (0.07) |

| | 2003 (as previously reported) | 2003 (as restated) |
|---|---|---|
| Net loss: | | |
| As reported | $ (185,760) | $ (203,024) |
| Add stock−based employee compensation expense included in reported net loss | 8,511 | 25,775 |
| Deduct pro forma stock−based compensation expense | 23,432 | 66,339 |
| Pro forma net loss | $ (200,681) | $ (243,588) |
| Basic and diluted net loss per share: | | |
| As reported | $ (5.05) | $ (5.52) |
| Pro forma | $ (5.46) | $ (6.62) |

Certain other footnotes appearing in these financial statements were impacted by these corrections. Refer to footnotes 2, 8, 10, 12, 15, 17 and 22.

**4. Business Acquisitions**

**Purchase Transaction**

The following transaction was accounted for as purchase transaction under FAS 141. Common stock issued as consideration for this transaction was valued at the average closing price of the Company's common stock for two days before and the day of the acquisition, which coincided with the announcement date of this acquisition. The excess of purchase price over fair value of net assets acquired is allocated to goodwill. Pro forma results of operations are not presented as the amounts are not material compared to the Company's historical results.

Table of Contents

**BROOKS AUTOMATION, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Microtool, Inc.*

On October 9, 2002, the Company acquired Microtool, Inc. ("Microtool"), a Colorado Springs, Colorado company that provides service diagnostics for the 200mm and 300mm equipment markets. The acquisition of Microtool provides the Company with additional software and services offerings. In consideration, the Company paid $0.5 million cash and issued 170,001 shares of its common stock with a value of $1.7 million, or $9.74 per share. The Company had reserved an additional 19,999 shares to be issued conditionally upon adjustments for finalization of the net tangible assets acquired from the selling stockholders; these shares, valued at $0.2 million, or $9.99 per share, were issued on February 6, 2003. The following table summarizes this transaction (in thousands):

|  | Microtool |
|---|---|
| Consideration: | |
| Cash | $    500 |
| Common stock | 1,856 |
| Transactions costs | 202 |
| Total consideration | 2,558 |
| Fair value of net tangible assets acquired | 545 |
| Excess of consideration over fair value of net assets acquired allocated to goodwill | $  2,013 |

**5. Marketable Securities**

The Company invests its cash in marketable debt securities and classifies them as available−for−sale. The Company records these securities at fair value in accordance with Statement of Financial Accounting Standards No. 115, "Accounting for Certain Investments in Debt and Equity Securities" ("FAS 115"). Marketable securities reported as current assets represent investments that mature within one year from the balance sheet date. Long−term marketable securities represent investments with maturity dates greater than one year from the balance sheet date. At the time that the maturity dates of these investments become one year or less, the securities are reclassified to current assets. Unrealized gains and losses are excluded from earnings and reported in a separate component of stockholders' equity until they are sold. At the time of sale, any gains or losses, calculated by the specific identification method, will be recognized as a component of operating results.

The following is a summary of marketable securities, including accrued interest receivable, as of September 30, 2005 and 2004:

| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| | | (Amounts in thousands) | | |
| **September 30, 2005:** | | | | |
| U.S. Treasury securities and obligations of U.S. government agencies | $108,083 | $      1 | $    545 | $107,539 |
| U.S. corporate securities | 29,428 | 12 | 240 | 29,200 |
| Mortgage−backed securities | 5,004 | — | 108 | 4,896 |
| Other debt securities | 13,140 | — | 279 | 12,861 |
| | $155,655 | $    13 | $  1,172 | $154,496 |
| **September 30, 2004:** | | | | |
| U.S. Treasury securities and obligations of U.S. government agencies | $ 62,243 | $    — | $    169 | $ 62,074 |
| U.S. corporate securities | 44,097 | 102 | 158 | 44,041 |
| Mortgage−backed securities | 7,957 | — | 53 | 7,904 |
| Other debt securities | 21,937 | 4 | 131 | 21,810 |
| | $136,234 | $    106 | $    511 | $135,829 |

Gross realized gains and losses realized on sales of available−for−sale marketable securities included in "Other (income) expense" in the Consolidated Statements of Operations for the years ended September 30, 2005, 2004 and 2003 are as follows:

| | Year Ended September 30, | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| Gross realized gains | $    — | $   148 | $   877 |
| Gross realized losses | — | 111 | 67 |
| Net realized gains | $    — | $    37 | $   810 |

67

Table of Contents

**BROOKS AUTOMATION, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Since April 2004, the Company has held its available−for−sale marketable securities until maturity and, as such, has not incurred any realized gains or losses for the year ended September 30, 2005.

The fair value of the marketable securities at September 30, 2005, by contractual maturity, are shown below. Expected maturities will differ from contractual maturities because the issuers of the securities may have the right to prepay obligations without prepayment penalties.

|  | Fair Value |
|---|---|
|  | (In thousands) |
| Due in one year or less | $ 121,561 |
| Due after one year through five years | 22,574 |
| Due after five years through ten years | 3,358 |
| Due after ten years | 7,003 |
|  | $ 154,496 |

**6. Property, Plant and Equipment**

Property, plant and equipment as of September 30, 2005 and 2004 were as follows:

|  | September 30, | |
|---|---|---|
|  | 2005 | 2004 |
|  | (In thousands) | |
| Buildings and land | $ 40,019 | $ 39,874 |
| Computer equipment and software | 62,190 | 62,824 |
| Machinery and equipment | 27,572 | 27,145 |
| Furniture and fixtures | 12,471 | 14,633 |
| Leasehold improvements | 16,093 | 26,147 |
| Construction in progress | 2,682 | 3,005 |
|  | 161,027 | 173,628 |
| Less accumulated depreciation and amortization | (106,862) | (115,121) |
| Property, plant and equipment, net | $ 54,165 | $ 58,507 |

Depreciation expense was $13.3 million, $13.8 million and $25.5 million for the years ended September 30, 2005, 2004 and 2003, respectively.

In the fourth quarter of fiscal 2005, the Company accelerated the depreciation on its existing Customer Relations Management system which will be phased out by December 31, 2005. The impact of this accelerated depreciation was $1.3 million during the fourth quarter of fiscal 2005.

In fiscal 2003, the Company identified certain facilities that it would be exiting early as a part of its restructuring plan and therefore no longer expected to utilize these assets, including certain equipment and leasehold improvements, to their full estimated life. As such, the Company accelerated the depreciation of these assets to conform to the new estimated life in accordance with the Company's plan of vacating these facilities and in accordance with Accounting Principles Board Opinion No. 20, "Accounting Changes." The impact of the accelerated depreciation on the fiscal year resulted in the recognition of an incremental $9.4 million of depreciation expense. In addition, in fiscal 2003, the Company recorded an impairment charge of $6.1 million related to capitalized costs of an abandoned internal systems application infrastructure program.

**7. Goodwill and Intangible Assets**

The Company performs an annual impairment test of its goodwill as required under the provisions of FAS 142 on September 30 of each fiscal year unless interim indicators of impairment exist. Goodwill is considered to be impaired when the net book value of a reporting unit exceeds its estimated fair value. Fair values are estimated using a discounted cash flow methodology. Discounted cash flows are based on the businesses' strategic plans and management's best estimate of revenue growth and gross profit by each reporting unit. In the fourth quarter of fiscal year 2005, the Company's equipment automation and factory

BROOKS AUTOMATION, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

automation segments were combined into the hardware segment, which reflects how management now evaluates its business (see Note 16).

In fiscal 2003, the semiconductor industry downturn continued, although prior to the fourth quarter of fiscal 2003, there were no interim indicators of impairment as the market indicated the recovery of the semiconductor industry. The Company performed its annual impairment test under FAS 142 as of September 30, 2003 using the present value of expected future cash flows. During this process detailed estimates of revenue and expense were developed for each of the Company's segments and as a whole based on internal as well as external market forecasts. Based on this analysis, the Company determined that the implied fair value of the former factory automation hardware segment's goodwill was less than its book value and therefore recorded a charge of $40.0 million to write−down the value of this goodwill.

In fiscal 2004, in connection with a third party letter of intent to purchase the assets of the SELS, which made up the Company's "Other" segment, the Company assessed the potential impairment of goodwill for this segment (See Note 20). The Company considered the offer in the letter of intent as an indication of fair value. Based on its analysis, the Company determined that the implied fair value of the then "Other" segment's goodwill was $7.4 million less than its book value and therefore recorded a charge to write−down the value of this goodwill in the fourth quarter, which has been recorded as a component of the loss from discontinued operations for fiscal year 2004. As there were no interim indicators of potential impairment of goodwill in the Company's other segments, the Company performed its annual impairment test under FAS 142 in the fourth quarter of fiscal 2004 using the present value of expected cash flows. During this process detailed estimates of revenue and expense were developed for the segments based on internal as well as external market forecasts. The Company's analysis indicated no impairment of the goodwill in these segments.

In fiscal 2005, the Company performed its annual impairment test for goodwill and determined that no adjustment to goodwill was necessary.

The changes in the carrying amount of goodwill by segment for the years ended September 30, 2005 and 2004 are as follows (in thousands):

|  | Hardware | Software | Total |
|---|---|---|---|
| Balance at September 30, 2003 | $ 25,419 | $36,954 | $62,373 |
| Adjustments to goodwill: |  |  |  |
| Purchase accounting adjustments on prior period acquisitions | (400) | (26) | (426) |
| Foreign currency translation | 1 | 86 | 87 |
| Balance at September 30, 2004 | 25,020 | 37,014 | 62,034 |
| Adjustments to goodwill: |  |  |  |
| Foreign currency translation | — | 60 | 60 |
| Balance at September 30, 2005 | $ 25,020 | $37,074 | $62,094 |

Purchase accounting adjustments of $0.4 million for fiscal 2004 represents adjustments resulting from the finalization of purchase price for a historical acquisition.

Components of the Company's identifiable intangible assets are as follows (in thousands):

|  | September 30, 2005- | | | September 30, 2004 | | |
|---|---|---|---|---|---|---|
|  | Cost | Accumulated Amortization | Net book value | Cost | Accumulated Amortization | Net book Value |
| Patents | $ 7,179 | $ 6,934 | $ 245 | $ 7,179 | $ 6,839 | $ 340 |
| Completed technology | 30,385 | 29,120 | 1,265 | 30,385 | 26,824 | 3,561 |
| License agreements | 305 | 305 | — | 305 | 305 | — |
| Trademark and trade names | 2,532 | 2,336 | 196 | 2,532 | 2,193 | 339 |
| Non−competition agreements | 1,726 | 1,716 | 10 | 1,726 | 1,688 | 38 |
| Customer relationships | 6,517 | 4,405 | 2,112 | 6,517 | 3,866 | 2,651 |
|  | $48,644 | $ 44,816 | $ 3,828 | $48,644 | $ 41,715 | $ 6,929 |

Ratable amortization expense for intangible assets was $3.1 million, $3.7 million and $4.7 million for the years ended September 30, 2005, 2004 and 2003, respectively.

69

BROOKS AUTOMATION, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Estimated future amortization expense for the intangible assets recorded by the Company as of September 30, 2005 is as follows (in thousands):

| Year ended September 30, | |
|---|---|
| 2006 | $1,818 |
| 2007 | $ 770 |
| 2008 | $ 659 |
| 2009 | $ 581 |
| Thereafter | $ — |

## 8. Earnings (Loss) Per Share

Below is a reconciliation of earnings (loss) per share and weighted average common shares outstanding for purposes of calculating basic and diluted earnings (loss) per share (in thousands, except per share data):

| | Year Ended September 30, | | |
|---|---|---|---|
| | 2005 (as restated) | 2004 (as restated) | 2003 (as restated) |
| Net income (loss) | $(11,612) | $ 14,659 | $ (203,024) |
| Weighted average common shares outstanding used in computing basic earnings (loss) per share | 44,919 | 43,006 | 36,774 |
| Dilutive common stock options | — | 567 | — |
| Weighted average common shares outstanding for purposes of computing diluted earnings (loss) per share | 44,919 | 43,573 | 36,774 |
| Basic earnings (loss) per share | $ (0.26) | $ 0.34 | $ (5.52) |
| Diluted earnings (loss) per share | $ (0.26) | $ 0.34 | $ (5.52) |

Approximately 5,374,000, 4,985,000 and 6,598,000 options to purchase common stock and 21,000, 0 and 0 shares of restricted stock were excluded from the computation of diluted earnings (loss) per share attributable to common stockholders for the years ended September 30, 2005, 2004 and 2003, respectively, as their effect would be anti−dilutive. The 4,985,000 options for the year ended September 30, 2004 had an exercise price greater than the average market price of the common stock. In addition, 2,492,000 shares of common stock for the assumed conversion of the Company's convertible debt were excluded from this calculation for all years presented as the effect of conversion would be anti−dilutive. These options, restricted stock awards and conversions could, however, become dilutive in future periods.

## 9. Investment in Shinsung

As a result of the acquisition of PRI Automation, Inc. ("PRI"), the Company acquired PRI's minority investment in Shinsung Engineering Co., Ltd. ("Shinsung"), a South Korean manufacturer of semiconductor clean room equipment and other industrial systems. At the time of the Company's acquisition of PRI on May 14, 2002, the fair market values of the Shinsung common shares and warrants were $10.7 million and $12.0 million, respectively. In December 2002, the Company received an offer from Shinsung, and on January 27, 2003, concluded the sale to Shinsung of the warrants for $0.5 million. As a result, the Company recorded an impairment charge of $11.6 million. In March 2003, the Company sold the Shinsung common shares for $7.7 million, net of transaction costs, incurring a $3.0 million net loss on the sale of the common shares. Both the impairment charge and the net loss on the sale of the common shares have been included in "Other (income) expense" in the Company's Consolidated Statements of Operations for the year ended September 30, 2003.

