IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARK LEVY,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>ROBERT J. THERRIEN and<br>BROOKS AUTOMATION, INC.<br><br>　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)　C. A. No. 06-517<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## OPENING BRIEF IN SUPPORT OF
## DEFENDANT BROOKS AUTOMATION, INC.'S
## MOTION TO DISMISS

J. Travis Laster (#3514)
Matthew F. Davis (#4696)
Abrams & Laster LLP
Brandywine Plaza West
1521 Concord Pike, Suite 303
Wilmington, Delaware 19803
(302) 778-1000
Email: Laster@AbramsLaster.com
　　　　Davis@AbramsLaster.com
*Attorneys for*
*Brooks Automation, Inc.*

&

Randall W. Bodner, Esq.
Michael T. Marcucci, Esq.
Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110
(617) 951-7000
*Of Counsel*

Filed October 12, 2006

{A&L-00017613-}

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

NATURE AND STAGE OF THE PROCEEDING....................................................................1

SUMMARY OF ARGUMENT .................................................................................................1

STATEMENT OF FACTS .........................................................................................................2

    I.      Section 16(b)'s Demand Requirement and Plaintiff's Purported "Demand"............................2

    II.    The Company's July 31 Restatement and August 14 Response to the June 16
        Letter.................................................................................................................................4

    III.   The Complaint ...................................................................................................................5

ARGUMENT..............................................................................................................................6

    I.      A SECTION 16(B) ACTION DOES NOT LIE AGAINST THE ISSUER AND,
        AS SUCH, BROOKS SHOULD BE DISMISSED AS A DEFENDANT ...........................6

    II.    PLAINTIFF HAS NOT SATISFIED SECTION 16(B)'S DEMAND
        REQUIREMENT..................................................................................................................6

          A.    The June 16, 2006 Letter was Not an Adequate Demand .....................................6

                1.    The Purported Demand Was Too Vague, Did Not Identify Any
                      Factual Basis for the Wrongful Acts it Alleged and Did Not
                      Demand that the Company Bring the Action Mr. Levy Filed on
                      August 22, 2006 ......................................................................................6

                2.    The June 16, 2006 Letter Did Not Identify Mr. Levy as the
                      Shareholder Bringing the Demand and the Complaint Does Not
                      Allege that He Was a Shareholder at the Time the Demand
                      Letter was Sent.....................................................................................10

          B.    Demand Would Not Have Been Mere Ceremony But Would Have
             Served a Valid Corporate Purpose ....................................................................11

CONCLUSION..........................................................................................................................13

i

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Allison v. General Motors Corp.*,
   604 F. Supp. 1106 (D. Del. 1985)................................................................7

*Brill v. Burlington N., Inc.*,
   590 F. Supp. 893 (D. Del. 1984)................................................................3

*Dreiling v. America Express Travel Related Serv's Co., Inc.*,
   351 F. Supp. 2d 1077 (W.D. Wash. 2004) *rev'd on other grounds*,
   458 F.3d 942 (9th Cir. 2006) ....................................................................7

*Pfizer Inc. v. Elan Pharm. Research Corp.*,
   812 F. Supp. 1352 (D. Del. 1993)..............................................................3

*In re Rockefeller Center Properties, Inc. Sec. Litigation*,
   184 F.3d 280 (3d Cir. 1999).......................................................................3

*Shlensky v. Dorsey*,
   574 F.2d 131 (3d. Cir. 1978)..............................................................7, 8, 10

*Smachlo v. Birkelo*,
   576 F. Supp. 1439 (D. Del. 1983)............................................................10

### STATE CASES

*Yaw v. Talley*,
   Civ. A. No. 12882, 1994 WL. 89019, 20 Del. J. Corp. L. 454 (Del. Ch. March 2,
   1994) ....................................................................................................9

### FEDERAL STATUTES, RULES & REGULATIONS

17 C.F.R. § 240.16b-3(d)(3) ..........................................................................11

Fed. R. Civ. P. 12(b)(6)...................................................................................6

15 U.S.C. § 78p(b) ..............................................................................*passim*

### MISCELLANEOUS

5C Charles A. Wright & Arthur R. Miller,
   Federal Practice and Procedure § 1363 (3d ed. 2004) ...............................3

## NATURE AND STAGE OF THE PROCEEDING

Plaintiff Mark Levy filed the complaint (the "Complaint") in this action on August 22, 2006 and alleged that defendant Robert J. Therrien violated Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) ("Section 16(b)"). The Complaint contains no allegations of wrongdoing by defendant Brooks Automation, Inc. ("Brooks" or the "Company") and states no claim against, nor any prayer for relief from, the Company.

Prior to filing the Complaint, Mr. Levy did not make the demand on the Company required by Section 16(b). By letter dated June 16, 2006, Plaintiff's counsel made general and vague allegations that certain individuals at the Company had violated Section 16(b). The letter neither identified specific trades that would have violated Section 16(b) nor demanded that the Company bring the Section 16(b) action against Mr. Therrien that Mr. Levy filed on August 22. By letter dated August 14, 2006, the Company responded to counsel's letter and explained the deficiencies therein.

Despite not making the demand on the Company required by Section 16(b), Mr. Levy filed the Complaint. The Company then filed a motion to dismiss the Complaint pursuant to Rules 12(b)(6) and 23.1 of the Federal Rules of Civil Procedure. This is the Company's opening brief in support of its motion to dismiss.

## SUMMARY OF ARGUMENT

1.      Section 16(b) is a simple statute. It prohibits officers, directors and 10% shareholders of public companies from making profitable short-swing trades in the issuer's stock. It permits either the issuer, or a shareholder on behalf of an issuer, to bring suit against a violator to recover any short-swing profits, which must then be disgorged to the company. The proper defendant in such an action is the alleged short-swing profiteer, not the company itself.

Further, before a shareholder brings such an action on behalf of a company, he must satisfy a straightforward requirement—he must first demand that the issuer bring the suit he wants to file. The Complaint fails on both counts. It improperly names Brooks as a defendant, and the Plaintiff has failed to comply with the statutory demand requirement.

2.      The Complaint improperly names Brooks as a defendant. A Section 16(b) action does not lie against an issuer like Brooks but only against an officer, director or 10% shareholder who engaged in short-swing trading. At a minimum, then, Brooks must be dismissed as a defendant.

3.      Instead of first making a demand that Brooks bring this action against Mr. Therrien, the Plaintiff filed suit and alleged that a vague, generic letter sent to Brooks by his counsel, which did not even identify the Plaintiff as the demanding shareholder, constituted his demand under the statute. In order to satisfy Section 16(b)'s demand requirement, however, a demand letter must give the company a fair opportunity to consider and (if appropriate) to initiate the action the shareholder and would-be plaintiff believes is warranted. The letter upon which Mr. Levy relies did not do so with respect to this, or any other, Section 16(b) action. As a result, the Complaint must be dismissed because of its failure to comply with Section 16(b)'s demand requirement.

## STATEMENT OF FACTS

**I.      Section 16(b)'s Demand Requirement and Plaintiff's Purported "Demand"**

Section 16(b) prohibits so-called short-swing trades in a corporation's stock by its officers, directors and 10% shareholders. Under the statute, an issuer, or a shareholder acting on its behalf, may bring an action against such an officer, director or shareholder to recover "any profit realized by him from any purchase and sale, or sale and purchase, of any equity security

(other than an exempted security) . . . within any period of less than six months." 15 U.S.C. § 78p(b). Section 16(b) is enforced by the issuer, or by a shareholder acting on its behalf, if the shareholder first provides the issuer the opportunity to do so by making a demand that the issuer bring the Section 16(b) claim itself. A shareholder action "in the name of and on behalf of the issuer" is authorized "if the issuer shall fail or refuse to bring such suit within sixty days after request." 15 U.S.C. § 78p(b). The plaintiff, Mark Levy, alleges that he complied with this requirement by way of a letter dated June 16, 2006 and sent by Mr. Levy's counsel to Brooks (the "June 16 Letter"). *See* Compl. ¶¶ 14-15 (D.I. 1); Exh. A.[1]

The June 16 Letter did not demand that Brooks bring a Section 16(b) action against Defendant Robert J. Therrien, Brooks' former CEO, to recover short-swing profits earned by Mr. Therrien on the November 1999 and March 2000 trades alleged in the Complaint. Rather, Plaintiff's counsel alleged that Defendant Therrien, three other named former officers, and "other current or former executive officers and directors of the Company" earned "short-swing insider trading profits by acquiring options to purchase Company stock within six months of corresponding sales of Company common stock at higher prices." *See* Exh. A. The letter was sent after Brooks had disclosed in April that a special committee of independent directors (the

---

[1] For purposes of the motion to dismiss only, the Company refers to allegations from the Complaint. The Company expressly does not admit the truth of the allegations set forth in the Complaint. In deciding the motion to dismiss, the Court may consider (i) well-pled allegations of fact found in the Complaint (but not Plaintiff's mere conclusions and characterizations) and (ii) documents referenced in the Complaint, available as a matter of public record or subject to judicial notice. *See* 5C Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363 (3d ed. 2004); *see also In re Rockefeller Center Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999) (holding that a court "can consider a 'document integral to or explicitly relied upon in the complaint'" without converting a motion to dismiss into a motion for summary judgment) (citation omitted); *Pfizer Inc. v. Elan Pharm. Research Corp.*, 812 F. Supp. 1352, 1358 (D. Del. 1993) ("Consideration of the terms of a document referenced in the complaint ... does not convert the motion to dismiss ... into one for summary judgment."); *Brill v. Burlington N., Inc.*, 590 F. Supp. 893, 895 n.2 (D. Del. 1984) (in ruling on a motion to dismiss, the court considered "those documents which were referred to in the plaintiff's amended complaint"). All exhibits attached hereto are either referenced in the Complaint, available as a matter of public record, or subject to judicial notice.

"Special Committee") was investigating certain matters regarding stock options and after the

Company had disclosed in a press release and a Form 8-K filed with the SEC in May that, as a

result of the Special Committee's investigation, Brooks would be restating its financial results

because the Company accounted for certain matters concerning stock options incorrectly.  The

June 16 Letter did not identify any sales within six months of stock option grants to, or within six

months of any purchase of Brooks stock by Mr. Therrien (or by anyone else), much less the

purchase and sale alleged in the Complaint to have violated Section 16(b).  The June 16 Letter

also did not identify Mr. Levy as the shareholder on whose behalf the purported "demand" was

being made.

