## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARK LEVY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-517 GMS |
| | ) | |
| ROBERT J. THERRIEN, | ) | |
| and BROOKS AUTOMATION, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION
## TO DEFENDANTS' MOTIONS TO DISMISS

ROSENTHAL, MONHAIT & GODDESS, P.A.
Jeffrey S. Goddess (Del. Bar No. 630)
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070
 (302) 656-4433
jgoddess@rmgglaw.com

*Attorneys for Plaintiff Mark Levy*

OF COUNSEL:

ABRAHAM, FRUCHTER & TWERSKY, LLP
One Penn Plaza, Suite 2805
New York, New York 10119
(212) 279-5050

Dated:        November 9, 2006

# TABLE OF CONTENTS

**PAGE:**

TABLE OF CITATIONS ........................................................................ ii

NATURE AND STAGE OF THE PROCEEDINGS ................................ 1

SUMMARY OF ARGUMENT ........................................................... 1

STATEMENT OF FACTS ................................................................. 3

ARGUMENT .................................................................................. 6

    I.    Standard On A Motion To Dismiss .......................................... 6

    II.    The Complaint Properly Pleads All The Elements
          Of A Section 16(b) Claim .................................................... 6

        A.    Demand Was Properly Made Or, In The .......................... 8
               Alternative, Has Been Demonstrated To
               Be Futile In This Action

        B.    Plaintiff Has Properly Alleged That Therrien's ............... 11
               November 1999 Purchase Was A Purchase At
               The Time It Was Made

        C.    The Complaint Properly Alleges That The Claims ............ 13
               Were Timely Asserted Based Upon A Tolling Of
               The Statute Of Limitations

CONCLUSION ............................................................................... 15

---

    Exhibits ................................................................................ A - D

    Unreported Opinions ............................................................. E - I

## TABLE OF CITATIONS

| CASE: | PAGE: |
|---|---|
| *Berkwich v. Mencher*,<br>239 F.Supp. 792 (S.D.N.Y. 1965) | 9, 10 |
| *Blasband v. Rales*,<br>971 F.2d 1034 (3d Cir. 1992) | 9 |
| *Burks v. Lasker*,<br>441 U.S. 471 (1979) | 10 |
| *Carr-Consolidated Biscuit Co. v. Moore*,<br>125 F.Spupp. 423 (M.D. Pa. 1954) | 13 |
| *Colan v. Monumental Corp.*,<br>524 F.Supp. 1023 (N.D. Ill. 1981), *aff'd*,<br>713 F.2d 330 (7th Cir. 1983) | 10 |
| *Cruz v. Beto*,<br>405 U.S. 319 (1972) | 6, 12 |
| *DiLorenzo v. Edgar*,<br>2004 U.S. Dist. LEXIS 4991 (D.Del. 2004)<br>(Exhibit E hereto) | 9, 10 |
| *Feder v. Frost*,<br>220 F.3d 29 (2d Cir. 2000) | 7 |
| *Gollust v. Mendell*,<br>501 U.S. 115 (1991) | 7 |
| *Grossman v. Young*,<br>72 F.Supp. 375 (S.D.N.Y. 1947) | 9 |
| *Hishon v. King & Spalding*,<br>467 U.S. 69 (1984) | 6 |

*Hughes v. Rowe*,                                                                          6, 13
    449 U.S. 5 (1980)

*Kern County Land Co. v. Occidental Petroleum Corp.*,                                        7
    411 U.S. 582 (1973)

*Litzler v. CC Invs., L.D.C.*,                                                              13
    362 F.3d 203 (2d Cir. 2004)

*Morales v. Regent Techs.*,                                                                 9
    1998 U.S. Dist. LEXIS 6742 (S.D.N.Y. 1998)
    (Exhibit F hereto)

*Murray v. Diagnostek, Inc.*,                                                              11
    1992 U.S. Dist. LEXIS 10299 (E.D.Pa. 1992)
    (Exhibit G hereto)

*Pellegrino v. Nesbit*,                                                                     10
    203 F.2d 463 (9th Cir. 1953)

*Ransom v. Marrazzo*,                                                                        6
    848 F.2d 398 (3d Cir. 1988)

*Retail Clerks Int'l Ass'n v. Schermerhorn*,                                            6, 12, 13
    373 U.S. 746 (1963)

*Sanders v. Wang*,                                                                         11, 12
    1999 Del.Ch. LEXIS 203 (Del. Ch. 1999)
    (Exhibit H hereto)

*Schrob v. Catterson*,                                                                     6, 13
    948 F.2d 1402 (3d Cir. 1991)

*Segen v. ComVest Venture Partners, LP*,                                                   10
    2005 U.S. Dist. LEXIS 1066 (D.Del. 2005)
    (Exhibit I hereto)

*Whitaker v. Whittaker Corp.*,                                                             13
    639 F.2d 516 (9th Cir. 1981)

**STATUTES:**

15 U.S.C. §78p(b)                                                                6, 9

**OTHER AUTHORITIES:**

1A *Corbin on Contracts* §273 (1963 & Supp. 1991)                     11

5C Charles A. Wright & Arthur R. Miller,                                    5
    *Federal Practice and Procedure*, §1363 (3d ed. 2004)

Arnold S. Jacobs, Section 16 of the Securities Exchange Act, §3:43        8

## NATURE AND STAGE OF THE PROCEEDINGS

This is an insider trading case brought under Section 16(b) ("Section 16(b)") of the Securities Exchange Act of 1934 (the "Exchange Act") by Mark Levy, a shareholder of Brooks Automation, Inc. ("Brooks" or the "Company"). The gravamen of the Complaint (D.I. 1) is that defendant Robert J. Therrien ("Defendant" or "Therrien"), realized millions of dollars in short-swing profits through the purchase and sale of Brooks common stock within a six month period. At all relevant times, Defendant was a Brooks senior officer and director causing him to be a statutory insider of Brooks for purposes of Section 16(b). As a result, defendant Therrien is required to disgorge to Brooks the short-swing insider trading profits he realized from trading in the common stock.

Defendants have moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). (D.I. 8 and 10.) Plaintiff respectfully submits this brief in opposition to those motions.

## SUMMARY OF ARGUMENT

1.     Sufficient demand was made upon the Company, and in any event further demand was futile as Brooks has acknowledged that it would not have under any circumstances instituted an action against Therrien to recover the Section 16(b) profits alleged in the Complaint.

2.     Defendant's acquisition of common stock was a simple purchase and not the exercise of any option previously granted by the Company, and defendant Therrien's

1

efforts to suggest otherwise raise factual disputes beyond the present stage of the proceedings.

     3.     The claims in the Complaint were timely asserted based upon a tolling of the statute of limitations.

## STATEMENT OF FACTS

Brooks is a publicly traded company, the common stock of which is registered with the SEC pursuant to Section 12 of the Exchange Act. Complaint ¶5. Plaintiff was a shareholder of Brooks at the time he made his demand on Brooks, as well as at the time this action was first instituted. (Declaration of Mark Levy, attached hereto as Exhibit A.) Complaint ¶3. Plaintiff brings this action to obtain a monetary recovery for the Company. Complaint ¶5. Defendant Robert J. Therrien ("Therrien") is the former President, Chief Executive Officer and Chairman of Brooks. Complaint ¶4.

In a Proxy Statement filed with the SEC on January 18, 2000, the Company reported that on August 13, 1999 it had loaned Therrien $546,750 to fund his exercise of an option to purchase 225,000 shares of common stock (the "Option"). Complaint ¶8. The Proxy Statement also represented that Therrien repaid all principal and accrued interest on the loan on November 19, 1999. *Id.* The Option expired on August 15, 1999. *See* Form 5 (attached as Exhibit B to Opening Brief in Support of Defendant Robert J. Therrien's Motion to Dismiss ("Therrien Op.Brf.")) at p. 2. (D.I. 9.)

Over six years later, on July 31, 2006, the Company filed an amended Form 10-K with respect to fiscal year ended September 30, 2005 (the "Amended 10-K"), disclosing for the first time that Therrien had actually acquired common stock in November 1999 in a transaction that was not pursuant to any option previously granted to him by the Company. Complaint ¶9. The Amended 10-K reported that Therrien had misrepresented

3

the facts of the loan and that there had been no discussions between Therrien and the Company concerning a loan in June 1999 as previously reported. *See* Amended 10-K (attached as Exhibit A to Therrien Op.Brf.) at p. 23. The Amended 10-K instead reported that the option expired in August 1999 and that compensation expense should have been recorded in connection with Therrien's purchase of discounted common stock in November 1999. Complaint ¶9; Amended 10-K, *supra*. To date, this has been the only disclosure of the relevant facts concerning Therrien's November 1999 purchase of common stock, inasmuch as Therrien has failed to file a Form 4 or an amended Form 5 accurately describing his November 1999 purchase of common stock. Complaint ¶13. The Amended 10-K was the first time the true nature of Therrien's transaction with Brooks was properly disclosed to Plaintiff and other members of the investing public.

Thus, and as alleged, the November 1999 purchase of 225,000 shares of common stock by Therrien at $2.43 per share, for a total of approximately $560,000, was *not* made pursuant to an existing option notwithstanding the fact that the purchase price per share was the same as that of the option that had expired in August 1999. Complaint ¶9. Then on or about March 23, 2000, less than six months after his November 1999 purchase, Therrien sold at least 225,000 shares of common stock in a secondary public offering at a price of $72.01, for total proceeds of $16,202,250, earning $15,655,500 ($16,202,250 - $546,750) in short-swing profits through these transactions. Complaint ¶¶11-12.

4

On June 16, 2006, acting through his counsel, Plaintiff, in response to public disclosures of questions concerning the propriety of certain options issued to Brooks' executives, wrote to the Board of Directors of Brooks demanding that it bring an action against Therrien, and others, for violations of Section 16(b) resulting from improprieties relating to the issuance of options to purchase common stock. *See* June 16, 2006 Letter (attached as Exhibit A to Opening Brief in Support of Defendant Brooks Automation, Inc.'s Motion to Dismiss ("Brooks Op.Brf.") (D.I. 11.)). On August 14, 2006 the Company, responding through its counsel, challenged the adequacy of Plaintiff's demand and further asserted that it had already been investigating past stock option grants alleged in Plaintiff's June 16, 2006 letter. *See* August 14, 2006 Letter (attached as Exhibit C to Brooks Op.Brf.) Nonetheless, more than sixty days passed from the time of Plaintiff's demand without the Company having either recovered the short-swing profits, or brought suit to recover those profits. Complaint ¶¶14-15.

On August 22, 2006 Plaintiff filed the Complaint initiating this action. On August 24, 2006, Plaintiff's counsel promptly forwarded a copy of the Complaint to Brooks' counsel. (Transmittal attached hereto as Exhibit B[1].) On October 2, 2006, the Company again wrote to Plaintiff's counsel, asserting that demand had been inadequate

---

1. The Court may consider documents referenced in the Complaint, available as a matter of public record or subject to judicial notice in deciding a motion to dismiss. *See* 5C Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* §1363 (3d ed. 2004).

5

but nonetheless stating that the Company would have rejected any demand to sue Therrien based on the allegations of the Complaint. (Company further response, attached hereto as Exhibit C.)

## ARGUMENT

### I.    Standard On A Motion To Dismiss

In ruling on a 12(b)(6) motion, factual allegations of a complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319 (1972) *(per curiam).* Moreover, the Court is required to give Plaintiff the benefit of every reasonable inference to be drawn from those allegations. *See Retail Clerks Int'l Ass'n v. Schermerhorn,* 373 U.S. 746 (1963); *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir. 1991). Accordingly, the Court must resolve any ambiguities concerning the sufficiency of the claims in favor of the plaintiff. *See Hughes v. Rowe,* 449 U.S. 5, 10 (1980) (per curiam). A "court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir. 1988).

### II.    The Complaint Properly Pleads All The Elements Of A Section 16(b) Claim

Section 16(b) is a statutory right intended to "prevent[ ] the unfair use of information which may have been obtained by [a] beneficial owner, director, or officer by reason of his relationship to the issuer. . . ." 15 U.S.C. § 78p(b). Section 16(b) implements this core purpose of the Exchange Act by providing a statutory scheme of

6

strict liability and disgorgement of profits when its terms are violated. *See, e.g., Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 594 (1973). Section 16(b) is unique within the federal securities laws in that the SEC has no right of enforcement. Only issuers and shareholders of the issuer having standing to assert such claims. *See, e.g., Gollust v. Mendell*, 501 U.S. 115, 118 (1991).     The statute provides for strict liability which attaches regardless of any degree of fault. *See, e.g., Gollust*, 501 U.S. at 122 . The elements of a Section 16(b) claim are: (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a beneficial owner of more than ten percent of any one class of the issuer's registered securities (4) within a six month period. *See, e.g., Feder v. Frost*, 220 F.3d 29, 32 (2d Cir. 2000).

Between them, Defendants advance three arguments as to why this Court should dismiss the Complaint: (a) that the Complaint was prematurely filed prior to Plaintiff's having made a proper demand on the Board of Directors of Brooks to institute this Section 16(b) lawsuit; (b) an asserted failure to state a claim based upon a contention that the transaction alleged to have been a purchase was, in fact, not a purchase pursuant to Section 16(b); and (c) that the Complaint was not timely filed based on the applicable statute of limitations. Defendants are in error on all three points.[2]

2. Brooks also includes a one paragraph section arguing that it should be dismissed as a defendant because no claim is brought against it. Brooks Op.Brf. at p. 6. However, Plaintiff states clearly in the Complaint that this action is brought to obtain a recovery for Brooks and that no relief is sought from the Company, Complaint ¶5. Brooks is simply a nominal defendant because it is an indispensable party to the action. *See generally,*

7

## A.    Demand Was Properly Made Or, In The Alternative, Has Been Demonstrated To Be Futile In This Action

Brooks argues that dismissal of the Complaint is warranted because the demand it received was unduly vague to be acted upon by the Company. See Brooks Op.Brf. at p.6. However, Plaintiff's demand was as specific as it could be under the circumstances, considering the information publicly available concerning the transactions and events at issue. The only piece of information known to Plaintiff at the time of demand was that the Company had launched an investigation into prior Company stock option grants. Accordingly, the demand was as comprehensive as the facts existing on that date would allow. Moreover, the Company, in its response to the demand, acknowledged that it was investigating "the stock option issues" raised in the demand. *See* Exhibit C to Brooks Op.Brf. at p. 2. Thus, the Company clearly understood the nature of the claims set forth in Plaintiff's demand.

Also, Brooks' argument is moot in any event since the Company has acknowledged that it would not have under any circumstances instituted an action against Therrien to recover the Section 16(b) profits alleged in the Complaint.[3] Instead, it

Arnold S. Jacobs, *Section 16 of the Securities Exchange Act*, §3:43. Should the Court desire, the Caption of the Complaint could be changed to explicitly denominate Brooks a nominal defendant.

3.  Brooks also argues that Plaintiff was not identified as the shareholder making demand or that the Complaint does not allege he was a shareholder at the time demand was made. As Brooks rejects the allegations of the Complaint, Plaintiff's identity was immaterial to the Company's decision to reject the demand. Furthermore, Section 16(b) states that the "suit to recover such profit may be instituted . . . by the owner of any security of the

8

forcefully argued its view as to the factual non-viability of a claim against its former CEO. *See* Exhibit C hereto, at p. 3. In such circumstances, where demand would have been futile, the demand requirement of Section 16(b) is excused. *See, e.g., DiLorenzo v. Edgar*, 2004 U.S. Dist. LEXIS 4991, \*9 (D. Del. 2004) (Robinson, J.), *citing, Berkwich v. Mencher*, 239 F. Supp. 792, 793-94 (S.D.N.Y. 1965); *Grossman v. Young*, 72 F. Supp. 375 (S.D.N.Y. 1947).

Similarly, where an issuer, such as Brooks herein, has unequivocally stated that it will not pursue the matter on its own behalf, plaintiff is not obligated to comply with the sixty-day-notice provision of § 16(b). *See, e.g., Morales v. Regent Techs.*, 1998 U.S. Dist. LEXIS 6742 (S.D.N.Y. 1998). A court may consider a board's reply to a perceived inadequate demand in evaluating whether demand was futile. *Cf. Blasband v. Rales*, 971 F.2d 1034, 1050-1051 (3d Cir. 1992). Thus, since Brooks has rejected any demand to sue Therrien regardless of the level of specificity in the demand letter and rejects the allegations of the Complaint, the statutory demand has been waived.

Brooks' assertion that a proper demand would have given it the opportunity to convince Plaintiff not to institute this suit is not a basis for dismissal of this action. The right of a shareholder to institute a Section 16(b) action once demand has been rejected

_____

issuer, *See* Section 16(b); 15 U.S.C. §78p(b), and Plaintiff's standing is properly alleged. Complaint ¶3. Moreover, Plaintiff was a shareholder of Brooks at the time demand was made and demand was made on his behalf. *See* Declaration of Mark Levy (attached as Exhibit A hereto).

9

is absolute. *See, e.g., Segen v. ComVest Venture Partners, LP*, 2005 U.S. Dist. LEXIS 1066, *12 (D. Del. 2005) (Farnan, J.), *citing, Pellegrino v. Nesbit*, 203 F.2d 463, 466-67 (9th Cir. 1953). The Section 16(b) demand exists for the purpose of giving the corporation the opportunity to vindicate its own rights by vigorously litigating the underlying claim not to exercise their business judgment to prevent a shareholder from pursuing the claim. *Colan v. Monumental Corp.*, 524 F.Supp.1023, 1027 (N.D.Ill. 1981), *aff'd*, 713 F.2d 330 (7th Cir. 1983); *Segen*, at *12 ("directors' decision not to prosecute the suit does not preclude a subsequent action by the shareholder himself"); *accord, Burks v. Lasker*, 441 U.S. 471, 484 n.13 (1979) (Congress intended to prevent boards of directors from cutting off shareholder lawsuits brought pursuant to §16(b).) Therefore, Brooks' proffered rationale for a more detailed demand is insufficient to overcome the futility of such a demand. Moreover, Plaintiff's counsel forwarded a copy of the Complaint as filed with the Court together with a cover letter on August 24, 2006. *See* Exhibit B attached hereto. At that time, Brooks could no longer feign ignorance of the basis of Plaintiff's Section 16(b) claim. Nonetheless, Brooks has still declined to bring suit. This failure of the Company to bring suit on its own behalf after becoming aware of plaintiff's suit also demonstrates demand futility. *DiLorenzo* at *10 (*citing, Berkwich v. Mencher*, 239 F. Supp. 792, 794 (S.D.N.Y. 1965)).[4]

---

4. Brooks' sprinkling of its argument with references to the prosecution of this action "drain[ing] Company resources," "imposing significant costs on the Company" or "[i]t is the Company whose resources will be expended" are baseless. Plaintiff is solely

10

**B.      Plaintiff Has Properly Alleged That Therrien's November
1999 Purchase Was A Purchase At The Time It Was Made**

In his papers, Therrien argues that his purchase of Brooks common stock in

November 1999 had been pursuant to an option which had been granted many years

earlier, with the result that his alleged exercise was a non-event for Section 16(b)

purposes. *See* Therrien Op.Brf. at pp. 5-7. Therrien asserts as a factual matter that he

was permitted to exercise the same option which had expired in August 1999. However,

that argument ignores that the Company's Amended 10-K explicitly states that the

relevant option expired in August 1999. *See* Amended 10-K at p. 23. An option to

purchase stock is a contract and the language of the agreement is controlling. If the

option contract expressly limits the time period for acceptance - - or exercise - - of the

option, then the acceptance must take place within the specified time period; time is of

the essence. *Cf. Murray v. Diagnostek, Inc.*, 1992 U.S. Dist. LEXIS 10299, \*12 (E.D.Pa.

