ROSENTHAL, MONHAIT & GODDESS, P. A.

ATTORNEYS AT LAW
SUITE 1401, 919 MARKET STREET
P. O. BOX 1070
WILMINGTON, DELAWARE 19899-1070

JOSEPH A. ROSENTHAL
NORMAN M. MONHAIT
JEFFREY S. GODDESS
CARMELLA P. KEENER
EDWARD B. ROSENTHAL
JESSICA ZELDIN
P. BRADFORD DELEEUW

TELEPHONE (302) 656-4433
FACSIMILE (302) 658-7567

July 1, 2008

The Hon. Leonard P. Stark
United States District Court
844 King Street, Lock Box 26
Wilmington, DE 19801

   RE: ***Levy v. Brooks Automation, Inc., et al.;***
     **D.Del., C.A. No. 06-517 GMS - LPS**

Dear Magistrate Judge Stark:

   Plaintiff herewith supplements his opposition to the pending motions of Defendants Robert Therrien and Brooks Automation, Inc. in which they seek dismissal of the Complaint.

   Therrien argues that his purchase of Brooks common stock in November 1999 is exempt from Section 16(b) because the acquisition was pursuant to the exercise of a stock option that had been issued years earlier (even though that option had expired pursuant to its terms by August 15, 1999.) *See* Therrien Op. Brf. (D.I. 11), at pp. 5-7.  However, this argument is further belied by the allegations in a Grand Jury Indictment issued in the District of Massachusetts against Therrien for tax evasion and in a civil complaint filed by the Securities Exchange Commission against Therrien in the same court for securities law violations, including violations of Section 16's reporting requirements.  Therrien's motion to dismiss the SEC Complaint was denied on March 12, 2008. (Both the Indictment and the SEC Complaint were first filed after the filing of Plaintiff's Answering Brief on November 9, 2006, and are enclosed herewith for the Court's reference.)

   Specifically, the Indictment and SEC Complaint allege, *inter alia*, that at no time prior to August 15, 1999 did Therrien provide Brooks Automation with a Notice of Exercise regarding the option at issue, inform Brooks, its outside law firm or outside accounting firm that he exercised the option, or received the common stock underlying the option.  Instead, the option expired pursuant to its terms and Therrien simply caused Brooks to transfer 225,000 shares of common stock to himself in November 1999 and caused Brooks to erroneously amend its books and records to indicate the exercise of the option on August 13, 1999.  Additionally, the allegations in the Indictment and SEC Complaint support Plaintiff's contention that his Section 16(b) claims were tolled as a consequence of Therrien's filing of a false Form 5 and his failure to correctly disclose the facts surrounding the relevant transactions.  *See* Plaintiff's Brf., (D.I. 14), at pp. 13-14.

         Respectfully submitted,

         Jeffrey S. Goddess (No. 630)

JSG/cmw
Enclosures
cc:    Arthur L. Dent, Esquire / Brian C. Ralston, Esquire (Via electronic filing)
        J. Travis Laster, Esquire / Matthew F. Davis, Esquire (Via electronic filing)

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )

v. )

ROBERT J. THERRIEN, )
Defendant. )

)
)
)
)
)

CRIMINAL NO. $07$-$C$-$/0238$ $6A0$

VIOLATION:
26 U.S.C. § 7201 (Tax Evasion)

## INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

1.     At all times material to this Indictment, defendant ROBERT J. THERRIEN

("THERRIEN") was an individual who resided in Boston, Massachusetts. During various

periods between 1989 and 2006, THERRIEN served as President, Chief Executive Officer, and

Chairman of the Board of Directors of Brooks Automation, Inc. At all times material to this

Indictment, THERRIEN held more than 10% of Brooks' outstanding stock. At all times material

to this Indictment, THERRIEN and his wife maintained certain joint investment accounts at

PaineWebber (now known as UBS).

2.     At all times material to this Indictment, Brooks Automation, Inc. ("Brooks") was

a Delaware corporation with its headquarters in Chelmsford, Massachusetts. Brooks supplied

integrated tool automation, factory interface, and factory automation solutions to the

semiconductor industry.

3.     At all times material to this Indictment, a nationally-known public accounting

firm acted as the outside auditors of Brooks' financial statements and prepared tax returns on

behalf of Brooks and certain individual officers and directors of Brooks (hereinafter, "Brooks' outside accounting firm"). During the relevant period, Brooks' outside accounting firm prepared personal tax returns as well as quarterly estimated tax projections for THERRIEN.

4.     At all times material to this Indictment, a Boston-based law firm was retained by Brooks to serve as outside corporate counsel (hereinafter, "Brooks' outside law firm").

### STOCK OPTIONS AND THEIR TAX TREATMENT (GENERALLY)

5.     The term "stock option" refers to a right granted by a company to purchase a specific number of shares of the company's stock at a specified price for a pre-determined period of time.

6.     The term "employee stock option" refers to a stock option granted by a company to one of its employees. An employee to whom a stock option is granted typically must wait a specified vesting period before being allowed to exercise the option.

7.     The term "exercise price" or "strike price" refers to the price at which the holder of an option will be permitted to purchase stock and is set on the day the stock option is granted.

8.     The term "vesting" refers to the ownership right that an employee gradually acquires through length of service at the company to receive stock options. A vesting schedule requires that a specified period of time elapse after the options are granted before they can be exercised.

9.     The tax treatment of stock options depends upon the type of options received by the employee. During the relevant period, the Internal Revenue Code and associated regulations recognized two types of options received by employees: incentive stock options (ISOs) and non-

2

qualified stock options (NQOs). ISOs are defined in Section 422 of the Internal Revenue Code; all other options are deemed NQOs.

10. If a company grants stock options to an employee holding 10% or more of the company's stock, such options may qualify for the favorable tax treatment afforded to ISOs only if, among other requirements, (i) the strike price is at least 110% of the fair market value (FMV) of the stock at the time the options are granted and (ii) the options are not exercisable after the expiration of five years from the date of the grant.

11. A stock option agreement sets forth the terms of the options the company has granted to an employee. Such an agreement specifies the type of options (ISOs or NQOs), the number of options, the exercise price, the vesting schedule, and the expiration date for the options.

12. Federal tax laws require the payment of ordinary income tax upon the exercise of NQOs. Thus, if a person exercises NQOs, thereby purchasing stock at a lower price than FMV on that date, the difference between the purchase price and FMV is taxed as ordinary income.

13. Although federal tax laws typically do not require the payment of ordinary income tax upon the exercise of ISOs, the difference between FMV and the exercise price is included in alternative minimum tax ("AMT") income, which may trigger the imposition of AMT. Profits from the sale of shares received through an exercise of ISOs may qualify to be taxed at the long-term capital gains rate, which is more favorable than regular income tax rates, provided other conditions are met.

3

## THE BROOKS STOCK OPTION PLAN

14.     During the relevant period, Brooks granted options to certain employees pursuant to its 1992 Combination Stock Option Plan (the "Plan"), as approved on May 13, 1992 and amended on December 5, 1994.

15.     According to the Plan, its purpose was to provide long-term incentives and rewards to those key employees of Brooks who were in a position to contribute to the company's long-term success and growth, to assist the company in retaining and attracting executives and key employees with requisite experience and ability, and to associate more closely the interests of such executives and key employees with those of the company's stockholders.

16.     The Plan provided for the issuance of stock options, including stock options intended to qualify as ISOs as defined in the Section 422 of the Internal Revenue Code.

## 1994 ISO AWARD TO THERRIEN

17.     Pursuant to the Plan, on August 15, 1994, Brooks granted THERRIEN 75,000 ISOs, as reflected in a Unanimous Consent in Lieu of a Special Meeting of Board of Directors.

18.     THERRIEN was provided with an Incentive Stock Option Agreement dated August 15, 1994, which reflected the terms of the award, including the number of ISOs subject to the specific grant, the exercise price of $7.30 per share, a vesting schedule, and a five-year expiration date.

19.     The Incentive Stock Option Agreement provided that, absent any modification to such requirement made at the company's discretion, the options were to be exercised through a

4

written Notice of Exercise to the company.

20. In keeping with the five-year limitation set forth in Section 422 of the Internal Revenue Code, the Incentive Stock Option Agreement stated that "[n]otwithstanding any provision of this Option to the contrary, in no event may this Option be exercised after 5 years from the date of this Option."

21. On or about December 8, 1994, Brooks had a 3-for-1 stock split. As a result of the stock split, the award of ISOs to THERRIEN on August 15, 1994 was updated, and THERRIEN thereafter held 225,000 ISOs at an exercise price of $2.43 per share (hereinafter, the "225,000 ISOs").