## 10. Income Taxes

The components of the income tax provision are as follows (in thousands):

| | Year Ended September 30, | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| Current: | | | |
| State | $ 6 | $ 6 | $ 6 |
| Foreign | 5,198 | 8,047 | 4,900 |
| | 5,204 | 8,053 | 4,906 |

70

BROOKS AUTOMATION, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

|  | Year Ended September 30, | | |
|---|---|---|---|
|  | 2005 | 2004 | 2003 |
| Deferred: | | | |
| Federal | — | — | — |
| State | — | — | — |
| Foreign | — | — | — |
|  | $ 5,204 | $ 8,053 | $ 4,906 |

The components of income (loss) from continuing operations before income taxes and minority interests, are as follows (in thousands):

|  | Year Ended September 30, | | |
|---|---|---|---|
|  | 2005 | 2004 | 2003 |
|  | (as restated) | (as restated) | (as restated) |
| Domestic | $(7,015) | $ 10,820 | $ (162,124) |
| Foreign | 4,264 | 21,578 | (32,682) |
|  | $(2,751) | $ 32,398 | $ (194,806) |

The differences between the income tax provision (benefit) and income taxes computed using the applicable U.S. statutory federal tax rate are as follows (in thousands):

|  | Year Ended September 30, | | |
|---|---|---|---|
|  | 2005 | 2004 | 2003 |
|  | (as restated) | (as restated) | (as restated) |
| Income tax provision (benefit) computed at federal statutory rate | $ (963) | $ 11,339 | $ (68,182) |
| State income taxes, net of federal benefit | (643) | 286 | (3,266) |
| Research and development tax credits | — | (1,079) | (1,007) |
| Foreign sales corporation/ETI tax benefit | (357) | (621) | — |
| Foreign income taxed at different rates | 2,035 | (3,090) | 4,419 |
| Dividends | 3,531 | 223 | 359 |
| Change in deferred tax asset valuation allowance | (1,164) | (4,618) | 46,219 |
| Permanent differences | 276 | 299 | (818) |
| Deferred compensation | 636 | 1,124 | 9,715 |
| Nondeductible amortization of goodwill | — | — | 10,337 |
| Withholding taxes | 3,328 | 3,895 | 3,099 |
| Foreign taxes deducted | (1,475) | — | — |
| Other | — | 295 | 4,031 |
| Income tax provision | $ 5,204 | $ 8,053 | $ 4,906 |

The Company does not provide for U.S. income taxes applicable to undistributed earnings of its foreign subsidiaries since these earnings are indefinitely reinvested.

71

Table of Contents

**BROOKS AUTOMATION, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The significant components of the net deferred tax assets are as follows (in thousands):

|  | Year Ended September 30, | |
| --- | --- | --- |
|  | 2005 | 2004 |
|  | (as restated) | (as restated) |
| Reserves not currently deductible | $ 25,630 | $ 37,874 |
| Federal, state and foreign tax credits | 13,546 | 29,334 |
| Capitalized research and development | — | — |
| Depreciation and amortization | 35,769 | 40,215 |
| Stock–based compensation | 6,749 | 7,351 |
| Net operating loss carryforwards | 166,079 | 165,410 |
| Deferred tax assets | 247,773 | 280,184 |
| Other liabilities | 2,054 | 2,927 |
| Deferred tax liability | 2,054 | 2,927 |
| Valuation allowance | 245,719 | 277,257 |
| Net deferred tax assets | $ — | $ — |

As a result of recognizing an operating loss during the years ended September 30, 2003 and September 30, 2005, and the continuing uncertainty in the semiconductor sector, the Company has determined that it is more likely than not that the net deferred tax assets will not be realized and has maintained a full valuation allowance against its net deferred tax assets from continuing operations at September 30, 2005 and 2004. The amount of the deferred tax asset considered realizable is subject to change based on future events, including generating taxable income in future periods. The Company continues to assess the need for the valuation allowance at each balance sheet date based on all available evidence. If the Company generates future taxable income against which these tax attributes may be applied, some portion or all of the valuation allowance would be reversed and a corresponding increase in net income would be reported in future periods.

The approximate $32.0 million decrease in the valuation allowance at September 30, 2005 compared to September 30, 2004 is principally due to expiring tax credits and changes in state and foreign tax rates.

As of September 30, 2005, the Company had federal, state and foreign net operating loss carryforwards from continuing and discontinued operations of approximately $687.7 million and federal and state research and development tax credit carryforwards of approximately $13.5 million available to reduce future tax liabilities, which expire at various dates through 2025. Included in the net operating loss carryforwards are stock option deductions of approximately $19.5 million. The benefits of these tax deductions approximate $7 million of which approximately $4.0 million will be credited to additional paid–in capital upon being realized or recognized.

**11. Common Stock Offering**

On December 16, 2003, the Company completed a public offering of 6,900,000 shares of its common stock. The Company received proceeds, net of $6.8 million of issuance costs, of $124.3 million on the sale of the common stock.

**12. Financing Arrangements**

On May 23, 2001, the Company completed the private placement of $175.0 million aggregate principal amount of 4.75% Convertible Subordinated Notes due in 2008. The Company received net proceeds of $169.5 million from the sale. Interest on the notes is paid on June 1 and December 1 of each year. The notes will mature on June 1, 2008. The Company may redeem the notes at stated premiums after June 6, 2004. Holders may require the Company to repurchase the notes upon a change in control of the Company in certain circumstances. The notes are convertible at any time prior to maturity, at the option of the holders, into shares of the Company's common stock, at a conversion price of $70.23 per share, subject to certain adjustments. The notes are subordinated to the Company's senior indebtedness and structurally subordinated to all indebtedness and other liabilities of the Company's subsidiaries. Refer to footnote 22 for subsequent information.

At September 30, 2005, the Company had $0.7 million of an uncommitted demand promissory note facility still in use, all of it for letters of credit.

Table of Contents

BROOKS AUTOMATION, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Debt consists of the following (in thousands):

|  | September 30, | |
|  | 2005 | 2004 |
|---|---|---|
| Convertible subordinated notes at 4.75%, due on June 1, 2008 | $175,000 | $175,000 |
| Other | 14 | 25 |
|  | 175,014 | 175,025 |
| Less current portion | 175,012 | 11 |
| Long-term debt | $ 2 | $175,014 |

The Company's debt repayments are due as follows (in thousands):

| Year ended September 30, | |
|---|---|
| 2006 | $175,012 |
| 2007 | 2 |
|  | $175,014 |

## 13. Postretirement Benefits

The Company sponsors defined contribution plans that meet the requirements of Section 401(k) of the Internal Revenue Code. All United States employees of the Company who meet minimum age and service requirements are eligible to participate in the plan. The plan allows employees to invest, on a pre–tax basis, a percentage of their annual salary subject to statutory limitations.

As part of its cost reduction initiatives, the Company discontinued its matching contribution to the employee defined contribution plans during fiscal 2001. Accordingly, the Company did not record any expense for worldwide defined contribution plans for the years ended September 30, 2003. This matching contribution was reinstated in April 2004. The Company's contribution expense for worldwide defined contribution plans was $1.9 million and $0.9 million for the years ended September 30, 2005 and 2004, respectively.

The Company had an accrual of $9.9 million related to the retirement benefit to be paid to its former Chief Executive Officer under the terms of his employment agreement as of September 30, 2004. The amount payable was earned over time and due upon his retirement. In accordance with his employment contract, the full retirement benefit as determined by the employment agreement of $10.1 million was paid in January 2005.

## 14. Stockholders' Equity and Convertible Redeemable Preferred Stock

### Preferred Stock

At September 30, 2005 and 2004 there were one million shares of preferred stock, $0.01 par value per share authorized; no shares and one share was issued and outstanding at September 30, 2005 and 2004, respectively. The outstanding share of preferred stock was issued in connection with the Company's acquisition of PRI and relates to PRI's former Canadian exchangeable shareholders and was redeemed in 2005. The right for the holder of the preferred share was the same in all material respects to those of a holder of common stock. Preferred stock may be issued at the discretion of the Board of Directors without stockholder approval with such designations, rights and preferences as the Board of Directors may determine.

### Rights Distribution

Brooks is a party to a rights agreement between itself and EquiServe Trust Company, N.A. Pursuant to this agreement, Brooks declared a dividend to its stockholders as of August 12, 1997 of the right to initially purchase Brooks common stock or 1/1,000 of a share of Series A Junior Participating Preferred Stock. The preferred stock purchase rights are attached to the shares of Brooks common stock until a triggering event occurs. The preferred stock purchase rights are triggered by the acquisition by a person or group, an "acquiring person" as defined in the rights agreement, other than Brooks or any of Brooks' subsidiaries or employee benefit plans, of 15% or more of the outstanding shares of Brooks common stock. In such event, the holder of a preferred stock purchase right paying the exercise price would be able to purchase, instead of a fraction of a share of Series A Junior Participating Preferred Stock, a number of shares of Brooks common stock having a market value equal to twice the

73

Table of Contents

## BROOKS AUTOMATION, INC.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

exercise price. In the event of specified mergers and similar transactions involving Brooks, shares of the other party to the transaction or its parent could be purchased at half of the market price of such shares by the holders of the preferred stock purchase rights. The preferred stock purchase rights are redeemable in whole, but not in part, by Brooks for $0.001 per right and expire July 31, 2007. Subject to restrictions, the preferred stock purchase rights may be exchanged for one share of Brooks common stock upon election by Brooks' board of directors. An "acquiring person" would not be permitted to exercise a preferred stock purchase right. The intended effect of the rights agreement is to deter any person or group from becoming an "acquiring person" without negotiating the acquisition with Brooks' board of directors.

## 15. Stock Plans

Based on information currently available, the Company believes that, although certain options may have been granted in violation of our applicable option plans, those options are valid and enforceable obligations of the Company.

### 2000 Equity Incentive Stock Option Plan

The purposes of the 2000 Equity Incentive Stock Option Plan (the "2000 Plan"), are to attract and retain employees and to provide an incentive for them to assist the Company to achieve long−range performance goals and to enable them to participate in the long−term growth of the Company. Under the 2000 Plan the Company may grant (i) incentive stock options intended to qualify under Section 422 of the Internal Revenue Code of 1986, as amended, and (ii) options that are not qualified as incentive stock options ("nonqualified stock options") and (iii) the issuance of stock appreciation rights, performance shares and restricted stock. All employees of the Company or any affiliate of the Company, independent directors, consultants and advisors are eligible to participate in the 2000 Plan. Options under the 2000 Plan generally vest over four years and expire seven years from the date of grant. A total of 6,000,000 shares of common stock were reserved for issuance under the 2000 Plan. Of these shares, options to purchase 2,578,488 shares are outstanding and 3,053,686 shares remain available for grant as of September 30, 2005.

In connection with the grant of certain stock options to employees in the three years ended September 30, 2005, the Company recorded deferred stock compensation equal to the difference between the deemed fair market value of the common stock on the date of grant and the options' exercise price. Deferred compensation related to stock awards which vest over time is recorded as a component of stockholders' equity and is amortized over the vesting period of the related award. The Company has calculated the amortization of deferred compensation expense of all stock options granted in the years ended September 30, 2005, 2004 and 2003 to be $1.5 million, $4.0 million and $25.8 million, respectively. During the years ended September 30, 2005, 2004 and 2003, the Company reversed deferred stock compensation of $0.1 million, $0.7 million and $7.1 million, respectively, relating to former employees that had terminated prior to vesting.

During the year ended September 30, 2005, the Company issued 288,000 shares of restricted stock or units under the 2000 Equity Incentive Stock Option Plan, net of cancellations. These restricted stock awards have graded vesting over periods ranging from two to three years. Compensation expense related to these awards is being recognized on a straight line basis over the vesting period, based on the difference between the fair market value of the Company's common stock on the date of grant and the amount received from the employee. The Company has calculated the amortization of deferred compensation expense of all restricted stock awards granted in fiscal 2005 to be $4.7 million and has recorded compensation expense of $1.5 million related to the vesting of these awards for the year ended September 30, 2005. The weighted average fair value of restricted awards outstanding at September 30, 2005 was $16.48 per share.

### 1998 Employee Equity Incentive Plan

The purposes of the 1998 Employee Equity Incentive Plan (the "1998 Plan"), adopted by the Board of Directors of the Company in April 1998, are to attract and retain employees and provide an incentive for them to assist the Company in achieving long−range performance goals, and to enable them to participate in the long−term growth of the Company. All employees of the Company, other than its officers and directors, (including contractors, consultants, service providers or others) who are in a position to contribute to the long−term success and growth of the Company, are eligible to participate in the 1998 Plan. Options under the 1998 Plan generally vest over a period of four years and generally expire seven years from the date of grant. From February 26, 2003 through September 30, 2005, 1,379,400 options were forfeited due to employee terminations. A

74

Table of Contents

BROOKS AUTOMATION, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

total of 1,989,149 options are outstanding and 313,032 shares remain available for grant under the 1998 Plan as of September 30, 2005.

### 1993 Non−Employee Director Stock Option Plan

The purpose of the 1993 Non−Employee Director Stock Option Plan (the "Directors Plan") is to attract and retain the services of experienced and knowledgeable independent directors of the Company for the benefit of the Company and its stockholders and to provide additional incentives for such independent directors to continue to work for the best interests of the Company and its stockholders through continuing ownership of its common stock. Each director who is not an employee of the Company or any of its subsidiaries is eligible to receive options under the Directors Plan. Under the Directors Plan, each eligible director receives an automatic grant of an option to purchase 25,000 shares of common stock upon becoming a director of the Company and an option to purchase 10,000 shares on July 1 each year thereafter. Options granted under the Directors Plan generally vest over a period of five years and generally expire ten years from the date of grant. A total of 225,000 options are outstanding and no shares remain available for grant under the Directors Plan as of September 30, 2005.

### 1992 Combination Stock Option Plan

Under the Company's 1992 Stock Option Plan (the "1992 Plan"), the Company may grant both incentive stock options and nonqualified stock options. Incentive stock options may only be granted to persons who are employees of the Company at the time of grant, which may include officers and directors who are also employees. Nonqualified stock options may be granted to persons who are officers, directors or employees of or consultants or advisors to the Company or persons who are in a position to contribute to the long−term success and growth of the Company at the time of grant. Options granted under the 1992 Plan generally vest over a period of four years and generally expire ten years from the date of grant. A total 222,152 options are outstanding and no shares remain available for grant under the 1992 Plan as of September 30, 2005.