**II.      The Company's July 31 Restatement and August 14 Response to the June 16 Letter**

Between the June 16 Letter, and Mr. Levy's August 22 Complaint, Brooks announced in

an amended Form 10-K filed with the SEC on July 31, 2006, a restatement of its financial results

based on the investigation conducted by the Special Committee (the "Restatement").  The

Company disclosed that it was restating the dates of certain of its stock option grants and taking

associated compensation charges, and, in addition, was taking a $5.8 million compensation

charge in connection with the November 1999 transaction at issue here and described more fully

below.  *See* Exh. B. (Excerpt from Brooks' Form 10-K); Compl. ¶ 9.

On August 14, 2006, the Company, through counsel, responded to the June 16 Letter (the

"August 14 Response").  *See* Compl. ¶ 15; Exh. C.  The August 14 Response explained the

deficiencies in the June 16 Letter, and informed Plaintiff's counsel that his letter was "simply too

vague to give the Company any meaningful guidance or to put it on notice of any potential

Section 16(b) violations by the four individuals you name, much less by the unnamed 'current or

former executive officers and directors' of the Company."  *Id.*  The August 14 Response also

informed Plaintiff's counsel that, prior to its receipt of the June 16 Letter, Brooks had

"commenced a comprehensive investigation into its stock option practices" and that the

investigation had resulted in the Restatement. Finally, the August 14 Response informed

Plaintiff's counsel that "[t]he Company continues to analyze and address various option dating

issues and ... that Brooks will continue to take appropriate steps to promote the long-term best

interests of the Company and its shareholders." *Id.*

On August 22, 2006, Mark Levy surfaced and filed the Complaint in this action, which

takes disclosures made by Brooks in the Restatement and alleges that Mr. Therrien violated

Section 16(b), as described below.

## III.    The Complaint

The Complaint alleges that Mr. Therrien violated Section 16(b) by engaging in a so-

called "short-swing" trade in Brooks stock while he was an officer and director of the Company.

Compl. ¶¶ 4, 9-11. According to the Complaint, Mr. Therrien violated Section 16(b) by

purchasing 225,000 shares of Brooks stock in November 1999 from the Company, and then

selling shares in March 2000. Compl. ¶¶ 9-11. The Complaint's allegations are based on

disclosures made in the Restatement. Specifically, the Complaint alleges and the Company's

amended Form 10-K filed on July 31, 2006 discloses that:

> [I]n November 1999, three directors of the Company (including Mr. Therrien)
> signed a ratification document pursuant to which Mr. Therrien was deemed to
> have been granted a loan as of August 1999. According to the document, in June
> 1999 [the Company's then] directors (Messrs. Khoury, Emerick and Therrien)
> discussed extending a loan to Mr. Therrien for the purpose of permitting him to
> exercise an option to purchase 225,000 shares of the Company's stock prior to its
> expiration in August 1999. Based on the document, the Company in November
> 1999 deemed Mr. Therrien to have timely exercised the options, and accounted
> for the exercise without recognizing compensation expense. As a result of facts
> obtained by the Special Committee, we determined that Mr. Therrien
> misrepresented the facts of the loan and the ratification document described above
> was false as there were no discussions concerning a loan in June 1999. As a
> result, we have determined that the option expired in August 1999 and that
> compensation expense should have been recorded in connection with Mr.
> Therrien's purchase of stock in November 1999. At that time, Mr. Therrien paid

approximately $560,000 (the exercise price of $2.43 per share, plus interest deemed due on the loan) for 225,000 shares then worth approximately $6,314,000 (or $28.06 per share).

Compl. ¶ 9 (quoting Exh. B). Mr. Therrien, as disclosed on a Form 4 filed with the SEC, sold

300,000 shares of Company stock in March 2000 and, the Complaint alleges, the shares acquired

in November 1999 were part of that sale. Compl. ¶ 11. According to the Complaint, the

November 1999 acquisition was "a purchase within the meaning of Section 16(b)." Compl. ¶ 10.

## ARGUMENT

### I.    A SECTION 16(B) ACTION DOES NOT LIE AGAINST THE ISSUER AND, AS SUCH, BROOKS SHOULD BE DISMISSED AS A DEFENDANT

Plaintiff's complaint is devoid of a claim against, or any prayer for relief from, the

Company. Here, Plaintiff has, quite literally, "fail[ed] to state a claim upon which relief can be

granted." Fed. R. Civ. P. 12(b)(6). By its nature, a Section 16(b) claim is brought on behalf of

the Company against an alleged violator, and any recovery inures to the benefit of the Company.

*See* 15 U.S.C. § 78p(b). Plaintiff acknowledges as much in his Complaint. Compl. ¶ 5. Brooks

is thus not a proper defendant in this action. At a minimum, even if the Court rejects the

Company's argument with respect to Plaintiff's inadequate demand as set forth below, Brooks

should be dismissed as a Defendant.

### II.    PLAINTIFF HAS NOT SATISFIED SECTION 16(B)'S DEMAND REQUIREMENT

#### A.    The June 16, 2006 Letter was Not an Adequate Demand

##### 1.    The Purported Demand Was Too Vague, Did Not Identify Any Factual Basis for the Wrongful Acts it Alleged and Did Not Demand that the Company Bring the Action Mr. Levy Filed on August 22, 2006

Despite Section 16(b)'s clear requirement that he do so and despite the Company's effort

to inform Plaintiff's counsel of the deficiencies in the June 16 Letter, Plaintiff failed to make an

adequate demand on the Company before filing this action. Most basically, the June 16 Letter

did not demand that Brooks bring the action Mr. Levy filed on August 22. There was ample time

after the Company's Restatement for Mr. Levy to make such a demand. Further, the June 16

Letter was inadequate on its face to constitute a demand that Brooks bring *any* Section 16(b)

action for two reasons: (1) it failed to identify any factual basis for a Section 16(b) violation,

namely, any short-swing trades, and (2) it failed to identify Mr. Levy (or anyone else) as the

shareholder on whose behalf the demand was made. As result of these omissions, the Complaint

was improperly filed on August 22 and should be dismissed.

The purpose of Section 16(b)'s demand requirement is to put the Company on notice of

potential wrongdoing and to give the issuer the opportunity to bring the action itself because

recovery under Section 16(b) inures to the issuer's benefit. "Adequacy of demand is tied to its

purpose," *Allison v. Gen. Motors Corp.*, 604 F. Supp. 1106, 1117 (D. Del. 1985), thus at a

minimum, a Section 16(b) demand letter "must identify the alleged wrongdoer, describe the

factual basis of the wrongful acts and the harm caused to the corporation, and request remedial

relief." *Dreiling v. Am. Express Travel Related Serv's Co., Inc.*, 351 F. Supp.2d 1077, 1085

(W.D. Wash. 2004) *rev'd on other grounds*, 458 F.3d 942 (9th Cir. 2006). "The substantive

requirements of demand are governed by the law of the state of incorporation," *id.*, and Brooks is

a Delaware corporation, *see* Compl. ¶ 5. As the Third Circuit has held, a demand that does not

give a company a "fair opportunity to initiate the action" is insufficient as a matter of law to

satisfy the demand requirement. *See Shlensky v. Dorsey*, 574 F.2d 131, 141 (3d. Cir. 1978).

This is as true for the demand required by Section 16(b) as it is in other derivative cases. *See*

*Dreiling*, 351 F.Supp.2d at 1085 (applying Delaware law governing adequacy of demand to a

Section 16(b) demand). By this standard, the June 16 Letter falls well short.

While the June 16 Letter is, in its entirety, an exercise in vagueness and generality, its most glaring failure is the complete absence of any description of the alleged factual basis for the purported Section 16(b) violations. The June 16 Letter said nothing at all about the trades underlying the Complaint. As such, "[i]t is completely lacking in the specificity which would give the directors a fair opportunity to initiate the action, which the shareholder[] subsequently undertook, which it is the purpose of the demand requirement . . . to provide." *Shlensky*, 574 F.2d at 141. The June 16 Letter did not identify any facts—short-swing trades—but merely restated Section 16(b) itself by alleging generically that various Brooks officers and directors "earned short-swing insider trading profits by acquiring options to purchase Company stock within six months of corresponding sales of Company common stock at higher prices." *See* Exh. A. The letter did not identify either suspect option grants or the supposedly "corresponding" sales. As a result, the June 16 Letter was not a sufficient demand with respect to *any* Section 16(b) claim, much less the one Plaintiff actually filed. Finally, and most importantly, the June 16 Letter said nothing at all about the allegations made in the Complaint about Mr. Therrien's November 1999 acquisition and March 2000 sale.

It is no defense for Plaintiff to argue that the necessary facts were not available to him on June 16. While it is true that the Restatement was not announced until July 31, that is an argument for waiting to make demand until there is actually something to say, not for encouraging generic demands made in the hope that facts later emerge that can be tied back to that placeholder demand. Pending further developments, the June 16 Letter merely attempted to secure a seat at the table should further disclosures by Brooks suggest a possible Section 16(b) claim. That is not, however, how the statute works. Vague demands like the June 16 Letter

serve no purpose at all because they do not provide issuers with any guidance, or a fair opportunity to initiate suit.

Section 16(b) requires that, before bringing a Section 16(b) action in the name of the issuer, a plaintiff-shareholder must make a demand that the Company bring "such suit." *See* 15 U.S.C. § 78p(b). It is not sufficient that the shareholder demand that the Company bring *any* Section 16(b) action. To hold otherwise would force issuers to engage in guesswork in response to any Section 16(b) demand letter, no matter how vague. "[T]o require a board to investigate claims asserted ambiguously in an equivocal communication would not be an efficient use of corporate resources because the board would lack the information necessary to make a good faith inquiry." *Yaw v. Talley*, Civ. A. No. 12882, 1994 WL 89019, 20 Del. J. Corp. L. 454, at * 8 (Del. Ch. March 2, 1994). This is as true with a Section 16(b) action as with any other derivative claim. In the specific Section 16(b) context, deeming generic demands to be sufficient would deprive issuers of their right to pursue Section 16(b) claims in the first instance and vitiate the statute's notice requirement. To hold that the June 16 Letter was sufficient would encourage shareholders or their counsel to inundate issuers with vague and generic Section 16(b) demand letters to lay the groundwork for suits once facts emerge that might be massaged to fit the placeholder demands.