1992), *citing*, 1A *Corbin on Contracts* §273 (1963 & Supp. 1991). If the terms of the

contract are plain on their face, then the analysis stops there. *Sanders v. Wang*, 1999

Del. Ch. LEXIS 203, \* 18 (Del. Ch. 1999).      Once expired the option could not be

exercised.

---

bearing the burden of the costs incurred in prosecuting this action while the Company
stands to reap a windfall upon Plaintiff's success. *See* Complaint ¶5. No one is asking
the Company to expend any material resources at all in pursuing this claim.

11

The option was issued pursuant to the 1992 Combination Stock Option Plan the ("1992 Plan"). *See* Exhibit B to Brooks Op.Brf. at p. 2 fn.1. The 1992 Plan was approved by Brooks' shareholders and states explicitly that "[i]n no event may a 1992 Plan ISO be exercisable . . . in the case of 1992 Plan ISOs granted to Ten Percent Stockholders, more than five years after the date of grant." *See* 1992 Plan attached hereto as Exhibit D, at p. 4. Ten percent stockholders was defined as "any individual who directly or indirectly owns stock possessing more than 10% of the total combined voting power of all classes of stock of the Corporation or any Parent Corporation or any Subsidiary Corporation at the time such 1992 Plan ISO is granted." *Id.* at p. 2. Therrien was, therefore, a Ten Percent Stockholder. The Board, as mere administrators of the 1992 Plan, did not have the authority to alter the material terms of the 1992 Plan. *See Sanders*, 1999 Del. Ch. LEXIS 203 at *31.

At most, Therrien has raised a factual dispute as to what actually occurred in November 1999. However, such a factual dispute - - assuming *arguendo* that a legitimate factual issue exists - - cannot be resolved on a Rule 12(b)(6) motion *See,* Point I, above. At this stage of the litigation, all reasonable factual inferences - - that Therrien's November 1999 purchase of Brooks stock was not the exercise of an option granted five years earlier - - must be drawn in Plaintiff's favor. *See, e.g. Cruz v. Beto,* 405 U.S. 319 (1972) (per curiam); *Retail Clerks Int'l Ass'n v. Schermerhorn,* 373 U.S.

746 (1963); *Schrob v. Catterson*, 948 F.2d 1402, 1405 (3d Cir. 1991)*; Hughes v. Rowe,* 449 U.S. 5, 10 (1980).

## C.    The Complaint Properly Alleges That The Claims Were Timely Asserted Based Upon A Tolling Of The Statute Of Limitations

"Section 16 compels disclosure (through a Form 4) that is so clear that an insider's short-swing profits will be discovered without any investigation other than the putting together of two and two." *Litzler v. CC Invs., L.D.C.*, 362 F.3d 203, 208 (2d Cir. 2004). An insider's failure to disclose covered transactions tolls the two year limitations period for suits under § 16(b) to recover profits connected with such a non-disclosed transaction. *Whittaker v. Whittaker Corp.*, 639 F.2d 516, 529-30 (9th Cir. 1981). Without such disclosure, the two year statute of limitations is tolled until "the claimant . . . gets actual notice that a person subject to Section 16(b) has realized specific short-swing profits that are worth pursuing." *Litzler,* 362 F.3d at 208; *Whittaker*, 639 F.2d at 530.[5] Here, Therrien did not and to date has not filed a Form 4 reporting his acquisition of the 225,000 shares from Brooks in November 1999. Therrien's argument that he disclosed

---

5. The *Whitaker* court also found that *Carr-Consolidated Biscuit Co. v. Moore*, 125 F.Supp. 423 (M.D.Pa. 1954), a dated decision relied upon by Therrien (*See* Therrien Op.Brf. at p. 8 fn.5) is premised on the now discarded theory that substantive statutes of limitation are entitled to literal application by the courts and may not be tolled. *Whitaker*, 639 F.2d at 530. Therrien further tortures the Second Circuit decision in *Litzler* regarding the tolling of a Section 16(b) claim. *Litzler* held that failing to file a Form 4 tolls the statute. In any event, Therrien intentionally concealed the nature of his transaction, as confirmed by the Amended 10-K, which meets the heightened standard advocated by Therrien.

13

the fact that he exercised an option in 1999 is entirely disingenuous. That disclosure entirely misidentified the nature and timing of his acquisition as he did not exercise an option at all but simply improperly purchased common stock at a favorable price in November 1999. Indeed, until the Amended 10-K was filed, public shareholders could not have known the facts giving rise to the underlying claim of this action. Therefore, the claim against Therrien was tolled.

14

## CONCLUSION

Therefore, for all the reasons set forth above, defendants' motions to dismiss should be denied in their entirety.[6] This matter should be allowed to progress, with the defendants submitting their contrary factual assertions in pleadings, to be followed by factual testing in the ordinary course.

_____

Jeffrey S. Goddess (Del. Bar No. 630)
ROSENTHAL, MONHAIT & GODDESS, P.A.
Suite 1401, 919 Market Street
P. O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
jgoddess@rmgglaw.com

Attorney for Plaintiff

OF COUNSEL:

ABRAHAM, FRUCHTER & TWERSKY LLP
One Penn Plaza, Suite 2805
New York, NY 10119
(212) 279-5050

_____

6. Assuming *arguendo* that Court finds the Complaint deficient, Plaintiff pursuant to Fed. R. Civ. Proc. 15(a), respectfully requests leave to amend the Complaint to allege the futility of demand upon the Company. *Accord Blasband v. Rales*, 971 F.2d 1034, 1055 (3d Cir. 1992) (plaintiff should be given leave to amend where amendment is likely to cure the defects resulting in dismissal).

15

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

```
--------------------------------------------x
```

MARK LEVY,

              Plaintiff,                        C.A. No. 06-517

    - against -

                                          DECLARATION OF
ROBERT J. THERRIEN,                        MARK LEVY
and BROOKS AUTOMATION, INC.,

              Defendants.

```
--------------------------------------------x
```

    I, Mark Levy, declare as follows:

    1.  I purchased one (1) share of Brooks Automation, Inc. on June 8, 2006. The settlement date of that purchase was June 13, 2006, as indicated on the statement attached hereto as Exhibit A.

    2.  As a shareholder of Brooks Automation Inc., I retained the law firm of Abraham Fruchter & Twersky LLP to demand that Brooks Automation Inc. recover profits realized by several of its officers and directors, including Robert J. Therrien, in violation of Section 16(b) of the Securities Exchange Act of 1934 [15 U.S.C. §78p(b)] and to the extent necessary commence an action to recover such profits.

    I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th Day of November, 2006 at Los Angeles, California.

                                       MARK LEVY

MARK A LEVY

## YOUR CMA TRANSACTIONS

May 27, 2006 - June 30, 2006

### SECURITY TRANSACTIONS

| Date | Description | Transaction Type | Quantity | Unit Price | Debit | Credit | Accrued Interest Earned/(Paid) |
|------|-------------|------------------|----------|------------|-------|--------|-------------------------------|
| 06/13 | BROOKS AUTOMATION INC UNSOLICITED ORDER PRICE 11.91 | Purchase | 1 | 11.9100 | 20.39 | | |

# EXHIBIT B

# Abraham Fruchter & Twersky LLP

One Penn Plaza, Suite 2805
New York, NY 10119
Tel : (212) 279-5050
Fax: (212) 279-3655
www.aftlaw.com

August 24, 2006

*By Federal Express*

Randall W. Bodner, Esq.
Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110

*Re: Robert J. Therrien*

Dear Mr. Bodner:

Enclosed is a copy of the Complaint filed on August 22, 2006 in the Delaware District Court.

Very truly yours,

/s/

Jack G. Fruchter

enc.

# EXHIBIT C



ROPES & GRAY LLP

ONE INTERNATIONAL PLACE    BOSTON, MA 02110-2624    617-951-7000    F 617-951-7050

BOSTON    NEW YORK    SAN FRANCISCO    WASHINGTON, DC

October 2, 2006

Randall W. Bodner
617-951-7776
Randall.Bodner@ropesgray.com

**BY FACSIMILE & FEDERAL EXPRESS**

Jack G. Fruchter, Esq.
Abraham Fruchter & Twersky LLP
One Penn Plaza
Suite 2805
New York, NY 10119

Re:    *Mark Levy v. Robert J. Therrien and Brooks Automation, Inc.*, No. 06-517 (D. Del.)

Dear Mr. Fruchter,

As you know, we represent Brooks Automation, Inc. ("Brooks" or the "Company") and have
received a copy of the Complaint in the above-referenced action (the "Action"). I am writing to
inform you that (i) Mr. Levy has failed to comply with the demand requirement of Section 16(b)
and (ii) that the Company's prior investigation of the very Section 16(b) theory advanced in the
Action established that there is simply no good faith basis for any such claim based on objective,
documented facts and a straightforward application of black letter law. As a result, it would be a
waste of the Company's assets as well as the time of its personnel to be subject to such an
Action. Therefore, I am writing to inform you that if Mr. Levy persists in the Action, Brooks
will seek its costs and attorneys' fees resulting from its participation therein.

On June 16, 2006, you sent a letter (the "June 16 Letter") addressed to the Board of Directors of
Brooks that purported to be a demand under Section 16(b) of the Exchange Act. Without
identifying any purported Brooks shareholder, you demanded that Brooks bring suit against
"Robert J. Therrien, Peter Frasso, Edward Grady, Robert Anastasi and other current or former
executive officers and directors of the Company (collectively the 'Proposed Defendants') to
recover short-swing profits earned in connection with purchases and sales of Company equity
securities within a period of six months." That generic request, however, was the extent of the
demand letter's articulation of any alleged violations. The June 16 Letter identified no particular
trades, let alone any that violated Section 16(b). Rather, the letter merely averred that the
"Proposed Defendants earned short-swing insider trading profits by acquiring options to
purchase Company stock within six months of corresponding sales of Company common stock
at higher prices." Finally, the June 16 Letter baldly asserted that "[t]o the extent that the options
were acquired without following the requisite corporate procedures or outside the contractual
provisions of the stock option program, those short-swing profits must be disgorged by the
Proposed Defendants to the Company."

ROPES & GRAY LLP

Jack G. Fruchter, Esq.                          - 2 -                          October 2, 2006

On August 14, 2006, we responded to your June 16 Letter on behalf of Brooks. Our response noted that you had failed to "identify any specific grants to, or sales by, any officer or director that, you contend, violate Section 16(b)." Further, the Company's response noted:

> "[y]our letter does not identify any specific trading activity which you believe violated Section 16(b). Your letter does not even place any sales within six months of the option grants. A purchase and a sale or a sale and a purchase of stock within six months is the very essence of—and a necessary element to establish—a Section 16(b) violation."

In response, neither you, nor your recent client, Mr. Levy, took any steps to provide any pertinent information to the Company before commencing the present Action.

**Inadequate Demand**

Given its complete lack of any allegations about specific trades alleged to have violated Section 16(b), the June 16 Letter is not sufficient to satisfy Section 16(b)'s demand requirement. An adequate demand is an absolute prerequisite to any Section 16(b) claim; thus, as a matter of law, the Action is not permissible. *See* 15 U.S.C. § 78p(b). The Complaint's bare allegation that a demand was made is not sufficient to satisfy Section 16(b)'s requirement given that the content of the so-called "demand" letter was not merely lacking, it was non-existent.

Unlike the Complaint, which identifies a specific purchase and a specific sale of Brooks shares by Mr. Therrien within six months of each other, the "demand" letter did no such thing. Your June 16 Letter did not identify any trades alleged to have violated Section 16(b), nor did it even identify a general time period during which the allegedly violative trades took place. The "demand" merely included a roll call of various Brooks officers and executives whom you claimed somehow violated Section 16(b), and, for good measure, alleged that "other current or former executive officers and directors of the Company" may have violated Section 16(b) as well. In reality, your letter was nothing more than a generic placeholder, with details and specific allegations to be filled in later. As such, it did not place the Company on sufficient notice to satisfy the demand requirement of Section 16(b).

The essence of a Section 16(b) violation is a short-swing trade and thus, at a minimum, a Section 16(b) demand letter must identify at least some trades the shareholder alleges violated the statute. There must be a reason to conclude from the face of the letter that a Section 16(b) violation has occurred. Your June 16 letter provided no factual basis to believe that any of the so-called "Proposed Defendants" or anyone else had violated Section 16(b). "[A]t a minimum, the demand made upon the board of directors must identify the alleged wrongdoer, describe the factual basis of the wrongful acts and the harm caused to the corporation, and request remedial relief." *Dreiling v. American Express Travel Related Services Co., Inc.*, 351 F.Supp. 1077, 1085 (W.D. Wash. 2004) *rev'd on other grounds*, 458 F.3d 942 (9th Cir. 2006) quoting *Levner v.*

-2-

ROPES & GRAY LLP

Jack G. Fruchter, Esq.                          - 3 -                          October 2, 2006

*Prince Alwaleed Bin Talal Bin Abdulaziz al Saud*, 903 F.Supp. 452, 456 (S.D.N.Y. 1994).
Because the June 16 Letter did not identify any trades, it did not describe the factual basis for the
alleged wrongdoing (*i.e.* a short-swing trade), and thus it did not put the Company on notice that
any Section 16(b) violations had occurred.

Only after Brooks announced the details of its restatement on July 31, 2006, did Mr. Levy
surface and provide Brooks with any information about the factual basis of the wrongdoing he
alleges. Contrary to Section 16(b), however, this detail was not provided in a demand letter to
the Company, but in the Complaint in this Action. This Action was filed, of course, long after
the Company had commenced its own investigation conducted by a special committee of the
Board of Directors (the "Special Committee") into the options dating issue; indeed the very
trades now cited in the Action are taken from the Company's own restatement disclosures that
were brought about by the Special Committee's investigation. Given the inadequacy of your
June 16 Letter (and given the utter absence of any demand on behalf of Mr. Levy himself), Mr.
Levy has not complied with the statute's demand requirement, and is thus not entitled to
maintain a Section 16(b) action on behalf of Brooks.

#### No Basis for a Section 16(b) Action

Had Mr. Levy made the demand that Section 16(b) requires—rather than simply filing suit after
Brooks announced its restatement—you and he would have learned that there is no good faith
basis to maintain this Action. Regardless of any other implications of the Special Committee's
investigation, a Section 16(b) claim against Mr. Therrien based on the information disclosed in
the restatement would not be successful and thus would not be in the Company's best interest to
pursue. The Company's own investigation and pre-existing analysis of the transactions now
alleged in the Complaint are as follows.

Under Rule 16b-3(d)(3), securities acquired from the issuer are exempt from Section 16(b) if the
securities so acquired are held for six months. 17 C.F.R. § 240.16b-3(d)(3). The "demand"
entirely omits any discussion of this exemption, or the other Section 16(b) exemptions afforded
to stock options or securities acquired from the issuer. Specifically, Rule 16b-3(d)(3) provides
an exemption for shares acquired from the issuer if:

"[t]he issuer equity securities so acquired are held by the officer or director for a period
of six months following the date of such acquisition, provided that this condition shall be
satisfied with respect to a derivative security if at least six months elapse from the date of
acquisition of the derivative security to the date of disposition of the derivative security
(other than upon exercise or conversion) or its underlying equity security."

-3-

ROPES & GRAY LLP

Jack G. Fruchter, Esq.                      - 4 -                        October 2, 2006

17 C.F.R. § 240.16b-3(d)(3). If Mr. Therrien held the shares he acquired from the Company in
November 1999 for six months, then the November 1999 purchase would be exempt from
Section 16(b) and could not be matched with any sales for the purpose of identifying any
improper short-swing profits. The only sales within six months of November 1999 that the
Complaint identifies (and the only ones of which the Company is aware) took place in March
2000. Thus, if the shares Mr. Therrien sold in March 2000 were not the shares he acquired in
November 1999, then the November 1999 acquisition qualifies for the Rule 16b-3(d)(3)
exemption.

Had Mr. Levy made the demand required by Section 16(b), you and he would have learned that
this is precisely what happened.

In March 2000, Mr. Therrien sold 300,000 shares of Brooks stock—255,000 shares on March 13,
2000 and 45,000 shares on March 23, 2000.[1] The Complaint alleges that 225,000 of these shares
consisted of the shares he acquired in November 1999. The Company's own investigation,
however, has determined that the shares Mr. Therrien sold in March 2000 were not the ones
acquired in November 1999; rather, Mr. Therrien acquired them in 1989.

Brooks obtained from Mr. Therrien a redacted copy of Schedule D-1 to his 2000 tax return,
which is attached as Exhibit 1 to this letter. As reflected thereon, Mr. Therrien sold 300,000
shares of Brooks stock in 2000, with a tax basis of approximately 14.7 cents per share, far less
than the $2.43 per share Mr. Therrien paid for the 225,000 shares he acquired in November 1999.
The same tax form indicates that he acquired the shares on February 16, 1989. Finally, the
March 2000 sales were listed as assets held for more than one year, and thus entitled to the long-
term capital gains tax rate. Had Mr. Therrien acquired the shares in November 1999 (or any time
after March 1999), the sale would not have qualified for such tax treatment.

Given that Mr. Therrien made no other sales within six months of November 1999, the
November 1999 stock purchase was exempt from Section 16(b) under Rule 16b-3(d)(3), and thus
Mr. Therrien did not realize improper short-swing profits by selling other Brooks shares in
March 2000.

Accordingly, you and Mr. Levy are now on notice that the Action is without merit, and we
demand that Mr. Levy dismiss the present claims with prejudice. If Mr. Levy persists in
proceeding with the Action, be aware that we believe that pursuing such a meritless lawsuit

---

[1] A Form 4 filed by Mr. Therrien and received by the SEC on June 12, 2000 indicates that he
sold 225,000 shares on March 13, 2000. A Form 4 filed by Mr. Therrien and received by the
SEC on September 11, 2000 identifies the March 13 sale as including 255,000 shares. This
larger total is consistent with the amount listed on Mr. Therrien's tax return, as discussed below,
and the Company believes that the later Form 4 was an effort to correct an error in the number of
shares identified on the original Form 4.