22. The total cost to THERRIEN to exercise the 225,000 ISOs was $546,750.

23. The remaining terms of THERRIEN's award – including the vesting schedule and expiration date of August 15, 1999 – did not change as a result of the stock split.

24. On or about March 1, 1995, THERRIEN executed an amended Form 3, "Initial Statement of Beneficial Ownership," which reflected an expiration date for the ISOs of August 15, 1999. The amended Form 3 was filed with the Securities and Exchange Commission (SEC).

25. On August 13, 1999, the last business day before the 225,000 ISOs expired, the market value of 225,000 shares of Brooks stock was $5,681,250, based upon a price of $25.25 per share.

5

## EXPIRATION OF THERRIEN'S 1994 ISO AWARD

26.    At no time prior to August 15, 1999 did THERRIEN provide Brooks with a written Notice of Exercise regarding the 225,000 ISOs.

27.    At no time prior to August 15, 1999 did THERRIEN inform Brooks, Brooks' outside law firm, Brooks' outside auditors, or PaineWebber that he had exercised the 225,000 ISOs.

28.    At no time prior to August 15, 1999 did Brooks transfer – or THERRIEN receive – 225,000 shares of Brooks stock based upon an exercise of ISOs.

29.    In early-November 1999, THERRIEN was informed that he had failed to exercise the 225,000 ISOs prior to their expiration on August 15, 1999.

30.    On or about November 8, 1999, THERRIEN falsely represented to Brooks personnel that he had had a conversation with two outside directors in the late-May/early-June time frame during which it was decided that 225,000 ISOs would be converted to NQOs with the same exercise price and that the expiration date would be extended until August 15, 2000. In actuality, as THERRIEN well knew, no such conversation had occurred.

31.    THERRIEN subsequently revised the false story he had told on November 8, 1999. The gist of the revised false story was that THERRIEN and two directors of Brooks had spoken by telephone in June 1999 and the directors authorized Brooks to extend a loan to THERRIEN in the amount of $546,750 for the purpose of paying the exercise price due from THERRIEN to exercise the 225,000 ISOs. As THERRIEN well knew, no such discussions had

6

occurred.

32.     The revised false story was advantageous to THERRIEN insofar as it permitted him to benefit from the favorable tax treatment afforded to ISOs.

33.     On or about November 9, 1999, THERRIEN and/or his agents caused Brooks' outside accounting firm to prepare two updated quarterly tax projections for THERRIEN. The first analyzed a scenario in which THERRIEN exercised $5,134,500 in ISOs, and the second analyzed a scenario in which he did not exercise any ISOs.

34.     In or about November 1999, in order to memorialize and execute the revised false story, THERRIEN caused Brooks' outside law firm to prepare three documents – a Promissory Note, a Directors Ratification, and an SEC Form 5, "Annual Statement of Changes in Beneficial Ownership."

35.     THERRIEN executed all three documents in November 1999.

36.     THERRIEN and his agents caused Brooks to transfer 225,000 shares of Brooks stock to THERRIEN in November 1999.

37.     THERRIEN and his agents caused Brooks to amend its books and records erroneously to reflect an exercise of the 225,000 ISOs on August 13, 1999 at a price of $2.43 per share.

38.     On or about November 16, 1999, during an audit committee meeting held at Brooks, THERRIEN and the two directors falsely represented to the lead audit partner at Brooks' outside accounting firm that the revised false story was true.

7

39.     THERRIEN and others caused the Directors Ratification and the Promissory Note to be transmitted to Brooks' outside accounting firm with the intent that they be relied upon by Brooks' outside accounting firm for the purpose of completing the year-end audit and certifying Brooks' publicly filed financial statement for 1999.

40.     On or about November 18, 1999, THERRIEN caused a wire transfer in the amount of $559,961.88 to be transmitted from a PaineWebber account controlled by him to a Brooks account at BankOne (now known as JP Morgan Chase) as re-payment of the purported loan, together with more than $13,000 interest.

41.     On or about December 12, 1999, THERRIEN executed Form 10-K for the year ended September 30, 1999 on behalf of Brooks, which incorporated representations made by THERRIEN relating to the exercise of 225,000 ISOs by THERRIEN.

42.     On or about January 28, 2000, THERRIEN reviewed the status and differing tax treatments of his outstanding Brooks stock option grants, which included both ISOs and NQOs.

43.     On or about October 10, 2000, THERRIEN filed with the Director, Internal Revenue Service at Andover, Massachusetts, a joint U.S. Individual Income Tax Return for calendar year 1999.

44.     In connection with the preparation of his joint U.S. Individual Income Tax Returns for calendar year 1999, THERRIEN failed to disclose to his tax preparer at Brooks' outside accounting firm that the 225,000 ISOs had expired unexercised.

45.     THERRIEN further failed to disclose to his tax preparer that his receipt of

8

225,000 shares of Brooks stock in November 1999 was not the result of any timely exercise of
ISOs.

46.     On his tax return for calendar year 1999, THERRIEN falsely reported – on Form
6251, "Alternative Minimum Tax – Individuals" – to the Internal Revenue Service that he had
exercised 225,000 ISOs.

47.     On his tax return for calendar year 1999, THERRIEN failed to report as ordinary
income the difference between the exercise price and the FMV of the 225,000 shares of Brooks
stock as of the date of the transaction.

9

## COUNT ONE
### Tax Evasion (26 U.S.C. § 7201)

The Grand Jury re-alleges and incorporates by reference paragraphs 1-47 of this Indictment and further charges that:

48.    On or about October 10, 2000, in the District of Massachusetts, the defendant

### ROBERT J. THERRIEN

a resident of Boston, Massachusetts, did willfully attempt to evade and defeat a large part of the income tax due and owing by him and his spouse to the United States of America, for calendar year 1999, by filing and causing to be filed with the Director, Internal Revenue Service Center, at Andover, MA, a false and fraudulent joint U.S. Individual Income Tax Return, Form 1040, on behalf of himself and his spouse, for the year 1999, wherein it was stated that their joint taxable ordinary income was $1,813,261, whereas, as the defendant then and there well knew and believed, their true joint taxable income was substantially greater than the amount reported and a substantial additional tax was due and owing to the United States of America.

All in violation of Title 26, United States Code, Section 7201.

10

A TRUE BILL

Foreperson of the Grand Jury

Linda M. Ricci
Assistant United States Attorney

DISTRICT OF MASSACHUSETTS        July 25, 2007

Returned into the District Court by the Grand Jurors and filed.

Deputy Clerk

11

# EXHIBIT B

FILED
UNITED STATES DISTRICT COURT CLERKS OFFICE
DISTRICT OF MASSACHUSETTS

2007 JUL 25 P 3: 32

U.S. DISTRICT COURT

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | **JURY TRIAL DEMANDED** |
| Plaintiff, ) | |
| v. ) | Case No. _____ |
| ROBERT J. THERRIEN, **07 CA 11364 RCL** | |
| Defendant. ) | |

MAGISTRATE JUDGE _____

**COMPLAINT**

1.    Plaintiff Securities and Exchange Commission ("Commission"), for its
Complaint against defendant Robert J. Therrien ("Therrien"), alleges the following:

**SUMMARY**

2.    This Commission enforcement action concerns a fraudulent stock options
backdating scheme perpetrated from at least 1999 through 2005 by Therrien, the former
Chairman of the Board and Chief Executive Officer of Brooks Automation, Inc.
("Brooks" or the "Company"), a Chelmsford, Massachusetts-based supplier of software
and related services to manufacturers of computer chips.

3.    Under well-settled accounting principles in effect throughout the relevant
period, Brooks was required to record an expense in its financial statements for any stock
options granted below the current market price ("in-the-money"), while the Company did
not need to record an expense for options granted to employees at the current market
price ("at-the-money"). In order to provide Brooks' employees and executives, including
himself, with lucrative in-the-money options (which result in an immediate financial
benefit to recipients), while avoiding having to inform shareholders of the millions of

dollars in compensation expenses thereby incurred and the resulting impact on the
Company's financial statements, Therrien engaged in a scheme to falsify company
records to create the false appearance that the options granted in-the-money actually had
been granted at-the-money on an earlier date. Therrien's scheme involved choosing
purported grant dates with the benefit of hindsight in order to grant options at a lower
price than the current market price at the time of the actual grant determination. Therrien
personally benefited by more than $10 million from his fraudulent conduct.

4.     As part of the scheme, Therrien, in or about November 1999, created and
signed false documents resulting in the issuance of in-the-money options to himself,
which he immediately exercised, to purchase 225,000 shares of Brooks' common stock.
Therrien signed these false documents after learning that his options to purchase the
shares had expired unexercised a few months earlier in or about August 1999. The
documents Therrien signed falsely indicated that he had actually exercised his options
before they expired. As a result, Therrien received approximately $5.8 million in
undisclosed compensation from Brooks. Brooks failed to report this compensation in its
Commission filings.