### Stock Options of Acquired Companies

In connection with the acquisition of PRI on May 14, 2002, the Company assumed the outstanding options of multiple stock option plans that were adopted by PRI. At acquisition, 6,382,329 options to purchase PRI common stock were outstanding and converted into 3,319,103 options to purchase the Company's Common Stock. There were options to purchase 188,533 shares outstanding at September 30, 2005. The Company does not intend to issue any additional options under the PRI stock option plan.

In connection with other acquisitions, the Company assumed the outstanding options of multiple stock option plans. There were options to purchase 2,032 shares outstanding at September 30, 2005. The Company does not intend to issue any additional options under these stock option plans.

### Stock Option Activity

Aggregate stock option activity for all the above plans for the years ended September 30, 2005, 2004 and 2003 is as follows:

| | Year Ended September 30, | | | | | |
|---|---|---|---|---|---|---|
| | 2005 | | 2004 | | 2003 | |
| | Shares | Weighted Average Price | Shares | Weighted Average Price | Shares | Weighted Average Price |
| Options outstanding at beginning of year | 5,709,626 | $25.43 | 4,639,910 | $28.93 | 9,019,022 | $34.62 |
| Granted | 652,250 | $16.38 | 2,486,159 | $23.84 | 980,800 | $12.14 |
| Exercised | (179,694) | $12.77 | (157,730) | $15.51 | (185,167) | $14.09 |
| Canceled | (976,828) | $29.77 | (1,258,713) | $36.95 | (5,174,745) | $35.83 |
| Options outstanding at end of year | 5,205,354 | $23.92 | 5,709,626 | $25.43 | 4,639,910 | $28.93 |
| Options exercisable at end of year | 4,120,400 | $25.83 | 3,234,428 | $27.75 | 2,522,030 | $34.00 |
| Weighted average fair value of options granted at market value during the year (restated) | | $ 7.39 | | $10.40 | | $ 7.30 |
| Weighted average fair value of options granted below market value during the year (restated) | | $ 6.20 | | $12.37 | | $11.33 |

Options available for
    future grant              3.366.718

75

BROOKS AUTOMATION, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The following table summarizes information about stock options outstanding at September 30, 2005:

| Range of Exercise Prices | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| | Shares | Weighted–Average Remaining Contractual Life (Years) | Weighted–Average Exercise Price | Shares | Weighted–Average Exercise Price |
| $  3.62 – $ 12.50 | 559,264 | 4.31 | $  10.37 | 363,064 | $  10.28 |
| $ 12.69 – $ 16.60 | 538,577 | 5.15 | $  14.19 | 208,479 | $  13.74 |
| $ 16.99 – $ 20.33 | 583,056 | 5.29 | $  18.05 | 214,568 | $  18.75 |
| $ 20.42 – $ 24.02 | 288,409 | 5.46 | $  22.84 | 141,636 | $  22.99 |
| $ 24.30 – $ 24.30 | 1,607,157 | 4.08 | $  24.30 | 1,589,246 | $  24.30 |
| $ 24.91 – $ 25.22 | 557,350 | 3.08 | $  25.21 | 557,350 | $  25.21 |
| $ 25.48 – $ 34.13 | 530,422 | 3.06 | $  28.96 | 527,938 | $  28.94 |
| $ 34.29 – $ 54.00 | 486,308 | 3.06 | $  40.45 | 463,308 | $  40.58 |
| $ 54.56 – $123.56 | 28,291 | 2.22 | $  78.43 | 28,291 | $  78.43 |
| $134.74 – $155.77 | 26,520 | 0.45 | $ 135.15 | 26,520 | $ 135.15 |
| $  3.62 – $155.77 | 5,205,354 | 4.09 | $  23.92 | 4,120,400 | $  25.83 |

*1995 Employee Stock Purchase Plan*

On February 22, 1996, the stockholders approved the 1995 Employee Stock Purchase Plan (the "1995 Plan") which enables eligible employees to purchase shares of the Company's common stock. Under the 1995 Plan, eligible employees may purchase up to an aggregate of 2,250,000 shares during six–month offering periods commencing on February 1 and August 1 of each year at a price per share of 85% of the lower of the fair market value price per share on the first or last day of each six–month offering period. Participating employees may elect to have up to 10% of their base pay withheld and applied toward the purchase of such shares. The rights of participating employees under the 1995 Plan terminate upon voluntary withdrawal from the plan at any time or upon termination of employment. As of September 30, 2005, 1,341,541 shares of common stock have been purchased under the 1995 Plan and 908,459 remain available for purchase.

## 16. Acquisition–Related and Restructuring Costs and Accruals

*Fiscal 2005 Activities*

The Company recorded a charge to continuing operations of $16.5 million in the year ended September 30, 2005 for restructuring costs. The Company also recorded a charge of $1.0 million in the year ended September 30, 2005 related to the discontinued SELS division, which is included in the loss from discontinued operations.

*Restructuring Costs*

Based on estimates of its near term future revenues and operating costs, the Company announced in fiscal 2005 plans to take additional cost reduction actions. Accordingly, charges of $17.5 million, of which $1.0 million related to, and is classified within discontinued operations, were recorded for these actions. Of this amount, $14.3 million related to workforce reductions of approximately 270 employees world wide, across all functions of the business and $3.2 million related to excess facilities. Of the $3.2 million of facilities charges, $1.5 million represents an additional accrual on a previous vacated facility due to a longer period than initially estimated to sub–lease the facility. Workforce reduction charges included $4.3 million for headcount reduction of approximately 100 individuals associated with our software segment, $3.6 million for reductions of approximately 65 employees in our Jena, Germany facility and $6.4 million related to various other actions undertaken in fiscal 2005. Excess facility charges consist of the present value of remaining lease obligations on facilities vacated in fiscal 2005. The accruals for workforce reductions are expected to be paid over the fiscal year 2006 and the facilities accruals over the respective lease terms extending through 2011. The Company estimates that salary and benefit savings in principally the selling, general and administrative functions as a result of these actions will be approximately $23.0 million annually. The impact of these cost

76

Table of Contents

**BROOKS AUTOMATION, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

reductions on the Company's liquidity is not significant, as these actions yield equivalent actual cash savings within twelve months.

The Company continues to review and align its cost structure to attain profitable operations amid the changing semiconductor cycles.

### Fiscal 2004 Activities

The Company recorded a charge to operations of $5.4 million in the year ended September 30, 2004 of which $0.1 million related to acquisitions and $5.3 million related to restructuring costs.

#### Acquisition–Related Costs

The $0.1 million related to acquisitions is comprised of legal and consulting costs to integrate and consolidate acquired entities into existing Brooks entities.

#### Restructuring Costs

Based on estimates of its near term future revenues and operating costs, the Company announced in fiscal 2004 several plans to take additional cost reduction actions. Accordingly, charges of $5.3 million were recorded for these actions. Of this amount, $3.9 million related to workforce reductions of approximately 60 employees world wide, across all functions of the business and $1.4 million related to excess facilities. Excess facilities charges of $1.4 million consisted of $0.2 million for excess facilities identified in fiscal 2004 that were recorded to recognize the amount of the remaining lease obligations. These costs have been estimated from the time when the space is vacant and there are no plans to utilize the facility. Costs incurred prior to vacating the facilities were charged to operations. Final exit costs for facilities abandoned in previous restructurings amounted to $0.7 million. The remaining $0.5 million represents a reevaluation of the assumptions used in determining the fair value of certain lease obligations related to facilities abandoned in a previous restructuring. The revised assumptions, including lower estimates of expected sub–rental income over the remainder of the lease terms, are based on management's evaluation of the rental space available. The Company believes that the cost reduction programs implemented will align costs with revenues. In the event the Company is unable to achieve this alignment, additional cost cutting programs may be required in the future. The facilities charges are expected to be paid over the remaining lease periods, expiring in fiscal 2011. These charges helped better align the Company's cost structure. The Company estimates that salary and benefit savings in principally the selling, general and administrative functions as a result of these actions will be approximately $5.6 million annually. The impact of these cost reductions on the Company's liquidity is not significant, as these actions yield equivalent actual cash savings within twelve months.

### Fiscal 2003 Activities

The Company recorded a charge to operations of $46.3 million in the year ended September 30, 2003 of which $6.2 million related to acquisitions, $6.1 million related to the write–off of capitalized costs related to cancelled internal application infrastructure programs, $39.8 million of restructuring costs and $5.8 million of restructuring reversals.

#### Acquisition–Related Costs

The $6.2 million related to acquisitions is comprised of the $3.2 million loss on the disposition of the Brooks Switzerland subsidiary, associated legal costs of $0.5 million and $2.5 million of legal, relocation and consulting costs to integrate and consolidate acquired entities into existing Brooks entities.

#### Restructuring Costs

Based on estimates of its near term future revenues and operating costs, the Company announced in fiscal 2003 several plans to take additional and significant cost reduction actions. Accordingly, charges of $45.9 million were recorded for these actions. Of this amount, $27.0 million related to workforce reductions of approximately 1,000 employees world wide, across all functions of the business, $12.8 million related to excess facilities and $6.1 million related to the write–off of capitalized costs of cancelled internal systems application infrastructure programs. Excess facilities charges of $12.8 million consisted of $2.7 million for excess facilities identified in fiscal 2003 that were recorded to recognize the lower of the amount of the remaining

77

Table of Contents

BROOKS AUTOMATION, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

lease obligations, net of any sublease rentals. These costs have been estimated from the time when the space is expected to be vacated and there are no plans to utilize the facility. Costs incurred prior to vacating the facilities were charged to operations. The remaining $10.1 million represents a reevaluation of the assumptions used in determining the fair value of certain lease obligations related to facilities abandoned in a previous restructuring. The revised assumptions, including lower estimates of expected sub−rental income over the remainder of the lease terms, are based on management's evaluation of the rental space available. These charges helped better align the Company's cost structure. The Company estimates that salary and benefit savings across all expense categories as a result of these actions were approximately $42.0 million annually. The impact of these cost reduction activities on the Company's liquidity was not significant, as these actions yield equivalent actual cash savings within twelve months. The Company estimates annual facilities savings of approximately $3.0 million principally within the Company's cost of sales as a result of these actions.

Periodically, the accruals related to restructuring charges are reviewed and compared to their respective cash requirements. As a result of these reviews, the accruals are adjusted for changes in cost and timing assumptions of previously accrued and recorded initiatives. During fiscal 2003, the Company identified $4.7 million of excess accruals associated with headcount reduction plans previously announced and implemented and $1.2 million of excess accruals for other restructuring costs. The final costs associated with these actions were lower than originally estimated and accrued. As a result, the excess accruals for these actions were reversed, with a corresponding reduction to restructuring expense in the Consolidated Statement of Operations for the year ended September 30, 2003.

The activity related to the Company's restructuring accruals is below, which includes activity related to our discontinued SELS division (in thousands):

| | Balance September 30, 2004 | Expense | Adjustments | Reversals | Utilization | Balance September 30, 2005 |
|---|---|---|---|---|---|---|
| | *Fiscal 2005 Activity* | | | | | |
| Facilities | $17,730 | $ 1,680 | $ 1,542 | $ — | $ (5,907) | $ 15,045 |
| Workforce−related | 2,460 | 14,451 | — | (184) | (8,298) | 8,429 |
| | $20,190 | $16,131 | $ 1,542 | $ (184) | $(14,205) | $ 23,474 |

| | Balance September 30, 2003 | Expense | Adjustments | Reversals | Utilization | Balance September 30, 2004 |
|---|---|---|---|---|---|---|
| | *Fiscal 2004 Activity* | | | | | |
| Facilities | $24,312 | $ 192 | $ 1,216 | $ — | $ (7,990) | $ 17,730 |
| Workforce−related | 4,955 | 3,922 | — | — | (6,417) | 2,460 |
| | $29,267 | $ 4,114 | $ 1,216 | $ — | $(14,407) | $ 20,190 |

| | Balance September 30, 2002 | Expense | Adjustments | Reversals | Utilization | Balance September 30, 2003 |
|---|---|---|---|---|---|---|
| | *Fiscal 2003 Activity* | | | | | |
| Facilities | $18,977 | $ 2,754 | $ 10,054 | $ — | $ (7,473) | $ 24,312 |
| Workforce−related | 13,480 | 27,029 | — | (4,658) | (30,896) | 4,955 |
| Other | 1,329 | — | — | (1,170) | (159) | — |
| | $33,786 | $29,783 | $ 10,054 | $ (5,828) | $(38,528) | $ 29,267 |

**17. Segment and Geographic Information**

The Company has two reportable segments: hardware and software. In the fourth quarter of fiscal year 2005, the Company's equipment automation and factory automation segments were combined into the hardware segment, which reflects how management now evaluates its business. Prior year amounts have been reclassified to conform to the current year presentation.

The hardware segment provides wafer handling products and components for use within semiconductor process equipment. These systems automate the movement of wafers into and out of semiconductor manufacturing process chambers and provide an integration point between factory automation systems and process tools. The products offered by the Company include vacuum and atmospheric systems and robots and related components. Also offered are assembly and manufacturing of customer designed automation systems, or contract automation systems. The primary customers for these solutions are manufacturers of process tool equipment. Additionally, hardware is also provided directly to fabs including automated material handling systems,

78

BROOKS AUTOMATION, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

or AMHS, that use overhead monorail systems and overhead hoist vehicles to store, transport and manage the movement of material throughout the fab. Other hardware products include equipment for lithography automation that manage the storage, inspection and transport of photomasks, or reticles.

The software segment addresses the need for production management systems driven by the extensive tracking and tracing requirements of the semiconductor industry. At the core of these production systems is the manufacturing execution system ("MES") that is primarily responsible for tracking the movement of production wafers in a fab, and managing the data and actions for every wafer, equipment, operator and other resources in the fab. These mission–critical systems provide real time information primarily to production operators, supervisors and fab managers. Also provided is other important software applications to meet the critical requirements of the fab, such as real time dispatching and scheduling, equipment communications, advanced process control, material control using the AMHS, activity execution and control, automated maintenance management of equipment, and other applications. Customers often purchase more than one of these software products from Brooks for a single fab, often driving the need for consulting and integration services. These software products enable semiconductor manufacturers to increase their return on investment by maximizing production efficiency, and may be sold as part of an integrated solution or on a stand–alone basis. These software products and services are also used in many similar manufacturing industries as semiconductor, including flat panel display, data storage, and electronic assembly.