To the extent the June 16 Letter said anything at all, it alleged that options acquired outside the stock option program or without following proper corporate procedures within six months of corresponding sales would give rise to Section 16(b) liability. The allegation in the Complaint, drawn as it is from the Restatement, is not about the acquisition of an option at all. Whether the November 1999 transaction is viewed as the exercise of an expired option, or a straight purchase of stock, it was not the grant of an option. The Complaint itself alleges that

"Therrien's purchase of stock in November 1999 was not made pursuant to an option previously granted to him by the Company." Compl. ¶ 9. Thus the transaction at the heart of the Complaint was not contemplated even by the broad and generic terms of the June 16 Letter. Comparing the Complaint in this action with the June 16 Letter makes clear that the June 16 Letter did not demand or request that the Company bring the Section 16(b) claim that Plaintiff purports to bring in the Complaint. As a result, the Complaint must be dismissed.

> **2.     The June 16, 2006 Letter Did Not Identify Mr. Levy as the Shareholder Bringing the Demand and the Complaint Does Not Allege that He Was a Shareholder at the Time the Demand Letter was Sent**

Just as an adequate Section 16(b) demand letter must request that the issuer bring the Section 16(b) claim a plaintiff-shareholder brings in his complaint, so too must the demand be made by the same shareholder who brings the Complaint. *See* 15 U.S.C. § 78p(b). A demand letter that does not identify the shareholder bringing the demand is ineffective. *See Smachlo v. Birkelo*, 576 F.Supp. 1439, 1444 (D. Del. 1983). "A company's board of directors should not be required to act upon the demand of an alleged shareholder when the shareholder fails to properly identify himself. . . .The board is required to act reasonably in considering a shareholder's demand. However, the board is not charged with being clairvoyant; it cannot be expected to act where the shareholder does not specify who he is." *Id.* While the Complaint alleges that the June 16 Letter was sent on Mr. Levy's behalf, he was nowhere mentioned in the letter itself. Thus, Brooks had no way to verify that the purported demand was being made by an actual shareholder. The Complaint also does not allege that Mr. Levy was a Brooks shareholder at the time of the June 16 Letter. Because of these deficiencies, the June 16 Letter did not satisfy Mr. Levy's demand requirement under Section 16(b) and the Complaint must be dismissed. *Cf. Shlensky v. Dorsey*, 574 F.2d 131, 141-42 (3d Cir. 1978) (holding that dismissal is the appropriate remedy where a shareholder has made an inadequate demand; otherwise the demand

requirement would be meaningless if a shareholder could simply file suit and then rely on the

Complaint or post-Complaint communications to satisfy the demand requirement).

**B.    Demand Would Not Have Been Mere Ceremony But Would Have Served a Valid Corporate Purpose**

Had Mr. Levy made an appropriate demand, there would have been the opportunity for

dialogue between the Company and Mr. Levy regarding the Section 16(b) claim Mr. Levy

advances in the Complaint.  After the Complaint, on October 2, 2006, the Company wrote to Mr.

Levy's counsel, despite his failure to make demand, and presented to him the result of its

independent investigation into the Section 16(b) implications of the November 1999 transaction

and the March 2000 sales by Mr. Therrien.  The Company set forth its position as to why a

Section 16(b) action would not be successful, and why Mr. Levy's position is ultimately

untenable.  Under Rule 16b-3(d)(3), transactions with the issuer itself (like Mr. Therrien's

November 1999 acquisition), are exempt from Section 16(b) provided that the shares acquired

are held for six months.  *See* 17 C.F.R. § 240.16b-3(d)(3).  As described in the Company's

October 2 letter, Mr. Therrien did, in fact, hold those shares for more than six months.

Consequently, pursuing such a claim would not be in the best interests of Brooks because it

would drain Company resources with little prospect for success.

The Company's October 2 response specifically invited Mr. Levy's counsel to contact the

Company's counsel if he wanted further information.  Mr. Levy's counsel offered a perfunctory

reply, contending that Rule 16b-3(d)(3) was somehow invalid and thus the November 1999

acquisition was not exempt.  Had Mr. Levy complied with the statute, instead of filing suit, there

would have been the opportunity for dialogue between Brooks and Mr. Levy, without imposing

significant costs on the Company, and a further opportunity for Mr. Levy to understand why the

Company believes his action is ultimately untenable (or for Mr. Levy to persuade Brooks that he

is correct), a dialogue which Mr. Levy's lawsuit has now cut off. Assuming that Mr. Levy has the best interests of Brooks Automation in mind, as does the Company, he may well agree that there are better uses for the Company's resources than challenging the scope of the SEC's rulemaking authority.

Mr. Therrien has no influence over the Company's position. He is neither the CEO nor a director of the Company. This is simply a situation where, based on its analysis of the facts, the Company determined that the claim advanced is unlikely to succeed. It is the Company whose resources will be expended while the Plaintiff pursues an action that is simply dead on arrival. The Plaintiff may want to gamble on his speculations, however, by pressing this action without making a demand, he is forcing the Company, and his fellow shareholders, to bet along side of him on what Brooks has investigated and deemed a losing hand.

## CONCLUSION

For the foregoing reasons, Brooks respectfully requests that the Court dismiss the action, in its entirety.

Respectfully submitted,

*/s/ J. Travis Laster*
J. Travis Laster (#3514)
Matthew F. Davis (#4696)
Abrams & Laster LLP
Brandywine Plaza West
1521 Concord Pike, Suite 303
Wilmington, Delaware 19803
(302) 778-1000
Email:    Laster@AbramsLaster.com
          Davis@AbramsLaster.com

*Attorneys for*
*Brooks Automation, Inc.*

&

Randall W. Bodner, Esq.
Michael T. Marcucci, Esq.
Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110
(617) 951-7000

*Of Counsel*

Filed October 12, 2006

## CERTIFICATE OF SERVICE

I, J. Travis Laster, hereby certify that on October 12, 2006, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of Court using CM/ECF which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Jeffrey S. Goddess, Esquire
> Rosenthal Monhait Gross & Goddess, P.A.
> Suite 1401, 919 Market Street
> P.O. Box 1070
> Wilmington, Delaware 19899

> */s/ J. Travis Laster*
> J. Travis Laster (#3514)
> Matthew F. Davis (#4696)
> Abrams & Laster LLP
> Brandywine Plaza West
> 1521 Concord Pike, Suite 303
> Wilmington, Delaware 19803
> (302) 778-1000
> Email:  Laster@AbramsLaster.com
>            Davis@AbramsLaster.com

> *Attorneys for Brooks Automation, Inc.*

# Exhibit A

# Abraham Fruchter & Twersky LLP

One Penn Plaza, Suite 2805
New York, NY 10119
Tel : (212) 279-5050
Fax: (212) 279-3655
www.aftlaw.com

June 16, 2006

*By Federal Express*

Board of Directors
Brooks Automation Inc.
15 Elizabeth Drive
Chelmsford, Massachusetts 01824

*Re: Demand Pursuant to Section 16(b) of the Securities Exchange Act of 1934*

To the Board of Directors:

This firm represents a current shareholder of Brooks Automation Inc. (the "Company"). We write pursuant to Section 16(b) of the Securities Exchange Act of 1934 to demand that you bring suit against Robert J. Therrien, Peter Frasso, Edward Grady, Robert Anastasi and other current or former executive officers and directors of the Company (collectively the "Proposed Defendants") to recover short-swing profits earned in connection with purchases and sales of Company equity securities within a period of six months.

According to filings made with the Securities and Exchange Commission relating to the Company, the Proposed Defendants, at all times relevant to the matters addressed in this letter, were senior officers and/or directors of the Company and subject to the short-swing insider trading provisions of Section 16(b). Specifically, the Proposed Defendants earned short-swing insider trading profits by acquiring options to purchase Company stock within six months of corresponding sales of Company common stock at higher prices. To the extent that the options were acquired without following the requisite corporate procedures or outside the contractual provisions of the stock option program, those short-swing profits must be disgorged by the Proposed Defendants to the Company. The Proposed Defendants' are believed to have reaped tens of millions of dollars in profits disgorgeable to the Company pursuant to Section 16(b). The computation of exact short-swing profits, however, must await a detailed analysis of the Proposed Defendants' trading records.

If you fail or refuse to prosecute the Proposed Defendants within sixty days, we will deem you to have failed to comply with the demand made herein and we may, on behalf of our client, institute a lawsuit to recover the short-swing profits for the Company. If you have any questions concerning the contents of this letter or wish to discuss this matter further, please do not hesitate to contact us.

Very truly yours,

Jack G. Fruchter

# Exhibit B

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# Form 10-K/A

## Amendment No. 1

(Mark One)

☑     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

       **For fiscal year ended September 30, 2005**

Or

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

       **For the transition period from     to    .**

**Commission File Number: 0-25434**

# Brooks Automation, Inc.

*(Exact name of Registrant as Specified in Its Charter)*

| | |
|---|---|
| **Delaware** | **04-3040660** |
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |
| **15 Elizabeth Drive** **Chelmsford, Massachusetts** | **01824** |
| *(Address of Principal Executive Offices)* | *(Zip Code)* |

**978-262-2400**
*(Registrant's Telephone Number, Including Area Code)*

**Securities registered pursuant to Section 12(b) of the Act:**

**None**

**Securities registered pursuant to Section 12(g) of the Act:**

**Common Stock, $0.01 par value**
**Rights to Purchase Common Stock**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☑

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☑

Indicate by check mark if disclosure of delinquent filers pursuant to Rule 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K/A or any amendment to the Form 10-K/A. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer.

See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑ Accelerated filer ☐ Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2). Yes ☐ No ☑

The aggregate market value of the registrant's Common Stock, $0.01 par value, held by nonaffiliates of the registrant as of March 31, 2005, was $673,316,217 based on the closing price per share of $15.18 on that date on the Nasdaq Stock Market. As of March 31, 2005, 45,261,240 shares of the registrant's Common Stock, $0.01 par value, were outstanding. As of November 29, 2005, 74,537,762 shares of the registrant's Common Stock, $0.01, par value, were outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's Proxy Statement involving the election of directors, which is expected to be filed within 120 days after the end of the registrant's fiscal year, are incorporated by reference in Part III of this Report.

Table of Contents

**Explanatory Note**
**Restatement of Consolidated Financial Statements**

We are amending our Annual Report on Form 10-K (the "Original Filing") for the year ended September 30, 2005 to restate our consolidated financial statements for the years ended September 30, 2005, 2004 and 2003 and the related disclosures. This Form 10-K/A also includes the restatement of selected financial data as of and for the years ended September 30, 2005, 2004, 2003, 2002 and 2001, which is included in Item 6.