ROPES & GRAY LLP

Jack G. Fruchter, Esq.                           - 5 -                           October 2, 2006

would be not be in good faith, and the Company will seek its costs and attorneys' fees incurred in addressing the Action.

If you have any questions, or wish to discuss the foregoing, please do not hesitate to call my colleague Michael Marcucci (617-951-7243) or me.

Very truly yours,

Randall W. Bodner

cc:     Michael T. Marcucci, Esq.
        Travis Laster, Esq.

Attachment Sequence No. **12A**    Page **2**

Name(s) shown on Form 1040. Do not enter name and social security number if shown on other side.    Your social security number

ROBERT J. THERRIEN & MARI I. THERRIEN

**Part II**    **Long-Term Capital Gains and Losses - Assets Held More Than One Year**

| (a) Description of property (Example: 100 sh. XYZ Co.) | (b) Date acquired (Mo., day, yr.) | (c) Date sold (Mo., day, yr.) | (d) Sales price (see page D-6) | (e) Cost or other basis (see page D-6) | (f) Gain or (loss). Subtract (e) from (d) | (g) 28% rate gain or (loss) * (see instr. below) |
|---|---|---|---|---|---|---|
| **8** BROOKS AUTOMATION, INC. - 255,000 SHS | 02/16/1989 | 03/13/2000 | 19,362,550. | 37,579. | 19,324,971. | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| BROOKS AUTOMATION, INC. - 45,000 SHS | 02/16/1989 | 12/31/2000 | 3,240,450. | 6,632. | 3,233,818. | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**9** Totals. Combine columns (d), (f), and (g). Enter here and on Schedule D, line 9 . . . . . . . . . . . . . . ▶ **9**

* **28% rate gain or loss** includes all "collectibles gains and losses" (as defined on page D-6) and up to 50% of the eligible gain on qualified small business stock (see page D-4).

Schedule D-1 (Form 1040) 2000

JSA
0A7610 1.000
   D88921 U468 07/09/2001 09:02:43 V0.07.00 10857-444-4

**REDACTED**

# EXHIBIT D

1

BROOKS AUTOMATION, INC.
-----------------------

1992 COMBINATION STOCK OPTION PLAN,
-----------------------------------
AS AMENDED
----------

Section I.  Purpose of the Plan.
-------------------

    The purposes of this BROOKS AUTOMATION, INC. 1992 Combination Stock
Option Plan (the "1992 Plan") are (i) to provide long-term incentives and
rewards to those key employees (the "Employee Participants") of BROOKS
AUTOMATION, INC. (the "Corporation") and its subsidiaries (if any), and any
other persons (the "Non-employee Participants") who are in a position to
contribute to the long-term success and growth of the Corporation and its
subsidiaries, (ii) to assist the Corporation in retaining and attracting
executives and key employees with requisite experience and ability, and (iii) to
associate more closely the interests of such executives and key employees with
those of the Corporation's stockholders.

        Section II.  Definitions.
        -----------

    "CODE" is the Internal Revenue Code of 1986, as it may be amended from
time to time.

    "COMMON STOCK" is the $.01 par value Common Stock of the Corporation.

    "CLASS A COMMON STOCK" is the $.01 par value Class A Non-Voting Common
Stock of the Corporation.

    "COMMITTEE" is defined in Section III, paragraph (a).

    "CORPORATION" is defined in Section I.

    "CORPORATION ISOs" are all stock options (including 1992 Plan ISOs)
which (i) are Incentive Stock Options and (ii) are granted under any plans
(including this 1992 Plan) of the Corporation, a Parent Corporation and/or
a Subsidiary Corporation.

    "EMPLOYEE PARTICIPANTS" is defined in Section I.

    "FAIR MARKET VALUE" of any property is the value of the property as
reasonably determined by the Committee.

    "INCENTIVE STOCK OPTION" is a stock option which is treated as an
incentive stock option under Section 422 of the Code.

    "1934 ACT" is the Securities Exchange Act of 1934, as amended.

Case 1:06-cv-00517-GMS-LPS    Document 14    Filed 11/09/2006    Page 35 of 74
Brooks Automation Inc · S-8 · Effective 7/20/96, On 7/1/96
Document 4 of 4 · EX-99.2 · Registrant's 1992 Combination Stock Option Plan

2

"1992 PLAN" is defined in Section I.

"1992 PLAN ISOs" are Stock Options which are Incentive Stock Options.

"NON-EMPLOYEE PARTICIPANTS" is defined in Section I.

"NON-QUALIFIED OPTION" is a Stock Option which does not qualify as an Incentive Stock Option or for which the Committee provides, in the terms of such option and at the time such option is granted, that the option shall not be treated as an Incentive Stock Option.

"PARENT CORPORATION" has the meaning provided in Section 425(e) of the Code.

"PARTICIPANTS" are all persons who are either Employee Participants or Non-Employee Participants.

"PERMANENT AND TOTAL DISABILITY" has the meaning provided in Section 22(e)(3) of the Code.

"SECTION 16 OF THE 1934 ACT" means Section 16 of the Securities Exchange Act of 1934, or any successor or similar provision.

"STOCKHOLDER APPROVAL" means the affirmative vote of at least a majority of the shares of Common Stock present and entitled to vote at a duly held meeting of the stockholders of the Corporation, unless a greater vote is required by state law, the Code or the rules under Section 16 of the 1934 Act in which case such greater requirement shall apply. Stockholder approval may be obtained by written consent or other means, to the extent permitted by applicable state law.

"STOCK OPTIONS" are rights granted pursuant to this 1992 Plan to purchase shares of Class A Common Stock at a fixed price.

"SUBSIDIARY CORPORATION" has the meaning provided in Section 425(f) of the Code.

"TEN PERCENT STOCKHOLDER" means, with respect to a 1992 Plan ISO, any individual who directly or indirectly owns stock possessing more than 10% of the total combined voting power of all classes of stock of the Corporation or any Parent Corporation or any Subsidiary Corporation at the time such 1992 Plan ISO is granted.

Section III.  Administration.
--------------

(a) THE COMMITTEE. The Plan shall be administered by the Board of Directors of the Corporation, or if the Board so determines, by a Compensation Committee designated by the Board of Directors of the Corporation (the administering body is hereafter referred to as the "Committee"). No person shall be eligible to be a member of the Committee if that person's membership would prevent the plan from complying with Section 16 of the 1934 Act or rules

-2-

Case 1:06-cv-00517-GMS-LPS    Document 14    Filed 11/09/2006    Page 36 of 74
Brooks Automation Inc · S-8 · Effective 7/20/98, on 7/1/98
Document 4 of 4 · EX-99.2 · Registrant's 1992 Combination Stock Option Plan

3

adopted thereunder. The Committee shall serve at the pleasure of the Board of Directors, which may from time to time, and in its sole discretion, discharge any member, appoint additional new members in substitution for those previously appointed and/or fill vacancies however caused. A majority of the Committee shall constitute a quorum and the acts of a majority of the members present at any meeting at which a quorum is present shall be deemed the action of the Committee.

(b) AUTHORITY AND DISCRETION OF THE COMMITTEE. Subject to the express provisions of this 1992 Plan and provided that all actions taken shall be consistent with the purposes of this 1992 Plan, and subject to ratification by the Board of Directors only if required by applicable law, the Committee shall have full and complete authority and the sole discretion to: (i) determine those persons who shall constitute key employees eligible to be Employee Participants; (ii) select the Participants to whom Stock Options shall be granted under this 1992 Plan; (iii) determine the size and the form of the Stock Options, if any, to be granted to any Participant; (iv) determine the time or times such Stock Options shall be granted including the grant of Stock Options in connection with other awards made, or compensation paid, to the Participant; (v) establish the terms and conditions upon which such Stock Options may be exercised and/or transferred, including the exercise of Stock Options in connection with other awards made, or compensation paid, to the Participant; (vi) make or alter any restrictions and conditions upon such Stock Options and the Stock received on exercise thereof, including, but not limited to, providing for limitations on the Participant's right to keep any Stock received on termination of employment; and (vii) adopt such rules and regulations, establish, define and/or interpret these and any other terms and conditions, and make all determinations (which may be on a case-by-case basis) deemed necessary or desirable for the administration of this 1992 Plan. Notwithstanding any provision of this 1992 Plan to the contrary, only Employee Participants shall be eligible to receive 1992 Plan ISOs. If the Corporation's Class A Common Stock is registered under Section 12(g) or Section 15(d) of the 1934 Act, then notwithstanding any provision of this 1992 Plan to the contrary, grants of Stock Options to non-employee directors must be uniformly offered to all such individuals.

(c) APPLICABLE LAW. This 1992 Plan, and all Stock Options shall be governed by the law of the state in which the Corporation is incorporated.

Section IV.  Terms of Stock Options.
----------------------

(a) AGREEMENTS. Stock Options shall be evidenced by a written agreement between the Corporation and the Participant awarded the Stock Option. Said agreement shall be in such form, and contain such terms and conditions (not inconsistent with this 1992 Plan) as the Committee may determine. If the Stock Option described therein is not intended to be an Incentive Stock Option, but otherwise qualifies as an Incentive Stock Option, such agreement shall include the following, or a similar, statement: "This stock option is not intended to be an Incentive Stock Option, as that term is described in Section 422 of the Internal Revenue Code of 1986, as amended."

-3-

Case 1:06-cv-00517-GMS-LPS   Document 14   Filed 11/09/2006   Page 37 of 74
Brooks Automation Inc · S-8 · Effective 7/20/96, On 7/1/98
Document 4 of 4 · EX-99.2 · Registrant's 1992 Combination Stock Option Plan

4

       (b) TERM. Stock Options shall be for such periods as may be determined by the Committee, provided that in the case of 1992 Plan ISOs, the term of any such 1992 Plan ISO shall not extend beyond three months after the time the Participant ceases to be an employee of the Corporation. Notwithstanding the foregoing, the Committee may provide in a 1992 Plan ISO that in the event of the Permanent and Total Disability or death of the Participant, the 1992 Plan ISO may be exercised by the Participant or his estate (if applicable) for a period of up to one year after the date of such Permanent and Total Disability or Death. In no event may a 1992 Plan ISO be exercisable (including provisions, if any, for exercise in installments) subsequent to ten years after the date of grant, or, in the case of 1992 Plan ISOs granted to Ten Percent Stockholders, more than five years after the date of grant.

       (c) PURCHASE PRICE. The purchase price of shares purchased pursuant to any Stock Option shall be determined by the Committee, and shall be paid by the employee in full upon exercise (a) in cash or, as the Committee, in its sole discretion, may permit, (b) by delivery of shares of Common Stock (valued at their Fair Market Value on the date of such exercise), (c) any other property (valued at its Fair Market Value on the date of such exercise), or (d) any combination of cash, stock and other property. In no event will the purchase price of Common Stock be less than the par value of the Class A Common Stock. Furthermore, the purchase price of Class A Common Stock subject to a 1992 Plan ISO shall not be less than the Fair Market Value of the Class A Common Stock on the date of the issuance of the 1992 Plan ISO, provided that in the case of 1992 Plan ISOs granted to Ten Percent Stockholders, the purchase price shall not be less than 110% of the Fair Market Value of the Class A Common Stock on the date of issuance of the 1992 Plan ISO.

       (d) FURTHER RESTRICTIONS AS TO INCENTIVE STOCK OPTIONS. To the extent that the aggregate Fair Market Value of Class A Common Stock with respect to which Corporation ISOs (determined without regard to this section) are exercisable for the first time by any Employee Participant during any calendar year exceeds $100,000, such Corporation ISOs shall be treated as options which are not Incentive Stock Options. For the purpose of this limitation, options shall be taken into account in the order granted, and the Committee may designate that portion of any Corporation ISO that shall be treated as not an Incentive Stock Option in the event that the provisions of this paragraph apply to a portion of any option, unless otherwise required by the Code or regulations of the Internal Revenue Service. The foregoing designation may be made at such time as the Committee considers appropriate, including after the issuance of the option or at the time of its exercise. For the purpose of this section, Fair Market Value shall be determined as of the time the option with respect to such stock is granted.

       (e) RESTRICTIONS. At the discretion of the Committee, the Class A Common Stock issued pursuant to the Stock Options granted hereunder may be subject to restrictions on vesting or transferability. For the purposes of this limitation, options shall be taken into account in the order granted.

       (f) WITHHOLDING OF TAXES. Pursuant to applicable Federal, state, local or foreign laws, the Corporation may be required to collect income or other taxes upon the grant of a Stock Option to, or exercise of a Stock Option by, a holder. The Corporation may require, as a

-4-

Case 1:06-cv-00517-GMS-LPS    Document 14    Filed 11/09/2006    Page 38 of 74
Brooks Automation Inc · S-8 · Effective 7/20/98, on 7/1/98
Document 4 of 4 · EX-99.2 · Registrant's 1992 Combination Stock Option Plan

5

condition to the exercise of a Stock Option, or demand, at such other time as it may consider appropriate, that the Employee pay the Corporation the amount of any taxes which the Corporation may determine is required to be withheld or collected, and the Employee shall comply with the requirement or demand of the Corporation. In its discretion, the Corporation may withhold shares to be received upon exercise of a Stock Option if it deems this an appropriate method for withholding or collecting taxes.

(g) SECURITIES LAW COMPLIANCE. Upon exercise (or partial exercise) of a Stock Option, the Employee or other holder of the Stock Option shall make such representations and furnish such information as may, in the opinion of counsel for the Corporation, be appropriate to permit the Corporation to issue or transfer Stock in compliance with the provisions of applicable federal or state securities laws. The Corporation, in its discretion, may postpone the issuance and delivery of Stock upon any exercise of this Option until completion of such registration or other qualification of such shares under any federal or state laws, or stock exchange listing, as the Corporation may consider appropriate. Furthermore, the Corporation is not obligated to register or qualify the shares of Class A Common Stock to be issued upon exercise of a Stock Option under federal or state securities laws (or to register or qualify them at any time thereafter), and it may refuse to issue such shares if, in its sole discretion, registration or exemption from registration is not practical or available. The Corporation may require that prior to the issuance or transfer of Stock upon exercise of a Stock Option, the Employee enter into a written agreement to comply with any restrictions on subsequent disposition that the Corporation deems necessary or advisable under any applicable federal and state securities laws. Certificates of Stock issued hereunder may bear a legend reflecting such restrictions.

(h) RIGHT TO STOCK OPTION. No employee of the Corporation or any other person shall have any claim or right to be a participant in this 1992 Plan or to be granted a Stock Option hereunder. Neither this 1992 Plan nor any action taken hereunder shall be construed as giving any person any right to be retained in the employ of the Corporation. Nothing contained hereunder shall be construed as giving any person any equity or interest of any kind in any assets of the Corporation or creating a trust of any kind or a fiduciary relationship of any kind between the Corporation and any such person. As to any claim for any unpaid amounts under this 1992 Plan, any person having a claim for payments shall be an unsecured creditor.

(i) INDEMNITY. Neither the Board of Directors nor the Committee, nor any members of either, nor any employees of the Corporation or any parent, subsidiary, or other affiliate, shall be liable for any act, omission, interpretation, construction or determination made in good faith in connection with their responsibilities with respect to this 1992 Plan, and the Corporation hereby agrees to indemnify the members of the Board of Directors, the members of the Committee, and the employees of the Corporation and its parent or subsidiaries in respect of any claim, loss, damage, or expense (including reasonable counsel fees) arising from any such act, omission, interpretation, construction or determination to the full extent permitted by law.

(j) PARTICIPATION BY FOREIGNERS. Without amending this 1992 Plan, except to the extent required by the Code in the case of Incentive Stock Options, the Committee may modify

-5-

Case 1:06-cv-00517-GMS-LPS    Document 14    Filed 11/09/2006    Page 39 of 74
Brooks Automation Inc · S-8 · Effective 7/20/96, On 7/1/96
Document 4 of 4 · EX-99.2 · Registrant's 1992 Combination Stock Option Plan

6

grants made to participants who are foreign nationals or employed outside the
United States so as to recognize differences in local law, tax policy, or
custom.

Section V. Amendment and Termination; Adjustments Upon Changes in Stock.

The Board of Directors of the Corporation may at any time, and from
time to time, amend, suspend or terminate this 1992 Plan in whole or in part;
provided, however, that neither the Board of Directors nor the Committee may
amend or modify the definition of Employee Participants, materially increase the
benefits accruing to Participants, increase the number of shares of Class A
Common Stock reserved for purposes of this 1992 Plan, extend the term of this
1992 Plan, materially modify the requirements to be a Participant in this 1992
Plan, or otherwise modify the Plan in any way or manner requiring the approval
of the Stockholders under the Code or Section 16 of the 1934 Act, or rules and
regulations thereunder, without Stockholder Approval and compliance with any
applicable law, rules, or regulations. Except as provided herein, no amendment,
suspension or termination of this 1992 Plan may affect the rights of a
Participant to whom a Stock Option has been granted without such Participant's
consent. The Committee is specifically authorized to convert, in its discretion,
the unexercised portion of any 1992 Plan ISO granted to an Employee Participant
to a Non-qualified Option at any time prior to the exercise, in full, of such
1992 Plan ISO. If there shall be any change in the Class A Common Stock or to
any Stock Option granted under this 1992 Plan through merger, consolidation,
reorganization, recapitalization, stock dividend, stock split or other change in
the corporate structure of the Corporation, appropriate adjustments may be made
by the Board of Directors of the Corporation (or if the Corporation is not the
surviving corporation in any such transaction, the Board of Directors of the
surviving corporation) in the aggregate number and kind of shares subject to
this 1992 Plan, and the number and kind of shares and the price per share
subject to outstanding options, provided that such adjustment does not affect
the qualification of any 1992 Plan ISO as an Incentive Stock Option. In
connection with the foregoing, the Board of Directors may issue new Stock
Options in exchange for outstanding Stock Options.

Section VI.   Shares of Stock Subject to the Plan.

The number of shares of Class A Common Stock that may be the subject of
awards under this 1992 Plan shall not exceed an aggregate of 1,550,000 shares.
Shares to be delivered under this 1992 Plan may be either authorized but
unissued shares of Class A Common Stock or treasury shares. Any shares subject
to an option hereunder which for any reason expires unexercised, shares
reacquired by the Corporation because restrictions do not lapse, shares returned
because payment is made hereunder in stock of equivalent value rather than in
cash, and/or shares reacquired from a recipient for any other reason shall, at
such time, no longer count towards the aggregate number of shares which have
been the subject of Stock Options issued hereunder, and such number of shares
shall be subject to further awards under this 1992 Plan, provided the total
number of shares then eligible for award under this 1992 Plan may not exceed the
total specified in the first sentence of this Section VI.