5.     As a result of this and other transactions, Therrien and Brooks concealed
millions of dollars in expense from investors, materially understating Brooks' expenses
and overstating the Company's income, by falsifying records and failing to maintain
records relating to stock option grants and exercises. During the period from May 1999
to September 2005, Therrien signed numerous public filings by Brooks that he knew or
was reckless in not knowing materially misrepresented its financial results.

2

6.     On or about May 11, 2006, Brooks announced that it intended to restate its financial statements contained in filings with the Commission for some or all of the periods between 1999 and 2005, and that those financial statements should not be relied upon. The announcement stated that "[t]he Company believes that it accounted for certain matters concerning stock options incorrectly, and as a result recognized less compensation expense than it should have in periods prior to fiscal 2006."

7.     On or about July 31, 2006, Brooks announced that "[d]riven by matters related to past stock option grants, the Company has revised its financial statements for the fiscal years 1996 through 2005 to record cumulative additional non-cash, pre-tax stock-based compensation expense of $64.5 million." In effect, Brooks restated its results and wrote off more than $64 million that had been reported as profit during that period. At least $54 million of Brooks' restatement is attributable to Therrien's fraudulent conduct.

8.     By engaging in the acts alleged in this Complaint, Therrien violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Sections 10(b), 13(b)(5), 14(a), and 16(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(b)(5), 78n(a) and 78p(a)] and Exchange Act Rules 10b-5, 13a-14, 13b2-1, 13b2-2, 14a-9 and 16a-3 [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, 240.13b2-2, 240.14a-9 and 240.16a-3] thereunder. Through his conduct, Therrien aided and abetted Brooks' uncharged violations of Exchange Act Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Exchange Act Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13] thereunder.

3

9.      For the reasons discussed herein, the Commission seeks all of the relief sought herein.

## JURISDICTION AND VENUE

10.     The Commission is an agency of the United States of America established by Section 4(a) of the Exchange Act [15 U.S.C. §78d(a)].

11.     This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§77t(d) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e) and 78aa]. Venue is proper in the District of Massachusetts because Brooks is a Chelmsford, Massachusetts-based company and the defendant resides within the district and committed many of the acts and/or omissions discussed herein within the district.

12.     The defendant, directly or indirectly, has made use of the means and instrumentalities of interstate commerce, of instruments of transportation or communication in interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the acts, practices and courses of business alleged in this complaint.

## DEFENDANT

13.     **Therrien**, of Osterville, Massachusetts, served as the President and Chief Executive Officer ("CEO") of Brooks between at least 1989 and 2004, and as Chairman of the Board ("Chairman") between at least 1989 and March 2006. Therrien asserted his Fifth Amendment privilege against self-incrimination during investigative testimony before the Commission staff in response to all substantive questions concerning the matters discussed in this Complaint.

4

## RELEVANT ENTITY

14.    **Brooks** is a Delaware corporation with its principal place of business in
Chelmsford, Massachusetts. Brooks is a supplier of, among other things, software and
related services to manufacturers of computer chips. Since 1995, Brooks' common stock
has been registered with the Commission pursuant to Sections 12(g) or 12(b) of the
Exchange Act, as appropriate, and is traded on the Nasdaq National Market System.
Brooks' fiscal year ends on September 30.

## FACTS

### Brooks' Procedures for Option Grants

15.    At relevant times, Brooks' Board of Directors used a unanimous written
consent procedure to approve option grants. Thus, Brooks' primary record of Board
authorization to issue options was typically a document captioned "Written Consent in
Lieu of Special Meeting of Board of Directors." Therrien routinely signed such written
consents throughout the relevant period.

16.    Brooks was a Delaware corporation, and Delaware law provided, at
relevant times, that such consents were effective when signed. Therrien knew, or was
reckless in not knowing, that Brooks routinely failed to maintain a record of when written
consents were signed. Rather, Brooks' record typically was a signed copy faxed from its
outside law firm, often received several weeks to months after the putative date of the
option award.

### GAAP Requirements for Stock-Based Compensation Accounting

17.    In its annual reports on Form 10-K filed with the Commission, Brooks
falsely represented that it accounted for its stock-based compensation in accordance with

5

Accounting Principles Board Opinion No. 25 ("APB 25"), *Accounting for Stock Issued to Employees*, one of two alternative available methods under generally accepted accounting principles ("GAAP") to account for stock-based compensation that were in effect throughout the time period discussed in this Complaint.

18.    Under APB 25, an employer must expense the "intrinsic" value of a fixed stock option on its "measurement date." APB 25 defines the measurement date as the first date that both the number of options an individual employee is entitled to receive and the exercise price are *known.* APB 25 ¶10 (emphasis added). A fixed stock option has intrinsic value if the exercise price of the option is less than the "quoted market price" of the underlying stock on the measurement date. If so, a corporation must record the difference between the exercise price and the quoted market price as a compensation expense over the expected life of the option, typically the option vesting period. APB 25 ¶10.

19.    Brooks' financial statements, which were included or incorporated by reference in filings with the Commission, generally represented that it accounted for its stock compensation plans in accordance with APB 25 and stated that no compensation expense on stock option grants to employees is recorded as long as the exercise price equals or exceeds the market price of the underlying stock on the date of the grant. None of Brooks' filings throughout the period, however, reflected any compensation expense that should have been recorded as a result of the issues described in this Complaint.

20.    Therrien signed annual reports filed on Form 10-K for the company's fiscal years ended September 30, 1999 through September 30, 2005, quarterly reports filed on Form 10-Q for quarters ended March 31, 1999 through June 30, 2004 and

6

registration statements on dates set forth below. These filings were materially misleading because they falsely represented that compensation expense for options grants would be recorded when the exercise price of the grant was lower than the market price of Brooks' stock on the grant date. The filings contained materially misleading financial results because they failed to reflect the compensation expenses incurred in grants of in-the-money options. Therrien knew or was reckless in not knowing that these filings were materially misleading. He knew or was reckless in not knowing that compensation expenses must be recorded for grants of in-the-money options. He knew or was reckless in not knowing that Brooks had granted in-the-money options but had not recorded expenses attributable to these grants. Therrien also signed false certifications of Brooks' 2002 and 2003 Forms 10-K and Forms 10-Q for periods ended June 30, 2002 through June 30, 2004, which stated that each report "fairly presents in all material respects the financial condition and results of operations of Brooks, Inc." and did not contain any misleading statements or omissions of material fact, although he knew or was reckless in not knowing that the certifications were not true.

### Therrien Receives A New Option in November 1999 Via Backdated Documents

21.     On or about August 15, 1994, Therrien was granted an option to purchase 75,000 shares of Brooks' common stock at a price of $7.30 per share pursuant to a Unanimous Consent in Lieu of a Special Meeting of Board of Directors. Brooks' stock thereafter underwent a stock split, as a result of which Therrien held an option to purchase 225,000 shares of Brooks' stock at a price of $2.43 per share (or for an aggregate price of $546,750). The option was good for a five-year period and therefore expired on or about August 15, 1999.

22.     In or about early November 1999, Brooks' finance department personnel discovered, and informed Therrien, that his option to purchase the 225,000 shares of Brooks' common stock had expired unexercised on or about August 15, 1999.

23.     In or about November 1999, three out of the four members of Brooks' Board (including Therrien) signed a document entitled "Directors Ratification," which was dated November 11, 1999 ("Directors Ratification"). Among other things, the Directors Ratification stated that it was intended to "ratify, approve and confirm . . . [that] in connection with telephone conversations between and among . . . Therrien [and the other two Board members] in mid-June 1999, the then board of directors authorized the Company to extend a loan in the amount of $546,750 to . . . Therrien . . . for the purpose of paying the exercise price due from Mr. Therrien to the Company to exercise certain options held by Mr. Therrien to purchase 225,000 shares of the Company's common stock . . . ." In fact, Brooks' Board did not authorize any loan to Therrien in or about June 1999 to pay the exercise price for his option.

24.     The November 11, 1999 "Directors Ratification" also attached a promissory note, dated August 13, 1999, which obliged Therrien to pay back the $546,750 which the Board had purportedly agreed to lend him in mid-June 1999 ("Promissory Note"). The Promissory Note was signed by Therrien. In fact, Therrien did not sign the Promissory Note on August 13 or on any other date prior to the expiration of his option.

25.     On or about November 18, 1999, Therrien exercised the option to purchase the 225,000 shares of Brooks' stock, conducted "as of" August 13, 1999. By exercising as of August 13, Therrien was able to purchase the shares at approximately

8

10% of the then current market price of approximately $28 per share. In fact, Therrien did not exercise the option to purchase the 225,000 shares on August 13 or on any other date before the option expired.