The Company evaluates performance and allocates resources based on revenues and operating income (loss). Operating income (loss) for each segment includes selling, general and administrative expenses directly attributable to the segment. Amortization of acquired intangible assets, including impairment of these assets and of goodwill and acquisition–related and restructuring charges are excluded from the segments' operating income (loss). The Company's non–allocable overhead costs, which include corporate general and administrative expenses, are allocated between the segments based upon segment revenues. Segment assets exclude deferred tax assets, acquired intangible assets, goodwill, marketable securities and cash equivalents.

Financial information for the Company's business segments is as follows (in thousands):

| | Hardware (as restated) | Software (as restated) | Total (as restated) |
|---|---|---|---|
| **Year ended September 30, 2005** | | | |
| Revenues | | | |
| Product | $ 310,025 | $ 28,047 | $ 338,072 |
| Services | 59,753 | 65,921 | 125,674 |
| | $ 369,778 | $ 93,968 | $ 463,746 |
| Gross profit | $ 99,785 | $ 62,646 | $ 162,431 |
| Segment operating income | $ 12,481 | $ 2,843 | $ 15,324 |
| Depreciation | $ 9,899 | $ 3,352 | $ 13,251 |
| Assets | $ 237,676 | $ 54,675 | $ 292,351 |
| **Year ended September 30, 2004** | | | |
| Revenues | | | |
| Product | $ 357,280 | $ 44,972 | $ 402,252 |
| Services | 58,194 | 74,607 | 132,801 |
| | $ 415,474 | $ 119,579 | $ 535,053 |
| Gross profit | $ 130,124 | $ 72,152 | $ 202,276 |
| Segment operating income | $ 35,231 | $ 11,605 | $ 46,836 |
| Depreciation | $ 8,817 | $ 4,940 | $ 13,757 |
| Assets | $ 296,115 | $ 79,647 | $ 375,762 |
| **Year ended September 30, 2003** | | | |
| Revenues | | | |
| Product | $ 200,712 | $ 24,730 | $ 225,442 |
| Services | 54,694 | 59,956 | 114,650 |
| | $ 255,406 | $ 84,686 | $ 340,092 |
| Gross profit | $ 52,674 | $ 45,842 | $ 98,516 |
| Segment operating loss | $ (54,849) | $ (26,853) | $ (81,702) |
| Depreciation | $ 22,808 | $ 2,664 | $ 25,472 |
| Assets | $ 211,642 | $ 54,512 | $ 266,154 |

A reconciliation of the Company's reportable segment operating income (loss) and segment assets to the corresponding consolidated amounts as of and for the year ended September 30, 2005, 2004 and 2003 is as follows (in thousands):

BROOKS AUTOMATION, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

| | As of and For the Year Ended September 30, | | |
|---|---|---|---|
| | 2005 (as restated) | 2004 (as restated) | 2003 (as restated) |
| Segment income (loss) from continuing operations | $ 15,324 | $ 46,836 | $ (81,702) |
| Amortization of acquired intangible assets | 3,100 | 3,663 | 4,654 |
| Asset impairment charges | — | — | 39,951 |
| Restructuring and acquisition−related charges | 16,542 | 5,356 | 46,257 |
| Total income (loss) from continuing operations | $ (4,318) | $ 37,817 | $(172,564) |
| Segment assets | $292,351 | $ 375,762 | $ 266,154 |
| Assets from discontinued operations | 55 | 1,706 | 7,673 |
| Goodwill | 62,094 | 62,034 | 62,373 |
| Intangible assets | 3,828 | 6,929 | 10,569 |
| Investments in marketable securities and cash equivalents | 265,752 | 224,608 | 146,476 |
| Total assets | $624,080 | $ 671,039 | $ 493,245 |

Net revenues based upon the source of the order by geographic area are as follows (in thousands):

| | Year Ended September 30, | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| North America | $241,681 | $272,694 | $168,979 |
| Asia/Pacific | 141,703 | 141,697 | 105,427 |
| Europe | 80,362 | 120,662 | 65,686 |
| | $463,746 | $535,053 | $340,092 |

Long−lived assets, including property, plant and equipment by geographic area are as follows (in thousands):

| | September 30, | |
|---|---|---|
| | 2005 | 2004 |
| North America | $51,115 | $55,330 |
| Asia/Pacific | 2,357 | 1,807 |
| Europe | 693 | 1,370 |
| | $54,165 | $58,507 |

## 18. Significant Customers and Related Party Information

On June 11, 2001, the Company appointed a new member to its Board of Directors. This individual is a director of one of the Company's customers. Accordingly, this customer is considered a related party for the period subsequent to June 11, 2001. Revenues from this customer for the years ended September 30, 2005, 2004, and 2003 were approximately $319,000, $409,000 and $250,000, respectively. The amounts due from this customer included in accounts receivable at September 30, 2005 and 2004 were $33,000 and $13,000, respectively. Related party transactions and amounts included in accounts receivable are on standard pricing and contractual terms and manner of settlement for products and services of similar types and at comparable volumes.

The Company had no customer that accounted for more than 10% of revenues in the years ended September 30, 2005, 2004 and 2003. The Company had one customer that accounted for more than 10% of its accounts receivable balance at September 30, 2005 and no customers that accounted for 10% of its accounts receivable balance at September 30, 2004.

## 19. Other Balance Sheet Information

Components of other selected captions in the Consolidated Balance Sheets are as follows (in thousands):

| | September 30, | |
|---|---|---|
| | 2005 | 2004 |
| Accounts receivable | $80,352 | $126,119 |
| Less allowance for doubtful accounts | 2,797 | 3,230 |
| | $77,555 | $122,889 |

The allowance for doubtful accounts was $6,499,000 and $5,977,000 at September 30, 2003 and 2002, respectively. The Company recorded additions (reductions) to the allowance for doubtful accounts of $0, $225,000 and $2,217,000 in fiscal 2005, 2004 and 2003, respectively, comprised of $(20,000), $187,000 and $533,000 charged to expense in fiscal 2005, 2004 and 2003, respectively, and $20,000, $38,000 and $1,684,000 of foreign exchange differences charged to other accounts in fiscal 2005, 2004 and 2003, respectively. The Company reduced the allowance for doubtful accounts by $433,000, $3,494,000 and $1,695,000, in fiscal 2005, 2004 and 2003, respectively, for write−offs and other adjustments.

# EXHIBIT A
# PART 4 OF 4

Table of Contents

BROOKS AUTOMATION, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

|  | September 30, | |
|---|---|---|
|  | 2005 | 2004 |
| Inventories | | |
| Raw materials and purchased parts | $24,612 | $27,030 |
| Work−in−process | 12,043 | 12,227 |
| Finished goods | 11,779 | 32,357 |
|  | $48,434 | $71,614 |

Reserves for excess and obsolete inventory were $12,707,000, $14,520,000, $15,505,000 and $25,915,000 at September 30, 2005, September 30, 2004, September 30, 2003 and September 30, 2002, respectively. The Company recorded additions to reserves for excess and obsolete inventory of $8,902,000, $9,259,000 and $8,350,000 in fiscal 2005, 2004 and 2003, respectively, comprised of $8,752,000, $7,340,000 and $7,517,000 charged to expense in fiscal 2005, 2004 and 2003, respectively, and $150,000, $421,000 and $833,000 of foreign exchange differences charged to other accounts in fiscal 2005, 2004 and 2003, respectively. The Company reduced the reserves for excess and obsolete inventory by $10,715,000, $10,244,000 and $18,760,000, in fiscal 2005, 2004 and 2003, respectively, for write−offs of inventory.

The Company provides for the estimated cost of product warranties, primarily from historical information, at the time product revenue is recognized and retrofit accruals at the time retrofit programs are established. While the Company engages in extensive product quality programs and processes, including actively monitoring and evaluating the quality of its component suppliers, the Company's warranty obligation is affected by product failure rates, utilization levels, material usage, service delivery costs incurred in correcting a product failure, and supplier warranties on parts delivered to the Company. Product warranty and retrofit activity on a gross basis for the years ended September 30, 2005, 2004, and 2003 is as follows (in thousands):

| | |
|---|---|
| Balance September 30, 2002 | $19,011 |
| Accruals for warranties during the year | 1,710 |
| Settlements made during the year | (8,912) |
| Balance September 30, 2003 | 11,809 |
| Accruals for warranties during the year | 3,980 |
| Settlements made during the year | (3,843) |
| Balance September 30, 2004 | 11,946 |
| Accruals for warranties during the year | 3,786 |
| Settlements made during the year | (5,950) |
| Balance September 30, 2005 | $ 9,782 |

## 20. Commitments and Contingencies

### Lease Commitments

The Company leases manufacturing and office facilities and certain equipment under operating leases that expire through 2013. Rental expense under operating leases, excluding expense recorded as a component of restructuring, for the years ended September 30, 2005, 2004 and 2003 was $4.7 million, $6.5 million and $9.4 million, respectively. Future minimum lease commitments on non−cancelable operating leases, lease income and sublease income are as follows (in thousands):

| | Operating Leases | Lease and Sublease Income |
|---|---|---|
| Year ended September 30, | | |
| 2006 | $ 10,117 | $ 1,633 |
| 2007 | 7,836 | 1,370 |
| 2008 | 7,636 | 1,379 |
| 2009 | 7,607 | 1,395 |
| 2010 | 7,211 | 1,410 |
| Thereafter | 12,458 | 1,426 |
| | $ 52,865 | $ 8,613 |

These future minimum lease commitments include approximately $32.0 million related to facilities the Company has elected to abandon in connection with its restructuring initiatives.

### Purchase Commitments

The Company has non−cancelable contracts and purchase orders for inventory of $32.3 million at September 30, 2005.

81

Table of Contents

BROOKS AUTOMATION, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*Contingencies*

There has been substantial litigation regarding patent and other intellectual property rights in the semiconductor and related industries. Brooks has in the past been, and may in the future be, notified that it may be infringing intellectual property rights possessed by other third parties. Brooks cannot guarantee that infringement claims by third parties or other claims for indemnification by customers or end users of its products resulting from infringement claims will not be asserted in the future or that such assertions, if proven to be true, will not materially and adversely affect Brooks' business, financial condition and results of operations. If any such claims are asserted against Brooks' intellectual property rights, the Company may seek to enter into a royalty or licensing arrangement. Brooks cannot guarantee, however, that a license will be available on reasonable terms or at all. Brooks could decide in the alternative to resort to litigation to challenge such claims or to attempt to design around the patented technology. Litigation or an attempted design around could be costly and would divert our management's attention and resources. In addition, if Brooks does not prevail in such litigation or succeed in an attempted design around, Brooks could be forced to pay significant damages or amounts in settlement. Even if a design around is effective, the functional value of the product in question could be greatly diminished.

On or about April 21, 2005, Brooks was served with a third–party complaint seeking to join Brooks as a party to a patent lawsuit brought by an entity named Information Technology Innovation, LLC based in Northbrook, Illinois ("ITI") against Motorola, Inc. ("Motorola") and Freescale Semiconductor, Inc. ("Freescale"). The lawsuit (the "ITI Lawsuit") also involves two individuals: Robert W. Atherton ("Atherton"), the named inventor on the patent, and Willis E. Higgins ("Higgins"), an attorney who worked with Atherton to obtain the patent. ITI began the ITI Lawsuit against Motorola in the United States District Court for the Northern District of Illinois (Eastern Division) in November 2004, and ITI added Freescale to the ITI Lawsuit in March 2005. ITI claims that Motorola and Freescale have infringed a U.S. patent that ITI asserts covers processes used to model a semiconductor manufacturing plant. ITI asserts that Brooks has induced and contributed to the infringement of the patent.

Freescale alleges that Brooks has a duty to indemnify Freescale and Motorola from any infringement claims asserted against them based on their use of Brooks' AutoSched software program by paying all costs and expenses and all or part of any damages that either of them might incur as a result of the ITI Lawsuit brought by ITI. AutoSched is a software program sold by Brooks and by one or more companies that formerly owned the AutoSched product prior to the acquisition of AutoSched by Brooks in 1999 from Daifuku U.S.A, Inc.

On July 7, 2005, Intel Corporation ("Intel") filed a lawsuit against ITI seeking a declaratory judgment that Intel has not infringed and is not infringing the patent (the "Intel Lawsuit"). In letters dated May 26, 2005 and September 23, 2005, Intel notified Brooks that Intel believes that Brooks has an indemnification obligation to Intel, but that, at present, Intel is not seeking to have those obligations determined and enforced in the Intel Lawsuit. Thus, Brooks has not been made a party to the Intel Lawsuit. The Intel Lawsuit is pending before the same judge as the ITI Lawsuit, but has a separate schedule.

Brooks believes that ITI is not a company that is engaged in the business of manufacturing hardware or software products. It is a limited liability company that apparently acquired an exclusive license to the patent at issue in the litigation and is now in the business of seeking to license the patent to others. Brooks also believes that in or after December 2004, ITI's parent, Global Patent Holdings,LLC, was acquired by Acacia Research Corporation. Brooks believes that Acacia Research Corporation is a publicly–traded company that is in the business of acquiring patents and then seeking to license the patents to others.

On September 7, 2005, the parties presented arguments to the court in the ITI Lawsuit about how the claims of the patent should be construed or interpreted. On October 4, 2005, the court issued its claim construction ruling. The fact discovery period in the ITI Lawsuit ends on November 30, 2005, and expert discovery is scheduled to end on February 3, 2006. No trial date has been set for the ITI Lawsuit.