On May 10, 2006, our Board of Directors concluded that our consolidated financial statements for the years ended September 30, 2005, 2004 and 2003 as well as the selected financial data for the years ended September 30, 2002 and 2001 should be restated to record additional non-cash stock-based compensation expense resulting from stock options granted during fiscal years 1996 to 2005 that were incorrectly accounted for under generally accepted accounting principles ("GAAP"). The Company's decision to restate its financial statements was based on the facts obtained by management and an independent investigation into our stock option accounting that was conducted under the direction of a special committee ("Special Committee") of the Board of Directors. The Board created the Special Committee, which was composed solely of independent directors, to conduct a review of matters related to past stock option grants (including the timing of such grants and associated documentation) after receiving inquiries regarding the timing of certain stock option grants. Separately, the Company's management also reviewed stock option grants from 1995 through the second quarter of fiscal 2006 to determine whether any material accounting errors had occurred with respect to stock option grants.

We have not amended and we do not intend to amend any of our other previously filed annual reports on Form 10-K for the periods affected by the restatements or adjustments. As we have previously announced, the consolidated financial statements and related financial information contained in such previously filed reports should no longer be relied upon. All the information in this Form 10-K/A is as of September 30, 2005 and does not reflect any subsequent information or events other than the restatement and related matters discussed in footnote 22 to the consolidated financial statements appearing in this Form 10-K/A. For the convenience of the reader, this Form 10-K/A sets forth the Original 10-K in its entirety. However, the following items have been amended solely as a result of, and to reflect, the restatement, and no other information in the Original Filing is amended hereby as a result of the restatement:

Part II – Item 6 – Selected Financial Data;

Part II – Item 7 – Management's Discussion and Analysis of Financial Condition and Results of Operations;

Part II – Item 8 – Financial Statements and Supplementary Data;

Part II – Item 9A – Controls and Procedures;

Part IV – Item 15 – Exhibits and Financial Statement Schedules

Other than discussed above, this Form 10-K/A does not reflect events occurring after the filing of the Original Filing or modify or update disclosures (including, except as otherwise provided herein, the exhibits to the Original Filing), affected by subsequent events. Accordingly, this Form 10-K/A should be read in conjunction with our periodic filings made with the Securities and Exchange Commission ("SEC") subsequent to the date of the Original Filing, including any amendments to those filings. In addition, in accordance with applicable SEC rules, this Form 10-K/A includes updated certifications from our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") as Exhibits 31.01, 31.02, and 32.

Table of Contents

different from any future results, performance or achievements expressed or implied by such forward-looking statements such as estimates of future revenue, gross margin, and expense levels as well as the performance of the semiconductor industry as a whole. Such factors include the "Factors That May Affect Future Results" set forth in Management's Discussion and Analysis of Financial Condition and Results of Operations below. Precautionary statements made herein should be read as being applicable to all related forward-looking statements whenever they appear in this report.

## Restatement of Consolidated Financial Statements

On May 10, 2006, our Board of Directors concluded that our consolidated financial statements for the years ended September 30, 2005, 2004 and 2003 as well as the selected financial data for the years ended September 30, 2002 and 2001 should be restated to record additional non-cash stock-based compensation expense resulting from stock options granted during fiscal years 1996 to 2005 that were incorrectly accounted for under generally accepted accounting principles ("GAAP"). Our decision to restate our financial statements was based on the facts obtained by management and an independent investigation into our stock option accounting that was conducted under the direction of a special committee ("Special Committee") of the Board of Directors. The Board created the Special Committee, which was composed solely of independent directors, to conduct a review of matters related to past stock option grants (including the timing of such grants and associated documentation) after receiving inquiries regarding the timing of certain stock option grants. Separately, the Company's management also reviewed stock option grants from 1995 through the second quarter of fiscal 2006 to determine whether any material accounting errors had occurred with respect to stock option grants.

We have concluded that there were material accounting errors with respect to a number of stock option grants. In general, these stock options were granted with an exercise price equal to the Nasdaq closing market price for our common stock on the date set forth on written consents signed by one or more directors. We used the stated date of these consents as the "measurement date" for the purpose of accounting for them under GAAP, and as a result recorded no compensation expense in connection with the grants.

We have concluded that a number of written consents were not fully executed or effective on the date set forth on the consents and thus that using the stated date as the measurement date was incorrect. We have determined a revised measurement date for each stock option grant based on the information now available to us. Generally, the changes in measurement dates are due to two kinds of errors: (1) we treated unanimous written consents of directors approving stock option grants as effective on the date stated on the consent, instead of the date upon which we received the consent form containing the last signature required for unanimity; and (2) we treated option grants to multiple employees as effective prior to the date upon which we had determined the exact number of options that would be granted to each individual employee. In cases where the closing market price on the revised measurement date exceeded the Nasdaq closing market price on the original measurement date, we have recognized compensation expense equal to this excess over the vesting term of each option.

We have determined that the cumulative, pre-tax, non-cash, stock-based compensation expense resulting from revised measurement dates was approximately $58.7 million during the period from our initial public offering in 1996 through September 30, 2005. The corrections made in the restatement relate to options covering approximately 6.0 million shares. In the restatement, we recorded stock-based compensation expense of $1.6 million, $3.1 million and $17.3 million for the years ended September 30, 2005, 2004 and 2003, respectively, and $36.7 million prior to fiscal 2003. In addition, we recorded an income tax benefit of $1.8 million prior to fiscal 2003. The cumulative effect of the restatement adjustments on our consolidated balance sheet at September 30, 2005 was an increase in additional paid-in capital offset by a corresponding increase in the accumulated deficit and deferred compensation which results in no net effect on stockholders' equity. The adjustments increased previously reported diluted loss from continuing operations per common share by $0.03 and $0.47 for the years ended September 30, 2005 and 2003, respectively, and decreased diluted earnings from continuing operations per common share by $0.07 for the year ended September 30, 2004. Approximately 99% of the charges relating to revised measurement dates arose from incorrect measurement dates for stock options granted during fiscal years 1996 through 2002. Subsequent to fiscal 2002 and prior to the inception of the investigation, we had revised our stock option and restricted stock grant practices. Neither the Company nor the Special Committee concluded that anyone now affiliated with the Company was complicit in any intentional wrongdoing. The Company and the Special Committee were unable to conclude that the accounting errors relating to revised measurement dates for

22

Table of Contents

stock option grants were the result of intentional misconduct of any company personnel. There was no impact on revenue or net cash provided by operating activities as a result of this compensation expense.

In addition to the compensation expenses described above, we also recorded approximately $5.8 million of non-cash, stock-based compensation expense in connection with a stock option held by former CEO Robert J. Therrien that we have concluded he was permitted to exercise in November 1999 despite its expiration in August of 1999. This transaction was previously accounted for and disclosed as a loan by the Company to Mr. Therrien for the purpose of permitting him to exercise the option. Specifically, in November 1999, three directors of the Company (including Mr. Therrien) signed a ratification document pursuant to which Mr. Therrien was deemed to have been granted a loan as of August 1999. According to the document, in June 1999 our directors (Messrs. Khoury, Emerick and Therrien) discussed extending a loan to Mr. Therrien for the purpose of permitting him to exercise an option to purchase 225,000 shares of the Company's stock prior to its expiration in August 1999. Based on the document, the Company in November 1999 deemed Mr. Therrien to have timely exercised the options, and accounted for the exercise without recognizing compensation expense. As a result of facts obtained by the Special Committee, we determined that Mr. Therrien misrepresented the facts of the loan and the ratification document described above was false as there were no discussions concerning a loan in June 1999. As a result, we have determined that the option expired in August 1999 and that compensation expense should have been recorded in connection with Mr. Therrien's purchase of stock in November 1999. At that time, Mr. Therrien paid approximately $560,000 (the exercise price of $2.43 per share, plus interest deemed due on the loan) for 225,000 shares then worth approximately $6,314,000 (or $28.06 per share). In the restatement, we have recognized compensation expense in November 1999 equal to the difference between the price paid by Mr. Therrien and the market value of the stock on the date of sale. The three directors including Mr. Therrien are no longer affiliated with the Company.

As part of our review, we assessed generally whether there were other matters which should have been corrected in our previously issued financial statements. Apart from the errors underlying the restatement described above, no other matters have come to our attention that should be adjusted in our previously issued financial statements.

As a result, we recorded in the restatement cumulative, non-cash pre-tax stock-based compensation expense of approximately $64.5 million and a tax benefit of $1.8 million. Principally as a result of losses incurred, we recorded a full valuation allowance against all deferred tax assets beginning in 2002 and consequently, there is no tax effect of the additional stock-based compensation expense recorded in the years ended September 30, 2005, 2004 and 2003.

### Related Proceedings

On May 12, 2006, we announced that we had received notice that the Boston Office of the United States Securities and Exchange Commission (the "SEC") was conducting an informal inquiry concerning stock option grant practices to determine whether violations of the securities laws had occurred. On June 2, 2006, the SEC issued a voluntary request for information to us in connection with an informal inquiry by that office regarding a loan we previously reported had been made to Mr. Therrien in connection with his exercise of stock options in 1999. On June 23, 2006, we were informed that the SEC had opened a formal investigation into this matter and on the general topic of the timing of stock option grants. On June 28, 2006, the SEC issued a subpoena to us seeking documents related to our stock option grant practices and a purported loan to Robert Therrien in August 1999 in connection with his exercise of a stock option.

On May 19, 2006, we received a grand jury subpoena from the United States Attorney (the "DOJ") for the Eastern District of New York requesting documents relating to stock option grants. Responsibility for the DOJ's investigation was subsequently assumed by the United States Attorney for the District of Massachusetts. On June 22, 2006, the United States Attorney's Office for the District of Massachusetts issued a grand jury subpoena to us in connection with an investigation by that office into the timing of stock option grants by us and the loan to Mr. Therrien mentioned above.

We are cooperating fully with the investigations being conducted by the SEC and the DOJ.