-6-

Case 1:06-cv-00517-GMS-LPS   Document 14   Filed 11/09/2006   Page 40 of 74
Brooks Automation Inc · S-8 · Effective 7/20/96, On 7/1/98
Document 4 of 4 · EX-99.2 · Registrant's 1992 Combination Stock Option Plan

7

Section VII.   Effective Date and Term of this Plan.
-----------------------------------

The effective date of this 1992 Plan is May 13, 1992 (the "Effective Date") and awards under this 1992 Plan may be made for a period of ten years commencing on the Effective Date. The period during which a Stock Option may be exercised may extend beyond that time as provided herein.

Dates of Approval by Board of Directors: May 13, 1992 and December 5, 1994 and November 1, 1995.

Dates of Approval by the Stockholders: May 13, 1992 and December 5, 1994 and February 22, 1996.

*Source:*   **SEC Info · www.secinfo.com · *Fran Finnegan & Company* · 11/8/06**

# EXHIBIT E

**STEPHEN J. DILORENZO, derivatively on behalf of dELiA\*S CORP. and ALLOY, INC., Plaintiff, v. CHRISTOPHER EDGAR, GERALDINE KARESTKY, STEPHEN I. KAHN, EVAN GUILLEMIN, dELiA\*S CORP., and ALLOY, INC., Defendants.**

Civ. No. 03-841-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2004 U.S. Dist. LEXIS 4991*

**March 24, 2004, Decided**

**DISPOSITION:** [*1] Defendants' motions to dismiss denied.

**COUNSEL:** For STEPHEN J. DILORENZO, plaintiff: Theodore J. Tacconelli, Ferry, Joseph & Pearce, P.A., Wilmington, DE.

For CHRISTOPHER EDGAR, GERALDINE KARETSKY, STEPHEN I. KAHN, EVAN GUILLEMIN, defendants: Allen M. Terrell, Jr., Richards, Layton & Finger, Wilmington, DE.

For DELIA\*S CORP., ALLOY INC., defendants: Jon E. Abramczyk, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION:**

**MEMORANDUM ORDER**

At Wilmington, this 24th day of March, 2004, having reviewed the motions of defendants to dismiss (D.I. 10, 13), and the memoranda submitted therewith;

IT IS ORDERED that defendants' motions (D.I. 10, 13) to dismiss are **denied** for the reasons that follow:

1. Plaintiff filed this derivative action on August 27, 2003 alleging violations of § 16(b) of the Securities Exchange Act of 1934, codified at *15 U.S.C. § 78p(b)*. (D.I. 1) The suit is brought on behalf of dELiA\*s Corporation ("dELiA\*s") and Alloy, Inc. ("Alloy"), and seeks to recover short-swing profits obtained by defendants Christopher Edgar, Geraldine Karetsky, Stephen [*2] Kahn and Evan Guillemin ("Former Director defendants"). On October 16, 2003, the defendants filed motions to dismiss pursuant to *Fed. R. Civ. P. 12(b) 1and 12(b)(6)*. (D.I. 10, 13)

2. During the relevant time period, the Former Director defendants were directors of dELiA\*s. Kahn was the Chief Executive Officer and Chairman of the Board. Edgar was the Executive Vice President and Vice Chairman. Guillemin was the Chief Financial Officer and Treasurer. On or about May 12, 2003, the Former Director defendants purchased in aggregate 7,297,298 shares of dELiA\*s common stock at a price of $ 0.37 per share for a total of $ 2.7 million. (D.I. 1, P 12) Of this amount Kahn purchased 4,054,054 shares; Karetsky purchased 2,702,703 shares; Edgar purchased 337,838 shares; and Guillemin purchased 202,703 shares. Further, dELiA\*s issued to the Former Director defendants a total of 600,000 warrants to purchase shares at $ 0.37 a share.

3. On July 30, 2003, dELiA\*s entered into an agreement with Alloy to conduct a tender offer for all of the publicly held shares of dELiA\*s. At that time, Karetsky and Kahn entered into an agreement to support the merger and tender [*3] their shares. Kahn, Edgar and Guillemin each received employment agreements with Alloy upon the effective date of the merger. (Id., P 10, 15)

4. On August 6, 2003, Dodger Acquisition Corp., a direct wholly owned subsidiary of Canal Park Trust and an indirect wholly owned subsidiary of Alloy, commenced a tender offer for 100% of dELiA*s shares at a price of $ .0928 per share. (Id., P 25; D.I. 12, at ex. 1) Plaintiff contends that the Former Director defendants obtained short-swing profits in violation of *§ 16(b)* as a result of an August 6, 2003 tender-offer by Alloy to dELiA*s shareholders for a cash-out merger between the corporations.

5. During the offer period, plaintiff commenced the present action but did not tender his shares. On September 7, 2003, the merger closed and plaintiff, along with other nontendering shareholders, was cashed-out and his shares canceled. Canal Park Trust is now the sole shareholder of dELiA*s stock. (D.I. 12)

6. Plaintiff was a dELiA*s shareholder at the time of the filing of the complaint. Plaintiff also contends that at the time of the transaction he was an Alloy shareholder and has maintained that interest. Plaintiff seeks a disgorgement [*4] of $ 4,071,892 in profits received by the Former Director defendants as a result of the transaction. Plaintiff also seeks $ 334,800 related to the acquisition of the 600,000 warrants.

7. Defendants' motions to dismiss contend that plaintiff's complaint fails for a lack of standing because he is no longer a shareholder of dELiA*s and because he failed to make demand upon the corporation's board of directors.

8. **Standard of Review.** In analyzing a motion to dismiss pursuant to *Rule 12(b)(6)*, the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. See *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998).* "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." Id. Claims may be dismissed pursuant to a *Rule 12(b)(6)* motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief. See *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).* [*5] The moving party has the burden of persuasion. See *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991).*

9. In considering a motion to dismiss, a court may consider Securities Exchange Commission documents that are expressly relied upon in the complaint. See *In re Burlington Coat Factory Sec. Litig, 114 F.3d 1410, 1426 (3d Cir. 1997); Indeck Maine Energy, L.L.C. v. ISO New England Inc., 167 F. Supp. 2d 675 (D. Del. 2001).* Further, on a motion to dismiss the court may take judicial notice of the contents of documents required by law to be filed, and actually filed, with federal or state officials. See *Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000); Ieradi v. Mylan Lab, Inc., 230 F.3d 594, 600 n.3 (3d Cir. 2000)* (citing *Fed. R. Evid. 201*).

10. **Standing under *Section 16(b).*** Section 16(b) establishes strict liability for covered individuals who engage in the sale or purchase of a covered security. *15 U.S.C. § 78p(b).* The right of recovery under *§ 16(b)* is held, however, solely by the issuer of the security. [*6] Id. A shareholder may bring a derivative action "in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter." Id.

11. There are three requirements for shareholder standing to bring suit under *§ 16(b).* See *Gollust v. Mendell, 501 U.S. 115, 115 L. Ed. 2d 109, 111 S. Ct. 2173 (1991).* First, the plaintiff must own a security within the meaning of the section. Second, the security held by the plaintiff must be a security of the issuer of the security traded by the covered individual. Third, the plaintiff must own a security of the issuer at the time the *§ 16(b)* action is instituted. *Id. at 123-24.* Unlike a typical shareholder derivative action, there is not a requirement that the plaintiff maintain continual ownership, only that he has "some continuing financial stake in the litigation" so as to satisfy minimum standing requirements imposed by the jurisdictional limitations of Article III. See *id. at 125.*

12. In the present case, plaintiff's complaint alleges that he owned shares of stock issued by dELiA*s at the time he [*7] filed the present action. Consequently, plaintiff satisfied the statutory requirements for standing at the time the suit was instituted. Defendants contend, however, that plaintiff is no longer a shareholder and lacks the requisite standing to maintain the suit. Plaintiff argues that his ownership of shares in Alloy provide a basis for his continuing financial interest in the outcome of the litigation.

13. In Gollust, the Supreme Court considered the

effect of a stock-exchange merger upon the plaintiff's previously filed § *16(b)* action. The unanimous Court concluded that although plaintiff was no longer a shareholder of the issuer, as his stock was exchanged for stock in the new corporation, he nonetheless had the minimal financial interest in the outcome of the litigation to satisfy constitutional concerns. *Id. at 126-28.* Consequently, under *Gollust,* where a plaintiff has standing at the commencement of the suit, an involuntary change in his status as a security holder resulting from a restructuring will not affect his standing to maintain the suit so long as minimal constitutional requirements are satisfied through the presence of some financial interest [*8] in the outcome of the litigation.

14. In the present case, the major distinguishing factor is the form of restructuring. Instead of a stock-exchange merger, dELiA*s effectuated a cash-out merger. The court concludes that § *16(b)*'s remedial purpose should not be truncated by the legal nuances of the corporate restructuring. A shareholder of a parent corporation has a financial interest, albeit tenuous, in the disgorgement of profits obtained by insiders of a corporate subsidiary. Although Congress did not provide statutory standing for such a party to institute a § *16(b)* suit, n1 a shareholder of a parent corporation has a cognizable interest for purposes of satisfying constitutional requirements. See *Allen v. Wright, 468 U.S. 737, 751, 82 L. Ed. 2d 556, 104 S. Ct. 3315 (1984)* ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."). Consequently, the court concludes that plaintiff satisfies the constitutional requirements to maintain the suit.

> n1 Where a shareholder of a parent corporation brings a suit against a subsidiary of the parent under a derivative theory, the suit is referred to as double derivative in nature. *Section 16(b)* suits premised upon double derivative standing have been rejected by a majority of courts. See *Lewis v. McAdam, 762 F.2d 800, 804 (9th Cir. 1985)* (concluding that standing does not exist in a cash-stock merger); *Untermeyer v. Valhi, Inc., 665 F. Supp. 297, 300-01 (S.D.N.Y. 1987)* (concluding that standing does not exist in a cash-out merger). These cases are distinguished,

however, because the Supreme Court in Gollust differentiated between standing to institute suit and a sufficient interest to maintain suit. See *Gollust, 501 U.S. at 123-24.*

[*9]

15. **Demand.** Defendants also contend that plaintiff does not have standing for failure to satisfy *Fed. R. Civ. P. 23.1*'s requirements for demand. It is clear, however, that *Rule 23.1* does not apply to actions brought pursuant to § *16(b)*. For example, unlike typical derivative actions, the decision to bring a § *16(b)* enforcement action does not enjoy protection of the business judgment rule. See *Cramer v. General Telephone & Elec. Corp., 582 F.2d 259, 276 (3d Cir. 1978).* Similarly, as discussed above, there are no requirements of continuous ownership. See *Gollust, 501 U.S. at 124-25.*

16. Where demand would have been futile, courts have excused the requirement under § *16(b)*. See *Berkwich v. Mencher, 239 F. Supp. 792, 793-94 (S.D.N.Y. 1965); Grossman v. Young, 72 F. Supp. 375 (S.D.N.Y. 1947).* On a motion to dismiss for failure to state a claim, the court must accept as true plaintiff's allegations of demand futility. *Id. at 380.*

17. In the present case, plaintiff pleads demand futility stating that he "has not made demand on dELiA*s Board of Directors [*10] because such demand would be futile in view of Alloy's acquisition of the company and defendants' control of dELiA*s Board." (D.I. 1, P 28) Plaintiff's allegations of control are supported by those documents submitted by defendants in support of their motion to dismiss. n2 (D.I. 12) Further, had plaintiff made a demand, § *16(b)* would preclude him from filing suit until either sixty days had passed or the board had rejected his demand. Due to the short timing of the merger, plaintiff's shares would be canceled before he would have been permitted to bring suit. The failure of the dELiA*s board to bring suit on its own behalf after becoming aware of plaintiff's suit also supports plaintiff's futility allegations. See *Berkwich, 239 F. Supp. at 794.* Consequently, for purposes of resolving the pending motion to dismiss the court finds that plaintiff has sufficiently alleged the existence of demand futility.

> n2 For example, the Former Director defendants represent four of the eleven

2004 U.S. Dist. LEXIS 4991, *10

members of the former dELiA*s and include three of the four former officers. (D.I. 12, ex. 2 at B-3) Collectively, the Former Director defendants owned 37.8% of the dELiA*s stock.

[*11]

Sue L. Robinson

United States District Judge

# EXHIBIT F

FOCUS - 13 of 52 DOCUMENTS

**RICHARD MORALES, Plaintiff, v. REGENT TECHNOLOGIES, INC., DAVID ARTHUR NELSON, and ROY W. MERS, Defendants.**

**98 Civ. 112 (RO)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1998 U.S. Dist. LEXIS 6742*

**May 11, 1998, Decided**
**May 12, 1998, Filed**

**DISPOSITION:** [*1] Defendants' motion to dismiss denied.

**COUNSEL:** For RICHARD MORALES, plaintiff: David Lopez, Esq., Southampton, NY.

**JUDGES:** Richard Owen, United States District Judge.

**OPINION BY:** Richard Owen

**OPINION:**

MEMORANDUM AND ORDER

OWEN, District Judge

Plaintiff alleges a violation of § 16(b) of the Securities Exchange Act of 1934, codified at *15 U.S.C. § 78p*(b). Section 16(b) provides, in relevant part:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer . . . . Suit to recover such profits may be instituted . . . by the owner of any security of the issuer in the name and in

behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter, but no such suit shall be brought more than two years after the date such profit was realized. . . .

*15* [*2] *U.S.C. § 78p*(b) (emphasis supplied). Defendants have moved to dismiss the complaint, pursuant to *Rules 12(b)(6) and 9(c) of the Federal Rules of Civil Procedure*, on the ground that plaintiff failed to comply with § 16(b)'s sixty-day-notice provision.

The following facts are alleged in the complaint. n1 On December 5, 1997, plaintiff (through his counsel) wrote to Regent Technologies, requesting that the corporation take steps to require an accounting and disgorgement of profits related to specific purchases and sales of Regent's stock by defendants Nelson and Mers. Regent (through its general counsel, Elaine Boze) replied on December 19, explaining that the precise shares sold had been purchased more than six months prior to their sale and that there had thus been no violation of § 16(b). Plaintiff responded on December 20 by citing case law rejecting the "share tracing" theory relied on by Regent. n2 Plaintiff's letter concluded with the following statement: "Unless I am informed within the week that recoveries have been effected I will take your letter of December 19 as Regent's final word on the matter and will file suit without further delay." On January 6, 1998, having heard [*3] nothing further from Regent, plaintiff filed the instant action.

n1 For the purposes of this motion, I accept the allegations in plaintiff's complaint as true. See *Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir. 1994).*

n2 The validity of this legal position is beyond the scope of this motion, and I therefore do not reach it.

Section 16(b) requires that, prior to commencing suit, a shareholder must first ask the corporation to bring suit on its own behalf. "Absent such a demand, or a showing that a demand would have been futile, an individual shareholder lacks the capacity under § 16(b) to bring suit." *Prager v. Sylvestri, 449 F. Supp. 425, 429 (S.D.N.Y. 1978).* Here, it is undisputed that plaintiff did not wait sixty days after his first letter to Regent before filing this suit. The question thus becomes whether Regent's response (and the absence thereof) to plaintiff's letters establishes that waiting for the full sixty-day period would have been futile.

In many cases in which making a demand on [*4] the defendant corporations has been held to be futile, the futility arises from the fact that the individual defendants control the corporation. See, e.g., *Heit v. Katz, 1978 U.S. Dist. LEXIS 18133, 1978 WL 1083* (S.D.N.Y. Apr. 26, 1978), *Netter v. Ashland Paper Mills, 19 F.R.D. 529 (S.D.N.Y. 1956), Kogan v. Schulte, 61 F. Supp. 604 (S.D.N.Y. 1945).* This is not the case here. Plaintiff has alleged only that, at all relevant times, defendant Nelson was an officer of Regent and a beneficial owner of more than 10% of its stock, and defendant Mers was chairman of Regent's board of directors. That degree of control is not of the same order as, for instance, the control exercised by the individual defendant in *Netter,* who controlled more than a majority of the defendant corporation's stock and who, along with his family members, constituted the entire board of directors of the defendant company. See *Netter, 19 F.R.D. at 531.*

However, plaintiff has alleged a different ground for a finding of futility: the defendant corporation's

unequivocal indication that it was unwilling to pursue the matter on its own behalf. In *Berkwich v. Mencher, 239 F. Supp. 792 (S.D.N.Y. 1965),* the district court found [*5] that the defendant corporation's own statement in a proxy statement that it did not intend to bring suit against one of its directors showed that any request that the corporation take action would be futile. See *Berkwich, 239 F. Supp. at 794* ("Surely plaintiff could take [the corporation] at its word.").

Here, after serving Regent with a demand, plaintiff received a similarly clear statement that corporation would not take action. Regent's December 19 letter stated Regent's position that "no violations of § 16(b) . . . occurred". n3 Having received that letter, plaintiff had a firm basis for believing that any further efforts to prod Regent to act would be futile, a basis which was confirmed by Regent's failure to respond to plaintiff's December 20 letter.

n3 Moreover, Regent's confidence in its own position was expressed in its letter as follows: "I suggest that you investigate the facts more thoroughly before you make further unfounded allegations against Mr. Mers and Mr. Nelson."

Because continued [*6] efforts to request that Regent bring suit against the individual defendants on its own behalf would have been futile, plaintiff was not obligated to comply with the sixty-day-notice provision of § 16(b). Therefore, defendants' motion to dismiss is denied.

So Ordered.

Dated: New York, New York

May 11, 1998

Richard Owen

United States District Judge

# EXHIBIT G

FOCUS - 10 of 30 DOCUMENTS

## WILLIAM A. MURRAY, Plaintiff, v. DIAGNOSTEK, INC., Defendant.

### CIVIL ACTION NO. 91-3597

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*1992 U.S. Dist. LEXIS 10299*

**July 16, 1992, Decided**
**July 16, 1992, Filed**

**DISPOSITION:** [*1] For the foregoing reasons, the motion of Diagnostek for summary judgment shall be granted.

**COUNSEL:** For WILLIAM A. MURRAY, PLAINTIFF: JONATHAN L. BRAFF, 6TH & WALNUT STS., STE. 510, THE CURTIS CENTER, PHILA, PA 19106, USA.

For DIAGNOSTEK, INC., DEFENDANT: DEBRA KLEBANOFF, 15TH AND CHESTNUT STS., THE PACKARD BLDG., PHILA, PA 19102-2678, USA.

**JUDGES:** REED, JR.

**OPINION BY:** LOWELL A. REED, JR.

**OPINION:**

**MEMORANDUM**

Reed, J.

July 16, 1992

### INTRODUCTION

In this lawsuit for specific performance of a stock option agreement and, in the alternative, equitable relief, defendant Diagnostek, Inc. ("Diagnostek" or "the Company") has filed a motion for summary judgment (Document No. 6) on both counts of the complaint. This Court has jurisdiction over this case pursuant to *28 U.S.C.A. § 1332* (West Supp. 1992), as the parties are of diverse citizenship and the amount in controversy exceeds $ 50,000 exclusive of interest and costs.