26. On or about November 19, 1999, Therrien repaid the loan which the Board had purportedly authorized in mid-June 1999 be made to him for the purpose of exercising the option to purchase the 225,000 Brooks' common stock shares.

27. Therrien was charged $13,211.88 in interest on the purported loan from August 13, 1999 to November 19, 1999. As a result, he was charged a total of $559,961.88 ($546,750 plus $13,211.88) for the 225,000 shares of Brooks' common stock. At the time, the 225,000 shares had a market value of approximately $6.3 million.

28. On or about November 15, 1999, Therrien filed an "Annual Statement of Changes in Beneficial Ownership" on a Form 5 with the Commission ("Form 5"). Among other things, the Form 5 falsely stated that Therrien had acquired 225,000 shares of Brooks' common stock on August 13, 1999.

29. Therrien knew, or was reckless in not knowing, when he signed the Directors Ratification, that the option to purchase the 225,000 shares of Brooks' common stock had expired in August 1999 and that he did not discuss a potential loan with anyone during the summer of 1999. Therrien also knew, or was reckless in not knowing, when he signed the Promissory Note, that Brooks did not extend a loan to him on or about August 13, 1999. Therrien signed the Promissory Note in November 1999 but it was purposefully backdated to August 13, 1999. Therrien knew, or was reckless in not knowing, that the purpose of the purported loan was to try to salvage his expired stock option. Therrien also knew, or was reckless in not knowing, at the time he signed the

9

Form 5, that he had not exercised his option on August 13 or on any other date before it expired.

30.     Therrien received a substantial undisclosed benefit from re-issuance of the option to purchase the 225,000 shares of Brooks' common stock in or about November 1999. The option had an exercise price of $2.43 per share, and had a cost basis of $559,962, including interest accrued on the loan. Using Brooks' November 18, 1999 closing stock price of $28.06, the option had a market value of $6,313,500. The value of the shares Therrien received upon exercising the option, representing compensation to him, was $5,753,538.

### Effect of the November 1999 Option Grant on Brooks' Financial Reporting

31.     In accordance with APB 25, Brooks should have recorded compensation expense of approximately $5.8 million, representing the intrinsic value of the option that was effectively granted to Therrien on or about November 18, 1999.

32.     As a result of the November 1999 option grant to Therrien, Brooks, which reported pre-tax net income of approximately $25.2 million for the year ended September 30, 2000 in its annual report on Form 10-K filed with the Commission on or about December 22, 2000, overstated its actual pre-tax income by approximately $5.8 million, or approximately 30%. Therrien knew or was reckless in not knowing that the company's financial results contained in the Form 10-K were materially misstated because of his options transaction. Nevertheless, he signed the Form 10-K as a director and President of the Company.

33.     The compensation charge for the Therrien option exercise should have been recorded in the quarter ended December 31, 1999, Brooks' first quarter of fiscal

2000. In its Form 10-Q for the quarter ended December 31, 1999, signed by Therrien as a director and President, and filed with the Commission on or about February 14, 2000, Brooks reported pre-tax net income of approximately $4.6 million. Had the Company recorded the correct compensation charge related to the Therrien option exercise, Brooks would have reported a pre-tax loss of approximately $1.2 million. Therrien knew or was reckless in not knowing that the company's financial results contained in the Form 10-Q were materially misstated because of his options transaction.

34.     In addition, Brooks understated its accumulated deficit by approximately $5.8 million during subsequent reporting periods, continuing through at least September 30, 2005, due to the impact of the uncorrected entry on Brooks' quarterly and annual filings after November 1999. For the year ended September 30, 2000, Brooks reported an accumulated deficit of approximately $16.4 million. An additional $5.8 million charge would have increased the accumulated deficit to approximately $22.2 million, or approximately 26%. Therrien signed annual reports on Form 10-K for the fiscal years ended September 30, 1999 through September 30, 2005 and quarterly reports on Form 10-Q for quarters ended March 31, 1999 through June 30, 2004. Therrien knew or was reckless in not knowing that each of these reports was materially misleading because it did not accurately reflect the expense that should have been recorded attributable to his November 1999 option transaction.

35.     In addition to the annual and quarterly filings affected by the November 1999 option grant, Brooks also filed registration statements for the offer and sale of additional securities, including a Form S-3 filed on or about February 14, 2000 and another Form S-3 filed on or about March 7, 2001 that incorporated by reference the false

11

Form 10-Q for the quarter ended December 31, 1999 and the false Form 10-K for the

year ended September 30, 2000, respectively. Therrien signed both of these Form S-3

filings as a director, CEO and President of Brooks. Therrien knew or was reckless in not

knowing that each of these filings was materially misleading because it did not accurately

reflect the expense that should have been recorded attributable to his November 1999

option transaction.

36.    In proxy materials related to an upcoming annual stockholders' meeting

filed with the Commission on or about January 18, 2000, Brooks falsely reported that the

$546,750 loan to Therrien had occurred on August 13, 1999. In addition, the filing failed

to disclose that Therrien's option to purchase the 225,000 shares of Brooks' common

stock had expired on or about August 15, 1999 and that Brooks had, in essence, granted

him a new option in or about November 1999. Information concerning Therrien's

executive compensation in the proxy materials was incorporated prospectively by

reference in Brooks' Form 10-K for the year ended September 30, 1999 and filed with the

Commission on or about December 29, 1999. Therrien signed the Form 10-K as a

director and President of Brooks. Therrien knew or was reckless in not knowing that the

proxy materials and the Form 10-K incorporating them by reference were materially

misleading because they did not accurately reflect his compensation attributable to his

November 1999 option transaction.

37.    In proxy materials related to an upcoming annual stockholders' meeting

filed with the Commission on or about January 24, 2001, Brooks did not disclose

Therrien's receipt of $5,753,538, representing the difference between the market value of

the new option he was granted in or about November 1999 and the cost to exercise the

12

option at that time. Information concerning Therrien's executive compensation in the

proxy materials was incorporated prospectively by reference in Brooks' Form 10-K for

the year ended September 30, 2000 and filed with the Commission on or about December

22, 2000. Therrien signed the Form 10-K as a director and President of Brooks. Therrien

knew or was reckless in not knowing that the proxy materials and the Form 10-K

incorporating them by reference were materially misleading because they did not

accurately reflect his compensation attributable to his November 1999 option transaction.

38.    Brooks' January 24, 2001 proxy filing also stated that, "[i]n order to align

the 1992 [Combination Stock Option] Plan with its current practices, in January 2000 the

Board of Directors amended the 1992 Plan to eliminate the Company's ability to grant

restricted stock under the 1992 Plan and to require that all options be granted with

exercise prices not less than fair market value." This statement was false and misleading

because, pursuant to the 1992 Plan, Brooks granted Therrien an option at a below-market

exercise price in or about November 1999. Therrien knew or was reckless in not

knowing that the proxy materials and the Form 10-K incorporating them by reference

were materially misleading because they did not accurately reflect his compensation

attributable to his November 1999 option transaction.

### Therrien Approves an Option Grant Backdated to October 1, 2001

39.    On or about September 28, 2001, Therrien wrote to all Brooks employees

announcing certain layoffs but noting that Brooks was going to accelerate its usual

January stock option program to the "October 2001 timeframe."

40.    In or about late October or early November 2001, Brooks' Board, which

included Therrien as a member, approved, via a "Written Consent in Lieu of Special

13

Meeting of Board of Directors" dated October 1, 2001, the awarding of "an aggregate amount of [approximately 1.9 million] options to the individuals listed on the attached Schedule A . . . ."

41.    A final decision concerning how many options each option recipient was to receive was not reached until on or about November 30, 2001.

42.    On or about December 6, 2001, Brooks' Director of Human Resources sent an e-mail to a number of Brooks employees, including Therrien. In the December 6, 2001 e-mail, the Director of Human Resources stated, in part: "We finalized all of the stock option grants last Friday [i.e., November 30, 2001]. . . . The effective date (October 1, 2001) and the share price ($25.22) are included in the [attached] documentation."

43.    The $25.22 share price on October 1, 2001 was the lowest price for Brooks' stock during the entire calendar year 2001.

44.    On or about February 5, 2002, Therrien signed a document, entitled "Certificate of the President," which stated, in part, that "[p]ursuant to a vote of the Board of Directors . . . on October 1, 2001 . . . the Company granted nonqualified stock options . . . to certain persons . . . ." This statement was false and misleading because Brooks' Board did not approve issuance of the approximately 1.9 million options until in or about late October or early November 2001.