Brooks believes that it has meritorious defenses to any claim that Brooks' AutoSched product infringes the patent identified in the ITI Lawsuit against Motorola and Freescale, as well as the Intel Lawsuit. Brooks plans to contest any such patent infringement claims in those lawsuits. Brooks also believes that meritorious defenses exist to the claims asserted by ITI against Motorola and Freescale, in the ITI Lawsuit and to the counterclaims asserted by ITI against Intel in the Intel Lawsuit. Brooks intends to cooperate fully with Motorola, and Freescale, and Intel in the defense of those claims. In any such matter there can be no assurance as to the outcome, and for the reasons described in the first paragraph of the "Contingency" section of this Note 19, the ITI litigations could have a material adverse effect on Brooks.

82

**BROOKS AUTOMATION, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

In any patent litigation matter there can be no assurances as to the final outcome and this litigation could have a material adverse effect on us. If a judgment of infringement were obtained against us, we could be required to pay substantial damages and a court could issue an order preventing us from continuing to sell our AutoSched product. We cannot predict the extent to which we might be required to seek licenses or alter our products as a result of the ITI litigation so that they no longer infringe upon the rights of others. We also cannot guarantee that the terms of any licenses we may be required to seek will be reasonable. Similarly, changing our products or processes to avoid infringing the rights of others may be costly or impractical and could detract from the value of our products. Further, the cost of defending this litigation and the diversion of management attention brought about by such litigation could be substantial, even if we ultimately prevail.

**21. Discontinued Operations**

In June 2005, the Company signed definitive purchase and sale agreements to sell substantially all the assets of the Company's Specialty Equipment and Life Sciences division ("SELS"), formerly known as IAS, which provided standard and custom automation technology and products for the semiconductor, photonics, life sciences and certain other industries. This sale was completed and all activities of SELS have ceased during the fourth quarter of fiscal 2005. Effective June 2005, the Company's consolidated financial statements and notes have been reclassified to reflect this business as a discontinued operation in accordance with Financial Accounting Standards Board Statement No. 144, "Accounting for the Impairment or Disposal of Long–Lived Assets."

The summary of operating results from discontinued operations is as follows (in thousands):

|  | Year Ended September 30, | | |
|  | 2005 | 2004 | 2003 |
|---|---|---|---|
| Revenues | $ 626 | $ 4,716 | $ 3,518 |
| Gross profit | $ (691) | $ 1,531 | $ 868 |
| Loss from discontinued operations, net of tax | $ (3,516) | $ (9,475) | $ (3,098) |

The loss from discontinued operations, net of tax of $3.5 million for the year ended September 30, 2005 includes a loss on disposal, net of tax of $24,000.

Due to the losses incurred since acquisition, no tax benefit is reflected for the losses incurred. The Company recorded impairment charges related to SELS of $7.4 million in 2004.

Assets and liabilities from discontinued operations are as follows (in thousands):

|  | September 30, | |
|  | 2005 | 2004 |
|---|---|---|
| Current assets | $ 55 | $ 1,403 |
| Non–current assets | — | 303 |
| Assets from discontinued operations | $ 55 | $ 1,706 |
| Current liabilities from discontinued operations | $ 399 | $ 674 |

Current assets include accounts receivable and inventory. Non–current assets include property, plant and equipment. Current liabilities include accounts payable and other current liabilities.

**22. Subsequent Events**

**Acquisitions**

On July 11, 2005, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with Helix Technology Corporation ("Helix"), a Delaware corporation and Mt. Hood Corporation ("Mt. Hood"), a newly–formed Delaware corporation and a direct wholly–owned subsidiary of the Company. This acquisition closed on October 26, 2005. Under the terms of the Merger Agreement, Mt. Hood merged (the "Merger") with and into Helix, with Helix continuing as the surviving corporation. Each share of Helix common stock, par value $1.00 per share, other than shares held by Helix as treasury stock and shares held by the Company or Mt. Hood, was cancelled and extinguished and automatically converted into 1.11 ("Exchange

83

Table of Contents

BROOKS AUTOMATION, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Ratio") shares of the Company's common stock. In addition, the Company assumed all options then outstanding under Helix's existing equity incentive plans, each of which is now exercisable into a number of shares of the Company's common stock (and at an exercise price) adjusted to reflect the Exchange Ratio. The Helix acquisition is preliminarily valued at approximately $459 million, consisting of 28.8 million shares of common stock valued at $444.4 million, the fair value of assumed Helix options of $6.0 million, and cash of $8.4 million, and will operate in the Company's hardware segment. This transaction qualifies as a tax−free reorganization under Section 368(a) of the Internal Revenue Code of 1986, as amended, and the Company is in the process of evaluating the impact that the Merger may have on the Company's net operating loss carryforwards and other tax attributes. The acquisition of Helix enables us to better serve our current market, increase our addressable market, reduce the volatility that both businesses have historically faced and position us to enhance our financial performance.

The following table summarizes the preliminary unaudited estimated fair value of the assets acquired and liabilities assumed at the date of acquisition. The Company is in the process of finalizing the purchase price allocation and, accordingly, the allocation of the purchase price is subject to adjustment (in millions):

| | |
|---|---:|
| Current assets | $ 80.0 |
| Property, plants and equipment | 19.7 |
| Intangible assets | 81.6 |
| Goodwill | 283.7 |
| Other assets | 14.7 |
| Total assets acquired | $ 479.7 |
| Current liabilities | $ 15.6 |
| Other liabilities | 5.1 |
| Total liabilities assumed | 20.7 |
| Total purchase price including acquisition costs | $ 459.0 |

Of the $81.6 million of acquired intangible assets, the following table reflects the preliminary allocation of the acquired intangible assets and related estimates of useful lives (in millions):

| | | |
|---|---:|---|
| Completed and core technology | $58.3 | 5−10−year estimated useful life |
| Customer and contract relationships | 18.6 | 4−11−year estimated economic consumption life |
| Trade names and trademarks | 4.7 | 6−9−year estimated useful life |
| | $81.6 | |

### Bond Acceleration (Unaudited)

The Company did not file its quarterly report on Form 10−Q for the period ended March 31, 2006 by the prescribed due date. As a result of this delay, the Company was not in compliance with its obligation under Section 6.2 of the indenture with respect to its 4.75% Convertible Subordinated Notes due 2008 to file with the SEC all reports and other information and documents which the Company is required to file with the SEC pursuant to Sections 13 or 15(d) of the Securities Exchange Act of 1934. Under the indenture, an event of default occurs if the Company fails to cure the default within 60 days after written notice of the default to the Company and the trustee by holders of at least 25% in aggregate principal amount of notes outstanding. On May 15, 2006, the Company received a notice from holders of more than 25% in aggregate principal amount of notes outstanding that the Company was in default of Section 6.2 of the indenture based on its failure to file its Form 10−Q. On Friday July 14, 2006, the Company received a further notice from holders of more than 25% of the aggregate outstanding principal amount of the notes accelerating the Company's obligation to repay the unpaid principal on the notes because its Report on Form 10−Q for the quarter ended March 31, 2006 had not yet been filed. On Monday, July 17, 2006, the Company paid the outstanding $175 million principal balance to the trustee. Under the terms of the indenture, holders of a majority in aggregate principal amount of the outstanding notes may elect to rescind an acceleration and its consequences. To date the Company has received no notice of any such election being made. If such an election were made, the funds paid to the trustee would be returned to the Company and the obligations set forth pursuant to the notes and the indenture would be restored.

### Stock Option Restatement Litigation (Unaudited)

On May 12, 2006, the Company announced that it had received notice that the Boston Office of the United States Securities and Exchange Commission (the "SEC") was conducting an informal inquiry concerning stock option grant practices to

84

Table of Contents

**BROOKS AUTOMATION, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

determine whether violations of the securities laws had occurred. On June 2, 2006, the SEC issued a voluntary request for information to the Company in connection with an informal inquiry by that office regarding a loan the Company previously reported had been made to Mr. Therrien in connection with his exercise of stock options in 1999. On June 23, 2006, the Company was informed that the SEC had opened a formal investigation into this matter and on the general topic of the timing of stock option grants. On June 28, 2006, the SEC issued a subpoena to the Company seeking documents related to the Company's stock option grant practices and a purported loan to Robert Therrien in August 1999 in connection with his exercise of a stock option.

On May 19, 2006, the Company received a grand jury subpoena from the United States Attorney (the "DOJ") for the Eastern District of New York requesting documents relating to stock option grants. Responsibility for the DOJ's investigation was subsequently assumed by the United States Attorney for the District of Massachusetts. On June 22, 2006, the United States Attorney's Office for the District of Massachusetts issued a grand jury subpoena to the Company in connection with an investigation by that office into the timing of stock option grants by the Company and the loan to Mr. Therrien mentioned above.

The Company is cooperating fully with the investigations being conducted by the SEC and the DOJ.

On May 22, 2006, a derivative action was filed nominally on our behalf in the Superior Court for Middlesex County, Massachusetts, captioned as Mollie Gedell, Derivatively on Behalf of Nominal Defendant Brooks Automation, Inc. v. A. Clinton Allen, *et al.* The Defendants in the case are: A. Clinton Allen, Director of the Company; Roger D. Emerick, former Director of the Company; Edward C. Grady, Director, President and CEO of the Company; Amin J. Khoury, former Director of the Company; Joseph R. Martin, Director of the Company; John K. McGillicuddy, Director of the Company; and Robert J. Therrien, former Director, President and CEO of the Company. The complaint alleges defendants breached their fiduciary duties by backdating stock option grants; violating Generally Accepted Accounting Principles; causing us to issue false and misleading financial statements; and causing us to file false proxy statements and Form 4's. The complaint further alleges that Messrs. Therrien, Grady, Emerick and Khoury were unjustly enriched as a result of their receipt and retention of backdated stock option grants. The Complaint seeks, on our behalf, *inter alia*, damages against the individual defendants for breaches of fiduciary duties; disgorgement of any backdated stock options or the proceeds of any related exercised stock options; other equitable relief to remedy breached fiduciary duties; and plaintiff's costs.

On May 26, 2006, a derivative action was filed in the Superior Court for Middlesex County, Massachusetts nominally on our behalf, captioned as Ralph Gorgone, Derivatively on Behalf of Nominal Defendant Brooks Automation, Inc. v. Edward C. Grady, *et al.* The Defendants in the action are: Mr. Grady; Mr. Allen; Mr. Emerick; Mr. Khoury; Robert J. Lepofsky, Director of the Company; Mr. Martin; Mr. McGillicuddy; Krishna G. Palepu, Director of the Company; Alfred Woollacott, III, Director of the Company; Mark S. Wrighton, Director of the Company; and Marvin Schorr, Director of the Company. The complaint alleges defendants breached fiduciary duties owed the Company by causing or allowing the backdating of stock option grants; the issuance of inaccurate financial results; abuse of control; gross mismanagement; waste of corporate assets; and unjust enrichment. The complaint seeks, on our behalf, *inter alia*, damages against the director defendants for breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; the Court to direct the Company to take actions to improve corporate governance and internal procedures; extraordinary equitable and/or injunctive relief; restitution and disgorgement of profits; and plaintiff's costs.

The parties have filed a motion to consolidate the two state derivative actions in Massachusetts Superior Court. If the motion is granted, a consolidated complaint is required to be filed within 30 days of the consolidation order.

On May 30, 2006, a derivative action was filed in the United States District Court for the District of Massachusetts, captioned as Mark Collins, Derivatively on Behalf of Nominal Defendant Brooks Automation, Inc. v. Robert J. Therrien, *et al.* The defendants in the action are: Mr. Therrien; Mr. Allen; Mr. Emerick; Mr. Grady; Mr. Khoury; Mr. Martin; and Mr. McGillicuddy. The complaint alleges breach of fiduciary duties in connection with the management of the Company; disseminating false information to the market; failing to design and implement adequate internal controls; and as against Messrs. Therrien, Grady, Emerick and Khoury, unjust enrichment. The complaint seeks, on our behalf, *inter alia*, damages against the individual defendants for breaches of fiduciary duties; disgorgement of backdated stock options or proceeds from exercised stock options; other equitable relief to remedy the breaches of fiduciary duties; and plaintiff's costs.

85

Table of Contents

## BROOKS AUTOMATION, INC.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

On June 7, 2006, a derivative action was filed in the United States District Court for the District of Massachusetts, captioned as City of Pontiac General Employees' Retirement System, Derivatively on Behalf of Brooks Automation, Inc. v. Robert J. Therrien, et al. The Defendants in this action are: Mr. Therrien; Mr. Emerick; Mr. Khoury; Mr. Allen; Mr. Grady; Mr. Lepofsky; Mr. Martin; Mr. McGillicuddy; Mr. Palepu; Mr. Woollacott, III; Mr. Wrighton; and Mr. Schorr. The complaint alleges violations of Section 10(b) and Rule 10b–5 of the Exchange act; Section 14(a) of the Exchange Act; Section 20(a) of the Exchange Act; breach of fiduciary duty; breach of fiduciary duty and/or aiding and abetting; abuse of control; gross mismanagement; constructive fraud; corporate waste; unjust enrichment; rescission against Messrs. Therrien, Emerick and Khoury; and breach of contract against Mr. Therrien. The complaint seeks, on our behalf, inter alia, damages against the individual defendants for breaches of fiduciary duties; extraordinary equitable and/or injunctive relief; and plaintiff's costs.

The parties have filed a motion to consolidate the two federal derivative actions in the United States District Court for the District of Massachusetts. If the order is granted, the plaintiffs will have 45 days to file a consolidated complaint, or to designate one of the existing complaints as the operative complaint.

On June 19, 2006, a putative class action was filed in the United States District Court, District of Massachusetts, captioned as Charles E. G. Leech Sr. v. Brooks Automation, Inc., et al. The defendants in this action are: the Company; Mr. Therrien; Ellen Richstone, the Company's former Chief Financial Officer; Mr. Emerick; Mr. Khoury; Robert W. Woodbury, Jr., the Company's Chief Financial Officer; and Mr. Grady. The complaint alleges violations of Section 10(b) of the Exchange Act and Rule 10b–5 against us and the individual defendants; Section 20(a) of the Exchange Act against the individual defendants; Section 11 of the Securities Act against us and Messrs. Grady, Woodbury, Emerick, Khoury and Therrien; Section 12 of the Securities Act against us and Messrs. Grady, Woodbury, Emerick, Khoury and Therrien; and Section 15 of the Securities Act against Messrs. Grady, Woodbury, Emerick, Khoury and Therrien. The complaint seeks, inter alia, damages, including interest, and plaintiff's costs.