23

Exhibit C



ROPES & GRAY LLP

ONE INTERNATIONAL PLACE    BOSTON, MA 02110-2624    617-951-7000    F 617-951-7050

BOSTON    NEW YORK    PALO ALTO    SAN FRANCISCO    WASHINGTON, DC    www.ropesgray.com

August 14, 2006

Randall W. Bodner
617-951-7776
Randall.Bodner@ropesgray.com

**BY FACSIMILE & FEDERAL EXPRESS**

Jack G. Fruchter, Esq.
Abraham Fruchter & Twersky LLP
One Penn Plaza
Suite 2805
New York, NY 10119

Re:    June 16, 2006 Letter Regarding Section 16(b) of the Securities Exchange Act of 1934

Dear Mr. Fruchter,

We represent Brooks Automation, Inc. ("Brooks" or the "Company"), and I am writing on behalf of the Company in response to your June 16, 2006 letter regarding alleged (and completely unspecified) violations of Section 16(b) of the Securities Exchange Act of 1934. *See* 15 U.S.C. § 78p(b). You assert that Robert J. Therrien, Peter Frasso, Edward Grady, Robert Anastasi, and other unnamed "current and former executive officers and directors of the Company" violated Section 16(b) and realized improper "short-swing" profits because, you allege, they sold Brooks stock within six months of receiving stock option grants from the Company. Despite this conclusory allegation, however, you do not identify any specific grants to, or sales by, any officer or director that, you contend, violate Section 16(b). You assert, without citing any support for the proposition, that "[t]o the extent the options were acquired without following the requisite corporate procedures or outside the contractual provisions of the stock option program, those short swing profits must be disgorged by the Proposed Defendants to the Company." Your letter fails to address at all—much less in reference to specific grants—the exemptions pursuant to Rule 16d-3 that apply to the acquisition of securities, including options, from the issuer. As a result of these omissions, your letter is simply too vague to give the Company any meaningful guidance or to put it on notice of any potential Section 16(b) violations by the four individuals you name, much less by the unnamed "current or former executive officers and directors" of the Company.

While Brooks appreciates your attention to its financial interests, your letter comes after the Company had already commenced a comprehensive investigation into its stock option practices.

On April 26, 2006, Brooks issued a press release announcing that a special committee of independent directors (the "Special Committee") was investigating past stock option grants,

ROPES & GRAY LLP

Jack G. Fruchter, Esq.                        - 2 -                        August 14, 2006

including the timing of such grants and related issues. The Company also disclosed in a Form 8-K filed with the United States Securities and Exchange Commission on May 15 that, based on a report from the Special Committee of work done to date, Brooks would be restating certain of its financial statements. On July 31, Brooks filed an amended Form 10-K with the SEC that included that restatement.

Your letter does not identify any specific trading activity which you believe violated Section 16(b). Your letter does not even place any sales within six months of the option grants. A purchase and a sale or a sale and purchase of stock within six months is the very essence of—and a necessary element to establish—a Section 16(b) violation. 15 U.S.C. § 78p(b).

The Company continues to analyze and address various options dating issues and rest assured that Brooks will continue to take appropriate steps to promote the long-term best interests of the Company and its shareholders.

In that regard, let me be clear that Brooks does not believe that you would be entitled to any fee in any action brought by or on behalf of the Company. Your "demand" not only fails to identify any specific trading activity that, you contend, violates Section 16(b), but it also comes after Brooks had already commenced its investigation. As noted above, and as set forth in a press release on April 26, 2006 and a Form 8-K filed with the SEC on May 15, 2006, the Company and the Special Committee began a comprehensive investigation into these matters long before your June 16 letter. It is clear that your letter was not a causative factor in any action Brooks has taken to date or any actions it may take in the future. The Company was already addressing the stock option issues raised in your letter when it received your demand.

Nevertheless, on behalf of Brooks, I thank you for your interest in this matter.

Very truly yours,

Randall W. Bodner

RWB:mal

Exhibit D

Westlaw.

Not Reported in A.2d                                                                                Page 1

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
(Cite as: Not Reported in A.2d)

C
Yaw v. TalleyDel.Ch.,1994.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County
Robert E. YAW, II, Plaintiff,
v.
William W. TALLEY, II, Larry E. LEE, Mrs. Pieter
A. Fisher, Individually and as Administratrix or
Executrix of the Estate of Pieter A. Fisher, and Alex
Massad, Defendants,
andRamco Holding Corp., a Delaware corporation,
Nominal Defendant.
Civ.A. No. 12882.

Submitted: Nov. 1, 1993.
Decided: March 2, 1994.

Robert K. Payson, Arthur L. Dent, and Stephen C.
Norman, Potter, Anderson & Corroon, Wilmington,
of counsel: David J. Branson and Daniel J.
Culhane, Kaye, Scholer, Fierman, Hays & Handler,
Washington, DC, James M. Sturdivant and Richard
B. Noulles, Gable & Gotwals, Tulsa, OK, for
plaintiff.
Henry N. Herndon, Jr., Morris, James, Hitchens &
Williams, Wilmington, of counsel: V. Burns Hargis
and Roger D. Graham, Hartzog, Conger, Cason &
Hargis, Oklahoma City, OK, for defendants
William W. Talley, II and Larry E. Lee.
Lawrence A. Hamermesh, Morris, Nichols, Arsht &
Tunnell, Wilmington, of counsel: Robert A. Sacks,
Michael H. Steinberg, and Steven S. Lucas,
Sullivan & Cromwell, Los Angeles, CA, for
defendant Mrs. Pieter A. Fisher Individually and as
Executrix of the Estate of Pieter A. Fisher.
R. Franklin Balotti, Richards, Layton & Finger,
Wilmington, of counsel: William Stutts, Baker &
Botts, Austin, TX, for defendant Alex Massad.
David C. McBride, Young, Conaway, Stargatt &
Taylor, Wilmington, of counsel: C. David Stinson,
McAfee & Taft, Oklahoma City, OK, for defendant
RAMCO Holding Corp.

MEMORANDUM OPINION
JACOBS, Vice Chancellor.
*1 Pending are motions to dismiss and for summary
judgment in this derivative action brought by the
plaintiff, Robert E. Yaw, II ("Yaw" or "the plaintiff"
). Yaw is a shareholder of the nominal defendant,
RAMCO Holding Corp. ("RAMCO"),[FN1] a
Delaware corporation. The individual defendants
are RAMCO's current directors, Dr. William W.
Talley, II ("Talley"); Mr. Larry E. Lee ("Lee");
and Mrs. Pieter A. Fisher, individually and as
executrix of the estate of her late husband, Pieter A.
Fisher, who was a RAMCO director (the "Estate").
Also named as a defendant is Alex Massad ("
Massad"), who was a RAMCO director from 1991
to mid-1992.

> FN1. The corporation is referred to as "
> RAMCO Oil and Gas, Inc." in certain
> correspondence referenced in the
> complaint and contained in the first
> McBride Affidavit. Because there is no
> indication to the contrary, the Court will
> assume, solely for purposes of this motion,
> that RAMCO and RAMCO Oil and Gas,
> Inc. are one and the same entity.

Yaw filed his complaint on March 2, 1993, alleging
that the defendants had engaged and/or acquiesced
in self-dealing transactions, corporate
mismanagement, waste of corporate assets, and the
usurpation of a corporate opportunity, for which the
defendants were jointly and severally liable. On
May 10, 1993, the defendants moved to dismiss the
complaint. In support, they filed an opening brief,
together with an affidavit to which was attached
certain correspondence referenced in the complaint.
In response, the plaintiff amended his complaint
on June 18, 1993.

The defendants renewed their motion to dismiss the
amended complaint, and submitted a reply brief,
together with a second affidavit containing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 2

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
**(Cite as: Not Reported in A.2d)**

evidentiary material outside the scope of the pleadings. The defendants rested their motion to dismiss on three grounds: (i) Yaw failed to comply with Chancery Court Rule 23.1; (ii) Yaw is bringing the litigation for an improper purpose, and therefore he is an unsuitable derivative plaintiff; [FN2] and (iii) two of Yaw's claims are barred by the statute of limitations.

> FN2. The parties agree that the motion to dismiss on this second ground may be treated as if converted into a motion for summary judgment. *See* Oral Arg.Tr. at 75-76, 93-95.

This is the Opinion of the Court, after briefing and oral argument, on the defendants' motions to dismiss and for summary judgment.

## I. THE FACTS

Except where otherwise noted, the facts are derived from both the amended complaint and from documents referenced in that complaint, which are attached to the first McBride affidavit. RAMCO, a Delaware corporation with its principal place of business in Tulsa, Oklahoma, was formed in 1987 to acquire and develop a diversified portfolio of oil and gas producing properties. RAMCO has four shareholders, Yaw, Talley, Lee and the Estate, each of whom owns 25% of RAMCO's outstanding common stock.[FN3] Messrs. Fisher, Massad, Lee, and Dr. Talley were directors of RAMCO until mid-1992. In June 1992, Mr. Fisher died and was replaced on the board by his wife. At that time Massad, who had been a director since 1991, also left the board. Mr. Lee and Dr. Talley remain on RAMCO's board of directors along with Mrs. Fisher. Mr. Lee served as RAMCO's Chief Executive Officer until his removal sometime prior to September 1992. McBride Aff.Ex.C. Dr. Talley is also an officer of RAMCO. Amended Complt. ¶ 3.

> FN3. Each shareholder owns 562,000 shares of Class A Common Stock.

Plaintiff additionally owns 15,000 shares of RAMCO Preferred Stock. Amended Cmplt. ¶ 1.

### A. *The Allegations of the Complaint*

Yaw complains of six transactions and events that, he claims, amounted to self-dealing, waste of corporate assets, corporate mismanagement and usurpation of a corporate opportunity by the defendant directors.

**\*2** Yaw first claims that Messrs. Talley, Lee, Fisher and Mrs. Fisher received excessive compensation amounting to corporate waste to the extent of $2 million. *Id.* at ¶ 12. In particular, plaintiff alleges that during 1991 and 1992, Lee received $800,000 while working part-time for RAMCO; the Fishers received $300,000; and Talley received $600,000. Plaintiff alleges that these payments were excessive, jeopardized RAMCO's financial health, and rendered it incapable of funding approximately $4 million in short term commitments. *Id.* at ¶ 13.

Second, the plaintiff alleges that in 1988 the defendant directors wasted RAMCO's corporate assets in a self-dealing transaction whereby Talley, through one of his business interests, sold various used computer equipment and furniture to RAMCO for $1.7 million. *Id.* at ¶ 14. To induce the board's approval of the sale, the computers were misidentified and overvalued. *Id.* at ¶ 15. Moreover, some of the furniture was never delivered, yet no corresponding deduction was ever made from the purchase price. *Id.* at ¶ 16.

Third, Yaw claims that RAMCO was caused to pay in excess of $1.5 million to "Design Too," an interior decoration firm, for the redecoration of RAMCO's offices in Tulsa, and that a substantial portion of those funds was converted to the personal use of Mr. Lee and/or his wife. *Id.* at ¶ 18.