Upon consideration of the motion of defendant Diagnostek for summary judgment, the response of plaintiff William A. Murray ("Murray") thereto, and the reply of the defendant, and for the reasons which follow, the motion shall be granted. Accordingly, final judgment shall be entered [*2] in favor of defendant Diagnostek and against plaintiff Murray.

### BACKGROUND

#### The Parties

Plaintiff Murray is an individual residing at 41 Gordon Drive, Media, Pennsylvania. Stipulation of Uncontested Facts ("Stipulation") (Document No. 9) at P 1. Defendant Diagnostek is a Delaware corporation with its principal place of business located at 4500 Alexander Boulevard, N.E., Albuquerque, New Mexico. Id. at P 2. During the relevant period, Diagnostek engaged in the business of establishing and operating out-patient diagnostic imaging centers through the syndication of limited partnership interests, having Diagnostek, or a subsidiary thereof, function as general partner. Id. at P 3; Plaintiff's Answer to Defendant's Motion for Summary Judgment ("Plaintiff's Answer to Motion"), March 11, 1985 letter-agreement from President of Diagnostek to Murray (the "Consulting Agreement"), Exhibit A to Murray Affidavit.

#### The Consulting Arrangement Between the Parties

In late 1984, Murray was employed as a Vice President at the Health System Agency, located in Philadelphia,

Pennsylvania. Complaint at P 5; Plaintiff's Answer to Motion at p. 1. During that period, [*3] Diagnostek sought to utilize the services of Murray to assist it in establishing medical imaging centers in southeastern Pennsylvania. Id.; Complaint at P 6. On or about April 8, 1985, plaintiff and defendant entered into an agreement pursuant to which Murray was to perform consulting services for Diagnostek in connection with its formation of new Diagnostek centers. Stipulation at P 4; Complaint at P 7; Plaintiff's Answer to Motion, the Consulting Agreement, Exhibit A to Murray Affidavit.

As compensation for his consulting services, Murray was to receive a stock option to purchase Diagnostek stock. Stipulation at P 5; Complaint at P 8. At some point after the closing of the offering of limited partnership interests in the Springfield Diagnostek Center, Diagnostek delivered a stock option agreement (the "Option Agreement") to Murray. Stipulation at P 6. As stated below, plaintiff Murray claims that he received the Option Agreement in mid-April 1985. Under the Option Agreement, Murray was granted the option to purchase 5,000 shares of Diagnostek stock at $ 1.25 per share. Complaint at P 9; Memorandum in Support of Defendant's Motion for Summary Judgment ("Defendant's Memo.") at [*4] p. 2.

#### The Dispute Regarding the Option Agreement

Plaintiff Murray alleges that he received and executed a final draft of the Consulting Agreement on or about April 8, 1985, and that on April 15, 1985, he accepted and executed the Option Agreement. Complaint at PP 7, 9. The Option Agreement was granted for a five-year (5) term. Id. at 9. Plaintiff claims that on April 11, 1990, less than five (5) years from the date he accepted the Option Agreement, he sent written notice to Diagnostek of his intent to exercise the stock option, enclosing a $ 6,250 check representing full payment for the 5,000 shares covered by the option. Id. at P 10. The envelope containing this correspondence was returned by the post office, which indicated that Diagnostek had relocated and that the mail forwarding order had expired. Id.

Plaintiff Murray claims that immediately upon his receipt of the returned correspondence on April 19, 1990, he again sent written notice to exercise the option to Diagnostek at the Company's new address, once again enclosing a $ 6,250 check. Id. at P 12. Murray contends that Diagnostek has refused to honor his exercise of the

option by issuing him the [*5] 5,000 shares of Diagnostek stock covered by the option, despite his having fully complied with the terms and conditions of the Option Agreement. Id. at P 13. He alleges that as of the date of his complaint, June 6, 1991, 5,000 shares of Diagnostek stock had a value of approximately $ 91,000. Id. at P 14.

In Count I, Murray seeks a judgment directing Diagnostek to specifically perform the Option Agreement by issuing him the 5,000 Diagnostek shares for $ 6,250, or by awarding Murray the difference between the value of the stock on the date of the judgment sought and $ 6,250 (approximately $ 85,000). In Count II, plaintiff seeks equitable relief under the doctrine of quantum meruit for the reasonable value of the consulting services he provided to Diagnostek. He claims these services have a fair and reasonable value of $ 7,500. Complaint at P 17.

Diagnostek contends summary judgment in its favor on Count I is warranted, because by its terms, the Option Agreement expired on February 5, 1990 and made no reference to either a date of signing or acceptance by Murray, the optionee; therefore, the attempt by Murray to exercise the option on April 11, 1990 was untimely. Defendant's [*6] Memo. at pp. 3-4. Diagnostek also asserts that it should be granted summary judgment on Count II, as Murray is not entitled to equitable relief. It asserts that upon the expiration of an unexercised option, the option holder is deemed under the law to have received the full equivalent of the price paid or services rendered for the option, and thus cannot invoke such equitable doctrines as quantum meruit or forfeiture to seek compensation. Id. at pp. 6-7.

#### DISCUSSION

#### The Summary Judgment Standard

The examination to be undertaken of a summary judgment motion in federal court is set forth in *Fed. R. Civ. P. 56*. Rule 56(c) states that

> the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law.

*Fed. R. Civ. P. 56(c)*. A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)*. "Factual disputes [*7] that are irrelevant or unnecessary will not be counted." Id. (citing 10A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 2725, at 93-95 (1983)). In addition, a dispute over a material fact must be "genuine," i.e., the evidence must be such "that a reasonable jury could return a verdict in favor of the non-moving party." Id.

> When a motion for summary judgment is made and supported as provided in . . . [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

*Fed. R. Civ. P. 56(e)*. The evidence proffered does not have to be in a form which would be admissible at trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)*. "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and [*8] it is from this list that one would normally expect the nonmoving party to make the showing . . . [required by Rule 56(e)]." Id.

The evidence of the nonmoving party is to be considered as true, and justifiable inferences arising from the evidence are to be drawn in his or her favor. *Anderson, 477 U.S. at 255*. If the evidence of the nonmoving party is "merely colorable," or is "not significantly probative," summary judgment may be granted. *Id. at 249-50*. For example, a nonmoving party may not successfully oppose a summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Federation, 110 S. Ct.*

*3177, 3188 (1990)*. Rather, the nonmoving party must offer specific facts contradicting the facts averred by the movant which indicate that there is a genuine issue for trial. *Id. at 3188*.

### Contract Law Principles

The Option Agreement states that it is to be governed by the laws of the State of New Mexico, the state where Diagnostek is headquartered. Option Agreement at P 6, Defendant's Memo., [*9] Exhibit A. The parties do not dispute this choice of law. Defendant's Memo. at p. 5 n.2; Plaintiff's Answer to Motion at p. 3.

"Absent any ambiguity, the construction of a contract is a question of law." *Boatwright v. Howard, 102 N.M. 262, 694 P.2d 518, 520 (1985)* (citing *Shaeffer v. Kelton, 95 N.M. 182, 619 P.2d 1226 (1980)*). The question of whether a contract is ambiguous is also a question of law. Id. (citing *Young v. Thomas, 93 N.M. 677, 604 P.2d 370 (1979)*). "It is the role of the courts to interpret and enforce a contract as written by the parties." Id. (citing Schaeffer). Where the terms of a contract are unambiguous, they are conclusive. *Master Builders, Inc. v. Cabbell, 95 N.M. 371, 622 P.2d 276, 282 (N.M. Ct. App. 1980)* (Sutin, J. concurring) (citing *Fuller v. Crocker, 44 N.M. 499, 105 P.2d 472 (1940)*), cert. denied, *95 N.M. 426, 622 P.2d 1046 (1981)*. An ambiguity exists in a contract only if the language employed is "fairly susceptible of two different constructions by reasonable [*10] intelligent . . . [persons] on reading it." Id. at 281 (citing *Houston Fire and Casualty Ins. Co. v. C and H Constr. & Paving Co., 82 N.M. 799, 487 P.2d 908 (1971); Alvarez v. Southwestern Life Ins. Co., Inc., 86 N.M. 300, 523 P.2d 544 (1974)*).

In *Zabel v. Dale Bellamah Land Co., 78 N.M. 586, 435 P.2d 205 (1967)*, the Supreme Court of New Mexico, quoting an earlier decision it had rendered, defined an option contract as follows:

> 'An option contract is a contract whereby one party agrees to keep an offer open for a stated time upon specified terms and conditions, and may become a contract binding upon both parties, depending on whether the optionee exercises his right.'

*Zobel, 435 P.2d at 206* (quoting *Hofmann v. McCanlies, 76 N.M. 218, 220, 413 P.2d 697, 698 (1966))*. In essence, it is a right, entitling the optionee receiving it "'to comply or not comply with the specific terms of the option, at the sole choice and election of the optionee.'" Id. (quoting *Northcutt v. McPherson, 81 N.M. 743, 745, 473 P.2d 357 (1970))*. [*11] In the words of a noted authority on contract law,

> the general view is that an option is necessarily a unilateral contract which binds the optionee to do nothing but grants him the right to accept or reject the offer in accordance with its terms within the time and in the manner specified in the option. The outstanding factor is that the optionee is not bound until he acts on the option one way or another.

1 Williston on Contracts § 61B (3d ed. 1957). See also 1A Corbin on Contracts § 273, at 592-93, 601 (1963) (the option holder has paid consideration for his optional power of acceptance; when he gives notice of acceptance, the transaction becomes a bilateral contract); *Master Builders, Inc., 622 P.2d at 282* (Sutin, J. concurring) (same) (citing *Robbs v. Illinois Rural Rehabilitation Corp., 313 Ill. App. 418, 40 N.E.2d 549 (1942))*.

"'The necessity for unequivocal and unqualified expression of intention to exercise an option and affirmative performance of the expressed method of exercising it are well-established legal principles.'" Id. (quoting *Northcutt, 473 P.2d at 359)*. [*12] See also *Northcutt, 473 P.2d at 359* ("The language of the agreement itself controls as to what act or acts constitute an election to exercise an option.") (citation omitted). If the time period for acceptance of an option contract is expressly limited by the grantor of the option, acceptance must take place within the specified time period; time is of the essence. 1A Corbin on Contracts § 273 (1963 & Supp. 1991). See also *In Re Roswog, 48 Bankr. 689, 692 (Bankr. M.D. Pa. 1985)* ("It is well settled that time is of the essence in an option contract.") (citing *New Eastwick Corp. v. Philadelphia Builders, 430 Pa. 46, 50, 241 A.2d 766, 769 (1968); Western Savings Fund Society of Philadelphia v. SEPTA, 285 Pa. Super. 187, 192, 427 A.2d 175 (1981))*.

**The Option Agreement**

The Option Agreement provides in paragraph two (2) that "the stock option granted hereby shall expire on the fifth anniversary of the date hereof." Defendant's Memo., Exhibit A, at P 2. The Option Agreement makes clear in two (2) different places that the "date hereof" is February 5, 1985. First, [*13] the introductory paragraph states as follows:

> STOCK OPTION AGREEMENT dated as of February 5, 1985, from and between Diagnostek, Inc., a Delaware corporation (the "Company") and William Murray (the "Optionee").

Second, the final sentence of the Option Agreement states that "IN WITNESS WHEREOF, the undersigned has duly executed this Agreement as of the day and year first above written," i.e., February 5, 1985. Thus, according to its terms, the Option Agreement expired on February 5, 1990, over two (2) months prior to the attempt of Murray to exercise the option on April 11, 1990.

The several arguments Murray offers in an attempt to show that his notice of intent to exercise the option was timely do not prove otherwise. Murray initially contends that the five-year term of the option did not begin to run until he accepted and signed the Option Agreement on April 15, 1985. He cites case law stating that a contract is made when it has been executed or accepted by both parties so as to become binding on both parties, not before. Plaintiff's Answer to Motion at p. 3. Although this is certainly true as a general proposition, plaintiff Murray overlooks the unique nature of an option [*14] contract.

As made clear in the discussion of option contract principles set forth above, an option is essentially nothing more than a right or unilateral contract, granting the optionee, here Murray, the right to accept or reject the offer embodied in the option in the manner and time period specified in the option agreement. The act of acceptance plays no role until the optionee chooses to exercise the option, which plaintiff belatedly attempted on April 11, 1990. Only then does the option become a bilateral contract, binding not just the person or entity which has granted the option, but the optionee as well. See, e.g., *Zobel v. Dale Bellamah Land Co., 78 N.M. 586, 435 P.2d 205, 206 (1967);* 1A Corbin on Contracts § 273, at 592-93, 601 (1963). Consequently, as correctly noted by counsel for Diagnostek, the signature and purported

acceptance of the grant of the option by Murray on April 15, 1985 was of no legal import in determining the duration of the option.

Plaintiff Murray next asserts that the Option Agreement is ambiguous, because although this document is expressly dated February 5, 1985, it was not delivered to Murray until at least one [*15] month later, and was not accepted and executed by him until April 15, 1985. Plaintiff's Answer to Motion at pp. 3-4. Invoking the rule that a contract ambiguity must be resolved against the drafter of the agreement, see, e.g., *Smith v. Tinley, 100 N.M. 663, 674 P.2d 1123, 1125 (1984)* (citation omitted), plaintiff argues that the latter date of April 15, 1985 should control in calculating the five-year duration of the option he was granted. Plaintiff's Answer to Motion at p. 4. I have reviewed the Option Agreement in its entirety and find as a matter of law that it is clear and unambiguous on the subject of its duration and the mechanical steps plaintiff Murray had to take to exercise the option. In other words, I find that the Option Agreement is not fairly susceptible of more than one construction by reasonably intelligent persons reviewing it. See *Master Builders, Inc. v. Cabbell, 95 N.M. 371, 622 P.2d 276, 281 (N.M. Ct. App. 1980)* (Sutin, J. concurring) (citing *Houston Fire and Casualty Ins. Co. v. C and H Constr. & Paving Co., 82 N.M. 799, 487 P.2d 908 (1971); Alvarez v. Southwestern Life Ins. Co., Inc., 86 N.M. 300, 523 P.2d 544 (1974))*. [*16]

The attempt by plaintiff Murray to create an ambiguity by referring to the delivery, acceptance and execution of the Option Agreement is unavailing. These subjects are not mentioned in the contract. "An omission in a written instrument . . . does not create an ambiguity . . . if it is otherwise clear and unambiguous." Id. The intent of parties to a contract is to be determined from the contract itself. *Boatwright v. Howard, 102 N.M. 262, 694 P.2d 518, 521 (1985)*. Resort to extrinsic facts is unnecessary if the contract is unambiguous. Id. (citations omitted). As noted, I have reviewed the Option Agreement and found as a matter of law that it is clear and unambiguous on the topic of its duration. Therefore, I decline to consider the extrinsic evidence proffered by the plaintiff on this subject.

Plaintiff also argues that February 5, 1985 cannot control in determining the timeliness of his attempt to exercise the option, as the option was granted as part of an overall Consulting Agreement still under negotiation

in February 1985. See Plaintiff's Answer to Motion at p. 5. Here, too, plaintiff Murray essentially attempts to create an ambiguity [*17] by reference to subjects not mentioned in an otherwise unambiguous agreement. Accordingly, for the same reasons that I refused to find the Option Agreement ambiguous through consideration of the purported post-February 1985 delivery, acceptance and execution of this document, I find that this additional argument must fail. See *Master Builders, Inc., 622 P.2d at 281* (Sutin, J. concurring) ("The omission in the option of any reference to payment of a commission did not create an ambiguity. If no provision is made for payment of a commission, none exists."). The key terms of the Option Agreement resemble the language of an agreement examined in the case of *Greer v. Stanolind Oil & Gas Co., 200 F.2d 920 (10th Cir. 1952)*. In Greer, the United States Court of Appeals for the Tenth Circuit addressed the terms of an oil and gas lease covering property in San Juan County, New Mexico. *Id. at 921.* The court of appeals affirmed the District Court of New Mexico in its determination that the lease began on May 20, 1947, the date stated in the lease, not the later date of delivery of the lease proposed by the appellants. [*18] *Id. at 922-23.* The lease in Greer began with the statement "This agreement, Entered into this the 20 day of May, 1947," and ended: "In Witness Whereof we sign the day and year first above written." *Id. at 921.* The court rejected evidence that the lease was separately signed and delivered on various dates between June 12 and July 15, 1947. *Id. at 921-22.* The court of appeals explained that

> it is of first importance that a contract shall have definitely ascertainable dates of commencement and termination. To that end, those dates should be determinable from the recitations in the contract itself; there should be no room for conjecture or speculation. If, however, the intent of the parties becomes material, it should be gathered from the language of the contract and resort to extraneous facts is justified only if the contract itself creates a patent ambiguity. . . . Obedient to that rule, the courts have generally construed contracts to run from the date they bear and not from the date of delivery.

*Id. at 922* (citations omitted).

In refusing to consider extraneous evidence of the date the lease [*19] was delivered, the court noted that the date of delivery was not referred to in the body of the lease instrument, and that there was nothing in the agreement indicating that the parties intended that the lease would not become operative until delivery. Id. The court thus concluded that there was no reason to go outside the contract to ascertain the intent of the parties. *Id. at 923.*

Plaintiff makes the additional argument that the characterization of the Option Agreement as a unilateral contract or right is belied by the use of the term "Agreement" in the title of this document, and by the signature line appearing at the end of the document for his signature (there is also a signature line for a representative of Diagnostek). Plaintiff's Answer to Motion at p. 5. This argument exalts form and semantics over substance. The word "Agreement" referred to by Plaintiff Murray is found in the title "Stock Option Agreement" (emphasis added). This title precedes the operative clauses comprising the agreement, all of which clearly indicate that what Murray is being given by the document is a unilateral right or option. Indeed, the first three clauses following the [*20] title are labeled "Grant of Option," "Option Period," and "Exercise of Option," respectively. Nor does the mere existence of a signature line at the end of the Option Agreement change the essential nature and effect of this document. Nothing in the Option Agreement indicates that either the signature line for Murray or the companion signature line for a representative of Diagnostek was intended to alter the February 5, 1985 starting date for the five-year life of the option.

In sum, I conclude as a matter of law that the attempt by Murray in April 1990 to exercise the option was untimely, as the option expired by its terms on February 5, 1990.

### The Request of Plaintiff

### Murray for Equitable Relief

In Count II of his complaint, plaintiff Murray seeks equitable relief under the doctrine of quantum meruit for the reasonable value of the consulting services he provided to Diagnostek. He claims the services he provided have a fair and reasonable value of $ 7,500. Complaint at P 17. There is no indication in the record

that Murray was to receive compensation for services rendered Diagnostek under any agreement or arrangement other than the Option Agreement.