45.    Therrien, as Brooks' Chairman and CEO, knew, or was reckless in not knowing, that: (a) the Board had not approved the granting of the approximately 1.9 million options on October 1, 2001; (b) a final decision concerning how many options each option recipient was to receive had not been reached until on or about November 30,

14

2001; and (c) it was improper for the Board and/or Brooks to treat the approximately 1.9 million options as if they had been granted on October 1, 2001.

46.     The exercise price for the approximately 1.9 million shares granted as of October 1, 2001 was $25.22 per share. The closing price on the date the options actually were granted, November 30, 2001, was $36.75 per share. As a result, additional non-cash compensation expense reflecting the difference between the exercise price and the fair market value of the stock on the actual grant date of approximately $22 million, less adjustments, should have been recorded and was included in Brooks' July 2006 restatement of its prior financial statements.

47.     Beginning with the Company's quarterly report on Form 10-Q for the quarter ended December 31, 2001, filed with the Commission on or about February 14, 2002, Brooks' first quarter of fiscal year 2002, and then each successive filing of quarterly and annual financial statements over the vesting period of these options (variously, two or four years), additional non-cash compensation expense charges should have been recorded. Therrien signed the Form 10-Q filed on or about February 14, 2002 as an officer and director and Form 10-Q filings made from that date until the period ended June 30, 2004. Therrien also signed each Form 10-K filed for the years ended September 30, 2002 through September 30, 2005. In addition, Brooks filed a Form S-3 registration statement on or about April 29, 2002 that incorporated by reference the Form 10-Q/A for the quarter ended December 31, 2001 (filed on or about April 4, 2002). Therrien signed this Form S-3 as a director, CEO and President of Brooks. Therrien knew or was reckless in not knowing that the financial statements contained in the filings

15

were materially misleading because they did not reflect compensation expenses from the grant of in-the-money options.

48.    In its proxy materials filed on or about January 21, 2003 relating to the election of directors, Brooks disclosed the October 2001 option grants to Therrien and other officers, as part of its required management compensation disclosure. The proxy disclosure stated that the exercise price was $25.22 per share, but failed to disclose that the actual grant date of the options differed from the stated grant date, resulting in an intrinsic value and additional compensation to the officers of approximately $2.7 million, less adjustments. Therrien's personal benefit, as reflected in the difference between the exercise price and the price on the date the options were actually granted, was approximately $1 million. The January 2003 proxy materials were incorporated prospectively by reference into Brooks' Form 10-K filing for the year ended September 30, 2002, filed with the Commission on or about December 30, 2002 and signed by Therrien. Therrien knew or was reckless in not knowing that the proxy materials and the Form 10-K incorporating them by reference were materially misleading because they did not accurately reflect the compensation attributable to the option grants backdated to October 1, 2001.

### Therrien Approves an Option Grant Backdated to January 4, 1999

49.    On or about November 19, 1998, Therrien attended a regular meeting of the Brooks Board of Directors. At that meeting, it was agreed, among other things, "that further consideration be given to granting additional options to senior management at some point in the next several months."

16

50.    In or about February 1999, Brooks' Board, which included Therrien as a member, approved, via a "Written Consent in Lieu of Special Meeting of Board of Directors," the granting of options to several categories of employees, effective January 4, 1999. The stock price of $14.62 per share on January 4, 1999 was the lowest market price for Brooks' stock during the entire calendar year 1999.

51.    Pursuant to the Board's written consent, Therrien was granted an option to purchase 115,000 shares of Brooks' common stock at $14.62 per share (or for approximately $1.6 million).

52.    Therrien approved the option grant as of January 4, 1999, knowing, or reckless in not knowing, that in fact the actual grant date was more than a month later.

53.    In fact, the recipients and amounts of the option grants were not determined until weeks after the purported grant date. For example, an agenda for the January 11, 1999 Board meeting includes "Stock Options," and a document captioned "Stock Option Summary Proposals" was included in the Board package for the January 11, 1999 meeting, dated January 8. The minutes of that meeting, however, make no reference to options. A summary of Board-approved options for the grant contains the handwritten notation, "Approved, Robert J. Therrien Feb. 10, 1999." In addition, written consents from two other outside directors were not faxed from Brooks' outside law firm until on or about February 26, 1999.

54.    In addition, the number of options to be granted also was not determined on the purported January 4 grant date. The Board's written consent, signed by Therrien, dated January 4, 1999, has an attached list of recipients totaling only 148,300 shares, while a 2006 Brooks printout shows that 355,566 shares were awarded on that date.

55.     Therrien, as Brooks' Chairman and CEO, knew, or was reckless in not

knowing, that: (a) the Board had not approved the granting of the options on January 4,

1999; (b) he himself had not approved the grant until February 10, 1999; and (c) it was

improper for the Board and/or Brooks to treat the options as if they had been granted on

January 4, 1999.

56.     The exercise price for the options granted as of January 4, 1999 was

$14.625 per share. The options were actually granted on February 10, 1999, resulting in

a revised fair market value of $23.75 per share. As required by APB 25, additional non-

cash compensation expense of approximately $3.1 million, less adjustments, should have

been recorded and was included in Brooks' July 2006 restatement of prior financial

statements.

57.     Brooks' Form 10-K for the fiscal year ended September 30, 1999, filed

with the Commission on or about December 29, 1999, the Forms 10-Q filed on or about

May 17, 1999 and on or about August 16, 1999, and each quarterly and annual filing

from the second quarter of fiscal 1999 until the end of the option vesting period were

misstated as a result of the missing additional non-cash compensation expense. Therrien

signed the Form 10-K filed on or about December 29, 1999, and the Forms 10-Q filed on

or about May 17, 1999 and August 16, 1999, as well as other filings containing the

misstatement described in this paragraph. Therrien knew or was reckless in not knowing

that the financial statements contained in the filings were materially misleading because

they did not reflect compensation expenses from the grant of in-the-money options.

58.     In its proxy materials relating to the election of directors filed on or about

January 18, 2000, Brooks disclosed the issuance of an option to purchase 115,000 shares

18

granted to Therrien as well as 54,000 options granted to other executives on January 4, 1999. The proxy disclosure stated that the exercise price was $14.63 per share and that this represented the fair market value of the Company's stock price on the grant date, but failed to disclose that the actual grant date of the options differed from the stated grant date. Information concerning Therrien's executive compensation in the proxy materials was incorporated prospectively by reference in Brooks' Form 10-K for the year ended September 30, 1999, filed with the Commission on or about December 29, 1999. Therrien signed the Form 10-K as a director and President of Brooks. Therrien knew or was reckless in not knowing that the proxy materials and the Form 10-K incorporating them by reference were materially misleading because they did not accurately reflect the compensation attributable to the option grants backdated to January 4, 1999.

59.    The difference between the price on the actual grant date and the price on the stated grant date results in an intrinsic value for the officer option grants of approximately $1.5 million that was not disclosed in the January 18, 2000 proxy. Therrien's personal benefit was approximately $1 million.

**Other Option Grants Included in the July 2006 Restatement of Prior Financials**

60.    Other option grants further demonstrate the widespread nature of Brooks' options backdating, Therrien's involvement in the option-granting process for which Brooks improperly accounted and the extensive benefits Therrien received as a result.

### A.    Option Grant Backdated to May 31, 2000

61.    A grant of options to purchase 458,256 shares was made to Brooks' employees as of May 31, 2000. As part of this grant, Therrien received an option to purchase 233,000 shares. The option grant included at least one employee who did not

19

start work at Brooks until weeks after May 31, 2000. Therrien knew that the employee did not commence his employment at Brooks on May 31, 2000, and knew, in late June, that the employee still had not started working at Brooks. Despite this knowledge, which shows that the actual grant date could not have occurred before late June, Therrien signed a Written Consent in Lieu of Special Meeting of Board of Directors authorizing the issuance of an option to purchase 40,000 shares of Brooks to this employee that was backdated to May 31, 2000.

62.    Therrien, as Brooks' Chairman and CEO, knew, or was reckless in not knowing, that: (a) the Board had not approved the granting of the options on May 31, 2000; (b) the purported grantees included at least one who was not even employed by Brooks as of that date; and (c) it was improper for the Board and/or Brooks to treat the options as if they had been granted on May 31, 2000.

63.    The exercise price for the 458,256 options granted as of May 31, 2000 was $39.75 per share. The actual grant date was August 17, 2000, reflecting an outside director's approval of the employee's grant, resulting in a revised fair market stock value of $45.94 per share. As required by APB 25, additional non-cash compensation expense of approximately $2.8 million, less adjustments, should have been recorded and was included in Brooks' July 2006 restatement.