On July 19, 2006, a putative class action was filed in the United States District Court for the District of Massachusetts, captioned as James R. Shaw v. Brooks Automation, Inc., et al. The Defendants in the case are: the Company; Mr. Therrien; Ms. Richstone; Mr. Emerick; Mr. Khoury; Mr. Woodbury; and Mr. Grady. As of this date, the Company has not been served with the complaint. The complaint alleges violations of Section 10(b) of the Exchange Act and Rule 10b–5 against all defendants and violations of Section 20(a) of the Exchange Act against all individual defendants. The complaint seeks, inter alia, damages, including interest, and plaintiff's costs.

The Company is aware of additional proposed class actions, posted on the websites of the Brower Piven, the Charles H. Johnson and Associates, and the Federwood & Sherwood law firms. The Company is not yet aware of the filing of such actions, and Brooks has not been served with a complaint or any other process in any of these matters.

### Nasdaq Delisting Notice (Unaudited)

On May 12, 2006, the Company received a staff determination letter from the Nasdaq Stock Market stating that its failure to timely file its quarterly report on Form 10–Q for the fiscal quarter ended March 31, 2006 was a violation of Nasdaq rules and that its securities would be delisted unless the Company requested a hearing. The Company requested a hearing, and this request stayed the delisting pending the outcome of the hearing. A hearing has been held at which the Company requested additional time to complete any necessary filings prior the delisting of its securities. On July 25, 2006, the Company received notice from the Nasdaq Stock Market that its common stock will not be delisted provided that it files its quarterly report on Form 10–Q for the fiscal quarter ended March 31, 2006 and all required restatements on or prior to August 15, 2006. If the Company is unable to file these reports on or before August 15, 2006, the Company's common stock may be delisted.

Table of Contents

**Item 9.** *Changes In and Disagreements With Accountants on Financial Accounting and Financial Disclosure*

Not applicable.

**Item 9A.** *Controls and Procedures*

Background of Restatement

On May 10, 2006, our Board of Directors concluded that our consolidated financial statements for the years ended September 30, 2005, 2004 and 2003 as well as the selected financial data for the years ended September 30, 2002 and 2001 should be restated to record additional non-cash stock-based compensation expense resulting from stock options granted during fiscal years 1996 to 2005 that were incorrectly accounted for under generally accepted accounting principles ("GAAP"). Our decision to restate our financial statements was based on the facts obtained by management and an independent investigation into our stock option accounting that was conducted under the direction of a special committee ("Special Committee") of the Board of Directors. The Board created the Special Committee, which was composed solely of independent directors, to conduct a review of matters related to past stock option grants (including the timing of such grants and associated documentation) after receiving inquiries regarding the timing of certain stock option grants. Separately, the Company's management also reviewed stock option grants from 1995 through the second quarter of fiscal 2006 to determine whether any material accounting errors had occurred with respect to stock option grants.

We have concluded that there were material accounting errors with respect to a number of stock option grants. In general, these stock options were granted with an exercise price equal to the Nasdaq closing market price for our common stock on the date set forth on written consents signed by one or more directors. We used the stated date of these consents as the "measurement date" for the purpose of accounting for them under GAAP, and as a result recorded no compensation expense in connection with the grants.

We have concluded that a number of written consents were not fully executed or effective on the date set forth on the consents and thus that using the stated date as the measurement date was incorrect. We have determined a revised measurement date for each stock option grant based on the information now available to us. Generally, the changes in measurement dates are due to two kinds of errors: (1) we treated unanimous written consents of directors approving stock option grants as effective on the date stated on the consent, instead of the date upon which we received the consent form containing the last signature required for unanimity; and (2) we treated option grants to multiple employees as effective prior to the date upon which we had determined the exact number of options that would be granted to each individual employee. In cases where the closing market price on the revised measurement date exceeded the Nasdaq closing market price on the original measurement date, we have recognized compensation expense equal to this excess over the vesting term of each option.

We have determined that the cumulative, pre-tax, non-cash, stock-based compensation expense resulting from revised measurement dates was approximately $58.7 million during the period from our initial public offering in 1996 through September 30, 2005. The corrections made in the restatement relate to options covering approximately 6.0 million shares. In the restatement, we recorded stock-based compensation expense of $1.6 million, $3.1 million and $17.3 million for the years ended September 30, 2005, 2004 and 2003, respectively, and $36.7 million prior to fiscal 2003. In addition, we recorded an income tax benefit of $1.8 million prior to fiscal 2003. The cumulative effect of the restatement adjustments on our consolidated balance sheet at September 30, 2005 was an increase in additional paid-in capital offset by a corresponding increase in the accumulated deficit and deferred compensation which results in no net effect on stockholders' equity. The adjustments increased previously reported diluted loss from continuing operations per common share by $0.03 and $0.47 for the years ended September 30, 2005 and 2003, respectively, and decreased diluted earnings from continuing operations per common share by $0.07 for the year ended September 30, 2004. Approximately 99% of the charges relating to revised measurement dates arose from incorrect measurement dates for stock options granted during fiscal years 1996 through 2002. Subsequent to fiscal 2002 and prior to the inception of the investigation, we had revised our stock option and restricted stock grant practices. Neither the Company nor the Special Committee concluded that anyone now affiliated with the Company was complicit in any intentional wrongdoing. The Company and the Special Committee were unable to conclude that the accounting errors relating to revised measurement dates for

87

Table of Contents

stock option grants were the result of intentional misconduct of any company personnel. There was no impact on revenue or net cash provided by operating activities as a result of this compensation expense.

In addition to the compensation expenses described above, we also recorded approximately $5.8 million of non−cash, stock−based compensation expense in connection with a stock option held by former CEO Robert J. Therrien that we have concluded he was permitted to exercise in November 1999 despite its expiration in August of 1999. This transaction was previously accounted for and disclosed as a loan by the Company to Mr. Therrien for the purpose of permitting him to exercise the option. Specifically, in November 1999, three directors of the Company (including Mr. Therrien) signed a ratification document pursuant to which Mr. Therrien was deemed to have been granted a loan as of August 1999. According to the document, in June 1999 our directors (Messrs. Khoury, Emerick and Therrien) discussed extending a loan to Mr. Therrien for the purpose of permitting him to exercise an option to purchase 225,000 shares of the Company's stock prior to its expiration in August 1999. Based on the document, the Company in November 1999 deemed Mr. Therrien to have timely exercised the options, and accounted for the exercise without recognizing compensation expense. As a result of facts obtained by the Special Committee, we determined that Mr. Therrien misrepresented the facts of the loan and the ratification document described above was false as there were no discussions concerning a loan in June 1999. As a result, we have determined that the option expired in August 1999 and that compensation expense should have been recorded in connection with Mr. Therrien's purchase of stock in November 1999. At that time, Mr. Therrien paid approximately $560,000 (the exercise price of $2.43 per share, plus interest deemed due on the loan) for 225,000 shares then worth approximately $6,314,000 (or $28.06 per share). In the restatement, we have recognized compensation expense in November 1999 equal to the difference between the price paid by Mr. Therrien and the market value of the stock on the date of sale. The three directors including Mr. Therrien are no longer affiliated with the Company.

As part of our review, we assessed generally whether there were other matters which should have been corrected in our previously issued financial statements. Apart from the errors underlying the restatement described above, no other matters have come to our attention that should be adjusted in our previously issued financial statements.

As a result, we recorded in the restatement cumulative, non−cash pre−tax stock−based compensation expense of approximately $64.5 million and a tax benefit of $1.8 million. Principally as a result of losses incurred, we recorded a full valuation allowance against all deferred tax assets beginning in 2002 and consequently, there is no tax effect of the additional stock−based compensation expense recorded in the years ended September 30, 2005, 2004 and 2003.

### Evaluation of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, we conducted an evaluation of our disclosure controls and procedures, as such term is defined under Rule 13a−15(e) promulgated under the Securities Exchange Act of 1934, as amended (the Exchange Act). Disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported on a timely basis and that such information is accumulated and communicated to management, including the chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure. Based upon this evaluation, our chief executive officer and our chief financial officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this annual report.

### Management's Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rules 13a−15(f) and 15d−15(f) under the Securities Exchange Act of 1934, as amended, as a process designed by, or under the supervision of our chief executive and chief financial officers and effected by our board of directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

Table of Contents

- pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and disposition of our assets;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorization of our management and directors; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, we conducted an assessment of the effectiveness of our internal control over financial reporting as of September 30, 2005. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) an *Internal Control–Integrated Framework*. Based on our assessment, we concluded that, as of September 30, 2005, our internal control over financial reporting was effective.

Our management's assessment of the effectiveness of our internal control over financial reporting as of September 30, 2005, has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which is included in Item 8 of this report.

### Management's Consideration of the Restatement

In coming to the conclusion that our disclosure controls and procedures and our internal control over financial reporting were effective as of September 30, 2005, management considered, among other things, the control deficiencies related to accounting for stock–based compensation and control environment, which resulted in the need to restate our previously issued financial statements as disclosed in Note 3, "Restatement of Previously Issued Financial Statements," included in Item 8 of this report. Management has concluded that the control deficiencies that resulted in the restatement of the previously issued financial statements did not constitute a material weakness as of September 30, 2005 because management determined that as of September 30, 2005 there were effective controls designed and in place to prevent or detect a material misstatement and therefore the likelihood of stock–based compensation, deferred compensation and deferred tax assets being materially misstated is not more than remote.

### Changes in Internal Control Over Financial Reporting

There were no changes in internal control over financial reporting during the fiscal fourth quarter ended September 30, 2005, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### Item 9B. *Other Information*

Not applicable.

### PART III

### Item 10. *Directors and Executive Officers of the Registrant*

The information required by this Item 10 is hereby incorporated by reference to the Company's definitive proxy statement to be filed by the Company within 120 days after the close of its fiscal year.

Table of Contents

**Item 11.** *Executive Compensation*

The information required by this Item 11 is hereby incorporated by reference to the Company's definitive proxy statement to be filed by the Company within 120 days after the close of its fiscal year.

**Item 12.** *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters*

The table below sets forth certain information as of our fiscal year ended September 30, 2005 regarding the shares of our common stock available for grant or granted under stock option plans that (i) were approved by our stockholders, and (ii) were not approved by our stockholders.

### Equity Compensation Plan Information

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights | Weighted–Average Exercise Price of Outstanding Options, Warrants and Rights | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans(1) |
|---|---|---|---|
| Equity compensation plans approved by security holders(2) | 3,216,205 | $ 26.52 | 3,053,686 |
| Equity compensation plans not approved by security holders(3) | 1,989,149 | 24.95 | 313,032 |
| Total | 5,205,354 | $ 25.83 | 3,366,718 |

(1)  Excludes securities reflected in the first column of the table.

(2)  Includes an aggregate of 190,565 options at a weighted average exercise price of $49.355 assumed by the Company in connection with past acquisitions and business combinations.

(3)  These plans are described in Note 14 "Stock Plans" of the Notes to the Consolidated Financial Statements.

The balance of the information required by this Item 12 is hereby incorporated by reference to the Company's definitive proxy statement to be filed by the Company within 120 days after the close of its fiscal year.

**Item 13.** *Certain Relationships and Related Transactions*

The information required by this Item 13 is hereby incorporated by reference to the Company's definitive proxy statement to be filed by the Company within 120 days after the close of its fiscal year.

**Item 14.** *Principal Accountant Fees and Services*

The information required by this Item 14 is hereby incorporated by reference to the Company's definitive proxy statement to be filed by the Company within 120 days after the close of its fiscal year.

Table of Contents

PART IV

**Item 15.** *Exhibits and Financial Statement Schedules*

(a) Financial Statements and Financial Statement Schedule

The consolidated financial statements of the Company are listed in the index under Part II, Item 8, in this Form 10–K/A.

Other financial statement schedules are omitted because of the absence of conditions under which they are required or because the required information is given in the supplementary consolidated financial statements or notes thereto.