The plaintiff's fourth claim is that defendants Talley and Lee converted RAMCO funds through improper expense account reimbursements. Yaw alleges three specific instances in which Lee allegedly charged his personal expenses to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
**(Cite as: Not Reported in A.2d)**

corporation: a $5,000 private birthday party for Mrs. Lee, a $4,000 personal dinner in Hong Kong, and $5,000 to pay a country club assessment and for wines now stored in Lee's home. Yaw also alleges that RAMCO reimbursed $40,000 of Talley's expenses, including $5,000 for a hunting trip to Russia. All told, plaintiff alleges, RAMCO was caused improperly to reimburse over $150,000 in personal expenses. *Id.* at ¶ 20.

Fifth, the plaintiff alleges that defendants Talley, Lee, Fisher and Mrs. Fisher managed RAMCO in a grossly negligent manner. Yaw claims that the defendants caused RAMCO to pay its creditors up to ninety days after the company's debts fell due. That practice, Yaw alleges, created a working capital deficit and gave rise to a potential claim against RAMCO for breach of its fiduciary duties to one of its limited partners in a partnership.[FN4] Yaw further claims that the defendants' failure to file timely audited financial statements with Chase Manhattan Bank caused RAMCO to fall out of full compliance with its credit agreement with that bank. *Id.* at ¶ 21.

> FN4. Plaintiff claims that this late payment pattern constituted a breach of fiduciary duty owed by these defendants to RAMCO's limited partner, New York Life Insurance Company, under an agreement requiring New York Life to pay RAMCO thirty days in advance for operating expenses related to the development of certain oil and gas properties. *Id.* at ¶ 21.

Finally, the plaintiff claims that in 1990, the defendants usurped a corporate opportunity of RAMCO. *Id.* at ¶ 23. RAMCO's board investigated an invitation from the Trust Company of the West to purchase an interest in a pipeline. Messrs. Lee and Fisher and Dr. Talley rejected the offer on RAMCO's behalf, but immediately thereafter acquired that interest for their personal accounts. *Id.* at ¶ 22-24. They then allegedly sold their interests 15 months later for a net profit of $2.75 million. *Id.* at ¶ 25.

**B.** *The Plaintiff's Purported Demand Upon the Board*

**\*3** Beginning on September 24, 1992, Yaw, assisted by his Washington, D.C. counsel, David J. Branson, Esquire, wrote four letters to Talley, Mrs. Fisher, and V. Burns Hargis, Esquire, an Oklahoma attorney who represented Messrs. Talley and Lee. *Id.* at ¶¶ 25-29. The defendants contend that these letters, which included two draft complaints, constituted a demand upon RAMCO's board of directors. The plaintiff insists that they did not. Because the legal character of these letters is disputed, some elaboration of their contents is required.

On September 24, 1992, Yaw wrote a letter to Talley, accusing Talley, Lee and Fisher of the alleged wrongful acts described above. Amended Cmplt. ¶ 25; McBride Aff.Ex.A. Yaw proposed that he and Talley meet and conclude an agreement regarding: (1) the "purchase [of] 100 percent of the outstanding shares of RAMCO" by any one of three identified third-party offerors; and (2) the " allocation of the proceeds of the sale of shares" in a manner that would compensate Yaw for the allegedly improper diversions of funds to the directors. McBride Aff.Ex. A at 1, 3. Yaw warned that if Talley refused to comply with these terms, he would file a federal court action against the directors in Tulsa, Oklahoma, charging them with "fraud, theft of corporate opportunity and misallocation of corporate resources." *Id.* at 1.

On September 29, 1992, Yaw wrote a letter to Mrs. Fisher, threatening to sue "all of the directors [including the late Mr. Fisher] who approved of or permitted the alleged acts of fraud, theft of corporate opportunity, and misallocation of corporate resources" detailed in his previous letter to Talley (a copy of which was enclosed). McBride Aff. Ex. B. Yaw advised Mrs. Fisher that a meeting with Talley was scheduled for October 5, 1992 in Tulsa.

On September 30, 1992, Yaw again wrote to Talley, notifying him of the scheduled meeting on October 5, 1992. Yaw expected that Talley and Lee would at that time "discuss [with Yaw] the sale of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 4

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
**(Cite as: Not Reported in A.2d)**

RAMCO Holding Corp. and respond to the issues raised in Yaw's September 24 letter." McBride Aff.Ex.C. Yaw also demanded RAMCO's audited financial statements for 1990 and 1991, as well as the materials furnished to the board in connection with the removal of Lee as RAMCO's Chief Executive Officer.

On October 6, 1992, Yaw again wrote to Mrs. Fisher, chronicling the events of the October 5 meeting that she had not attended. He also reported to Mrs. Fisher that a potential purchaser had made an offer to buy RAMCO for $16 million, less the company's debt. Yaw stated that although Talley and Lee had refused to consider a sale of the company, they nevertheless wanted time to prepare an offer to purchase Yaw's shares. Yaw sent a copy of that October 6 letter to Massad. McBride Aff.Ex. D.

Three months later, on January 13, 1993, Mrs. Fisher's California attorney, Michael H. Steinberg, Esquire, received from Yaw's attorney, Mr. Branson, a draft complaint in a proposed derivative action to be brought in the United States District Court for the District of Delaware. McBride Ex. E.

*4 On February 4, 1993, Yaw's attorney wrote to Mr. Hargis (the Oklahoma attorney who represented Talley and Lee) a letter sharply criticizing Lee's res ponse to the offer of a new third party bidder, Lyco Energy Corporation ("Lyco"), to purchase 100% of RAMCO's shares. Lee had told Lyco that the RAMCO board would not determine which offers, if any, to entertain until the board met at the end of that month. McBride Aff.Ex. F at 2.[FN5] Criticizing Lee's position, Yaw's counsel stated that Lee should have consulted the other shareholders:

> FN5. Lyco apparently had submitted to Mr. Lee an offer to purchase 100% of RAMCO's shares for $16 million, less the company's debt. Lyco requested certain information in order to perform due diligence. It appears that Lee did not provide any information, but instead requested evidence of Lyco's financing. Although Lee received a letter from

Donaldson, Lufkin, Jenrette's Energy Group, confirming that firm's involvement in procuring financing, Lee still refused to meet with Lyco until after the board meeting. McBride Aff.Ex.G. at 1-2.

RAMCO does not need to hold a Board meeting to determine if the company is for sale. Mr. Lee can take a telephone poll of the other three shareholders and learn if there is a consensus, immediately. *Id.* Referencing the draft complaint he had previously sent to Mrs. Fisher's counsel, Yaw's counsel warned that if no binding contract to sell RAMCO were executed by February 28, 1993, he had been instructed to file suit in the United States District Court for the District of Delaware.[FN6]

> FN6. Mr. Yaw's counsel stated that:
> The action will seek damages from the defendant directors for a continuous and continuing breach of their fiduciary duties and will seek the immediate appointment of a conservator for the corporation to stop Messrs. Talley and Lee from taking any more funds from the corporation.
> McBride Aff.Ex. F at 2.

Mr. Hargis responded to Yaw's attorney in a letter dated February 8, 1993, as follows:
Presumably, you are writing to me because I am the attorney for Talley and Mr. Lee. However, the issues raised and demands made in your letter are matters with which the corporation must deal.

McBride Aff.Ex. G.

Yaw's counsel then replied to Mr. Hargis in a letter dated February 9, 1993:
I did write to you because you are the attorney for Dr. Talley and Mr. Lee. My letter seems to have caused some confusion, however, as evidenced by your recommendation that I contact Mr. Stinson, counsel for the company.
Mr. Yaw has no intention of suing the company. His complaint is with the directors as detailed in the complaint....
The directors continue to take excessive compensation. A sale of the company is one way

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
**(Cite as: Not Reported in A.2d)**

to stop that practice. Ergo, Mr. Yaw's decision to file the complaint on March 1, 1993 if there is no contract to sell the company then in place.

McBride Aff.Ex.H. Enclosed with this letter was a copy of a draft complaint substantially similar to the one ultimately filed in this Court.

## II. THE CONTENTIONS

The defendants seek the dismissal of this action on three grounds. First, they argue that the letters written by Yaw and his attorney to the defendants and their counsel constituted a pre-suit demand that the board properly refused. Second, the defendants contend that Yaw is not a proper plaintiff because he brings this action for ulterior motives that are adverse to the company's interests. Third, they argue that two of Yaw's claims (the 1988 computer and furniture purchase claims) are barred by the statute of limitations.

In response, the plaintiff argues that his letters did not constitute a pre-suit demand because they were written to the defendants as stockholders, not as directors, of RAMCO. Moreover, the letters did not demand that the board take corporate action to redress the claims made here, but only requested that the defendants, as individuals, sell their shares. In any event, Yaw contends, the particularized facts alleged in the complaint establish that demand was excused.

*5 Alternatively, Yaw contends that even if his letters were found to constitute a Rule 23.1 demand, the defendants improperly refused it. Although Yaw recognizes that the making of a demand " tacitly concedes the independence of a majority of the board to respond," he argues that the Court must still inquire into the Board's good faith and the reasonableness of its investigation of the alleged wrongdoing. *Levine v. Smith*, Del.Supr., 591 A.2d 194, 214 (1991); *Spiegel v. Buntrock*, Del.Supr., 571 A.2d 767, 777 (1990). In that regard, he contends that the particularized facts alleged in the complaint create a reasonable doubt that the directors acted in good faith and reasonably investigated his claims. The defendants

vehemently disagree.

Second, the defendants argue that the complaint must be dismissed because Yaw is not a proper plaintiff. They contend that Yaw brought this suit impelled by improper ulterior motives, namely, to accomplish his personal objective of selling the company and garnering for himself the lion's share of the proceeds. [FN7] They say that Yaw is using this action simply as a device to inject himself into the negotiations for the sale of RAMCO. The decision to sell RAMCO, defendants say, properly rests with the board, which is empowered to manage the corporation by 8 *Del.C.* § 141(a). Finally, defendants argue that because Yaw is prosecuting this action for his own personal gain, he will not act for the benefit of all shareholders, as *Youngman v. Tahmoush*, Del.Ch., 457 A.2d 376, 381 (1983) requires. The plaintiff vigorously disputes these charges.

> FN7. Defendants suggest that Yaw may be aligned with some of the potential purchasers, such as Lyco, which would make him an inappropriate derivative plaintiff because his interests would conflict with those of the corporation and the remaining shareholders.

Lastly, the defendants contend that 10 *Del.C.* § 8106 , the three-year statute of limitations, bars the 1988 furniture and computer purchase claims.