Option contracts [*21] generally do not come within the equitable rule against forfeiture, entitling an optionee to equitable relief, such as the compensation in quantum meruit sought here. See *Cillessen v. Kona Co., 73 N.M. 297, 387 P.2d 867, 870 (1964)* (citations omitted). When the time in which the optionee may accept the option expires, he is deemed to have received the full equivalent of the price paid or services rendered for the option; thus, "a refusal to give effect to an acceptance that is one minute late results in no forfeiture." 1A Corbin on Contracts § 273, at 593 (1963). Put another way, "something else must be lost when an option expires besides the consideration paid for it to have a 'forfeiture' of the consideration paid for the option, since the option consideration has been fully earned by giving the option for the time it lasted." Id. at 179 (Supp. 1991).

Because plaintiff Murray does not claim any loss other than the fair value of his consulting services in Count II, his claim for equitable relief fails as a matter of law. Murray is deemed to have received the equitable relief he seeks pursuant to the grant of the option, regardless of the [*22] fact that this right expired before being exercised.

### CONCLUSION

For the foregoing reasons, the motion of Diagnostek for summary judgment shall be granted. Accordingly, a final judgment shall be entered in favor of Diagnostek and against Murray.

An appropriate final judgment follows.

### FINAL JUDGMENT

AND NOW, this 16th day of July 1992, upon consideration of the motion for summary judgment of defendant Diagnostek, Inc. ("Diagnostek") on both counts of the complaint (Document No. 6), the response of plaintiff William A. Murray ("Murray") thereto, and the reply of the defendant, as well as the pleadings, answers to interrogatories, and affidavits of record, and for the reasons stated in the attached memorandum, having determined based upon the record in this case that there is no genuine issue of material fact and that Diagnostek is entitled to judgment in its favor on both counts of the

1992 U.S. Dist. LEXIS 10299, *22

complaint as a matter of law, it is hereby **ORDERED** that the motion of Diagnostek is **GRANTED.**

**JUDGMENT IS HEREBY ENTERED** in favor of Diagnostek, Inc. and against William A. Murray on each

count of the complaint.

**LOWELL A. REED, JR., [*23]   J.**

# EXHIBIT H

8 of 8 DOCUMENTS

LISA SANDERS, Plaintiff, v. CHARLES B. WANG, SANJAY KUMAR, RUSSELL
M. ARTZT, WILLEM F.P. de VOGEL, RICHARD A. GRASSO, IRVING
GOLDSTEIN and SHIRLEY STRUM KENNY, Defendants, and COMPUTER
ASSOCIATES INTERNATIONAL, INC., Nominal Defendant. EDWARD BICKEL,
derivatively on behalf of COMPUTER ASSOCIATES INTERNATIONAL, INC.,
Plaintiff, v. CHARLES B. WANG, SANJAY KUMAR, RUSSELL M. ARTZT,
WILLEM F.P. de VOGEL, IRVING GOLDSTEIN, and RICHARD A. GRASSO,
Defendants, and COMPUTER ASSOCIATES INTERNATIONAL, INC., Nominal
Defendant.

C.A. No. 16640

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1999 Del. Ch. LEXIS 203; 24 Employee Benefits Cas. (BNA) 1924*

August 4, 1999, Submitted
November 8, 1999, Decided

SUBSEQUENT HISTORY: As Corrected November 10, 1999.

COUNSEL: [*1] Pamela S. Tikellis, James C. Strum and Robert J. Kriner of Chimicles & Tikellis, Wilmington, DE. OF COUNSEL: Scott Fisher of Garwin, Bonzaft, Gerstein & Fisher, New York, New York, Attorneys for Plaintiff Edward Bickel.

Norman M. Monhait of Rosenthal, Monhait, Gross & Goddess, Wilmington, Delaware. OF COUNSEL: Martin P. Unger of Tenzer Greenblatt; New York, New York; George H. Linck, New York, New York. Attorneys for Plaintiff Lisa Sanders.

Alan J. Stone and Jessica Zeldin of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware. OF COUNSEL; Moses Silverman and Jonathan J. Freedman of Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York. Attorneys for Defendants Richard A. Grasso, Irving Goldstein, Shirley Strum Kenny, Willem F.P. de Vogel and Computer Associates International, Inc.

Wayne N. Elliott and James L. Holzman, Prickett, Jones, Elliott, Wilmington, Delaware. OF COUNSEL; David E. Nachman and Caroline S. Press, Solomon, Zauderer, Ellenhorn, Frischer & Sharp, New York, New York.

Attorneys for Defendants Charles B. Wang, Sanjay Kumar and Russell M. Artzt.

JUDGES: Myron T. Steele, Vice Chancellor.

OPINION BY: Myron T. Steele

OPINION:

### MEMORANDUM OPINION

STEELE, [*2] V.C.

I. Issues Presented

1. Can a board of directors rely upon its purported discretion to administer a shareholder-approved "key employee stock ownership plan" to grant key executives more shares than expressly authorized by the plain language of the KESOP? No.

Where an employee stock ownership plan contains a clear, unambiguous limitation on the total number of shares authorized, the board of directors may not exceed this limit based upon a general provision that does nothing more than grant them discretion to administer the plan.

2. By establishing a prima facie case that a board of directors awarded at least 9.5 million more shares than actually authorized by a stock plan, do the plaintiffs state claims for gross negligence, waste of corporate assets and breach of fiduciary duty? Yes.

An allegation that a board of directors' awarded at least 9.5 million more shares than a stock plan expressly authorized sufficiently establishes claims for gross negligence, waste of corporate assets and a breach of fiduciary duty.

> 3. Where the pleadings establish with certainty that a stock plan did not authorize defendant directors to award the amount of shares they undisputedly [*3] did award, is it appropriate that plaintiffs be granted judgment on the pleadings for their claims against the directors for gross negligence, waste, and breach of the fiduciary duties of loyalty and care, when the requested relief includes: (a) rescission of the unauthorized share award; (b) imposition of a constructive trust over persons receiving any benefit flowing from that award; (c) damages against the directors; and, (d) fees and costs? Not entirely.

When the pleadings can establish with certainty only that a stock plan did not authorize defendant directors to award the amount of shares that they actually awarded, judgment on the pleadings is appropriate only to the extent that the plaintiff is entitled to equitable relief as a result of the unauthorized award, whether by (1) rescission of the unauthorized award; and, (2) a constructive trust over any person receiving benefits resulting from that award. With the record very limited at the pleadings stage and the defendants asserting a triable affirmative defense to the damage claims, any judgment on the plaintiffs' claims seeking compensatory damages would be premature.

## II. Background

### 1. The Basic Allegation [*4]

The plaintiffs, shareholders of Computer Associates International, Inc. ("CA"), sue CA's seven directors for

gross negligence, corporate waste and for breach of their fiduciary duties by granting three of the board members, who are also the company's top executives, n1 20.25 million shares of CA common stock under the 1995 Key Employee Stock Ownership Plan ("KESOP" or the "plan"). The plaintiffs' allege that this share grant to the "Participants" far exceeded the number authorized by the KESOP and assert various claims against the directors flowing from this grant. Though the two plaintiffs' positions vary over exactly how many of the granted shares are excess, they both agree that the board granted excess shares which damaged the corporation.

> n1 The recipients of these grants are defendants *Charles B. Wang.* Chairman of the Board and CEO of CA; *Sanjay Kumar,* the President and COO of CA; and *Russell P. Artzt,* the Executive Vice President-Research and Development for CA and CA's Senior Development Officer. All three individuals are also directors of CA.

[*5]

### 2. The KESOP and the Challenged Share Grants

The CA board adopted the KESOP on May 25, 1995. The shareholders approved the Plan at an Annual Meeting held in August, 1995. Its terms are quite straightforward. The Plan is administered by the Compensation Committee of the board, which "shall be vested with all discretion and authority as it deems necessary or appropriate to administer the Plan and to interpret the provisions of the Plan." n2 An express provision authorizes the Compensation Committee "to grant up to 6,000,000 shares of Common Stock to the Participants." n3 This is to be done by granting 2 million shares, outright, upon the Plan's adoption n4 and then by additional grants of up to 4 million total shares, contingent on CA's common stock reaching certain specified price targets and maintaining those target prices for at least 30 trading days on the New York Stock Exchange. n5 In deciding whether these targets have been met the Committee may adjust the stock price to account for any stock splits that occur after the KESOP was adopted. n6 However, the plan does not permit the Committee to adjust the number of shares granted to account for stock splits or any other [*6] recapitalization transactions. In addition to share price performance

targets determining how many shares may be granted, similar performance targets determine when the shares will actually vest. In particular, § 4.4 permits "Early Vesting" of all of the shares granted (the six million total) if the CA share price trades at $ 180 or more for at least 60 trading days.

> n2 § 6.1 of the KESOP (The KESOP is Exhibit B of the Complaint).
>
> n3 The Committee is authorized to grant up to 6,000,000 shares of Common Stock to the Participants." § 3.1 of the KESOP.
>
> n4 § 3.2 of the KESOP.
>
> n5 *Id.* at § 3.3 *Additional Grants.*
>
> n6 *Id.* at § 3.2.

On May 21, 1998, the Compensation Committee certified that the price of CA common stock had traded for at least 60 trading days in a twelve-month period at $ 180 or better (the actual price was $ 53.33 per share, which is equivalent to $ 180, adjusted for the stock splits) which triggered the § 4.4 "Early Vesting" provision. Before this [*7] event, in August 1995, June 1996, and November 1997, CA gave all holders of Common Stock one share for every two shares held, amounting to three separate "three for two" stock splits. The Compensation Committee granted the Participants 20.25 million total shares total, which is equivalent to 6 million shares adjusted for these three stock splits.

### III. Contentions

#### 1. Plaintiffs

There are two plaintiffs. The first, Lisa Sanders, filed this action on September 15, 1998. She amended her Complaint on October 26, 1998. The second plaintiff, Edward Bickel, intervened in this action with a Complaint in Intervention on November 19, 1998.

Sanders alleges the Committee violated the KESOP by exceeding the limit on additional share grants (four million) in order to adjust for the three stock splits. However, Sanders does not take issue with the initial two million share grant presumably in the belief they were

awarded before the stock splits happened. Thus, Sanders believes that the defendant board should have awarded a total of 10.75 million shares (6 million under the plan + 4.75 million in dividends on the initial two million share grant) and that they awarded 9.5 million [*8] shares more than authorized. Sanders charges the board with waste of CA's assets, gross negligence and breach of the directors' fiduciary duties of loyalty and care. Sanders seeks: (1) cancellation or rescission of the 9.5 million share award; (2) imposition of a constructive trust over the Participant-directors and an accounting of the benefits received from these shares; (3) damages; and, (4) fees and costs.

Bickel takes a harder line, arguing that the KESOP authorizes only six million shares total, and does not permit any adjustment for stock splits, nor any dividends on *any* of the shares. He argues that granting any shares above this limit violates the KESOP. Thus, Bickel believes that the Committee granted 14.25 million shares in excess.

Bickel charges the entire CA board, individually and/or jointly, with waste of corporate assets, mismanagement gross negligence, and breach of the fiduciary duties of loyalty, due care, and "good faith." Bickel seeks: (1) rescission of the unlawfully awarded shares (14.25 million); and, (2) imposition of a constructive trust over defendants Wang, Kumar and Artzt for any benefits flowing from these shares; and, (3) an injunction against the [*9] voting rights of these shares against defendants Wang, Kumar and Artzt; and, (4) damages from all directors individually; and, (5) fees and costs.

In the present motions plaintiffs ask for judgment on the pleadings or, alternatively, for summary judgment on the basis that they have established on the undisputed facts that the CA board exceeded its authority which alone warrants judgment for the plaintiffs on all their claims.

#### 2. Defendants

The defendant directors say that:

> 1. Demand requirements have not been met by the plaintiffs, because
>
> > a) a majority of the directors are disinterested

Page 4

and independent, and

> b) the share grant resulted from a valid exercise of business judgment;

2. A disinterested Compensation Committee awarded the 20.25 million shares within its discretion to administer the Plan under § 6.2. The Committee believes the Plan gave it authority to adjust the number of shares granted to account for the stock splits that happened after the shareholders approved the Plan.

3. Because plaintiffs disagree over how many excess shares were awarded, their allegations are arbitrary, confirming the defendants' argument that their decision [*10] resulted from the valid exercise of business judgment;

4. The terms of the Plan, specifically that all 6 million shares vest when the share price stays at $ 180 for at least 60 days, demonstrate the Plan's intent to award the Participants 3.75% equity in the company, or about $ 1.08 billion worth of shares (6 million x $ 180);

5. The strict reading of the share limitation provision frustrates the purpose of the Plan and penalizes its recipients. In particular, defendants say that plaintiff's strict reading does not make economic sense because if, instead of stock splits, there had been a "reverse stock split" or a share consolidation, then the defendant Participants would get twice as much equity, or over $ 2 billion. Defendants say that if this were actually the case that the plaintiffs would then not support their own proposition that a strict reading is required, and would in fact argue just the opposite.

6. In any event, exculpatory provisions in the CA charter and in § 7.3 of the Plan promulgated pursuant to § 102(b)7 of the DGCA, shield the directors from personal liability for money damages.

On these various grounds, the defendants move both for dismissal for failure [*11] to state claims upon which relief can be granted and for judgment on the pleadings.

## IV. Discussion

*1. The Threshold Question of the Demand Requirement For A Derivative Action*

The defendants argue that the plaintiffs have not met the demand requirements of Delaware law and have not pleaded facts to excuse them from this requirement. Defendants believe this precludes the plaintiffs from pursuing these derivative claims.

When a shareholder of a corporation discovers acts which somehow injure the corporation, Delaware law requires that the shareholder "demand" that the corporation's board of directors examine the injurious acts and pursue legal redress. This is known as the "demand requirement," and its underlying policy is to curb a myriad of individual shareholders from bringing potentially frivolous lawsuits "on behalf of the corporation," which may tie up the corporation's governors in constant litigation and diminish the board's authority to govern the affairs of the corporation. These suits are commonly known as "strike suits." If this Court had to entertain these lawsuits without a threshold barrier like the demand requirement, then the role of the board of [*12] directors as the shareholders' chosen arbiter of the corporation's interests, legal and otherwise, could be constantly frustrated.

There are cases, however, where the *board itself* acts causing shareholder complaint. In these cases a question is rightfully raised over whether the board will pursue these claims with 100% allegiance to the corporation, since doing so may require that the board sue *itself* on behalf of the corporation. So in order to balance the desire to discourage strike suits with the need to hold boards of directors accountable, Delaware law provides a basic test to determine whether a plaintiff may bypass the board of directors to pursue the claims for the corporation.

Under this test a plaintiff may be excused from demanding that the directors sue themselves if that plaintiff can demonstrate, through particularized factual allegations, a reasonable doubt that: (1) the board is disinterested and independent; or, (2) the acts complained of were the product of the board's valid exercise of business judgment. n7 Once this showing of "demand futility" is made, by fulfilling at least one of the elements of the test, the plaintiff may file a "derivative" action, [*13] under Court of Chancery Rule 23.1.

> n7 *Aronson v. Lewis, Del. Supr., 473 A.2d 805 (1984).*

Here, plaintiffs did not make demand on the CA board and have argued that making demand would be futile. Plaintiffs first say that enough of the CA board is self-interested to make demand futile, since three of the seven directors are recipients of the allegedly excessive share awards, and three of the remaining four directors are responsible for actually making the allegedly wasteful awards. Second, plaintiffs argue that they have alleged particular facts raising at least a reasonable doubt that the transaction awarding the excess shares was a valid exercise of the board's business judgment by alleging that the share awards far exceed a clear limitation contained in the KESOP.

I need not address whether the CA board is disinterested or independent because I find that the facts alleged raise a reasonable doubt that the share transaction resulted from a valid exercise of business judgment. As a minimum, [*14] the plaintiffs have sufficiently alleged facts which, taken as true, show that the CA board violated an express KESOP provision limiting the number of shares they were authorized to award. As I discuss in detail later, the provision is not ambiguous and it is clear from the uncontroverted facts that the number of shares the board actually awarded exceeded its limitation of six million shares. Thus the facts raise doubt that the board's actions resulted from a valid exercise of business judgment.

The defendants raise the issue that the plaintiffs have differing allegations over exactly how many of the shares granted were excess. Defendants say that since the plaintiffs' own allegations here are arguably "arbitrary," they can not lead to reasonable doubt that the awards were an exercise of valid business judgment. I disagree with this argument. In these circumstances, the issue of exactly how many of the awarded shares were excess is secondary to and severable from the primary issue of whether the board exceeded the shareholders' grant of express authority. This ancillary issue of the appropriate number of shares only comes into play after a determination that at least some portion [*15] of the 20.25 million share grant exceeded the board's authority. Though the plaintiffs' allegations may differ on this precise point, each plaintiff's core allegation that the board exceeded its authority is still the same.

For immediate purposes here, I find the plaintiffs have sufficiently pleaded facts which cast doubt that the board's alleged acts could be the result of a valid exercise

of business judgment. Therefore, demand is excused.

### 2. Judgment on the Pleadings/Motion to Dismiss

Plaintiffs and defendants each move for judgment on the pleadings. Judgment on the pleadings is appropriate where under any set of facts pleaded and drawing all inferences from these facts in favor of the nonmoving party, the moving party would still be entitled to judgment as a matter of law. n8 This substantive standard is the same as that of summary judgment, but without the need to look beyond the pleadings, and "is the proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact . . . a determination of whether a contract is ambiguous is a question for the court to resolve as a matter of law." n9

> n8 *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, Del. Supr., 624 A.2d 1199 (1993).*

[*16]

> n9 *Cantera v. Marriott Senior Living Services, Inc., 1999 Del. Ch. LEXIS 26,* *9, Del. Ch. C.A. No. 16498, Lamb, V.C., (citing *Pellaton v. Bank of New York, Del. Supr., 592 A.2d 473, 478 (1991)). See also SBC Interactive, Inc. v. Corporate Media Partners, Del. Supr., 714 A.2d 758, 761 (1998).*

Similarly, a motion to dismiss for failure to state a claim upon which relief may be granted, under Court of Chancery Rule 12(b)6 requires that under any possible set of facts consistent with the facts alleged in the complaint the plaintiff would still not be entitled to judgment. n10 Any conclusory allegations that lack factual basis in the complaint will not survive a motion to dismiss. n11 Further, I must accept all well-pleaded facts as true and construe any inferences from these facts in the light most favorable to the non-moving party. n12

> N10 *Lewis v. Austen, 1999 Del. Ch. LEXIS 125,* *12, Del. Ch. C.A. No. 12937, Jacobs, V.C. (June 2, 1999) ("a plaintiff must allege facts that, taken as true,

Case 1:06-cv-00517-GMS-LPS   Document 14   Filed 11/09/2006   Page 63 of 74

establish each and every element of a
claim upon which relief could be
granted.").

[*17]

n11 *In re The Walt Disney Company
Shareholders' Litigation, Del. Ch., 731
A.2d 342, 353 (1998).*

n12 *O'Reilly v. Transworld
Healthcare, Inc., 745 A.2d 902, 922,*
Steele, V.C. (August 20, 1999).