64.    Beginning with the Company's annual report on Form 10-K filed with the Commission on or about December 22, 2000, and then each successive filing of quarterly and annual financial statements over the vesting period of these options, additional non-cash compensation expense charges should have been recorded. In addition, Brooks filed S-3 registration and proxy statements that incorporated by reference the Company's Form

20

10-K filed on or about December 22, 2000. Therrien signed this Form 10-K as a director and President of the Company and signed Forms 10-Q during the relevant period. Therrien knew or was reckless in not knowing that the financial statements contained in the filings were materially misleading because they did not reflect compensation expenses from the grant of in-the-money options.

65.    Brooks also filed a proxy statement for the election of directors on or about January 24, 2001 that disclosed the May 31, 2000 option grants to Therrien and other officers and directors. The proxy disclosure stated that the exercise price was equal to the fair market value of the stock on the grant date but failed to disclose that the actual grant date of the options differed from the stated grant date, resulting in an intrinsic value and additional compensation to the officers and directors of approximately $2.3 million, less adjustments. Therrien's personal benefit was $1.4 million. Information concerning Therrien's executive compensation in the proxy materials was incorporated prospectively by reference in Brooks' Form 10-K for the year ended September 30, 2000 and filed with the Commission on or about December 22, 2000. Therrien signed the Form 10-K as a director and President of Brooks. Therrien knew or was reckless in not knowing that the proxy materials and the Form 10-K incorporating them by reference were materially misleading because they did not accurately reflect the compensation attributable to the option grants backdated to May 31, 2000.

### B. Option Grant Backdated to January 5, 2000

66.    Another backdated option grant occurred as of January 5, 2000. The faxed written consents authorizing this grant all bear a notation that they were sent to directors (including Therrien) for signature from Brooks on or about February 4, 2000. One

director's consent shows a fax date for his signature of on or about February 7, 2000. The actual grant date was therefore February 7 as opposed to January 5.

67.    Therrien, as Brooks' Chairman and CEO, knew, or was reckless in not knowing, that: (a) the Board had not approved the granting of the options on January 5, 2000; and (b) it was improper for the Board and/or Brooks to treat the options as if they had been granted on January 5, 2000.

68.    The exercise price for the 655,700 shares was $30.13 per share on the stated grant date of January 5, 2000. That market price represented the lowest price for a ten-month period during calendar year 2000. The actual grant date was February 7, 2000, resulting in a revised fair market stock value of $62.25 per share. As required by APB 25, additional non-cash compensation expense of approximately $20.6 million, with adjustments, should have been recorded and was included in Brooks' July 2006 restatement.

69.    Beginning with Brooks' Form 10-Q for its second quarter of fiscal 2000, filed with the Commission on or about May 15, 2000, and then each quarterly and annual filing over the four-year vesting period, additional non-cash compensation charges should have been recorded. Therrien signed Forms 10-K and Forms 10-Q filed during the relevant period. Therrien knew or was reckless in not knowing that the financial statements contained in the filings were materially misleading because they did not reflect compensation expenses from the grant of in-the-money options.

70.    In addition, Brooks filed a Form S-3 registration statement on or about February 12, 2002 that incorporated by reference the Company's annual report on Form 10-K for the year ended September 30, 2001, which in turn misstated financial statements

22

for both 2000 and 2001 resulting from the improper accounting of this grant. Therrien signed this Form S-3 as a director, CEO and President of Brooks. Therrien knew or was reckless in not knowing that this filing was materially misleading because it did not accurately reflect compensation expenses from the grant of in-the-money options.

71.    Brooks also filed a proxy statement on or about January 24, 2001 that excluded disclosures related to the January 5, 2000 option grant. The 2001 proxy materials disclosed that the options were granted at $30.13 per share (except approximately 12,000 stock options granted to Therrien at $33.14 per share). The proxy, however, failed to disclose that the actual date of the option grants was February 7, 2000 and that the officers received approximately $4.7 million of additional compensation representing the intrinsic value of their options. Therrien's personal benefit was approximately $1.2 million. Therrien signed Brooks' Form 10-K, filed on or about December 22, 2000, which incorporated prospectively by reference the compensation information contained in the proxy. Therrien knew or was reckless in not knowing that the proxy materials and the Form 10-K incorporating them by reference were materially misleading because they did not accurately reflect the compensation attributable to the option grants backdated to January 5, 2000.

### Therrien's False Certification of Financials

72.    Therrien signed false certifications of Brooks' 2002 and 2003 annual reports filed on Form 10-K and of the quarterly reports filed on Forms 10-Q for the quarters ended June 30, 2002 through June 30, 2004, which stated that the report "fairly presents in all material respects the financial condition and results of operations of Brooks Automation Inc." and did not contain any misleading statements or omissions of

material fact, although he knew or was reckless in not knowing that the certifications were not true.

## Therrien's False Statements to Accountants

73.    In connection with the preparation of Brooks' filings with the Commission between at least 1999 and 2004, Therrien made false statements to accountants and omitted to state material information necessary to make the statements made not misleading. For example, on November 15, 2000, December 13, 2001, and December 24, 2002, in connection with the audit of Brooks' financial statements for the fiscal years ended September 30, 2000, September 30, 2001 and September 30, 2002, respectively, Therrien signed representation letters to Brooks' outside auditors, PricewaterhouseCoopers, stating that Brooks' financials were fairly presented in conformity with generally accepted accounting principles and that there were no material agreements or accounts that had not been properly recorded in the records underlying the consolidated financial statements.

74.    The representation letters also stated that all options granted during the relevant reporting periods were issued at exercise prices equal to or exceeding the fair market value of Brooks' stock on the grant date.

75.    These representations were false, because, among other things, the financial statements did not reflect the issuance to Therrien of an in-the-money option to purchase 225,000 shares of Brooks during November 1999, and the resulting compensation to Therrien. The financial statements also did not accurately reflect Brooks' compensation expense as a result of the company-wide in-the-money option grants described in this Complaint. Therrien made similar statements and omissions to

Brooks' outside accountants in connection with other filings during these and other
reporting periods. Therrien knew or was reckless in not knowing that his statements and
omissions to accountants were materially misleading.

### July 2006 Restatement

76.    On or about July 31, 2006, Brooks restated its financial statements for
fiscal years 1996 through 2005 to record cumulative non-cash, pre-tax stock-based
compensation expense of $64.5 million, partially offset by a $1.8 million income tax
benefit related to the above charges.

77.    The total restatement included an approximately $5.8 million charge
related to the November 1999 Therrien option exercise. The additional non-cash
compensation charges recorded in the restatement were material in substantially all of
Brooks' historical reporting periods. Brooks was required to restate its annual financial
statements for fiscal years 2003-2005 and selected financial data for fiscal years 2001-
2002. Additional charges were also taken related to options granted during fiscal years
1996-2000 but the financial statements for those years were not presented in the
restatement.

78.    The additional pre-tax, non-cash compensation recorded in each fiscal
year was as follows:

| Fiscal Year | Non-Cash Stock-Based Compensation Expense |
|---|---|
| 2005 | $ 1.6 million |
| 2004 | $ 3.1 million |
| 2003 | $17.3 million |
| 2002 | $18.7 million |
| 2001 | $ 7.5 million |
| 2000 | $14.1 million |

25

| | |
|---|---|
| 1999 | $ 0.6 million |
| Pre-1999 | $ 1.6 million |
| Total | $64.5 million |

79.    The financial statement impact continued to be material subsequent to fiscal year 2002 resulting from the continued vesting of the grants that occurred prior to fiscal year 2002. As required by APB 25, the compensation expense recorded for the individual grants is recognized ratably over the vesting period of the grants. For example, for the fiscal year ended 2005, Brooks' net loss increased from approximately $10 million to approximately $11.6 million, or approximately 13%, with a similar increase on a per-share basis. For the fiscal year ended 2003, the restatement increased Brooks' loss from approximately $185.7 million to approximately $203.0 million, or approximately 9%, with a similar increase on a per share basis.

80.    The effect of the restatement was even more significant for the years prior to fiscal year 2002. For fiscal year 2001, Brooks' net loss increased from approximately $29.8 million to approximately $37.3 million, or approximately 20%, with a similar increase on a per-share basis. For fiscal year 2000, Brooks' net income of approximately $12.8 million and diluted earnings per share of $0.78 prior to the restatement were reduced to a loss as a result of the $14.1 million in adjustments.

81.    The fiscal year 2000 compensation charge includes the approximately $5.8 million compensation charge relating to the effect of restating the November 1999 Therrien option exercise, which alone would have affected fiscal year 2000 results by approximately 30%.

82.    In addition to the $5.8 million benefit which he received as a result of the November 1999 option grant, Therrien received at least $4.6 million in undisclosed benefits as a result of the fraudulent option practices described in this Complaint.