(b) Exhibits

| Exhibit No. | Description | Reference |
|---|---|---|
| 2.01 | Agreement and Plan of Merger dated September 21, 1998 relating to the combination of FASTech Integration, Inc. with the Company. | A** |
| 2.02 | Stock for Cash Purchase Agreement dated March 31, 1999 relating to the acquisition of Hanyon Tech. Co., Ltd. by the Company. | B** |
| 2.03 | Assets for Cash Purchase Agreement dated June 23, 1999 relating to the acquisition of substantially all the assets of Domain Manufacturing Corporation and its Subsidiary Domain Manufacturing SARL by the Company. | C** |
| 2.04 | Agreement and Plan of Merger dated July 7, 1999 relating to the combination of Smart Machines Inc. with the Company. | D** |
| 2.05 | Master Purchase Agreement dated September 9, 1999 relating to the acquisition of substantially all of the assets of the Infab Division of Jenoptik by the Company. | E** |
| 2.06 | Agreement and Plan of Merger dated January 6, 2000 relating to the combination of AutoSimulations, Inc. and Auto–Soft Corporation with the Company. | F** |
| 2.07 | Interests for Stock Purchase Agreement dated May 5, 2000 relating to the acquisition of Irvine Optical Company LLC by the Company, as amended. | G** |
| 2.08 | Stock Purchase Agreement dated as of February 16, 2001 relating to the acquisition of SEMY Engineering, Inc. by the Company. | H** |
| 2.09 | Asset Purchase Agreement dated June 26, 2001 relating to the acquisition of assets of the e–diagnostic infrastructure of KLA–Tencor Corporation and its subsidiary KLA–Tencor Technologies Corporation. | I** |
| 2.10 | Agreement and Plan of Merger dated June 27, 2001 relating to the combination of Progressive Technologies Inc. with the Company. | J** |
| 2.11 | Asset Purchase Agreement dated October 5, 2001 relating to the acquisition of substantially all of the assets of General Precision, Inc. and GPI–Mostek, Inc. by the Company. | K** |
| 2.12 | Share Purchase Agreement dated October 9, 2001 relating to the acquisition of Tec–Sem AG by the Company. | L** |
| 2.13 | Amended and Restated Agreement and Plan of Merger relating to the acquisition of PRI Automation, Inc. by the Company. | M** |

91

Table of Contents

| Exhibit No. | Description | Reference |
|---|---|---|
| 2.14 | Combination Agreement dated as of November 24, 1998 between PRI Automation, Inc., 1325949 Ontario Inc. and Promis Systems Corporation Ltd. | N** |
| 2.15 | Share Sale–, Purchase– and Transfer Agreement dated July 3, 2002 relating to the acquisition of Hermos Informatik GmbH. | O** |
| 2.16 | Service and Logistics Agreement by and between Applied Materials, Inc. and the Company, effective May 1, 2004. | WW** |
| 2.17 | Agreement and Plan of Merger, dated as of July 11, 2005, by and among the Company, Helix Technology Corporation and Mt. Hood Corporation. | aa–2.1** |
| 2.18 | Amendment No. 1 to Agreement and Plan of Merger, dated as of August 29, 2005, among the Company, Helix Technology Corporation and Mt. Hood Corporation. | aa–2.2** |
| 3.01 | Certificate of Incorporation of the Company. | P** |
| 3.02 | Certificate of Amendment to Certificate of Incorporation of the Company. | aa–3.2** |
| 3.03 | Certificate of Amendment to Certificate of Incorporation of the Company. | VV** |
| 3.04 | Certificate of Amendment to Certificate of Incorporation of the Company. | ZZ–3.1** |
| 3.05 | Certificate of Elimination of Special Voting Preferred Stock. | ZZ–3.2** |
| 3.06 | Certificate of Increase of shares Designated as Series A Junior Participating Preferred Stock. | ZZ–3.3** |
| 3.07 | Certificate of Designation of Series A Junior Participating Preferred Stock. | R** |
| 3.08 | Form of Certificate of Designations, Preferences, Rights and Limitations of Special Voting Preferred Stock of the Company. | S** |
| 3.09 | Certificate of Ownership and Merger of PRI Automation, Inc. into the Company. | aa–3.6** |
| 3.10 | Amended and Restated Bylaws of the Company. | ZZ–3.4** |
| 4.01 | Specimen Certificate for shares of the Company's common stock. | T** |
| 4.02 | Description of Capital Stock (contained in the Certificate of Incorporation of the Company). | P** |
| 4.03 | Rights Agreement dated July 23, 1997. | U** |
| 4.04 | Amendment No. 1 to Rights Agreement between the Company and the Rights Agent. | V** |
| 4.05 | Amendment No. 2 to Rights Agreement between the Company and the Rights Agent. | Z** |
| 4.06 | Amendment No. 3 to Rights Agreement between the Company and the Rights Agent. | bb–99.4** |
| 4.07 | Registration Rights Agreement dated January 6, 2000. | V** |
| 4.08 | Shareholder Agreement dated January 6, 2000 by and among the Company, Daifuku America Corporation and Daifuku Co., Ltd. relating to the acquisition of the businesses of Auto–Soft Corporation and AutoSimulations, Inc. from Daifuku America Corporation by the Company. | F** |

Table of Contents

| Exhibit No. | Description | Reference |
|---|---|---|
| 4.09 | Stockholder Agreement dated September 30, 1999 by and among the Company, Jenoptik AG, M+W Zander Holding GmbH and Robert J. Therrien relating to the acquisition of substantially all of the assets of the Infab Division of Jenoptik AG by the Company. | E** |
| 4.10 | Indenture dated as of May 23, 2001 between the Company and State Street Bank and Trust Company (as Trustee). | W** |
| 4.11 | Registration Rights Agreement dated May 23, 2001 among the Company and Credit Suisse First Boston Corporation and SG Cowen Securities Corporation (as representatives of several purchasers). | W** |
| 4.12 | Form of 4.75% Convertible Subordinated Note of the Company in the principal amount of $175,000,000 dated as of May 23, 2001. | W** |
| 4.13 | Stock Purchase Agreement dated June 20, 2001 relating to the acquisition of CCS Technology, Inc. by the Company. | X** |
| 4.14 | Asset Purchase relating to the Agreement dated February 15, 2002 relating to the acquisition of substantially all of the assets of Intelligent Automation Systems, Inc. and IAS Products, Inc. by the Company. | Y** |
| 4.15 | Asset Purchase Agreement by and among the Company, NexStar Corporation and Zygo Corporation dated December 13, 2001. | AA** |
| 4.16 | Agreement and Plan of Merger dated September 20, 2002 among the Company, MTI Acquisitions Corp. and MicroTool, Inc. | TT** |
| 9.1 | Form of Voting and Exchange Trust Agreement among PRI Automation, Inc., 1325949 Ontario Inc., Promis Systems Corporation Ltd. and Montreal Trust Company of Canada, as trustee. | N** |
| 9.2 | Form of Supplement to Voting and Exchange Trust Agreement among the Company, 1325949 Ontario Inc., Brooks−PRI Automation (Canada), Inc. and Montreal Trust Company of Canada, trustee. | S** |
| 9.3 | Form of Support Agreement among PRI Automation, Inc., 1325949 Ontario Inc., and Promis Systems Corporation, Ltd. | N** |
| 9.4 | Form of Supplement to Support Agreement among the Company, 1325949 Ontario Inc., and Brooks−PRI Automation (Canada), Inc. | Z** |
| 10.01 | Employment Agreement between the Company and Robert J. Therrien dated as of September 30, 2001.* | AA** |
| 10.02 | Form of Indemnification Agreement for directors and officers of the Company.* | Q** |
| 10.03 | Employment Agreement between the Company and Ellen B. Richstone. * | BB** |
| 10.04 | Form of Agreement between Executive Officers and the Company Relating to Change of Control.* | CC** |
| 10.05 | Agreement dated November 11, 1999 between Ellen B. Richstone and the Company Relating to Change of Control.* | CC** |
| 10.06 | Transitional Services Agreement dated September 30, 1999 between the Company and Jenoptik AG relating to the Company's German manufacturing facility. | CC** |

93

| Exhibit No. | Description | Reference |
|---|---|---|
| 10.07 | Corporate Noncompetition and Proprietary Information Agreement dated January 6, 2000 by and among the Company, Daifuku America Corporation and Daifuku Co., Ltd. relating to the acquisition of the businesses of Auto−Soft Corporation and AutoSimulations, Inc. from Daifuku America Corporation by the Company. | F** |
| 10.08 | Agreement to Amend Corporate Noncompetition and Proprietary Information Agreement by and among the Company, Daifuku America Corporation and Daifuku Co., Ltd. dated April 2002. | TT** |
| 10.09 | Demand Promissory Note Agreement dated as of May 2, 2000, between the Company and ABN AMRO Bank N.V. | P** |
| 10.10 | Purchase Agreement for the Company's headquarters dated January 17, 2001. | DD** |
| 10.11 | Lease between the Company and the Nasr Family Trust for 25000 Avenue Stanford, Valencia, California. | K** |
| 10.12 | 1993 Nonemployee Director Stock Option Plan.* | EE** |
| 10.13 | 1992 Combination Stock Option Plan.* | FF** |
| 10.14 | 1995 Employee Stock Purchase Plan, as amended.* | P** |
| 10.15 | 1998 Employee Equity Incentive Option Plan.* | P** |
| 10.16 | 2000 Combination Stock Option Plan.* | P** |
| 10.17 | 2001 Restricted Stock Purchase Plan for KLA Product Line Acquisition.* | GG** |
| 10.18 | Progressive Technologies Inc. 1991 Stock Option and Stock Purchase Plan.* | HH** |
| 10.19 | Helix Technology Corporation 1996 Equity Incentive Plan.* | cc−4.1** |
| 10.20 | Helix technology Corporation Amended and Restated Stock Option Plan for Non−Employee Directors.* | cc−4.2** |
| 10.21 | Helix Technology Corporation 1981 Employee Stock Option Plan.* | cc−4.3** |
| 10.22 | Deferred Compensation Plan.* | dd−4.1** |
| 10.23 | Lease between Bentall Properties LTD and Westminster Management Corporation and Brooks Automation (Canada) Corp. for Crestwood Corporate Centre, Richmond, B.C. for 13777 Commerce Parkway, Richmond, B.C. | AA** |
| 10.24 | Employment Agreement for Mitchell G. Tyson dated October 23, 2001.* | TT** |
| 10.25 | Management Agreement dated as of November 20, 2000 between the Company and Wan Keun Lee, as the majority shareholder of Shinsung Eng. Co. Ltd. | II** |
| 10.26 | Joint Venture Agreement between the Company, Chung Song Systems Co., Ltd. And Shinsung Eng. Co. Ltd. | JJ** |
| 10.27 | Master Manufacturing Services Agreement dated as of October 26, 1999 by and between the Company and Shinsung Eng. Co. Ltd. | KK** |
| 10.28 | Master Engineering Services Agreement dated as of October 26, 1999 by and between the Company and Shinsung Eng. Co. Ltd. | KK** |

94

Table of Contents

| Exhibit No. | Description | Reference |
|---|---|---|
| 10.29 | PRI Automation, Inc. 2000 Stock Option Plan.* | LL** |
| 10.30 | PRI Automation, Inc. 1997 Non−Incentive Stock Option Plan.* | II** |
| 10.31 | PRI Automation, Inc. 1994 Incentive and Non−Qualified Stock Option Plan.* | MM** |
| 10.32 | Commotion Technology, Inc. 2000 Flexible Stock Incentive Plan.* | NN** |
| 10.33 | Promis Systems Corporation Ltd Amended and Restated Stock Option Plan.* | OO** |
| 10.34 | Nonqualified Stock Option granted by PRI Automation, Inc. to Mark Johnston.* | PP** |
| 10.35 | Equipe Technologies Non−Statutory Stock Options.* | QQ** |
| 10.36 | Lease Agreement dated as of May 5, 1994 between the Company and The Prudential Insurance Company of America for 805 Middlesex Turnpike, Billerica, MA. | RR** |
| 10.37 | Amendment to Lease dated as of July 24, 2000 between the Company and BCIA New England Holdings LLC (successor in interest to The Prudential Insurance Company of America) for 805 Middlesex Turnpike, Billerica, MA. | SS** |
| 10.38 | Lease Agreement dated as of October 12, 2000 between the Company and Progress Road LLC for 17 Progress Road, Billerica, MA. | SS** |
| 10.39 | First Amendment to Lease dated as of March 21, 2000 between the Company and Progress Road LLC for 17 Progress Road, Billerica, MA. | SS** |
| 10.40 | Lease between the Company and BerCar II, LLC for 12 Elizabeth Drive, Chelmsford, Massachusetts dated October 23, 2002. | TT** |
| 10.41 | First Amendment to Lease between the Company and BerCar II, LLC for 12 Elizabeth Drive, Chelmsford, Massachusetts dated November 1, 2002. | TT** |
| 10.42 | Separation Agreement for Ellen B. Richstone dated October 31, 2002.* | TT** |
| 10.43 | Employment Agreement by and between the Company and Edward C. Grady dated January 31, 2003.* | UU** |
| 10.44 | Employment Agreement by and between the Company and Robert W. Woodbury, Jr. dated February 26, 2003.* | VV** |
| 10.45 | Service and Logistics Agreement by and between Applied Materials, Inc. and the Company, effective May 1, 2004(1).* | WW** |
| 10.46 | Amended Employment Agreement by and between the Company and Robert J. Therrien dated June 1, 2004.* | WW** |
| 10.47 | Amended and Restated Employment Agreement by and between the Company and Edward C. Grady dated June 1, 2004.* | WW** |
| 10.48 | Form of 2000 Equity Incentive Plan New Employee Nonqualified Stock Option Agreement.* | ee−10.44** |
| 10.49 | Form of 2000 Equity Incentive Plan Existing Employee Nonqualified Stock Option Agreement.* | ee−10.45** |
| 10.50 | Form of 2000 Equity Incentive Plan Director Stock Option Agreement.* | ee−10.46** |

95

Table of Contents

| Exhibit No. | Description | Reference |
|---|---|---|
| 10.51 | Form of 1998 Employee Equity Incentive Plan New Employee Nonqualified Stock Option Agreement.* | ee−10.47** |
| 10.52 | Form of 1998 Employee Equity Incentive Plan Existing Employee Nonqualified Stock Option Agreement.* | ee−10.47** |
| 10.53 | Fiscal 2004 Management Incentive Plan Program.* | ee−10.48** |
| 10.54 | Fiscal 2005 Management Incentive Plan Program. | ff |
| 12.01 | Calculation of Ratio of Earnings to Fixed Charges. | ff |
| 21.01 | Subsidiaries of the Company. | ff |
| 23.01 | Consent of PricewaterhouseCoopers LLP (Independent registered public accounting firm for the Company). | ff |
| 31.01 | Rule 13a−14(a),15d−14(a) Certification. | Filed herewith |
| 31.02 | Rule 13a−14(a),15d−14(a) Certification. | Filed herewith |
| 32 | Section 1350 Certifications. | Filed herewith |

(1)  Portions of this agreement therein identified by *** have been omitted pursuant to a request for confidential treatment and have been filed separately with the Commission on July 29, 2004 pursuant to Rule 24b−2 of the Securities Act of 1934, as amended.

A.  Incorporated by reference to the Company's registration statement on Form S−4 (Registration No. 333−64037) filed on September 23, 1998.

B.  Incorporated by reference to the Company's current report on Form 8−K filed on May 6, 1999.

C.  Incorporated by reference to the Company's current report on Form 8−K filed on July 14, 1999.

D.  Incorporated by reference to the Company's current report on Form 8−K filed on September 15, 1999, as amended on September 29, 2000.

E.  Incorporated by reference to the Company's current report on Form 8−K filed on October 15, 1999.

F.  Incorporated by reference to the Company's current report on Form 8−K filed on January 19, 2000 as amended on February 14, 2000.