## III. THE SUFFICIENCY OF THE PLAINTIFF'S CLAIMS

### A. The Statute of Limitations Defense

I first address whether the statute of limitations defense bars the computer and furniture purchase claims. In deciding that issue on a motion to dismiss:

all facts of the pleadings and reasonable inferences to be drawn therefrom are accepted as true, but neither inferences nor conclusions of fact unsupported by allegations of specific facts upon

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
**(Cite as: Not Reported in A.2d)**

which the inferences or conclusions rest are accepted as true.

*Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 n. 6 (1988).

The challenged claims arise out of alleged computer equipment and furniture purchases by RAMCO from one of Talley's business interests in 1988. Defendants argue that those claims are time-barred by 10 *Del.C.* § 8106. [FN8] As this Court has previously noted:

> FN8. Section 8106 provides in pertinent part:
> No action ... to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of the defendant shall be brought after the expiration of *3 years* from the accruing of the cause of such action....
> *Id.* (emphasis added).

It is by now firmly established that the three-year statute of limitations applies to shareholder derivative actions which seek recovery of damages or other essentially legal relief. *Halpern v. Barran,* Del.Ch., 313 A.2d 139, 141 (1973) (citing *Bokat v. Getty Oil Co.,* Del.Supr., 262 A.2d 246 (1970)).

However, in actions seeking damages or essentially legal relief the statute of limitations is not inflexibly applied. As a substantive matter, fiduciaries who benefit personally from their wrongdoing, especially as a result of fraudulent self-dealing, will not be afforded the protection of the statute. *Halpern,* 313 A.2d at 142 (interpreting *Bovay v. H.M. Byllesby & Co.,* Del.Supr., 38 A.2d 808 (1944) ). Moreover, even in the absence of fraudulent concealment,

\*6 ... *Bokat,* in harmonizing *Bovay,* recognized ... that where wrongful self-dealing is alleged in a derivative action, the statute does not run against the plaintiff until he or she knew or had reason to know the facts alleged to give rise to the wrong.

*Kahn v. Seaboard Corp.,* Del.Ch., C.A. No. 11485,

Allen, C., slip op. at 15 (Jan. 14, 1993). To invoke these tolling exceptions to the statute, the party asserting the claim must observe certain pleading requirements. Specifically, where the complaint asserts a claim that on its face would otherwise be time-barred, the plaintiff bears the burden of pleading facts that would operate to toll the statute. *In re USACafes, L.P. Litig.,* Del.Ch., Cons. C.A. No. 11146, Allen, C. (Jan. 21, 1993); *see also In re MAXXAM Inc./ Federated Dev. Shareholders Litig.,* Del.Ch., C.A. Nos. 12111 and 12353, Jacobs, V.C. (Apr. 13, 1993).

The complaint in this case pleads facts that, without more, would bar the computer and furniture purchase claims. The alleged wrongdoing occurred in 1988, more than three years before this action was commenced on March 2, 1993. Yaw has pled no facts sufficient to invoke the tolling exceptions for concealment of self-dealing by a fiduciary. He has not alleged that these transactions were either fraudulently concealed from him, or that he, as a reasonably attentive and diligent shareholder relying on the company's directors, was nonetheless kept ignorant of these abuses until sometime within the three-year limitations period. For those reasons, the 1988 computer and furniture purchase claims are time barred and will be dismissed.

### B. Whether the Plaintiff's Pre-Suit *Communications Operate as a Demand*

The second issue is whether the letters and proposed complaints that Yaw and his counsel sent to the defendants and their counsel constituted a demand within the meaning of Chancery Court Rule 23.1. For the reasons next discussed, I conclude that they did not.

On a motion to dismiss under Rule 23.1,[FN9] the plaintiff must demonstrate either that no pre-suit demand was made because it would have been futile, or that a demand was made but was wrongfully refused. To demonstrate that demand would have been futile, the plaintiff must allege particularized facts creating a reasonable doubt that "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
**(Cite as: Not Reported in A.2d)**

the product of a valid exercise of business judgment.
" *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 814 (1984). However, by the very making of a demand, the shareholder plaintiff tacitly concedes the independence of a majority of the board to respond. When a board refuses a demand thus made, the only permissible challenge is to the board's good faith and to the reasonableness of its investigation. *Levine v. Smith,* Del.Supr., 591 A.2d 194, 212 (1991); *Spiegel v. Buntrock,* Del.Supr., 571 A.2d 767, 777 (1990). Thus, a judicial determination that a plaintiff has made a demand carries with it significant legal consequences.

> FN9. Rule 23.1 pertinently requires that:
> The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and the reasons for his failure to obtain the action or for not making the effort.
> Ch.Ct.R. 23.1.

*7 Before reaching the demand excused-demand refused analysis, this Court must first consider whether the plaintiff did, in fact, make a pre-suit demand. There is no all-inclusive legal formula defining what types of communications will constitute a demand. That determination is essentially fact-driven. *See Bergstein v. Texas Int'l Co.,* Del.Ch., 453 A.2d 467, 469 (1982). Precedents do, however, provide guidance here. The United States District Court for the District of Delaware, applying Delaware law, has held that:
At a minimum, a demand must identify the wrongdoers, describe the factual basis of the wrongful acts and the harm caused to the corporation, and request remedial relief.

*Allison on Behalf of G.M.C. v. General Motors Corp.,* D.Del., 604 F.Supp. 1106, 1117 (1985). The mere sending of a proposed complaint, without more, will not necessarily constitute a demand because it might not identify the specific remedial corporate action that the shareholder wants the board to take.[FN10] As the Chancellor has held:

> FN10. Letters to the board requesting a meeting or threatening suit in an effort to extract information or other concessions specific to the individual plaintiff, have also been held not to constitute a demand. *Seibert v. Harper & Row, Publishers, Inc.,* C.A. No. 6639, Berger, V.C., letter op. at 8-9 (Dec. 5, 1984).

I do not accept that the mere sending of a copy of a complaint constitutes a demand that the board take the legal action therein embodied. For an action to constitute a valid demand, it must embody a *specific request* for the board to take *legal action* on behalf of the corporation.
*Leslie v. Telephonics Office Technologies,* Del.Ch., C.A. No. 13045, Allen, C., slip op. at 24-25 (Dec. 30, 1993) (emphasis added).

From these precedents it is possible to distill three elements essential to a determination that a demand has been made. To constitute a demand, a communication must specifically state: (i) the identity of the alleged wrongdoers, (ii) the wrongdoing they allegedly perpetrated and the resultant injury to the corporation, and (iii) the legal action the shareholder wants the board to take on the corporation's behalf. Those elements are consistent with and derive from the policies underlying the demand requirement. One of those policies is to put the board on notice of possible wrongdoing and enable it to take corrective intracorporate action. *See, e.g., Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 624 (1984). It is essential that the communication contain these three elements to enable the board to perform its duty to make a good faith investigation of claims of alleged wrongdoing, and, where appropriate, to rectify the misconduct.

In many cases, the fact that a Rule 23.1 pre-suit demand is being made will be facially clear from the communication itself. But cases such as this will also arise, where the character of the shareholder communication is ambiguous or unclear. In such cases the party asserting that a demand was made (here, the defendants) should bear the burden of proof, by showing that at least the three essential elements enumerated above are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 8

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
(Cite as: Not Reported in A.2d)

embodied in the communication. Only then will the communication acquire the dignity of a legally significant act that would entitle the board to argue that a demand was made and properly refused.

**\*8** Policy considerations require that the burden lie with the party asserting that a demand was made, and that ambiguous communications be construed against a finding of a demand. This Court has recognized the severe procedural consequences to a plaintiff found to have made a pre-suit demand, namely, being precluded from challenging the board's independence and disinterestedness. In that connection this Court has observed:

The peculiarities of the law of demand in Delaware can make it quite significant whether a demand is deemed to be made because a demand on the board to take action is said to concede (and waive any challenge to) the board's ability to exercise a binding business judgment. In light of the weighty consequence of a demand under Delaware law, I doubt that it is necessary to extend this waiver by construing *ambiguous communications* to be demands that have that effect.

*Leslie v. Telephonics Office Technologies*, Del.Ch., C.A. No. 13045, Allen, C., slip op. at 24 (Dec. 30, 1993) (emphasis added, citations omitted).

To interpret an ambiguous communication as a demand would discourage a shareholder from bringing potential wrongdoing to the corporation's attention in a forum other than the courtroom, for fear that his position, should he later decide to sue derivatively, would procedurally be more difficult to support. Furthermore, to require a board to investigate claims asserted ambiguously in an equivocal communication would not be an efficient use of corporate resources, because the board would lack the information necessary to make a good faith inquiry. Therefore, an ambiguous communication (i.e., one which does not clearly and specifically embody the three essential elements discussed above) ought not to be considered a demand within the meaning of Rule 23.1.

Applying this analysis to the plaintiff's letters, I conclude that they do not constitute a demand. Although the letters do allege wrongdoing by

identified persons and do describe the alleged harm to the corporation, they do not specifically request the board to embark upon a particular course of remedial corporate action.[FN11] The plaintiff's letters consistently ask the other shareholders to agree to sell their shares to a third party bidder, but they do not request that the board formally resolve to sell RAMCO. Yaw's correspondence merely reveals his ultimate objective: an immediate disposition of all of RAMCO's shares that would enable him to cash out his 25% interest at a price reflecting a control premium. Such a price would be presumably higher than Yaw could otherwise obtain. Yaw wants out of a relationship with business partners that, for whatever reasons, has soured. Such a sale of RAMCO shares, and a distribution to Yaw of more than his *pro rata* share of the proceeds, would benefit Yaw individually, but not the corporation or its shareholders as a group. I conclude, for these reasons, that the plaintiff's letters do not constitute a Rule 23.1 demand upon the RAMCO board.

> FN11. Plaintiff's argument that the letters were sent to the addressees as shareholders, not *qua* directors, is disingenuous, because he sent a copy of the letter discussing the October 5, 1992 meeting to Massad, who was never a shareholder of RAMCO. *See* McBride Aff.Ex.D.
>
> Yaw's letters do, however, come excruciatingly close to constituting a demand whether they suggest that "a sale of the company is one way to stop" the overcompensation of directors, one of the practices of which Yaw complains. McBride Aff.Ex.H. In that letter Yaw stops just short of expressly demanding that the board, in a specific remedial action, resolve to sell the company to stem those alleged abuses.