I find that under the undisputed facts in this case, no
matter how favorably I draw factual inferences in favor
of the defendants, that plaintiffs have established a prima
facie case that the CA board exceeded its authority. The
CA board can not justify its clear violation of the express
terms of the KESOP nor can it justify the unauthorized
share awards under any other legal authority.

The plaintiffs are entitled to a limited judgment on
the contract interpretation issue of-law raised in the
pleadings and, as a result, to equitable relief. However,
this case does not warrant any judgment or relief, at this
stage, with respect to the plaintiffs money damage claims
against the directors. For the reasons explained below,
correspondingly the defendants' motions for judgment on
the pleadings and/or to dismiss the complaint are denied.

A. Standards for [*18] Contract Interpretation

Contract interpretation starts with the terms of the
contract, If the terms are plain on their face, then the
analysis stops there. n13 The "primary goal of contract
interpretation is to satisfy the reasonable expectations of
the parties at the time they entered into the contract," a
process which "often requires a court to engage in an
analysis of the intent or shared understanding of the
panics" at the time of the contract. n14 Under the plain
meaning rule of contract construction, if a contract is
"clear on its face, the Court should rely solely on the
clear literal meaning of the words." n15

n13 *Eagle Indus., Inc. v. DeVilbiss
Health Care, Inc., Del. Supr., 702 A.2d
1228, 1232 (1997).*

n14 *Demetree v. Commonwealth
Trust Co., 1996 Del. Ch. LEXIS 112, *11,*
Del. Ch., C.A. No. 14354, Allen, C., (Aug.
27, 1996).

n15 *Id.*

----------------End Footnotes---
--------------

One begins to analyze the terms by determining
whether provisions are "reasonably subject to more than
one interpretation." n16 Toward that [*19] end, contract
language "is not rendered ambiguous simply because the
parties in litigation differ concerning its meaning." n17
Nor is it rendered ambiguous simply because the parties
"do not agree upon its proper construction." n18 A
contract is ambiguous "only when the provisions in
controversy are reasonably or fairly susceptible of
different interpretations or may have two or more
different meanings." n19

n16 *Supermex Trading Co. v.
Strategic Solutions Group, Inc., 1998 Del.
Ch. LEXIS 66, *7,* Del. Ch., C.A. No.
16183, Lamb, V.C., (May 1, 1998).

n17 *City Investing Co. Liquidating
Trust v. Continental Cas. Co., Del.Supr.,
624 A.2d 1191, 1198 (1993).
Rhone-Poulenc Basic Chems. Co. v.
American Motorists Ins. Co., Del.Supr.,
616 A.2d 1192, 1196 (1992).*

n18 *Rhone-Poulenc, Del.Supr., 616
A.2d at 1196;* accord *City Investing,
Del.Supr., 624 A.2d at 1198.* See Wright,
S 2730.1, at 65 ("The mere assertion that
ambiguity or divergent intent exists will
not prevent summary judgment from being
entered.").

n19 *MHM/LLC, Inc. v. Horizon
Mental Health Mgmt, Inc., 1996 Del. Ch.
LEXIS 129, *5,* Del. Ch., C.A. No. 14465,
Steele, V.C., (Oct. 3, 1996) ("To be
ambiguous, the provision must be capable
of being read reasonably to support the
different positions."), *aff'd, Del.Supr., 694
A.2d 844 (1997).*

- - - - - - - - - - - - - - - -End Footnotes- - -
- - - - - - - - - - - - - -

[*20]

Delaware courts adhere to the "objective" theory of contacts. A contract's "construction should be that which would be understood by an objective reasonable third party." n20

> Where the parties have entered into an unambiguous integrated written contact, the contract[']s construction should be that which would be understood by an objective reasonable third party. . . . Inquiry into the subjective unexpressed intent or understanding of the individual parties [to the contract] is neither necessary nor appropriate where words of the contract are sufficiently clear to prevent reasonable persons from disagreeing as to their meaning. n21

The standards of contact interpretation here are "black letter law" and fully comport with New York contract law, under which the parties agree this Plan arises.

> n20 *Supermex,* Del. Ch., slip op. at 7 (quoting *Demetree v. Commonwealth Trust Co., 1996 Del. Ch. LEXIS 112,* *11, Del. Ch., C.A. No. 14354, Allen, C., (Aug. 27, 1996)).

> n21 *Demetree v. Commonwealth Trust Co., 1996 Del. Ch. LEXIS 112,* *12, Del. Ch., C.A. No. 14354. See *also Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., Del. Supr., 702 A.2d 1228, 1232 (1997)* ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.").

[*21]

**B. Interpreting this KESOP**

The Plan here is simply a contract between CA shareholders (which includes plaintiffs), on one hand, and the defendant board of directors (which includes the management Participants), on the other. One party to the contract (plaintiffs) claims that the other party (defendants, some of whom are beneficiaries, some of whom are fiduciaries under the contract) committed a single act (awarding excess shares) in clear violation of a specific provision of the contact (the share ceiling in § 3.1). The accused party answers this claim saying that another provision in the contract (the "Rules and Interpretation" provision in § 6.2) authorized them to act contrary to the limitation in the first provision and that their actions carried out the implied intent of the contract as well as its specific intent declared under § 1.1.

In analyzing the terms of the Plan, I find they are not susceptible to varying interpretations under any reasonable analysis that could lead to the conclusion that the board had the authority to award excess shares over the limitation found in § 3.1. When the language is "clear and unequivocal, a party will be bound by its clear [*22] meaning." n22 Section 3.1 could not be more clear in limiting the total share grant under the Plan. While § 6.2 gives the board authority to interpret and administer the Plan, I can not find that the board could reasonably ignore a clear six million share limit in order to authorize an award of 20.25 million shares.

> n22 *Abb Flakt, Inc. v. National Union Fire Insurance Company of Pittsburgh, P.A., Del. Supr., 731 A.2d 811, 816,* Walsh, J., (1999) (citations omitted).

Further, while § 3.3 explicitly permits any stock splits to be reflected when calculating performance targets, *no other provisions or language* explicitly support the proposition that the § 3.1 limit may be contravened or unilaterally adjusted for these same stock splits. The presence of this § 3.3 authorization and the corresponding and conspicuous absence of a provision authorizing alteration of § 3.1 reinforces my conclusion that the Plan's clear language provided *no power* to alter the limitations [*23] in § 3.1 based on any stock split criteria.

Finally, § 1.1 does not state objectives that, read along with the board's § 6.2 discretion, justify ignoring

the § 3.1 share ceiling in order to achieve these objectives. The basic premise of contract law that "in upholding the intention of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein" requires that I give effect to § 3.1, particularly where doing so does not conflict with the plan's other provisions. n23 Those who drafted § 1.1 also wrote § 3. It is simply illogical to say that § 3.1 is inconsistent with the Plan's statement of intent found in § 1.1. I must conclude that § 3.1 and its plain meaning is, in fact, integral to understanding the Plan's intent. It is as much a part of understanding how the drafters and the approving shareholders intended the Plan to operate and the purpose of this Plan as any other particular provision.

> n23 *E.I. du Pont de Nemours & Co. v. Shell Oil Co., Del. Supr., 498 A.2d 1108, 1113 (1985)*. The meaning of contract provisions should be "interpreted using standard rules of contract interpretation which require a court to determine, from the language of the contract, the intent of the parties. In discerning the intent of the parties, the [contract] should be read as a whole and, if possible, interpreted to reconcile all of the provisions of the document." *Kaiser Aluminum Corp. v. Matheson, Del. Supr., 681 A.2d 392, 395 (1996)*.

[*24]

As a practical matter, my rough calculations indicate that even under the strictest reading of the Plan, the three Participants will together still receive nearly $ 320 million. $ 320 million is no mere bagatelle. I find it remarkable that defendants would have me believe that CA's shareholders would consider that $ 320 million for three individuals failed to "encourage, recognize, and reward sustained outstanding individual performance by certain key employees." n24

n24 § 1.1 of the KESOP.

Thus, given, (1) a clear, unambiguous contract provision; (2) two other contract provisions subject to interpretation; (3) no facial inconsistency between the three provisions; (4) a single act that clearly violates the unambiguous provision; and, (5) the fact that the sole justification for the act complained of lies in the two provisions that are subject to interpretation, I find that the relevant law weighs against the use of an interpretable provision to materially disregard another provision that could not be clearer [*25] on its face. Applying this analysis to the facts, I find that the Committee awarded the 20.25 million shares in clear violation of § 3.1, and without any legal justification under the Plan.

The defendants make no attempt to find support for their actions under other sources of director power: the CA corporate charter, any CA by-laws, the Delaware General Corporation Act, or the Delaware corporate common law. It is appropriate, nonetheless, to address several of their specific justifications for their view of § 3.1.

### (1) Murky "Intent" to Award 3.75% Equity or $ 1.08 Billion in Shares

The defendants justify their award of more shares than expressly permitted in § 3.1 by arguing that it carries out the "fundamental and unambiguous" intent to award the Participants 3.75% of the company's equity or about $ 1.08 billion worth of stock, once the relevant performance goals are reached. n25 I find the defendants' argument that their construction of the Plan is "unambiguous" to be unsupported by the reality of the Plan's clear terms and, more importantly, by the fact that their result can only be reached by patently violating an express term of the Plan.

> n25 Defendants' Reply Brief in Support of Defendants' Motions and In Opposition to Both Plaintiffs' Motions at 1.

[*26]

The defendants admit that they never explained this "unambiguous" intent to the shareholders when seeking approval for the Plan. Further, nothing in the documents I have reviewed shows that this was the case, though it seems it would have been simple enough for the Plan's proponents to describe this "fundamental" feature of the Plan, either in the text of the Plan itself, or, at minimum, in the proxy materials. If the defendant board members believed that at the time they formulated the Plan that its clear and fundamental intent was to award 3.75%

equity/$ 1.08 billion in shares, they have not adequately explained why they did not write a Plan that clearly stated and expressly provided for this result.

Instead, defendants answer by citing authority for the proposition that they did not need to include such a "fundamental and unambiguous" feature of the Plan in clear language because not every single detail of a plan must be spelled out to shareholders. They argue that shareholders should be able to infer this unstated intent by simply reading the Plan's terms together. They say shareholders are capable of making math calculations that arrive at the above result, without needing [*27] it explicitly stated. However, the authorities cited were cases in which the information that was not explicitly conveyed was so obvious that those courts rejected the overly-literal reading the parties had given to the language (such as construing the phrase "an option" as limiting the awardee to one, single option).

Defendants' argument that shareholders could do simple math to arrive at their result takes an over-simplistic, narrow, and self-serving view of what shareholders might conclude from reading the Plan. Many shareholders might have taken at face value the clear provision limiting the award total to six million shares, particularly in the absence of any explicit modifiers accounting for the share price at the time of the award or at the time of intervening stock splits. In making this argument, defendants give absolutely no credence to the possibility that many shareholders (just like plaintiff shareholders here assert) might simply have read the Plan at face value without gleaning the purported underlying, unstated, "fundamental" economic intent. A disguised intent, not immediately obvious in the language of the contract and requiring a tortured construction of its terms, [*28] can not overcome plain, unambiguous language.

I find the Plan's language straightforward enough that only the plaintiffs' reading can be plausible, and the defendants' reading, at best, distorts the Plan's plain language. The defendants' assertion that the express six million share limit means nothing if it does not result in the Participants getting $ 1.08 billion worth of stock defies any interpretation of the Plan consistent with the common meaning of its terms and the view of any reasonable person in the position of either party.

Further, since the board, as the corporate governing body, considered and approved the Plan long before it reached the shareholders, I will not give them the

after-the-fact benefit of their own failure to make their view of the Plan's intent plain to the shareholders. If the board truly intended the shareholders to know that the Plan could result in an award of as much as 3.75% of the equity of the company or $ 1.08 billion in shares regardless of how many shares needed to be awarded to reach this result, I find it remarkable that neither the board's presentation of the plan to shareholders, the unambiguous terms of the plan, nor any reasonable reading [*29] of the Plan as a whole makes that intent clear.

> (2) Section 6.2 Does Not Give Defendants Broad Discretion to Interpret and Administer the Plan so they May Adjust the § 3.1 Ceiling For Stock Splits

The defendants argue that the purpose of the Plan, stated in § 1.1, and the shareholders' intent in enacting the Plan are both thwarted by a strict reading of the Plan's terms. They say that § 6.2 gives the Compensation Committee broad authority to interpret and administer the Plan to carry out its objectives, and allows them to disregard an express provision where that provision is inconsistent with the Plan's objectives. Thus they argue that they may adjust the § 3.1 ceiling to incorporate the stock splits into the final award under the Plan.

I conclude that § 6.2 is not so explicit that it can be used as a source of power for the board to alter the terms of the Plan itself. Interpreting the Plan in order to administer it properly is one thing, fundamentally altering its substantive terms is quite another. More than a loosely worded clause implying flexibility to carry out the logistics of administration must be present. Though I do not think it necessary to look [*30] beyond the four corners of the Plan to find that § 6.2 does not empower the board to alter the Plan's terms, I nevertheless find it quite illuminating that other CA stock plans instituted by this very board contain clear, express provisions that empower the board to adjust the grants of shares to account for stock splits. n26

> n26 See Exhs. C, D, E, F of the Complaint.

One must recognize that the board had every opportunity and the ability to insert a similar provision in this KESOP. Past practice showed that where the board

wanted such authority and the shareholders have been asked to grant it, that after being fully informed of the consequences, they have approved similar provisions, Further, the board's fiduciary role as arbiter of the processes by which all of these plans came about only reinforces my view that they must be held to the plain, unambiguous limitation found in § 3.1. I can not accept that either the board or the shareholders believed that the six million share ceiling, which is literally [*31] the first substantive clause of the Plan, is superfluous and can be ignored by an exercise of board discretion. The board's role, at most, under § 6.2 is ministerial in nature and does not permit them to alter materially the numerical limit (the share ceiling). Section 6.2 can not justify altering § 3.1 under any reasonable interpretation of the Plan, particularly given the existence of other plans that show the board and shareholders knew how to authorize this type of material alteration when they so desired.

**C. Defendants' Motion to Dismiss**

For a waste claim to survive a motion to dismiss, the plaintiff must allege facts sufficient to show that the corporation received no consideration for the transferred asset. The standard is stringent and requires that no person of ordinary business judgment would conclude that the deal was fair to the corporation. It is my view that the alleged acts, drawing all inferences in plaintiffs' favor raise sufficient question about the appropriateness of the share grants to state a claim for breach of fiduciary duty and for this Court to deny the defendants' motion to dismiss. Decidedly, the characterization of the claim as one for "waste" [*32] or for unjust enrichment can not be the focus of analysis. Having concluded as a matter of law that the Board exceeded its authority, the alleged acts clearly call into question whether the transaction as consummated could have benefited CA and whether the breach of fiduciary duty caused corporate officers to be unjustly enriched.

> It is, of course, fundamental that a fiduciary who breaches his duty is liable for *any loss* suffered by the beneficiary of his trust . . . [and] any profit made through the breach of trust may be disgorged through the device of constructive trust. n27

n27 *Thorpe v. Cerbco, 1993 Del. Ch.*

*LEXIS 257,* *40, Del. Ch., C.A. No. 11713, Allen, C. (Oct. 29, 1993), *quoted in* DONALD J. WOLFE & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 12-7(b) (1998).

It seems to me that just as in the corporate opportunity context, a share grant in excess of that authorized by a KESOP calls the mechanism of the constructive trust into play as an effective [*33] remedial measure. n28 This case presents an interesting but complicating twist in that certain management executives, who also served in a fiduciary capacity, received a benefit wrongfully and unfairly conferred upon them by directors who also served as fiduciaries but who did not receive the benefit. At this stage of the proceedings, it is clear that plaintiffs are entitled to judgment on the pleadings that the directors wrongfully authorized the award and that the director executives who received the award must disgorge the benefit received in order to avoid being unjustly enriched.

> n28 *See Guth v. Loft, Inc., Del. Supr., 23 Del. Ch. 255, 5 A.2d 503, 510 (1939).*

What remains unclear, subject to further proof and incapable of resolution at this stage of the proceedings, is the nature of the breach of fiduciary duty giving rise to the imposition of a constructive trust in order to redress the unjust enrichment. The claims for money damages relating back to the date of approval or issuance of [*34] the unfair share grants implicates the fundamental nature of the breach of fiduciary duty giving rise to the imposition of a constructive trust. A constructive trustee (here, the management executives/directors who received the improper share grants) may face personal liability for monetary damages if they are necessary to make the shareholders whole. The directors authorizing the share grants face damage claims, yet to be proved, for which they may be liable or from which, depending upon the proof of the nature of their conduct) they may be exculpated.

As stated above, I have only ruled as a matter of law that the board exceeded its authority. I draw no conclusion whether these acts were breaches of the duty

of care or duty of loyalty or whether they resulted from negligent or grossly negligent conduct. At this stage, I can only conclude that the plaintiffs have sufficiently stated their claims.

### D. Exculpatory Provisions Shielding the Directors

The defendants invoke exculpatory provisions from the CA corporate charter and § 7.3 of the KESOP, promulgated pursuant to § 102(b)7 of the DGCA, to shield them from personal liability for any damage claims brought against them [*35] for violation of their duty of care. n29 The Delaware Supreme Court's decision in *Emerald Partners v. Berlin* instructs this Court that the use of exculpatory provisions to shield fiduciaries from personal liability presents an affirmative defense not amenable to pre-trial disposition. n30 However, where the *only* alleged acts are breaches of the duty of care, then this Court may consider the defense for the purpose of pre-trial disposition. n31 Because the nature of the defendants' breach of fiduciary duty remains unclear at this time, I may not now properly consider exculpatory provisions. The defendants will have the opportunity to present their affirmative defense as the case progresses. At this stage of the proceedings, I can not conclude as a matter of law that the Board acted in good faith and that their actions constituted no more than mere carelessness.

> n29 *"No Individual Liability.* No member of the Committee or the Board, or any officer of the Company, shall be liable for any determination, decision, or action made in good faith with respect to the Plan or any award under the Plan." § 7.3 of the KESOP.

[*36]

> n30 *Emerald Partners v. Berlin, Del. Supr., 726 A.2d 1215, 1223,* Walsh, J., (1999).

> n31 *Id.*

### 3. Only a Limited Judgment Is Possible At This Stage

Since at this stage it is only clear to me as a matter of

law that the Plan does not authorize the defendants to award *20.25* million shares, I am only able to enter a limited order granting partial judgment on the pleadings. Sanders alleges an improper award of 9.5 million shares, while Bickel alleges an improper award of 14.25 million shares, As I understand the Plan, the share grants take place in two stages: first, an initial 2 million share grant occurs immediately upon the Plan's adoption, and second, the board may award up to 4 million shares in "Additional Grants," based on share price performance.