## CLAIMS

### FIRST CLAIM
### (Violation of Section 17(a) of the Securities Act)

83.    Plaintiff repeats and incorporates by reference the allegations in paragraphs 1-82 of the Complaint as if set forth fully herein.

84.    By reason of the foregoing, the defendant, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instruments of transportation or communication in interstate commerce or of the mails, in the offer or sale of securities: (a) employed a device, scheme or artifice to defraud; (b) obtained money or property by means of an untrue statement of material fact or omitting to state a material fact necessary to make the statement made, in light of the circumstances under which it was made, not misleading; or (c) engaged in a transaction, practice or course of business which operated as a fraud or deceit upon purchasers of Brooks' stock.

85.    As a result, the defendant violated Section 17(a) of the Securities Act.

### SECOND CLAIM
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)

86.    Plaintiff repeats and incorporates by reference the allegations in paragraphs 1-82 of the Complaint as if set forth fully herein.

87.    By reason of the foregoing, the defendant directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or of the mails,

27

or of the facilities of a national securities exchange: (a) employed a device, scheme or artifice to defraud; (b) made untrue statements of material fact or omitting to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud or deceit upon purchasers of Brooks' stock.

88.    As a result, the defendant violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### THIRD CLAIM
### (Violations of Section 13(b)(5) of the Exchange Act and Exchange Act Rules 13b2-1 and 13b2-2)

89.    Plaintiff repeats and incorporates by reference the allegations in paragraphs 1-82 of the Complaint as if set forth fully herein.

90.    As set forth above, the defendant, as an officer of Brooks, violated Exchange Act Section 13(b)(5) by knowingly circumventing or knowingly failing to implement a system of internal accounting controls or knowingly falsifying any book, record, or account described in Exchange Act Section 13(b)(2).

91.    As set forth above, the defendant violated Exchange Act Rule 13b2-1 by, directly or indirectly, falsifying or causing to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Exchange Act.

92.    As set forth above, the defendant violated Exchange Act Rule 13b2-2 by, among other things, either directly or indirectly making or causing a materially false or misleading statement to be made to an accountant in connection with an audit, review or examination of Brooks' financial statements.

28

## FOURTH CLAIM
### (Aiding and Abetting Brooks' Violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 Thereunder)

93.    Plaintiff repeats and incorporates by reference the allegations in paragraphs 1-82 of the Complaint as if set forth fully herein.

94.    As set forth above, Brooks made materially false and misleading Commission filings throughout the period of the fraud described herein. As a result, Brooks violated Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1 and 13a-13 throughout the period of the fraud described herein.

95.    As set forth above, Brooks failed to maintain accurate books and records and failed to implement adequate internal controls. As a result, Brooks violated Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

96.    As set forth above, the defendant knew, or was reckless in not knowing, that Brooks' conduct was improper, and knowingly and substantially assisted Brooks' violations of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1 and 13a-13.

97.    By reason of the foregoing, the defendant aided and abetted Brooks' violations of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1 and 13a-13 and, therefore, is liable for such violations pursuant to Section 20(e) of the Exchange Act.

98.    As set forth above, the defendant knew, or was reckless in not knowing, that Brooks' conduct was improper, and knowingly and substantially assisted Brooks' violations of Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

99.     By reason of the foregoing, the defendant aided and abetted Brooks'

violations of Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and, therefore, is

liable for such violations pursuant to Section 20(e) of the Exchange Act.

## FIFTH CLAIM
### (Violation of Exchange Act Rule 13a-14)

100.    Plaintiff repeats and incorporates by reference the allegations in

paragraphs 1-82 of the Complaint as if set forth fully herein.

101.    The defendant certified in each of Brooks' annual reports for the fiscal

years ended September 30, 2002, September 30, 2003 and September 30, 2004, filed with

the Commission on Forms 10-K, and its quarterly reports for quarters ended June 30,

2002 through June 30, 2004, filed with the Commission on Forms 10-Q, that he had

reviewed this report and, based on his knowledge, this report (i) did not contain any

untrue statement of material fact or omit to state a material fact necessary to make the

statements made, in light of the circumstances under which such statements were made,

not misleading and (ii) included financial statements and other financial information

which fairly presented, in all material respects, Brooks' financial condition, results of

operations and cash flows.

102.    By engaging in the conduct alleged above, the defendant violated

Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## SIXTH CLAIM
### (Violation of Section 14(a) of the Exchange Act and Rule 14a-9 Thereunder)

103.    Plaintiff repeats and incorporates by reference the allegations in

paragraphs 1-82 of the Complaint as if set forth fully herein.

104.    As set forth above, Brooks, under Therrien's direction, filed proxy

materials containing false and misleading statements regarding Therrien's compensation,

Brooks' option granting practices and incorporating by reference the false financial

statements described above.

105.    By reason of the foregoing, the defendant violated Section 14(a) of the

Exchange Act and Rule 14a-9 thereunder.

**SEVENTH CLAIM**
**(Violation of Section 16(a) of the Exchange Act and Rule 16a-3 Thereunder)**

106.    Plaintiff repeats and incorporates by reference the allegations in

paragraphs 1-82 of the Complaint as if set forth fully herein.

107.    As set forth above, Therrien filed a false Form 5 with the Commission as

part of a scheme to conceal the fact that his option to purchase 225,000 shares of Brooks

had expired and that Brooks had issued him a new in-the-money option.

108.    By reason of the foregoing, the defendant violated Section 16(a) of the

Exchange Act and Rule 16a-3 thereunder.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court issue a final

judgment:

**I.**

Permanently enjoining the defendant from violating, directly or indirectly,

Section 17(a) of the Securities Act.

**II.**

Permanently enjoining the defendant from violating, directly or indirectly, Section

10(b) of the Exchange Act and Rule 10b-5 thereunder.

## III.

Permanently enjoining the defendant from violating, directly or indirectly, Section 13(b)(5) of the Exchange Act and Exchange Act Rules 13b2-1 and 13b2-2.

## IV.

Permanently enjoining the defendant from violating, directly or indirectly, Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder.

## V.

Permanently enjoining the defendant from violating, directly or indirectly, Exchange Act Rule 13a-14.

## VI.

Permanently enjoining the defendant from violating, directly or indirectly, Section 14(a) of the Exchange Act and Rule 14a-9 thereunder.

## VII.

Permanently enjoining the defendant from violating, directly or indirectly, Section 16(a) of the Exchange Act and Rule 16a-3 thereunder.

## VIII.

Ordering the defendant to pay civil money penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act in amounts to be determined by the Court.

## IX.

Ordering the defendant to disgorge all of his ill-gotten gains (including prejudgment interest thereon).

32

## X.

Barring, pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of

the Exchange Act, the defendant from serving as an officer or director of any issuer that

has a class of securities registered pursuant to Section 12 of the Exchange Act.

## XI.

Order such other relief as the Court deems just and proper.


Respectfully submitted,


Silvestre A. Fontes
    Senior Trial Counsel
Michele T. Perillo
    Senior Enforcement Counsel

ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION
33 Arch Street, 23rd Floor
Boston, Massachusetts 02110
(617) 573-8991 (Fontes)
(617) 573-4590 (facsimile)

July 25, 2007

# EXHIBIT C

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:07-cv-11364-WGY

Securities and Exchange Commission v. Therrien
Assigned to: Judge William G. Young
related Case: 1:08-cv-10834-WGY
Cause: 15:77 Securities Fraud

Date Filed: 07/25/2007
Jury Demand: Both
Nature of Suit: 850
Securities/Commodities
Jurisdiction: U.S. Government Plaintiff

**Plaintiff**

**Securities and Exchange Commission**    represented by    **Luke T. Cadigan**
U.S. Securities and Exchange
Commission
33 Arch Street
23rd Floor
Boston, MA 02110-1424
617-573-8919
Fax: 617-573-4590
Email: cadiganl@sec.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michele T. Perillo**
U.S. Securities & Exchange Commission
33 Arch Street
23rd Floor
Boston, MA 02110
617-573-5916
Fax: 617-424-5940
Email: perillom@sec.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Silvestre A. Fontes**
Securities and Exchange Commission
33 Arch Street
Suite 2300
Boston, MA 02110
617-573-8991
Fax: 617-573-4590
Email: fontess@sec.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Asita Obeyesekere**
Securities and Exchange Commission
73 Tremont Street
6th Floor
Boston, MA 02108
617-573-8977
Fax: 617-424-5940
Email: obeyesekere@sec.gov
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