G.  Incorporated by reference to the Company's registration statement on Form S−3 (Registration No. 333−42620) filed on July 31, 2000.

H.  Incorporated by reference to the Company's current report on Form 8−K filed on March 1, 2001.

I.  Incorporated by reference to the Company's current report on Form 8−K filed on July 9, 2001.

J.  Incorporated by reference to the Company's current report on Form 8−K filed on July 24, 2001.

K.  Incorporated by reference to the Company's current report on Form 8−K filed on October 19, 2001 as amended on April 4, 2002.

L.  Incorporated by reference to the Company's current report on Form 8−K filed on October 22, 2001.

96

Table of Contents

M.   Incorporated by reference to the Company's registration statement on Form S−4 (Registration No. 333−75490, filed on April 4, 2002.

N.   Incorporated by reference to PRI Automation, Inc.'s registration statement on Form S−3 (Registration No. 333−69721) filed on December 24, 1998.

O.   Incorporated by reference to Company's current report on Form 8−K filed on July 30, 2002.

P.   Incorporated by reference to the Company's quarterly report on Form 10−Q filed on May 15, 2000 for the quarterly period ended March 31, 2000.

Q.   Incorporated by reference to the Company's registration statement on Form S−1 (Registration No. 33−87296) filed on December 13, 1994.

R.   Incorporated by reference to the Company's registration statement on Form S−3 (Registration No. 333−34487) filed on August 27, 1997.

S.   Incorporated by reference to the Company's registration statement on Form S−3 (Registration No. 333−87194) filed April 29, 2002, as amended May 13, 2002.

T.   Incorporated by reference to the Company's registration statement on Form S−3 (Registration No. 333−88320) filed May 15, 2002.

U.   Incorporated by reference to the Company's current report on Form 8−K filed on August 7, 1997.

V.   Incorporated by reference to the Company's registration statement on Form 10−K filed for the annual period ended September 30, 2001.

W.   Incorporated by reference to the Company's current report on Form 8−K filed on May 29, 2001.

X.   Incorporated by reference to the Company's registration statement on Form S−8 (Registration No. 333−67432) filed on August 13, 2001.

Y.   Incorporated by reference to the Company's current report on Form 8−K filed on March 1, 2002.

Z.   Incorporated by reference to the Company's registration statement on Form 8−A/ A filed on June 4, 2002.

AA.   Incorporated by reference to the Company's annual report on Form 10−K filed December 13, 2001 for the annual period ended September 30, 2001, as amended on April 2002.

BB.   Incorporated by reference to the Company's annual report on Form 10−K filed on December 30, 1998 for the year ended September 30, 1998.

CC.   Incorporated by reference to the Company's annual report on Form 10−K filed on December 29, 1999 for the annual period ended September 30, 1999.

DD.   Incorporated by reference to the Company's quarterly report on Form 10−Q filed on May 11, 2001 for the quarterly period ended March 31, 2001.

EE.   Incorporated by reference to the Company's registration statement on Form S−8 (Registration No. 333−22717) filed on March 4, 1997.

FF.   Incorporated by reference to the Company's registration statement on Form S−8 (Registration No. 333−07313) filed on July 1, 1996.

97

**Table of Contents**

GG.  Incorporated by reference to the Company's registration statement on Form S–8 (Registration No. 333–61928) filed on May 30, 2001.

HH.  Incorporated by reference to the Company's registration statement on Form S–8 (Registration No. 333–67482 filed on August 13, 2001.

II.  Incorporated by reference to PRI Automation, Inc.'s annual report on Form 10–K filed on December 21, 2000 for the annual period ended September 30, 2000.

JJ.  Incorporated by reference to PRI Automation, Inc.'s quarterly report on Form 10–Q for the quarter ended June 28, 1998.

KK.  Incorporated by reference to PRI Automation, Inc.'s amendment No. 1 to annual report on Form 10–K/ A filed April 4, 2002 for the annual period ended September 30, 2002.

LL.  Incorporated by reference to PRI Automation, Inc.'s Registration Statement on Form S–8 (Registration No. 333–33894), filed on April 3, 2000.

MM.  Incorporated by reference to PRI Automation, Inc.'s Registration Statement on Form S–8 (Registration No. 333–25217), filed on April 14, 1997.

NN.  Incorporated by reference to PRI Automation, Inc.'s Registration Statement on Form S–8 (Registration No. 333–49822), filed on November 13, 2000.

OO.  Incorporated by reference to PRI Automation, Inc.'s Registration Statement on Form S–8 (Registration No. 333–74141), filed on March 9, 1999.

PP.  Incorporated by reference to PRI Automation, Inc.'s Registration Statement on Form S–8 (Registration No. 333–41067), filed on November 26, 1997.

QQ.  Incorporated by reference to PRI Automation, Inc.'s Registration Statement on Form S–8 (Registration No. 333–45063), filed on January 28, 1998.

RR.  Incorporated by reference to PRI Automation, Inc.'s Registration Statement on Form S–1 (Registration No. 33–81836).

SS.  Incorporated by reference to PRI Automation, Inc.'s annual report on Form 10–K filed on December 7, 2001 for the annual period ended September 30, 2001, as amended in April 2002.

TT.  Incorporated by reference to the Company's annual report on Form 10–K filed on December 30, 2002 for the annual period ended September 30, 2002.

UU.  Incorporated by reference to the Company's quarterly report on Form 10–Q filed on February 14, 2003 for the quarterly period ended December 31, 2002.

VV.  Incorporated by reference to the Company's quarterly report on Form 10–Q filed on May 13, 2003 for the quarterly period ended March 31, 2003.

WW.  Incorporated by reference to the Company's quarterly report on Form 10–Q filed on July 29, 2004 for the quarterly period ended June 30, 2004.

ZZ.  Incorporated by reference to the referenced exhibit number filed with the Company's current report on Form 8–K filed on October 27, 2005.

aa.  Incorporated by reference to the referenced exhibit number filed with the Company's registration statement on Form S–4 (Reg. No. 333–127945), filed on August 30, 2005, as amended on September 26, 2005.

98

Table of Contents

bb.   Incorporated by reference to the referenced exhibit number filed with the Company's registration statement on Form 8−A/A filed on July 11, 2005.

cc.   Incorporated by reference to the referenced exhibit number filed with the Company's registration statement on Form S−8 (Reg. No. 333−129724), filed on November 16, 2005.

dd.   Incorporated by reference to the referenced exhibit number filed with the Company's registration statement on Form S−8 (Reg. No. 333−123242), filed on March 10, 2005.

ee.   Incorporated by reference to the exhibit number filed with the Company's annual report on Form 10−K for the annual period ended September 30, 2004.

ff.   Incorporated by reference to the same exhibit number to the Company's annual report on Form 10−K filed on December 13, 2005 for the annual period ended September 30, 2005.


*     Management contract or compensatory plan or arrangement.

**    In accordance with Rule 12b−32 under the Securities Exchange Act of 1934, as amended, reference is made to the documents previously filed with the Securities and Exchange Commission, which documents are hereby incorporated by reference.

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

BROOKS AUTOMATION, INC.

By:          /s/ Edward C. Grady

Edward C. Grady,
*Chief Executive Officer*

Date: July 31, 2006

100

EXHIBIT 31.01

CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES−OXLEY ACT OF 2002

I, Edward C. Grady, do certify that:

1. I have reviewed this annual report on Form 10−K/A of Brooks Automation, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a−15(e) and 15d−15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a−15(f) and 15d−15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; and

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ EDWARD C. GRADY
Edward C. Grady
Chief Executive Officer

Date: July 31, 2006

EXHIBIT 31.02

CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES−OXLEY ACT OF 2002

I, Robert W. Woodbury, Jr., do certify that:

1. I have reviewed this annual report on Form 10−K/A of Brooks Automation, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a−15(e) and 15d−15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a−15(f) and 15d−15(f) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; and

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ ROBERT W. WOODBURY, JR.
Robert W. Woodbury, Jr.
Senior Vice President and Chief Financial
Officer (Principal Accounting Officer)

Date: July 31, 2006

EXHIBIT 32

CERTIFICATION

PURSUANT TO SECTION 906 OF THE SARBANES–OXLEY ACT OF 2002 (SUBSECTIONS (A) AND (B) OF SECTION 1350, CHAPTER 63 OF TITLE 18, UNITED STATES CODE)

Pursuant to Section 906 of the Sarbanes–Oxley Act of 2002 (subsections (a) and (b) of Section 1350, Chapter 63 of Title 18, United States Code), the undersigned officer of Brooks Automation, Inc., a Delaware corporation (the "Company"), does hereby certify that:

(1) The Annual Report on Form 10–K/A for the year ended September 30, 2005 of the Company fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Annual Form 10–K/A fairly presents, in all materials respects, the financial condition and results of operations of the Company.

Dated: July 31, 2006

/s/ EDWARD C. GRADY
Edward C. Grady
Director and Chief Executive Officer
(Principal Executive Officer)

Dated: July 31, 2006

/s/ ROBERT W. WOODBURY, JR.
Robert W. Woodbury, Jr.
Senior Vice President and Chief Financial
Officer (Principal Accounting Officer)

A signed original of this written statement required by Section 906 has been provided to Brooks Automation, Inc. and will be retained by Brooks Automation, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

---

Created by 10KWizard    www.10KWizard.com

# EXHIBIT B

# FORM 5

☐ Check box if no longer subject to
Section 16. Form 4 or Form 5
obligation may continue. See
Instruction 10).
☐ Form 3 Holdings Reported
☒ Form 4 Transactions Reported

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## ANNUAL STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility
Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

OMB APPROVAL

OMB Number:      3235-0362
Expires:   September 30, 1998
Estimated average burden hours
per response ..................1.0

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 6. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Therrien    Robert    I.<br>(Last)    (First)    (Middle)<br>c/o Brooks Automation, Inc.<br>15 Elizabeth Drive<br>(Street)<br>Chelmsford    MA    01824<br>(City)    (State)    (Zip)<br><br>RECD S.E.C.<br>NOV 1 5 1999<br>074 | Brooks Automation, Inc.  (BRKS)<br><br>3. IRS or Social Security Number of Reporting Person (Voluntary) | ___ Director    X  10% Owner<br>X  Officer (give title    ___ Other (specify<br>below)    below)<br>President |
| | 4. Statement for Month/Year<br>9/99 | 7. Individual or Joint/Group Report (check applicable line)<br>X  Form Filed by One Reporting Person<br>___ Form Filed by More than One Reporting Person |
| | 5. If Amendment, Date of Original (Month/Year) | |

### TABLE I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned at End of Month (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|
| | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 8/30/99 | M | | 225,000 | A | $2.43 | 1,137,530. | D | |

* If the form is filed by more than one reporting person, see Instruction 4(b)(v).

SEC 2270 (7-96)

(Over)

30941601

FORM 5 (continued)

## Table II -- Derivative Securities Acquired, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned at End of Year (Instr. 4) | 10. Ownership of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | | |
| Option (right to buy) | $2.43 | 8/13/99 | M | | | 225,000 | (1) | 8/15/99 | Common Stock | 225,000 | $2.43 | 0 | | |
| Option (right to buy) | $2.21 | | | | 225,000 | | (2) | 8/15/04 | Common Stock | 150,000 | | 150,000 | D | |
| Option (right to buy) | $12.10(3) | | | | | | (3) | 7/25/01(3) | Common Stock | 5,000(3) | | 5,000(3) | D | |
| Option (right to buy) | $11.00(3) | | | | | | (4) | 7/25/06(4) | Common Stock | 5,000(3) | | 5,000(3) | D | |
| Option (right to buy) | $12.88 | | | | | | (5) | 12/12/07 | Common Stock | 100 | | 100 | D | |
| Option (right to buy) | $14.625 | 1/4/09 | A | | 115,000 | | (5) | 1/4/09 | Common Stock | 115,000 | | 115,000 | D | |

**Explanation of Responses:**

(1)    Grant to reporting person of option to buy shares of Common Stock under the Brooks Automation, Inc. 1992 Combination Stock Option Plan. The option becomes exercisable in 20 percent increments on 8/15/95, 8/15/96, 8/15/97, 8/15/98 and 8/15/99.

(2)    Grant to reporting person of option to buy shares of Common Stock under the Brooks Automation, Inc. 1992 Combination Stock Option Plan. The option becomes exercisable in 25 percent installments on 12/31/94, 12/31/95, 12/31/96 and 12/31/97.

(3)    These two options were originally erroneously granted as a single "incentive stock option." Under the Brooks Automation, Inc. 1992 Combination Stock Option Plan, only half of this option was permitted to be an incentive stock option. To correct this error, the Company that divided the option into one incentive stock option to buy 5,000 shares of Common Stock and one nonqualified option to buy 5,000 shares of Common Stock. The nonqualified option has been further revised to reflect that the exercise price of the nonqualified portion has been impacted by the exercise price of the shares of Common Stock subject to the Incentive Stock Option. To comply with the requirements of the Internal Revenue Code. The originally reported option is grant (a) as it became exercisable in 25 percent installments on 7/25/98, 7/25/99, 7/25/00 and 7/25/01. The corrected Incentive Stock Option becomes fully exercisable at 7/25/01. The originally reported nonqualified option was allocated the first five of these installments and, fully vested. The corrected Incentive Stock Option becomes exercisable at 7/25/01.

(4)    Grant to reporting person of option to buy 100 shares of Common Stock under the Brooks Automation, Inc. 1992 Combination Stock Option Plan. The option becomes fully exercisable at 12/12/06.

(5)    Grant to reporting person of option to buy shares of Common Stock under the Brooks Automation, Inc. 1992 Combination Stock Option Plan. The option becomes exercisable in 25% increments on 1/4/00, 1/4/01, 1/4/02 and 1/4/03.

**      Intentional misstatements or omissions of facts constitute Federal Criminal Violation. See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:    File three copies of this Form, one of which must be manually signed. If space provided is insufficient, see Instruction 6 for procedure.

/s/ Robert J. Therrien                          1/12/99

**Signature of Reporting Person                Date

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.
SEC2070 (secdoc-146.01)

Page 2
SEC 2270 (7/96)