*C. Demand Futility Analysis*

**\*9** That conclusion only begins the inquiry, because to survive the pending motion to dismiss, the plaintiff must still demonstrate that a demand would

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
**(Cite as: Not Reported in A.2d)**

have been futile as to each remaining claim. *See Needham v. Cruver*, Del.Ch., C.A. Nos. 12428 and 12430, Hartnett, V.C., slip op. at 8 (May 12, 1993) (noting that the "pre-suit demand futility analysis must be conducted for each claim in a stockholder derivative action").

Regarding the claims of overcompensation, expense account abuse, and usurpation of corporate opportunity,[FN12] the plaintiff has pleaded with particularity that each of these alleged breaches personally benefitted defendants Talley, Lee and Fisher, who constituted a majority of the directors who approved the challenged board actions. The complaint therefore alleges, as to each of these claims, self-dealing that creates a reasonable doubt that a majority of the directors were disinterested. Under the first branch of *Aronson*, futility is established when the particularized facts alleged in the complaint create a reasonable doubt that a majority of the board profited personally from an " ' interested director' transaction." *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 815 (1984).

> FN12. Since the computer and furniture sales claims have been dismissed on other grounds, I need not consider them. (*See supra* Part III.A.)

The defendants respond that the pleaded facts do not create a reasonable doubt that the directors were not disinterested or independent, because the defendants did not receive the same dollar amounts in the challenged transactions. However, the defendants present no authority or reasoned argument why it is required that the directors benefit in the same manner or in the exact same amount from a transaction, in order to be deemed interested for demand futility purposes. I therefore conclude that as to the four claims enumerated above, a demand would have been futile and is excused.

The mismanagement claim requires a different analysis, because it does not involve a transaction in which it is claimed that the directors who approved it were interested. The plaintiff must therefore establish a reasonable doubt that the board's

decisions to pay the company's debts in an untimely manner and to submit financial statements were not the product of a valid exercise of business judgment. *Aronson*, 473 A.2d at 814. Plaintiff alleges that (i) the defendants' failure to pay the company's debts in a timely manner gave rise to a potential claim (and lawsuit) against RAMCO for breach of its fiduciary duty to its limited partner, New York Life; and (ii) that the defendants' failure to file audited statements with Chase Manhattan Bank caused RAMCO to fall out of compliance with its credit agreement with that bank. Those facts, as pleaded in this complaint, create a reasonable doubt that those board decisions were the products of a valid exercise of business judgment. Demand with regard to the mismanagement claim would have been futile and is therefore excused.

### D. *Sufficiency of Pleadings on the Redecoration Claim*

The pleaded facts underlying the plaintiff's redecoration claim are far more problematic. For the reasons set forth below, those facts fail to establish demand futility, because they do not state a derivative claim against the board, but only a conversion claim against defendant Lee.

*10 The amended complaint alleges in pertinent part:
18. In 1990, over $1.5 million of RAMCO's corporate funds were allegedly spent for decorating RAMCO's offices in Tulsa, Oklahoma. On information and belief, defendant Lee and/or his wife converted a substantial part of that amount for their personal use.
19. The corporate funds converted by Lee and/or his wife must be returned to RAMCO.

32. .... All of the directors are alleged to have participated in the acts of self-dealing and are therefore not capable of exercising independent business judgment.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Page 10

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
(Cite as: Not Reported in A.2d)

38. By entering into the redecoration scheme to benefit himself, Lee profited in this self-dealing transaction at the expense of RAMCO, thereby breaching his fiduciary duty of loyalty to RAMCO and RAMCO's shareholders.

Amended Cmplt. ¶¶ 18, 19, 32, 38. These allegations clearly state a claim for conversion against Lee. While the complaint alleges in general and nonspecific terms that the directors each engaged in various self-dealing transactions, it cannot be fairly read to claim that a majority of the board participated in the redecoration/conversion scheme. Although plaintiff states in his brief that Lee converted the funds "with the complicity of the board of directors" (PAB at 4), that statement is without factual support in the complaint. The complaint also falls short of alleging that the directors approved the disbursement of funds for redecoration with knowledge that a substantial portion of those funds would be converted to Lee's personal use.

Because the pleaded facts do not allege that a majority of the directors were either interested in the transaction with Lee or approved that transaction knowing that it was wrongful, the redecoration claim cannot survive scrutiny under Rule 23.1 unless the pleaded facts create a reasonable doubt that the board's decision was the product of a valid exercise of business judgment. In that connection, only Lee is alleged to have stood on both sides of that transaction, and no pleaded facts indicate that the other directors acquiesced in a disproportionate distribution to Lee of $1.5 million. For these reasons, and because it is alleged that the board approved the expenditure of corporate funds for redecoration (as distinguished from the conversion), the plaintiff has shown no basis to doubt that the board's action was anything but the product of a valid exercise of business judgment. Therefore, a demand, had one been made, would not have been futile and is not excused.

I am reluctant, however, to dismiss this claim without affording the plaintiff an opportunity to amend his complaint to state a claim against the directors. The statement in plaintiff's brief that Lee

converted some portion of the $1.5 million *with the complicity of the other directors,* suggests that he may have a basis to assert such a claim. The uncertainty over the board's awareness of, or acquiescence in, the alleged conversion, and the dollar magnitude of that claim, make it just to allow the plaintiff to plead that claim specifically, provided that he has a basis for doing so. Chancery Court Rule 15(a) empowers this Court, in the exercise of its discretion, to allow the plaintiff to amend his pleading freely when justice so requires. Ch.Ct.R. 15(a). The plaintiff will therefore be granted thirty days to amend his complaint solely in connection with the redecoration claim.

IV.

*11 The final issue presented is whether Yaw is a proper derivative plaintiff. Both parties agreed at oral argument that this question should be treated as a summary judgment matter, since the defendants submitted and relied upon materials not referenced in the complaint. *See Lineberger v. Welsh,* Del.Ch., 290 A.2d 847, 848 (1972); *see also* Tr. at 45-49, 91-95. Summary judgment is appropriate where the moving party can "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ch.Ct.R. 56(c) (Replacement Vol.1987). [FN13] The moving party bears the burden of meeting that standard. *Brown v. Ocean Drilling & Exploration Co.,* Del.Supr., 403 A.2d 1114 (1979).

> FN13. Rule 56(e) further provides that: " an adverse party may not rest upon the mere allegations or denials of his pleading, but his response ... must set forth specific facts showing that there is a genuine issue for trial." Ch.Ct.R. 56(e); *see also Feinberg v. Makhson,* Del.Supr., 407 A.2d 201, 203 (1979).

This Court has held that the plaintiff in a derivative action, in addition to being a shareholder, must be a suitable derivative plaintiff. In *Katz v. Plant Industries, Inc.,* Del.Ch., C.A.No. 6407, Marvel, C., letter op. at 3-4 (1981), this Court enumerated

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 11

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
(Cite as: Not Reported in A.2d)

several factors for consideration in determining whether a derivative plaintiff is suitable:

Among the elements ... are: economic antagonisms between representatives and class; the remedy sought by plaintiff in the derivative action; indications that the named plaintiff was not the driving force behind the litigation; plaintiff's unfamiliarity with the litigation; other litigation pending between the plaintiff and defendants; the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself; plaintiff's vindictiveness toward the defendants' [sic] and, finally, the degree of support plaintiff was receiving from the shareholders he purported to represent.

*Id.* at 3 (quoting *Davis v. Comed., Inc.,* 619 F.2d 588, 593-95 (6th Cir.), *reh'g denied,* 623 F.2d 28 (1980)). In *Youngman v. Tahmoush,* Del.Ch., 457 A.2d 376, 381 (1983), Vice Chancellor Hartnett held that the critical question is whether there exists a substantial conflict of interest between the plaintiff and the other shareholders. The Court placed upon the defendants the burden of showing such a material conflict.

Here, the defendants argue that a recent $3 million judgment entered against Yaw in favor of U.S. Trust (*see* Second McBride Aff.Exs. A-F) has imposed financial pressures upon Yaw that impel him to seek an immediate sale of RAMCO and ignore its long-term growth prospects. Those pressures are said to make Yaw an inappropriate plaintiff. *Tr.* at 32. The defendants concede that Yaw does not seek a sale of the company as an item of relief in this action, but contend that he is using this action as leverage to insinuate himself into the negotiations for that sale. *Id.* at 33, 36. Arguing that *Youngman* calls for a "motivational test," *id.* at 38-39, the defendants argue that to validate Yaw's status as a derivative plaintiff would harm RAMCO by interfering with the directors' discretion to decide whether and on what terms a sale of the company should take place. *Id.* at 40.

*12 The plaintiff counters that if he is not allowed to prosecute these claims, then no one can, because he is the only shareholder not accused of wrongdoing, and no other shareholder is able to bring these claims to light. Plaintiff argues that although his interest in seeing RAMCO sold may be a relevant factor, it is not conclusive. That is, Yaw's interest in having the company sold does not compel a conclusion that he will not faithfully and vigorously prosecute the corporation's claims.

I agree. Yaw's goal of restoring all funds wrongfully extracted from the corporation is consistent with the financial interest of all RAMCO shareholders generally, including the defendants *qua* shareholders. In that capacity, the defendants stand to benefit if assets wrongfully extracted are restored to the corporation, even though in their capacity as directors those same defendants would be the ones required to repay the funds. The defendants have not persuaded me that Yaw's personal motivation creates a substantial likelihood that this derivative action would not be vigorously prosecuted. *Emerald Partners v. Berlin,* Del.Ch., 564 A.2d 670, 674 (1989) (noting that a derivative plaintiff "will not be disqualified simply because he may have interests which go beyond the interests of the class"). The plaintiff's economic interest in seeking the return of funds allegedly misappropriated from the company is sufficiently aligned with the interests of the corporation, and the shareholders as a group, to permit Yaw to prosecute this action. The defendants' motion for summary judgment will therefore be denied.

3

To summarize: the defendants' motion to dismiss the 1988 computer and furniture purchase claims on the basis of the statute of limitations, is granted. The defendants' motion for summary judgment on the ground that Yaw is an unsuitable derivative plaintiff, is denied. The defendants' motion to dismiss the remaining claims pursuant to Rule 23.1 is denied, except as to the office redecoration/conversion claim. That claim will be dismissed, subject to the plaintiff's right to amend the complaint within thirty days for the sole purpose of pleading the office redecoration/conversion claim against the defendant directors.

IT IS SO ORDERED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
**(Cite as: Not Reported in A.2d)**

Del.Ch.,1994.
Yaw v. Talley
Not Reported in A.2d, 1994 WL 89019 (Del.Ch.),
20 Del. J. Corp. L. 454

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.