It is clear from this that when the shareholders' approved the Plan in August 1995 the Plan *immediately* granted 2 million shares to the Participants. Based on this, it is my opinion that any dividends on CA common stock after this date should rightfully accrue to these awarded shares, [*37] even though these shares might not have been vested at the time granted. I believe this arrangement is analogous to an escrow, by which funds are held in an interest bearing account, but not fully accessible to the recipient until a specified condition occurs. Even though the recipient can not access the funds prior to that condition being met, they still receive the benefit of any interest that accrues on the funds in the meantime. In short, what would be the point of "granting" two million shares to the Participants if this "conditional ownership" denies them any of the additional pecuniary benefits flowing from these shares?

Therefore, the 4.75 million shares awarded after the Plan's adoption as dividends on the initial grant are not "Additional Grants" under the Plan; and, thus, do not violate the 4 million share limit on additional grants. These 4.75 million shares are simply stock dividends based upon shares *already properly granted.*

Conversely, the same is not true of the additional share grant of four million shares in May, 1998. This additional grant happened *after* these stock dividends were declared. As explained in the analysis of the contract terms above, there [*38] is no authority in the Plan for retroactive adjustments for share dividends/stock splits. Thus, the 9.5 million share grant that purportedly adjusted the 4 million share grant for the dividend/stock splits is invalid.

The board had authority to grant only 10.75 million of the 20.25 million shares granted. Therefore, I can enter judgment on the pleadings that plaintiffs are entitled to cancellation or rescission of the 9.5 million shares issued to the defendants Wang, Kumar, and Artzt. Further, they

are entitled to an order imposing a constructive trust in favor of CA over Wang, Kumar and Artzt and an accounting for any profits or benefits directly traceable to these 9.5 million shares.

### 4. Policy

No doubt the strict construction of the KESOP will suggest to some that this Court may not be aware of the tension that exists, particularly in growth-oriented (often technology) companies, between shareholder dilution that may result from aggressively expanding management stock compensation plans and the need to use those plans to attract and maintain skilled management That is, of course, not correct. Often growth companies must attract and retain the best managers by awarding [*39] these executives enhanced equity positions since high-end cash salaries and other compensation may not be economically feasible.

It is certainly the province of shareholders, by way of their franchise, to compensate their executives as lavishly as they deem necessary to ensure the growth and prosperity of their company. However, with the shareholder franchise quite dispersed, it is critical as a matter of governance policy that this Court ensure that these compensation plans when approved by shareholders are administered in strict accordance with the terms of the Plan and as the shareholders had the right to anticipate.

I am mindful of the understandable arguments put forth by defendants' counsel that strict adherence to the facial terms of the Plan here could have the effect of penalizing the CA executives despite the dividends resulting from their efforts to maximize shareholder value. However no court can blind itself to the reality that: (1) the limitation clause here plainly and unambiguously sets a ceiling for the share grants; and, (2) other shareholder approved CA plans explicitly authorize the board to adjust the grants, while this one plainly does not. The "penalized" [*40] executives sit on the CA

board which knew that it was free to present shareholders with a KESOP that included a recapitalization adjustment provision and free to seek shareholder approval of an amendment of the terms of the KESOP if they believed it to be deficient in achieving the Plan's objectives. They did neither. The history of this very company shows that a fully informed, rational shareholder electorate could be persuaded to grant the board broad explicit discretionary authority to adjust share grant ceilings if management achieved measurable economic benefits for the shareholders. Given the clear record here that no such shareholder endorsement sanctioned these particular grants, the results of these plaintiffs' challenge should be unsurprising.

### V. Conclusion

The defendants exceeded their authority under the KESOP by awarding 9.5 million excess shares to the Participants. The plaintiffs are granted partial judgment on the pleadings in that I order these shares returned to the corporation and a constructive trust imposed on the defendant Participants and an accounting rendered for any economic benefit derived from these shares.

The defendants properly transferred 4.75 [*41] million shares (outside of the Plan's six million share limit) to the Participants as stock dividends on shares that the defendants had already granted. As a result, I grant the defendants partial judgment on the pleadings.

The defendants' motion to dismiss plaintiffs' claims are denied.

All other motions of the parties are denied.

Plaintiffs' counsel are to submit an order, approved as to form, consistent with this Memorandum Opinion.

Myron T. Steele

Vice Chancellor

# EXHIBIT I

1 of 1 DOCUMENT

LEON SEGEN, derivatively on behalf of Intraware, Inc., Plaintiff, v. COMVEST
VENTURE PARTNERS, LP; COMVEST MANAGEMENT, LLC;
COMMONWEALTH ASSOCIATES MANAGEMENT COMPANY, INC.;
COMMONWEALTH ASSOCIATES, LP; RMC CAPITAL LLC; MICHAEL S.
FALK; ROBERT PRIDDY; TRAVIS L. PROVOW; KEITH ROSENBLOOM;
INTRAWARE INC., Defendants.

Civ. Action No. 04-822 JJF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2005 U.S. Dist. LEXIS 10661; Fed. Sec. L. Rep. (CCH) P93,271

June 2, 2005, Decided

**DISPOSITION:** [*1] Motion To Dismiss Complaint (D.I. 5) filed by ComVest Defendants and Motion To Dismiss (D.I. 8) filed by Priddy Defendants denied.

**COUNSEL:** Theodore J. Tacconelli, Esquire of FERRY, JOSEPH & PEARCE, P.A., Wilmington, Delaware; Of Counsel: Paul D. Wexler, Esquire of BRAGAR WEXLER EAGEL & MORGENSTERN, P.C., New York, New York; Glenn F. Ostrager, Esquire of OSTRAGER CHONG FLAHERTY & BROITMAN P.C., New York, New York, for Plaintiff.

Jeffrey L. Moyer, Esquire and Srinivas M. Raju, Esquire of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Of Counsel: Clifford Thau, Esquire, Steven Paradise, Esquire, and Sean Bukowski, Esquire of VINSON & ELKINS, LLP, New York, New York, for Defendants ComVest Venture Partners LP, ComVest Management LLC, Commonwealth Associates, LP, Michael S. Falk, Travis L. Provow, and Keith Rosenbloom.

Neal J. Levitsky, Esquire of FOX ROTHSCHILD, LLP, Wilmington, Delaware; Of Counsel: Robert N. Dokson, Esquire of ELLIS, FUNK, GOLDBERG, LABOVITZ & DOKSON, P.C., Atlanta, Georgia, for Defendants Robert Priddy and RMC Capital, LLC.

**JUDGES:** Joseph J. Farnan, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Joseph J. Farnan

**OPINION:**

## MEMORANDUM OPINION

**FARNAN, District** [*2] **Judge.**

Presently before the Court is a Motion To Dismiss The Complaint (D.I. 5) filed by Defendants ComVest Venture Partners, LP, ComVest Management, LLC, Commonwealth Associates Management Company, Inc., Commonwealth Associates LP, Michael S. Falk, Travis L. Provow, and Keith Rosenbloom ("the ComVest Defendants"), and a Motion To Dismiss (D.I. 8) filed by Defendants Robert Priddy and RMC Capital, LLC ("the Priddy Defendants"). Both motions rely upon the same grounds and arguments. (D.I. 9.) For the reasons discussed, the motions will be denied.

## BACKGROUND

On July 6, 2004, Plaintiff, Leon Segen, filed this lawsuit under Section 16(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), *15 U.S.C. § 78p.* Plaintiff claims to sue derivatively on behalf of Intraware, Inc. ("Intraware"). This action arises from allegations that Defendants, a *§ 13(d)* group, garnered short-swing profits disgorgeable to Intraware.

Section 16(b) of the Exchange Act provides that if a statutory insider purchases and sells, or sells and

purchases, shares of any equity security of an issuer within a period of less than six months, any profits arising from those transactions [*3] are recoverable by the issuer. A statutory insider is defined as an officer or director of the issuer or a greater than 10% holder of the issuer's securities. See *15 U.S.C. § 78p(b)*.

Pursuant to SEC *Rule 16a-1(a)(1)*, promulgated under the Exchange Act, where two or more persons "act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding or disposing of securities of an issuer" as set forth in *§ 13(d)(3) of the Exchange Act*, such persons are deemed a "group" for purposes of determining *§ 16(b)* liability. In making the group determination, the shares held by persons in such a group are aggregated to determine whether the group has a greater than 10% beneficial ownership in a registered class of equity securities of the issuing corporation. SEC *Rule 16a-1(a)(1)*. If the group is a greater than 10% beneficial owner, each group member is potentially subject to liability under *§ 16(b)*.

In his Complaint, Mr. Segen alleges that the ComVest Defendants and the Priddy Defendants are group members who acted for the purpose of acquiring, holding, or disposing of equity securities issued by Intraware. (D.I. 1, para. 15.) [*4]

Mr. Segen asserts the following facts. Mr. Falk, Mr. Priddy, and Mr. Rosenbloom were limited partners of ComVest Venture Partners, LP and the managers of ComVest Management, LLC. Commonwealth Associates Management Company wholly owned ComVest Managment, LLC. (D.I. 1, para. 4.) Mr. Priddy, Mr. Rosenbloom were directors and Mr. Falk was Chairman and principal stockholder of Commonwealth Associates Management Company. (D.I. 1, para. 5.)

Mr. Falk is the Chairman, CEO, and President of Commonwealth Associates, LP, and Mr. Provow is a partner and board member. Commonwealth Associates, LP is a limited partner of ComVest Venture Partners, LP. (D.I. 1, para. 6.)

Mr. Priddy is the Chairman and principal member of RMC Capital, LLC, a Georgia limited liability company whose pricipal business is investing in securities. (D.I. 1, para. 7.)

On April 2, 2001, ComVest Venture Partners, LP ("Comvest") and Mr. Priddy invested $ 2,000,000 and $

1,000,000, respectively, in a private placement by Intraware. (D.I. 1, para. 17.) ComVest purchased 200,000 shares of Intraware's Series B Convertible preferred stock and warrants to purchase 400,000 shares of Intraware common stock at an initial exercise price [*5] of $ 1.125 per share. Mr. Priddy purchased 100,000 shares of Series B preferred stock and warrants to purchase 200,000 of common stock.

As a result of participation in the April placement, the group became a greater than 10% owner of Intraware's common stock and Mr. Falk was appointed to Intraware's Board of Directors. Commonwealth Associates, LP ("Commonwealth") acted as the placement agent for Intraware in the April placement, and was paid a fee of 6% of the gross proceeds of the placement and its expenses. (D.I. 1, para. 19.)

On August 31, 2001, ComVest and Mr. Priddy invested in a second private placement by Intraware. In connection with this placement, Mr. Provow was appointed to the Board of Directors as a designee of the group. Mr. Provow also invested in the August placement. (D.I. 1, para. 20.) Commonwealth again acted as the placement agent for Intraware in the August placement, and was paid a placement fee of 5% of the gross proceeds of the August placements, its expenses, and warrants to purchase 700,000 shares of Intraware stock at an exercise price of $ .01 per share. In or about November 2001, Commonwealth exercised its August warrants and distributed a portion of [*6] the shares to ComVest, Mr. Falk, and Mr. Rosenbloom. (D.I. 1, para. 20.)

In order for Intraware to issue its debt in the August placement, ComVest and Mr. Priddy agreed to exchange their Series B preferred shares for shares of a new Series B-1 preferred stock. In connection with this exchange, the group members required Intraware to lower the conversion price of ComVest's and Mr. Priddy's Series B preferred shares and the exercise price of their April warrants. (D.I. 1, para. 22.)

Following the August placement, ComVest and Commonwealth made certain distributions to other group members, all of the details of which are not known. (D.I. 1, para. 30.)

On November 9, 2001, ComVest sold 200,000 shares of Intraware's common stock at a price of $ .58 per share, matchable with the purchase on August 31, 2001, at $ .01

per share, yielding short swing profits of $ 114,000. Further, Mr. Priddy engaged in a series of trades that led to disgorgeable profits of $ 1,195,838.37. (D.I. 1, para. 31.)

On May 24, 2002, ComVest and Mr. Priddy participated in a third private placement by Intraware. Comvest invested $ 250,000 and Mr. Priddy invested $ 300,000. Commonwealth again acted as the placement [*7] agent. (D.I. 1, para. 23.)

On July 5, 2002, Mr. Segen made demand on Intraware to commence this action. By letter dated September 5, 2002, Intraware declined to commence the lawsuit. (D.I. 1, para. 38.)

## PARTIES' CONTENTIONS

By their motions, Defendants contend that Mr. Segen can prove no set of facts consistent with his allegations that would entitle him to relief for three reasons. First, Defendants contend that Mr. Segen did not bring this lawsuit within the two year statute of limitations period. Second, Defendants contend that Mr. Segen's Complaint does not state facts that show the existence of a *§ 13(d)* group for purposes of the *Section 16(b) of the Exchange Act*. Third, Defendants contend that Mr. Segen's Complaint does not plead particularized facts to show that the decision by the Intraware's Board of Directors to refuse demand was wrongful and not protected by the business judgment rule.

In response, Mr. Segen contends that the law is clear that the two year limitations period is tolled until Defendants comply with the requirements of *§ 16(a) of the Exchange Act* by filing an SEC Form 4 with the Commission or until Intraware had actual knowledge of Defendants' violation [*8] of the statute. Mr. Segen further contends that the Complaint properly alleges that there was a *§ 13(d)* group that traded Intraware securities, and that the pleading specifies the acts performed by the group members. In support of his contention, Mr. Segen cites a number of cases in which other courts have denied motions to dismiss at the pleading stage. Finally, Mr. Segen contends that the business judgment rule is not available to a defendant in these circumstances to prevent a shareholder from bringing suit if the issuer refuses to do so.

Defendants reply that Mr. Segen is not entitled to equitable tolling of the statute of limitations because Defendants were not required to file the forms at issue as they did not own more than 10% of the securities of Intraware and were not otherwise a "group." Next, Defendants reply that the Complaint makes clear that the alleged group members disposed of their securities at different times and at different prices, thereby preventing Plaintiff from alleging facts necessary to plead a group even under the notice pleading standard of Federal *Rule 8*. Finally, Defendants reply that Intraware's Board determined that Defendants did not constitute [*9] a group for *Section 16(b)* purposes and, thus, are entitled to the benefit of the business judgment rule.

## DISCUSSION

### I. Standard Of Review

When a court analyzes a motion to dismiss brought pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, it must accept the factual allegations of the Complaint as true. *Langford v. City of Atlantic City, 235 F.3d 845, 847 (3d Cir. 2000)*. The court must draw all reasonable inferences in favor of the nonmoving party. *Id.*

### II. Whether Plaintiff's Complaint Satisfies the Statute Of Limitations

Because the Court concludes that the Complaint alleges facts sufficient to establish the potential applicability of equitable tolling, the Court will deny Defendants' motions to dismiss with regard to the statute of limitations.

The statute of limitations for a *§ 16(b)* claim runs for two years from the date of the transaction that led to the profits until the filing of the complaint. *15 U.S.C. § 78p(b)*. Citing authority from the Second and Ninth Circuits, Plaintiff contends that tolling of the time period is appropriate when no SEC Form [*10] 4 has been filed and the issuer does not have actual notice of all of the information that is contained in a Form 4. Defendants do not dispute that they did not file *§ 16(a)* reports. Rather, they contend that Mr. Segen had actual notice that Defendants allegedly realized short-swing profits at some point prior to his sending a demand letter on July 5, 2002.

Accepting the factual allegations of the Complaint as true, as the Court must do on a motion to dismiss, the Court concludes that Mr. Segen has sufficiently alleged that he lacked adequate notice of Defendants' wrongful

Case 1:06-cv-00517-GMS-LPS   Document 14   Filed 11/09/2006   Page 74 of 74

Page 4

2005 U.S. Dist. LEXIS 10661, *10; Fed. Sec. L. Rep. (CCH) P93,271

conduct to support an equitable tolling claim. (D.I. 1, para. 29.) Further, the Court concludes that whether equitable tolling is warranted in these circumstances requires further development of the facts and, therefore, may best be addressed once discovery is complete by a motion for summary judgment. Accordingly, the Court will deny Defendants' motions to dismiss with regard to the statute of limitations claim.

## II. Whether The Complaint Fails To State A *Section 16(b)* "Group" Claim

Because the Court concludes that the Complaint alleges facts sufficient to establish that Defendants potentially acted [*11] in concert with respect to their investments in Intraware, the Court will deny Defendants' motions to dismiss with regard to the "group" claim.

The Court finds the Complaint gives details with regard to the alleged relationships between the Defendants and that the Complaint alleges that Defendants entered into the same agreements with respect to investments made on April 2, 2001, August 31, 2001, and May 24, 2002, and in connection with exchanging Series B preferred shares for Series B-1 preferred shares. (D.I. 1, paras. 17-26.) With these facts alleged, the Court cannot conclude that Mr. Segen has failed to plead facts to support his claim that Defendants acted as a group for purposes of *§ 16(b)*. In the Court's view, there must be a full factual record for the Court to properly determine whether a group exists and, if so, what its dimensions are. For these reasons, the Court will deny Defendants' motions with regard to the "group" claim.

## III. Whether The Business Judgment Rule Is Applicable To *Section 16(b)* Lawsuits

Because shareholders have an absolute right to sue if the issuer does not sue within sixty days of receiving a demand, the Court will deny Defendants' motions [*12] with regard to the business judgment rule.

A stockholder may maintain an action against a corporate insider under *§ 16(b) of the Exchange Act* "if the issuer shall fail or refuse to bring such suit within

sixty days after request or shall fail diligently to prosecute the same thereafter. . . ." Thus, *§ 16(b)* creates a primary right to sue in favor of the issuer and its security holders. See, e.g., *Pellegrino v. Nesbit, 203 F.2d 463, 466-67 (9th Cir. 1953)*. It is well-settled that, "although an action under *§ 16(b)* cannot be brought unless the shareholder has first made a demand on the directors, the directors' decision not to prosecute the suit does not preclude a subsequent action by the shareholder himself." *Cramer v. Gen. Tel. & Elecs. Corp., 582 F.2d 259, 276 n. 22 (3d Cir. 1978)*. Thus, the Court will deny Defendants' motions with regard to their contentions that Plaintiff has not overcome the presumption of the business judgment rule.

## CONCLUSION

For the reasons discussed, the Court will deny the Motion To Dismiss The Complaint (D.I. 5) filed by the ComVest Defendants and the Motion To Dismiss (D.I. 8) filed by the Priddy Defendants. [*13]

An appropriate Order will be entered.

## ORDER

At Wilmington this 2 day of June 2005, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1) The Motion To Dismiss The Complaint (D.I. 5) filed by Defendants ComVest Venture Partners, LP, ComVest Management, LLC, Commonwealth Associates Management Company, Inc., Commonwealth Associates LP, Michael S. Falk, Travis L. Provow, and Keith Rosenbloom is DENIED; and

2) The Motion To Dismiss (D.I. 8) filed by Defendants Robert Priddy and RMC Capital, LLC is DENIED.

Joseph J. Farnan

UNITED STATES DISTRICT JUDGE