Robert J. Therrien                     represented by **R. Robert Popeo**
Mintz, Levin, Cohn, Ferris, Glovsky &
Popeo, PC
One Financial Center
Boston, MA 02111
617-542-6000
Fax: 617-348-4745
Email: rrpopeo@mintz.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam L. Sisitsky**
Mintz, Levin, Cohn, Ferris, Glovsky &
Popeo, PC
One Financial Center
Boston, MA 02111
617-348-1689
Fax: 617-542-2241
Email: asisitsky@mintz.com
*ATTORNEY TO BE NOTICED*

**John Sylvia**
Mintz, Levin, Cohn, Ferris, Glovsky &
Popeo, PC
One Financial Center
Boston, MA 02111
617-542-6000
Fax: 617-542-2241
Email: jfsylvia@mintz.com
*ATTORNEY TO BE NOTICED*

**Joseph P. Messina**
Mintz, Levin, Cohn, Ferris, Glovsky &
Popeo, PC

One Financial Center
Boston, MA 02111
617-542-6000
Fax: 617-542-2241
Email: jpmessina@mintz.com
*ATTORNEY TO BE NOTICED*

**Kristen S. Scammon**
Mintz, Levin, Cohn, Ferris, Glovsky &
Popeo, PC
One Financial Center
Boston, MA 02111
617-542-6000
Fax: 617-542-2241
Email: ksscammon@mintz.com
*ATTORNEY TO BE NOTICED*

**Tracy A. Miner**
Mintz, Levin, Cohn, Ferris, Glovsky &
Popeo, PC
One Financial Center
Boston, MA 02111
617-542-6000
Fax: 617-542-2241
Email: tminer@mintz.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/25/2007 | 1 | COMPLAINT against Robert J. Therrien, filed by Securities and Exchange Commission. (Attachments: # 1 Civil Cover Sheet)(Gaudet, Jennifer) (Entered: 07/25/2007) |
| 07/25/2007 | | ELECTRONIC NOTICE of Case Assignment. Judge Reginald C. Lindsay assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Bowler (Gaudet, Jennifer) (Entered: 07/25/2007) |
| 07/25/2007 | | Summons Issued as to Robert J. Therrien. (Gaudet, Jennifer) (Entered: 07/25/2007) |
| 07/26/2007 | 2 | NOTICE of Appearance by R. Robert Popeo on behalf of Robert J. Therrien (Popeo, R.) (Entered: 07/26/2007) |
| 07/26/2007 | 3 | NOTICE of Appearance by John Sylvia on behalf of Robert J. Therrien (Sylvia, John) (Entered: 07/26/2007) |
| 07/26/2007 | 4 | NOTICE of Appearance by Joseph P. Messina on behalf of Robert J. Therrien (Messina, Joseph) (Entered: 07/26/2007) |

| 07/26/2007 | 5 | NOTICE of Appearance by Adam L. Sisitsky on behalf of Robert J. Therrien (Sisitsky, Adam) (Entered: 07/26/2007) |
|---|---|---|
| 08/07/2007 | 6 | Assented to MOTION for Extension of Time to September 7, 2007 to Respond to Complaint by Robert J. Therrien.(Sylvia, John) (Entered: 08/07/2007) |
| 08/08/2007 | | Judge Reginald C. Lindsay : Electronic ORDER entered granting 6 Motion for Extension of Time to Respond to the Complaint to 9/7/07 (Hourihan, Lisa) (Entered: 08/08/2007) |
| 09/06/2007 | 7 | Assented to MOTION for Extension of Time to 9/14/2007 to Respond to Complaint by Robert J. Therrien.(Sylvia, John) (Entered: 09/06/2007) |
| 09/10/2007 | | Judge Reginald C. Lindsay : Electronic ORDER entered granting 7 Motion for Extension of Time to Respond to the Complaint to 9/14/07 (Hourihan, Lisa) (Entered: 09/10/2007) |
| 09/14/2007 | 8 | MOTION to Dismiss by Robert J. Therrien.(Sylvia, John) (Entered: 09/18/2007) |
| 09/14/2007 | 9 | MEMORANDUM in Support re 8 MOTION to Dismiss filed by Robert J. Therrien. (Sylvia, John) (Entered: 09/18/2007) |
| 09/20/2007 | 10 | Assented to MOTION for Extension of Time to 10/12/07 to File Response/Reply *to Motion to Dismiss* by Securities and Exchange Commission.(Perillo, Michele) (Entered: 09/20/2007) |
| 09/25/2007 | | Judge Reginald C. Lindsay : Electronic ORDER entered granting 10 Motion for Extension of Time to File Response/Reply re 8 MOTION to Dismiss Responses due by 10/12/2007 (Hourihan, Lisa) (Entered: 09/25/2007) |
| 10/12/2007 | 11 | Opposition re 8 MOTION to Dismiss *the Complaint* filed by Securities and Exchange Commission. (Perillo, Michele) (Entered: 10/12/2007) |
| 01/22/2008 | | ELECTRONIC NOTICE of Reassignment. Judge Judge William G. Young added. Judge Judge Reginald C. Lindsay no longer assigned to case. (Hourihan, Lisa) (Entered: 01/22/2008) |
| 01/23/2008 | | ELECTRONIC NOTICE of Hearing on Motion 8 MOTION to Dismiss : Motion Hearing set for 3/12/2008 02:00 PM in Courtroom 18 before Judge William G. Young. (Smith, Bonnie) (Entered: 01/23/2008) |
| 03/12/2008 | | Electronic Clerk's Notes for proceedings held before Judge William G. Young: ; Motion Hearing held on 3/12/2008 re 8 MOTION to Dismiss filed by Robert J. Therrien ; After hearing, the Court rules denying 8 Motion to Dismiss 16.1 Conference held ( Final Pretrial Conference set for NO SOONER THAN 11/3/2008 02:00 PM before Judge William G. Young., Jury Trial set for RUNNING TRIAL LIST AS OF 12/1/2008 09:00 AM before Judge William G. Young.).The parties have 2 weeks to file a joint case management proposal. (Court Reporter: Womack.)(Attorneys present: Fintess,Perillo,Silvia) (Smith, Bonnie) (Entered: 03/13/2008) |
| 03/24/2008 | 12 | ANSWER to 1 Complaint with Jury Demand by Robert J. Therrien.(Sylvia, John) (Entered: 03/24/2008) |

| 03/25/2008 | 13 | JOINT SUBMISSION pursuant to Local Rule 16.1 *Case Management Proposal pursuant to Court's 3/12/08 Order* by Securities and Exchange Commission.(Fontes, Silvestre) (Entered: 03/25/2008) |
| 03/26/2008 | 14 | Judge William G. Young: ORDER entered. re 13 Joint Statement is SO ORDERED AS MODIFIED as the case management scheduling order. DISCOVERY DUE October 31, 2008 and DISPOSITIVE MOTIONS DUE November 1, 2008. (Paine, Matthew) (Entered: 03/26/2008) |
| 04/25/2008 | 15 | NOTICE of Appearance by Luke T. Cadigan on behalf of Securities and Exchange Commission (Cadigan, Luke) (Entered: 04/25/2008) |
| 05/21/2008 | 16 | NOTICE of Appearance by Asita Obeyesekere on behalf of Securities and Exchange Commission (Obeyesekere, Asita) (Entered: 05/21/2008) |
| 06/03/2008 | 17 | MOTION for Protective Order by Robert J. Therrien. (Attachments: # 1 Exhibit A)(Messina, Joseph) (Entered: 06/03/2008) |
| 06/03/2008 | 18 | MEMORANDUM in Support re 17 MOTION for Protective Order filed by Robert J. Therrien. (Messina, Joseph) (Entered: 06/03/2008) |
| 06/06/2008 | 19 | Opposition re 17 MOTION for Protective Order filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit Notice of and Subpoena for Deposition)(Cadigan, Luke) (Entered: 06/06/2008) |
| 06/06/2008 | 20 | MOTION to Compel *Defendant's Deposition* by Securities and Exchange Commission.(Cadigan, Luke) (Entered: 06/06/2008) |
| 06/10/2008 | 21 | NOTICE of Appearance by Tracy A. Miner on behalf of Robert J. Therrien (Miner, Tracy) (Entered: 06/10/2008) |
| 06/10/2008 | 22 | NOTICE of Appearance by Kristen S. Scammon on behalf of Robert J. Therrien (Scammon, Kristen) (Entered: 06/10/2008) |
| 06/10/2008 | 23 | Opposition re 20 MOTION to Compel *Defendant's Deposition* filed by Robert J. Therrien. (Messina, Joseph) (Entered: 06/10/2008) |

## PACER Service Center

### Transaction Receipt

| 06/25/2008 11:29:08 | | | |
| --- | --- | --- | --- |
| **PACER Login:** | ab0779 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:07-cv-11364-WGY |
| **Billable Pages:** | 3 | **Cost:** | 0.24 |